1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

9  | THE DUWAMISH TRIBE; and CECILE
10 | HANSEN, in her capacity as the Chairwoman
     of the Duwamish Tribal Council of the
     Duwamish Tribe,

No.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

11 |                              Plaintiffs,

12 |     v.

13 |
14 | DEB HAALAND, in her official capacity as
     U.S. Secretary of the Interior; BRYAN
15 | NEWLAND, in his official capacity as
     Assistant Secretary for Indian Affairs; U.S.
16 | DEPARTMENT OF THE INTERIOR;
     BUREAU OF INDIAN AFFAIRS; OFFICE
17 | OF FEDERAL ACKNOWLEDGEMENT; and
     UNITED STATES OF AMERICA,

18 |                              Defendants.

19

20

21

22

23

24

25

26

*For at least 12,000 years, the Duwamish people have been living here. They are buried under the streets and the sidewalks and houses of Seattle. Their DNA rises from the roots of the trees, and when the wind blows through the leaves, those are the sounds of our ancestors.*

– Ken Workman, Duwamish Tribe Councilmember and descendant of Chief Seattle

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE  +1 206 623 7580
FACSIMILE: +1 206 623 7022

1

## I.     **INTRODUCTION**

2     1.     For more than a century and a half, the Duwamish Tribe, also known as "The People

3   of the Inside" or dxʷdəwʔabš, has fought to realize the promises made to it by the United States in

4   the Treaty of Point Elliott. Chief Si'ahl, known as Chief Sealth or Seattle (and for whom the City

5   of Seattle is named), signed the Treaty on behalf of his mother's tribe, the Duwamish Tribe, and

6   his father's tribe, the Suquamish Tribe, in 1855. Congress ratified that Treaty in 1859, and by

7   doing so, recognized the Duwamish Tribe as a sovereign that has a government-to-government

8   relationship with the United States. Since 1859 and to this day, Congress has repeatedly recognized

9   the Duwamish Tribe's sovereignty and rights under the Treaty. Critically, Congress has never

10   acted to terminate the Duwamish Tribe's sovereignty or its treaty rights. Yet for over 40 years, the

11   U.S. Department of Interior has refused to acknowledge the Duwamish Tribe as a federally

12   recognized Indian tribe with the rights and privileges of other recognized tribes. The Department

13   of Interior apparently contends that the Duwamish Tribe that signed the Treaty of Point Elliott has

14   somehow ceased to exist. That contention not only conflicts with the historical record, it also

15   conflicts with determinations made by other federal authorities, which the Department of Interior

16   cannot simply ignore. Congress and courts with express jurisdiction have repeatedly recognized

17   the continued existence of the Duwamish Tribe. The Department of Interior lacks authority to

18   reach a contrary determination. Only Congress has the constitutional authority to abrogate the

19   Duwamish Tribe's sovereignty and treaty rights—and has never done so. Therefore, the Court

20   must hold the United States to its word and declare that the Duwamish Tribe persists.

21     2.     This is an action brought by the Duwamish Tribe to secure its tribal sovereignty

22   that predates the founding of the United States. The Duwamish Tribe brings this action under the

23

24   COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 2

**K&L GATES LLP**
**925 FOURTH AVENUE**
**SUITE 2900**
**SEATTLE, WASHINGTON  98104-1158**
**TELEPHONE: +1 206 623 7580**
**FACSIMILE: +1 206 623 7022**

Administrative Procedure Act and the Fifth Amendment of the U.S. Constitution, seeking judicial review of the Department's Final Decision on Judicial Remand Against Acknowledgement of the Duwamish Tribal Organization, which was upheld by the Interior Board of Indian Appeals and the Secretary of the Interior on July 17, 2019, constituting a final agency action ("Final Decision"). By refusing to acknowledge the Duwamish Tribe and place the Tribe on its list of federally recognized tribes, the Final Decision unlawfully terminates the prior federal recognition of the Duwamish Tribe.

3.      In issuing the Final Decision, Defendants have:

i.      Unlawfully withheld agency recognition of the Tribe in violation of the U.S. Constitution, Acts of Congress, and other laws;

ii.     Rendered a Final Decision that is contrary to the Tribe's inherent sovereignty and constitutional rights, powers, and privileges;

iii.    Rendered a Final Decision that is in excess of the Department's statutory jurisdiction, authority, or limitations;

iv.     Rendered a Final Decision without observing the Tribe's rights under the Fifth Amendment of the U.S. Constitution as required by law;

v.      Rendered a Final Decision that is arbitrary, capricious, an abuse of the Department's discretion, and not in accordance with law; and

vi.     Rendered a Final Decision that is not supported by substantial evidence.

## II.     <u>JURISDICTION AND VENUE</u>

4.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1362.

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

5.     Venue is proper in this district under 28 U.S.C. § 1391(e). The Tribe is located and does business in this district, and most of the underlying acts and omissions at issue are based on events that occurred and persons and entities that have been or are located in this district.

III.     **PARTIES**

6.     Plaintiff Duwamish Tribe ("Duwamish Tribe" or "Tribe") is an Indian tribe with its ancestral homeland in present-day Seattle and surrounding areas, before non-Indian settlers moved west and started inhabiting the Tribe's lands. The Duwamish Tribe and Chief Seattle welcomed the settlers and in 1855, Duwamish Chief Seattle, for whom the City of Seattle ("City") is named, signed a treaty with the United States on behalf of the Tribe at Point Elliott, Washington ("Treaty of Point Elliott" or "Treaty"). By signing the Treaty, the Duwamish Tribe agreed to relinquish its ancestral lands to the United States in exchange for monetary payments and other promises made under the Treaty. Today, the Duwamish Tribe governs itself pursuant to a Constitution originally adopted in 1925 and actively amended since, most recently in 2014. The Tribe's more than 600 members are direct descendants of the members of the Duwamish Tribe as it existed when Chief Seattle signed the Treaty.

7.     Plaintiff Cecile Hansen is the elected Chairwoman of the Duwamish Tribal Council, which governs the Duwamish Tribe, and is authorized to bring this action on behalf of the Tribe.

8.     Defendant Deb Haaland is the present Secretary of the Interior ("Secretary") and, in her official capacity, supervises the activities of the Bureau of Indian Affairs ("BIA") in the implementation of the United States' statutory, regulatory, treaty, and trust responsibilities toward Indian tribes.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 4

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

9.     Defendant Bryan Newland is the present Assistant Secretary – Indian Affairs ("AS-IA"), and in his official capacity, is authorized to exercise the authority of the Secretary with respect to Indian Affairs.

10.     Defendant U.S. Department of the Interior ("Department"), acting through the BIA, the Office of Federal Acknowledgment, and the Interior Board of Indian Appeals ("IBIA"), is the administrative agency that receives, processes, and decides applications from Indian groups for recognition of tribal status in accordance with Part 83 of Title 25 of the Code of Federal Regulations ("Part 83"), 25 C.F.R. pt. 83, and the U.S. Constitution, statutes, regulations, treaties, and other laws.

11.     Defendant the United States of America includes all government agencies and officers, including the above-named Defendants, charged with the administration of Indian Affairs and responsibility for protection of property and rights of the Tribe, including under the terms of the Treaty.

## IV.     STATEMENT OF FACTS

**After the Duwamish Tribe signed the Treaty of Point Elliott in 1855, the United States broke many of the promises made to the Tribe, and the Tribe was ultimately forced from its historic villages.**

12.     Before settlers began inhabiting the Puget Sound region, the Duwamish Tribe's ancestral homeland was the territory of present-day Seattle, Burien, Tukwila, Renton, and Redmond, and members were heavily concentrated along the Black, Cedar, and Duwamish Rivers. *See Duwamish Tribe v. United States* (dkt. # 109), 5 Ind. Cl. Comm. 117, 130–31 (1957). A current map of the Seattle area showing the modification of the Duwamish watershed, the approximate locations of historic Duwamish villages and longhouses (in blue), as identified in a map compiled by David Buerge, author of *Chief Seattle and the Town that Took his Name*, (based on evidence

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

submitted to the Court of Claims and other anthropological reports) and a map compiled by the

Port of Seattle, is shown below and attached as **Exhibit 1**:

13.     On January 22, 1855, the Duwamish Tribe was the lead signatory of the Treaty of

Point Elliott, 12 Stat. 927. Isaac Stevens, Governor of the Territory of Washington and

Superintendent of Indian Affairs for the Territory, signed the Treaty on behalf of the United States.

Chief Seattle, whose mother was Duwamish and father was Suquamish, signed the Treaty on

behalf of both Tribes. Chief Seattle was the first signatory (after Governor Stevens), signing:

"Seattle, Chief of the Dwamish and Suquamish tribes, his x mark." A photo of Chief Seattle is

shown below (collection of the Duwamish Tribe):

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 6

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1
2
3
4
5
6
7
8
9
10



11    14.    Under the Treaty of Point Elliott, the United States promised the Duwamish Tribe,

12  in exchange for ceding the Tribe's territory that encompasses present-day Seattle, Burien, Tukwila,

13  Renton, and Redmond to the United States, that the United States would pay just compensation,

14  create a reservation, guarantee the Tribe's aboriginal fishing and hunting rights, and secure other

15  rights for the Tribe.

16    15.    After the Treaty was signed, the Department recommended for several years that

17  the Duwamish Tribe be allotted a separate reservation "on or near the lake fork of the D'Wamish

18  river," in present-day Renton on or near the Black River. In the late 1860s, however, the City's

19  founders and many other non-Indian settlers petitioned against the creation of the Duwamish

20  reservation on the Black River, calling the reservation "unnecessary" and "injurious" to the

21  settlers. In light of this opposition, the United States never created a designated reservation for the

22  Duwamish Tribe on the Black River or elsewhere, as promised at the time of the signing of the

23  Treaty of Point Elliott.

24

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

16.     Without a reservation of their own, Duwamish members were forcibly removed from the Seattle area.

17.     Duwamish women in particular were the victims of serious crimes committed by settlers during this time period, including murders and kidnappings, which largely went unpunished by local authorities.

18.     In 1865, the City passed Ordinance No. 5, banning all Indians from living in the City and remaining in the City after dark.

19.     In 1873, the City passed Ordinance No. 42, prohibiting "dissolute Indian women" from being present in the city after dark.

20.     Between 1855 and 1904, non-Indian settlers burned down 94 traditional longhouses and other belongings owned by Duwamish members. The photo below shows one of those longhouses and camps on the Duwamish River in present-day West Seattle, before it was burned to the ground, as shown below (collection of the Duwamish Tribe):



21.     In 1916, as authorized by Congress, the U.S. Army Corps of Engineers created the Lake Washington Ship Canal, which cut a channel from the Ballard Locks through Lake Union

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

and Portage Bay to the higher elevation Lake Washington. As a result of the new ship canal, Lake Washington was lowered by nine feet; the Black River dried up, leaving the last remaining historic Duwamish village on the Black River without a source of food or a mode of transportation; and the Cedar River salmon run was wiped out. A photo of the Black River drying out in November 1916 is shown below (Collection of the Renton History Museum, #1994.068.3883):

Side-by-side maps of the region, before and after the Lake Washington Ship Canal was completed in 1916, show the dramatic landscape changes. The Historic Map depicts the historic Duwamish River watershed, the Black River, and Duwamish longhouses; the Present-day Map depicts the post-1916 watershed, showing the modification of wetlands and waterways, and the disappearance of the Black River and longhouses, shown below and attached as **Exhibit 2**:

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 9

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

**Historic Map**     **Present-day Map**

22.     Around this time, in the early 1900s, a federal agent described the uniquely unjust circumstances of the Indigenous peoples of the Pacific Northwest, including the Duwamish, famously writing: "No Indian has given more to the white man—no Indian has received less." This is particularly true of Duwamish Chief Seattle, who welcomed the settlers, showed them how to survive in an unfamiliar land, provided guides and transportation by canoe, and other tangible assistance—which is why the settlers named their new settlement in Chief Seattle's honor—yet the historic Chief's Duwamish Tribe continues to receive nothing but unfulfilled promises from the U.S. government.

23.     Notwithstanding the discriminatory laws, settler abuse, and feats of civil engineering that forced the Duwamish from their ancestral homelands, the Tribe's members have largely remained in King, Pierce, and Kitsap counties, from the signing of the Treaty through modern times. After the Treaty signing, Duwamish made homes at logging camps and makeshift

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 10

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

Duwamish homesteads. In many cases, with no reservation of their own, and due to the federal government's policy to relocate Indigenous peoples to existing reservations, the Duwamish moved to those reservations, including the Port Madison (home of the Suquamish Tribe), Lummi, Muckleshoot, Swinomish, and Tulalip Reservations, among others.

24.     Other Duwamish members, however, defied local ordinances, refused to move to reservations, and remained in present-day Seattle. For example, Chief Seattle's daughter, Princess Angeline, refused to leave her home in Seattle and stayed in her waterfront cabin on Western Avenue between Pike and Pine Streets. She washed laundry for the settlers and sold native handicrafts to survive. At one point, she was photographed walking Seattle's downtown streets, shown below (collection of the Duwamish Tribe):



25.     Other Duwamish women married non-Indian settlers in the 19th and 20th centuries, which was consistent with the historical Duwamish practice of affiliation through marriage. Similar practices of intermarriage between Coast Salish tribes in the Puget Sound region were also common. These Duwamish women, and their kin, nevertheless continued to be part of the Duwamish Tribe and continued to carry on the Tribe's customs and traditions, as well as the

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

political efforts to secure the Tribe's rights guaranteed by the Treaty of Point Elliott and the U.S. Constitution.

26.     Some of the Duwamish people who moved to reservations beginning in the late 1800s ultimately enrolled in other tribes. Regardless of whether the Duwamish people who moved to other tribes' reservations maintained dual enrollments or exclusive membership in the Duwamish Tribe, many of the ancestors of today's membership maintained their social, cultural, and communal ties with other Duwamish members living both on and off reservations.

27.     In 1894, for example, some 300 tribal members attended a cultural ceremony held between the Duwamish and Puyallup Tribes at the Black River village. At the time, a band of Duwamish remained at a village near the Black and Cedar Rivers under the leadership of Chief Seattle's successor, Chief William. Some Duwamish members continued to live in the region as a community and practice their distinctive religious and cultural rituals until the Black River was drained in 1916 and thereafter.

28.     The Duwamish Tribe continued to organize cultural, political, and social events for its members during this time period. Local newspapers recorded many of these events, reporting on the Tribe, Chief Seattle, or Princess Angeline from 1868 to 1893; a commemoration of the Treaty of Point Elliott in 1897; Duwamish Tribe involvement in potlatches, sing-gambles, and treaty signing celebrations in 1906, 1907, 1913, 1916, and 1917 (the latter of which potentially involved 300 to 400 members); and the Duwamish Tribe's enrollment list compilation efforts in 1914–15. A timeline of the relevant historic events from this time period, 1855 to 1926, is shown below and attached as **Exhibit 3**:

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 12

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

Historical Overview of Duwamish Tribe 1855 to 1926

**The Duwamish Tribe established an official Constitution and instituted other formalities in the early 1900s to secure its tribal sovereignty and its treaty rights.**

29.     In the early 1900s, initially led by Chief William's successors, Duwamish Chief Charles Satiacum and Chief (or Sub-Chief) William Rogers, the Duwamish Tribe aimed to secure its rights under the Treaty of Point Elliott. In 1915, the Tribe created an official enrollment list after years of members' forced dispersal from their historic villages along the Black, Cedar, and Duwamish Rivers. The Duwamish Tribe also increased its efforts to secure a designated reservation for the Tribe. A Seattle newspaper reported on the efforts of Chief Satiacum, Sub-Chief Rogers, and Duwamish member John Seattle (the great-grandson of Chief Seattle), in 1916.

30.     In 1916, federal agent Charles Roblin was tasked by the Department to compile official enrollment rolls for the tribes of Western Washington to process land allotment claims by individual Duwamish members. Roblin finished compiling these rolls in 1919, listing several Duwamish members who were not enrolled in other tribes and were living off reservations.

31.     At the time, the Department's official policy excluded Indian women who married

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 13

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

non-Indians, and their mixed-race children, from tribal enrollment rolls. The Department concluded that such Indian women, and their children, in no respects could be "deemed members of the tribe to which the mother belonged prior to her marriage," even though the Duwamish Tribe had no such rule. This Department policy excluded a significant portion of Indian women, including Duwamish women, from being able to claim land allotments that Congress had designated for Indians. Although the U.S. Supreme Court ultimately deemed the Department's discriminatory policy to be unconstitutional in *Nice v. United States*, 241 U.S. 591 (1916), many federal agents, including Roblin, continued to hold biased views of Indian women and their children.

32.     Both the 1915 and 1919 tribal enrollment rolls were incomplete, as many Duwamish women who had married non-Indian settlers, and their kin, were excluded from these rolls. These Duwamish women were excluded at least in part due to the Department's official policy to exclude Indian women and their mixed-race children from tribal enrollment and due to federal agents' biases against these women.

33.     Throughout this time, Duwamish Chief Satiacum and his successor and grandnephew, Peter James, represented the Tribe in a multi-tribal council known as the Northwest Federation of American Indians ("NFAI") and before Congress. Meetings with the NFAI and testimony by Duwamish leaders before Congress gave rise to legislation under which Indian nations, tribes, and bands were eligible for and received benefits from the federal government. The Tribe's and the NFAI's efforts resulted in the passage of the Act of Feb. 12, 1925, ch. 214, 43 Stat. 886 ("Act of 1925"), which authorized "the tribes and bands of Indians . . . with whom were made . . . the treat[y] of . . . Point Elliott, dated January 22, 1855," including the Duwamish Tribe, to

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1    bring treaty claims against the United States in the Court of Claims.

2        34.    In 1925, the Duwamish Tribe, led by Peter James and others (many of whom

3    descended from Duwamish women who had married non-Indians), was one of the first tribes in

4    the region to recognize the need to adopt more formal and democratic governance standards, both

5    to guarantee the Duwamish Tribe's political autonomy (if not its very survival) and the treaty rights

6    promised to the Tribe by the United States. The Duwamish Tribe therefore renamed its government

7    the Duwamish Tribal Organization of the Duwamish American Indians and adopted an official

8    Constitution and Bylaws, providing that tribal membership was open to descendants of the

9    Duwamish Tribe without specifying a blood quantum standard. The Tribe's purpose was to

10   (1) "promote and co-operate with efforts and more perfect union and education development of its

11   members," (2) "establish[] and cultivat[e] . . . a closer acquaintance and comradeship among its

12   members," (3) "promote morality, a good citizenship, of the younger generation, and to obtain all

13   the rights thereof for its members," (4) "promote the study and to preserve the history and the

14   traditions of the Duwamish tribe," and (5) "promote the general welfare of the Duwamish tribe,

15   and advance[] . . . its members," and (6) "to investigate the legal problems of the Duwamish tribe,

16   and to oppose any movement which may be detrimental to its tribe."

17       35.    The following year, in 1926, the Tribe compiled an official, all-inclusive enrollment

18   list expressly recognizing the membership of the Duwamish women and their kin who had been

19   excluded from the 1915 and 1919 tribal enrollment rolls. According to the Department, about 91

20   percent of today's membership has a direct ancestor included on this 1926 list. Final Decision on

21   Remand ("FDR") at 89 (July 24, 2015).

22       36.    Since 1925, leadership of the Duwamish Tribe has advanced the rights of its

23

24   COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 15

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

members and other Native Americans by lobbying Congress to pass statutes, encouraging other tribes to establish constitutions and formalize their governments, pursuing claims against the United States before the Court of Claims and Indian Claims Commission on behalf of itself and other tribes, participating in multi-tribal organizations, and carrying out other political acts to preserve tribal sovereignty and the rights promised under the Treaty of Point Elliott, among other treaties with Indian tribes.

**Since Congress ratified the Treaty of Point Elliott in 1859, Congress, the courts, and the Executive Branch have recognized the Duwamish Tribe and its treaty rights through modern times.**

37.    In 1859, Congress ratified the Treaty of Point Elliott, which marks the first time that Congress officially recognized the Duwamish Tribe and its rights under the Treaty.

38.    Nearly every year from 1860 to 1924, Congress passed an Act appropriating funds for fulfilling the treaty promises made to the "Dwamish" or "D'Wamish and other allied Tribes in Washington." These Acts funded annuities and other benefits that were paid or disbursed to Duwamish members living both on and off reservations, as the Department claimed jurisdiction over Duwamish members, whether "attached or unattached to reservations," through at least 1918. A true and correct copy of the last of these appropriations statutes, the Act of Dec. 6, 1924, ch. 5, 43 Stat. 704, 708, denominating the "Dwamish and other allied tribes in Washington," is attached as **Exhibit 4**.

39.    Congress then passed the Act of 1925, due in part to the Tribe's lobbying efforts, authorizing the Duwamish Tribe and other "Indian tribes, or any of them, residing in the State of Washington to submit to the Court of Claims growing out of treaties."

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

40.     In 1934, the Court of Claims ruled that the Duwamish Tribe had standing under the Act of 1925, as an Indian tribe and a signatory to the Treaty of Point Elliott, to bring claims for communal property (56 longhouses) and for the government's failure to pay the Tribe certain annuities in violation of the Treaty. *Duwamish v. United States*, 79 Ct. Cl. 530, 533, 538, 580 (1934). At the time, the federal government did not dispute that the Duwamish Tribe was a signatory to the Treaty (unlike the Department's official position today); but it nevertheless argued that the court lacked jurisdiction to rule on the Tribe's claims under the Act of 1925 on the ground that individual tribal members brought "individual" claims for lost longhouses, etc.—as opposed to "tribal" claims brought by the Tribe itself. The court, however, outright rejected the government's position that the Duwamish Tribe's claims were "individual," which would have precluded the court's jurisdiction. *Id.* at 575. The court concluded that the government's position was "untenable" because, based on the treaty itself, "the nature of the transaction, the object to be accomplished, and the payment to be made," the Tribe's claims for abandoned property were "tribal." *Id.* at 575–76 (emphasis added); *see id.* at 538 ("The treaties were concluded with the tribes as Indian entities and not with individuals."). A true and correct copy of *Duwamish v. United States*, 79 Ct. Cl. 530 (1934) is attached as **Exhibit 5**.

41.     In 1938, Congress passed the Act of June 24, 1938, ch. 648, 52 Stat. 1037 ("Act of 1938"), authorizing the Secretary "to withdraw from the United States Treasury and to deposit in banks . . . the common or community funds of any Indian tribe which are, or may hereafter be, held in trust by the United States." *Id.* (emphasis added). Until at least the late 1960s, the Department deposited funds held in trust by the United States with the Duwamish Tribal Council pursuant to the Act of 1938.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 17

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

42.     In 1946, Congress passed the Act of Aug. 13, 1946, ch. 959, 60 Stat. 1049, creating the Indian Claims Commission to hear claims of any "Indian tribe, band, or other identifiable group of American Indians," including the Duwamish Tribe, against the United States.

43.     In 1953, the House of Representatives issued a congressional report identifying the "Duwamish Tribal Council" as one of several "Indian tribal governing bodies." H.R. Rep. No. 82-2503, at 1366 tbl.K (1953). The Duwamish Tribal Council was apparently listed because a Department official identified the Duwamish Tribe as one of 36 "Tribes, Bands or Groups" that was under his jurisdiction. PF HTR at 68.[1] In addition, the Department's earlier records had repeatedly referred to the Duwamish Tribe as a "tribe" under its jurisdiction or otherwise acknowledged the Duwamish Tribe's leaders as the exclusive representatives of the Tribe from treaty times through 1918 (PF HTR at 40–41), in 1921 (*id.* at 55–56), in 1925 (*id.* at 56–67), in 1933 (*id.* at 57), in 1939 (*id.* at 58), in 1940 (*id.* at 59; PF ATR at 107), and in 1950 (PF HTR at 59). Today, the Duwamish Tribe is the only Indian tribe listed in that report that is not currently on the Department's list of federally recognized tribes. A true and correct copy of Table K of H.R. Rep. No. 82-2503 is attached as **Exhibit 6**.

44.     In 1957, the Indian Claims Commission expressly concluded that the Duwamish Tribe is "an identifiable tribe of American Indians within the meaning of the Indian Claims Commission Act" and is the "successor in interest to . . . the entity that was a party to the Treaty of January 22, 1855." *Duwamish Tribe*, 5 Ind. Cl. Comm. at 130–31. The Commission further found that the Duwamish Tribe "aboriginally used and occupied lands on the southern end of Lake Washington, the Black Cedar and Duwamish Rivers, and Elliott Bay" and "held original Indian

---

[1] PF HTR, PF ATR, and PF GTR refer to the Proposed Finding Historical Technical Report, Anthropological Technical Report, and Genealogical Technical Report dated June 18, 1996, respectively.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 18

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

title as of the date of the Treaty." *Id*. The Commission awarded a $62,000 judgment in favor of the Duwamish Tribe for the value of Indian title lands that were taken from the Tribe without just compensation and in violation of the Treaty. A true and correct copy of *Duwamish Tribe v. United States* (dkt. # 109), 5 Ind. Cl. Comm. 117 (1957) is attached as **Exhibit 7**. A true and correct copy of a map compiled by the Library of Congress in 1978, showing the territory for which the Duwamish Tribe and its members were awarded a $62,000 judgment, along with the territories for which its neighboring tribes were awarded monetary judgments, is shown below and is attached as **Exhibit 8**.[2]

45.     Through at least the late 1950s, the Department issued Indian identification cards, known as "blue cards," to Duwamish members because of their affiliation with the Duwamish

---

[2] *See Indian Land Areas Judicially Established*, LIBRARY OF CONGRESS (1978), https://www.loc.gov/resource/g3701e.ct008649/?r=0.006,0.486,0.37,0.235,0 (last accessed Apr. 7, 2022).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 19

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1  Tribe. At the time, blue cards were required for tribal members to receive certain federal and state

2  benefits, including healthcare and educational benefits, as well as state-issued hunting and fishing

3  licenses. The Department expressly recognized that the Duwamish Tribe was the "successor in

4  interest to the Duwamish Tribe as constituted in 1855." PF HTR at 70.

5  46.     In 1964, the Indian Claims Commission determined that the Duwamish Tribe and

6  11 other signatory tribes to the Treaty of Point Elliott were entitled to the payment of certain sums

7  as consideration for the cession of aboriginal tribal lands and other treaty claims, awarding the

8  Duwamish Tribe $23,863.17. *See Upper Skagit Tribe of Indians, et al. v. United States*, 13 Ind. Cl.

9  Comm. 583 (1964).

10  47.     In 1966, Congress passed the Act of Oct. 14, 1966, Pub. L. No. 89-660, 80 Stat.

11  910 ("Act of 1966"), "[a]n Act to provide for the disposition of funds appropriated to pay a

12  judgment in favor of the Duwamish Tribe of Indians in the Indian Claims Commission docket No.

13  109, and for other purposes." A true and correct copy of the Act of 1966 is attached as **Exhibit 9**.

14  48.     In 1974, after Judge Boldt recognized the treaty rights of 14 treaty tribes in *United*

15  *States v. Washington* ("*Washington I*"), 520 F.2d 676 (9th Cir. 1975), the Department

16  commissioned a task force led by Peter Three Stars, a Tribal Operations Specialist, to investigate

17  the tribal status of nine other groups of Indians in Washington that were party to the same treaties

18  ("Three Stars Determination"). In addition to Three Stars, the task force consisted of Michael

19  Smith, a Tribal Operations Specialist in BIA's Central Office, and John Weddel, a Tribal

20  Operations Officer in the BIA's Portland Area Office and historian. The Three Stars

21  Determination, based on the task force's "extensive research," concluded that the Duwamish Tribe

22

23

24

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 20

**K&L GATES LLP**
**925 FOURTH AVENUE**
**SUITE 2900**
**SEATTLE, WASHINGTON  98104-1158**
**TELEPHONE: +1 206 623 7580**
**FACSIMILE: +1 206 623 7022**

and three other tribes (Snohomish, Snoqualmie, and Jamestown Clallam Tribes[3]) were entitled to official recognition by the Department but that five other tribes were not entitled to federal recognition. With respect to the Duwamish Tribe, Three Stars concluded that "[a]ccording to available Agency records and Agency staff comments," the Tribe satisfied federal recognition criteria because, among other reasons, the Tribe "has had treaty relations with the United States"; "has been treated as a tribe or band by other Indian tribes"; "has been treated as having collective rights in tribal lands or funds, even though not expressly designated as a tribe" by the Department; "has exercised political authority over its members, through a tribal council or other governmental forms"; "has been recognized by the Indian Claims Commission"; "has received Federal services"; and has had regular "contacts with the BIA." The task force determined that although the Duwamish Tribe is "[l]andless," the Tribe "deserves recognition," and "officially recogniz[ed] the Duwamish descendants as an Indian tribe and eligible for the benefits accruing therefrom, such as treaty fishing rights recently recognized as theirs by the court." True and correct copies of documentation comprising the Three Stars Determination is attached as **Exhibit 10**.

49.     In 1976, Congress issued the Report on Terminated and Nonfederally Recognized Indians: Final Report to the American Policy Review Commission ("1976 Report"), identifying the Duwamish Tribe as a "landless tribe" that satisfies nearly all of the criteria for determining if a group constitutes a tribe, including "treaty relations with the United States" and being "denominated by act of Congress," and concluding that the Tribe is "eligible" for recognition. 1976 Report at 186–87. A true and correct copy of an excerpt of the 1976 Report is attached as **Exhibit 11**. The following year, on May 17, 1977, the American Indian Review Commission

---

[3] The Jamestown Clallam Tribe is now known as the Jamestown S'Klallam Tribe. *See Jamestown S'Klallam Tribe*, https://jamestowntribe.org/ (last accessed Apr. 11, 2022).

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1    issued its Final Report to Congress ("1977 Report"), which identified the Duwamish Tribe as one

2    of a few Indian tribes that had treaty relations with the United States and were acknowledged in

3    Department records but had not yet been "officially" recognized by the Department. *Id.* at 454.

4    The 1977 Report concluded that "with the sole exception of termination acts," "[t]here is no legal

5    basis for withholding general services from Indians," "no legitimate foundation for denying Indian

6    identification to any tribe or community," and that the "BIA has no authority to refuse services to

7    any member of the Indian population." *Id.* at 442. A true and correct copy of an excerpt of the

8    1977 Report is attached as **Exhibit 12**.

9         50.    In 1994, Congress passed the Federal Recognized Indian Tribe List Act of 1994,

10   Pub. L. No. 103-454, 108 Stat. 4791 (codified as 25 U.S.C. § 5130 *et seq.*) ("List Act"), providing

11   that an Indian tribe that is recognized by an Act of Congress, by the Department's regulations set

12   forth under Part 83, or by a decision of a United States court must be placed on the Department's

13   list of federally recognized tribes. Critically, the List Act provides that "a tribe which has been

14   recognized in one of these manners may not be terminated <u>except by an Act of Congress</u>." 25

15   U.S.C. § 5130 note (emphasis added). The Duwamish Tribe, which has been recognized by dozens

16   of acts of Congress and two U.S. courts with jurisdiction to make such determinations, the Court

17   of Claims and the Indian Claims Commission, has never had its prior federal recognition

18   terminated by Congress.

19        51.    In 2001, near the end of the Clinton administration, the Department's Acting

20   AS-IA, Michael Anderson, determined that the Duwamish Tribe satisfied the Part 83 criteria and

21   should be placed on the Department's list of federally recognized tribes. The Final Determination

22   to Acknowledge the Duwamish Tribal Organization, dated January 19, 2001, concluded that the

23

24

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

Tribe satisfied the Part 83 criteria and "as an alternative basis for recognition, the [Tribe] has demonstrated prior Federal acknowledgement in the form of numerous statutory references of the 'Dwamish Tribe' or the 'D'Wamish Tribe,' beginning with the Senate ratification of the 1855 Treaty of Point Elliott in 1859, up until the final appropriation statute." According to the AS-IA, "[t]hese are unequivocal expressions of congressional recognition and solicitude" and "[a]bsent any other clear congressional intent to the contrary, the fulfilling of the treaty obligations cannot be ignored." A true and correct copy of the Final Determination to Acknowledge the Duwamish Tribal Organization, dated January 19, 2001, is attached as **Exhibit 13**.

52.     As determined by the former Acting AS-IA, since Congress ratified the Treaty in 1859, Congress has never terminated or otherwise abrogated its prior recognition of the Duwamish Tribe or its treaty rights. *See* PF at 20. A timeline is shown below and attached as **Exhibit 14**:



**The Department has since attempted to terminate the prior federal recognition of the Duwamish Tribe and its rights under the Treaty of Point Elliott.**

53.     Although Congress, the Court of Claims, and the Indian Claims Commission have already recognized the Duwamish Tribe as an Indian tribe, and as the successor in interest to the

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

tribe that signed the Treaty of Point Elliott—and indeed, certain Department officials have as well—the Department has to date refused to place the Duwamish Tribe on the list of federally recognized tribes.

54.     In 1977, the Duwamish Tribe first wrote the Department, asking it to place the Tribe on the list of federally recognized tribes. At that time, the Department recognized Indian tribes on a case-by-case basis.

55.     In 1978, for the first time, the Department promulgated regulations establishing a uniform procedure for acknowledging Indian tribes and for processing petitions for acknowledgement. Procedures for Establishing that an American Indian Group Exists as an Indian Tribe, 43 Fed. Reg. 39,361 (Sept. 29, 1978) ("1978 regulations").

56.     The following year, in 1979, after the Duwamish Tribe had intervened in a case pending before this Court to secure its fishing rights guaranteed by the Treaty of Point Elliott, Judge Boldt concluded that the Duwamish Tribe was not the successor in interest to the tribe that signed the Treaty. *See United States v. Washington*, 476 F. Supp. 1101 (W.D. Wash. 1979). The Ninth Circuit affirmed, concluding that although the Duwamish Tribe, among other tribes, has a formal Constitution and government, engaged in organized fishing operations, and had previously pursued treaty claims, the Duwamish Tribe had not sufficiently "controlled the lives of the members," nor "clearly established . . . [a] continuous informal cultural influence," and its members "have intermarried with non-Indians and many are of mixed blood." *United States v. Washington*, 641 F.2d 1368 (9th Cir. 1981). Neither Judge Boldt nor the Ninth Circuit specifically addressed the dozens of Acts of Congress denominating the Duwamish Tribe from 1859 to 1966, the Court of Claims' relevant findings in 1934, the Indian Claims Commission's relevant findings

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 24

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

in 1957, or the Congressional reports from 1953 to 1977—all of which recognized the Duwamish

Tribe as an Indian tribe and/or the successor in interest to the historic tribe that signed the Treaty.

57.     Despite these adverse rulings with respect to the Tribe's treaty rights, the

Duwamish Tribe persevered and submitted a formal acknowledgement petition to the Department

in 1987 and a revised petition in 1989.

58.     By 1994, the Department had promulgated revised regulations to officially

recognize Indian tribes. Procedures for Establishing that an American Indian Group Exists as an

Indian Tribe, 59 Fed. Reg. 9280 (Feb. 25, 1994) ("1994 regulations"). But the Department had still

not reached a conclusion as to whether the Duwamish Tribe satisfied the criteria under the 1978

regulations. The 1994 regulations were adopted after the Department's acknowledgment process

had been routinely criticized, namely because the process took too much time, was too expensive

for petitioning tribes, and produced inconsistent results. Even after the 1994 regulations were

promulgated, the Department's recognition process continued to draw criticism.

59.     On June 28, 1996, nearly 20 years after the Duwamish Tribe first sought

administrative recognition, the Department published its Proposed Finding ("PF") against federal

acknowledgement of the Duwamish Tribe. The Department found that the Duwamish Tribe had

satisfied four of the seven criteria demonstrating that the Tribe has existed as an Indian tribe,

including: The Tribe has sufficient governing procedures and membership criteria, 99 percent of

the Tribe's membership descends from the Tribe as it existed in treaty times, most of the Tribe's

members were not members of other Indian tribes, and Congress has never terminated the federal

relationship with the Tribe. Yet, the Department denied the Tribe's petition on the ground that the

following three criteria were not satisfied: (a) the Tribe was not identified as an American Indian

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

entity on a substantially continuous basis since 1900, (b) a predominant portion of the Tribe did not comprise a distinct community from historical times until the present, and (c) the Tribe did not maintain sufficient political influence or authority over its members from historical times until the present. The Department also improperly concluded that the Duwamish Tribe was somehow "not the same entity as the historically acknowledged tribe" that signed the Treaty of Point Elliott.

60.     After the period for comment closed, on January 19, 2001, the last day of President Bill Clinton's administration, the Acting AS-IA concluded that the "express statutory references" to the Duwamish Tribe "are unequivocal expressions of congressional recognition and solicitude," and, "[a]bsent any other clear congressional intent to the contrary, the fulfilling of the treaty obligations cannot be ignored." The Acting AS-IA called Plaintiff Cecile Hansen that day to tell her that the Duwamish had been acknowledged.

61.     Shortly after President George Bush took office on January 20, 2001, however, the Department informed Plaintiff Hansen that the final determination on the Duwamish Tribe would not be sent to the Federal Register. Several months later, on September 25, 2001, the new AS-IA signed a final determination reversing the Final Determination to Acknowledge the Duwamish Tribal Organization, dated January 19, 2001, declining to acknowledge the Duwamish under the 1978 regulations and refusing to otherwise consider the Duwamish under the 1994 regulations.

62.     After the Duwamish Tribe unsuccessfully petitioned the IBIA and the Secretary for reconsideration, the Secretary declined the request that the AS-IA reconsider the final determination against acknowledgment on May 8, 2002.

63.     The Duwamish Tribe then sued Defendants in this Court, challenging the final determination against acknowledgment of the Tribe. On March 22, 2013, the Court concluded that

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 26

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

the Department's failure to either consider the Duwamish petition under both the 1978 and 1994 regulations, or provide an explanation of its different treatment of the Duwamish Tribe relative to other tribes, "violated fundamental norms of administrative procedure and was arbitrary and capricious," and that the Duwamish were entitled to "the benefit of a more transparent decision making process." *Hansen v. Salazar*, No. C08-0717-JCC, 2013 WL 1192607, at *10 (W.D. Wash. Mar. 22, 2013). The court vacated the final determination declining to acknowledge the Duwamish Tribe. *Id.* at *11.

64.     Around this time, in 2015, the Department again promulgated revised acknowledgment regulations seeking "to make the process and criteria more transparent, promote consistent implementation, and increase timeliness and efficiency." Federal Acknowledgement of American Indian Tribes, 80 Fed. Reg. 37,862 (July 1, 2015) ("2015 regulations"). The Department acknowledged that "[f]or decades, the current [Part 83] process has been criticized as 'broken' and in need of reform" because it is "too slow . . . expensive, burdensome, inefficient, intrusive, less than transparent, and unpredictable." *Id.* The 2015 regulations would, among other things, "institutionaliz[e] a phased review that allows for faster decisions; reduc[e] the documentary burden while maintaining the rigor of the process; allow[] for a hearing on a negative proposed finding to promote transparency and integrity; enhanc[e] notice to tribes . . . ; establish[] the Assistant Secretary's final determination as final for the Department to promote efficiency; and codify[] and improv[e] upon past Departmental implementation of standards . . . to ensure consistency, transparency, and predictability and fairness." *Id.*

65.     On remand, and in disregard of the Court's order, the Department refused to permit the Tribe to supplement the record or to otherwise afford the Tribe a formal hearing. Although the

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

Tribe submitted 298 exhibits, nine declarations, and expert research with its Second Request for Reconsideration before the IBIA, the IBIA improperly concluded that even if it could consider this new evidence, such evidence would not affect the Final Decision. The Department also refused to consider the Duwamish Tribe under the 2015 regulations, despite the Tribe's specific request to be considered under those more favorable regulations.

66.    As a result, the Department again denied the Duwamish Tribe's acknowledgement petition under the 1978 and 1994 regulations, thereby illegally terminating the Tribe's prior recognition by Congress and by two U.S. courts, which had already concluded that the Duwamish Tribe is an Indian tribe and the successor in interest to the Tribe that signed the Treaty of Point Elliott. The Department issued its Final Decision on July 24, 2015, determining that the Duwamish Tribe failed to satisfy criteria (a), (b), and (c) under both versions of the regulations. The Final Decision was upheld by the IBIA on April 17, 2019, and by the Secretary on July 17, 2019. The action by the Secretary constitutes a final agency action marking the continuation of the federal government's efforts to extinguish the Tribe as it existed at treaty times.

67.    To justify its refusal to recognize the Duwamish Tribe, the Department has repeatedly emphasized a blatantly discriminatory justification—namely, that some of the Tribe's members, since 1926, have descended from Duwamish women who, according to the agency, "founded families of mixed-blood 'Indians.'"

**The Duwamish Tribe continues to persevere today.**

68.    To date, and despite the best efforts of Duwamish leaders since 1855, the federal government has not created a reservation for the Duwamish Tribe or secured many other treaty rights promised to its members in the Treaty of Point Elliott.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 28

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

69.     Most of the Duwamish Tribe's members continue to reside in King, Pierce, and Kitsap counties to this day.

70.     The Duwamish Tribe's members today are direct descendants of members of the Duwamish Tribe on whose behalf Chief Seattle signed the Treaty of Point Elliott. The Department concedes that 99 percent of the Tribe's members today "descend from the historical Duwamish Indian tribe as it existed before 1880." 66 IBIA 149, 156 (Apr. 17, 2019).

71.     Since the signing of the Treaty in 1855, an unbroken chain of leadership has governed the Tribe, including Chief Seattle, Chief William, Chief William Rogers, Chief Satiacum, Honorable Peter James, Honorable George James, Chief Henry Moses, Honorable Ruth Scranton, Honorable Willard Bill, and Honorable Cecile Hansen. Throughout this time, Duwamish tribal members and their descendants have participated in tribal meetings, gatherings, and cultural practices and have been engaged with the larger Seattle and Pacific Northwest community. A timeline of tribal leadership is shown below and attached as **Exhibit 15**:



72.     Since 1981, Duwamish Tribal Services ("DTS") has operated as a 501(c)(3) nonprofit organization to promote the social, cultural, and economic survival of the Duwamish

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1    Tribe. DTS continues to administer the Emergency Food Assistance Program funded by the state

2    government, providing an average of 72 native people and their families with monthly food

3    vouchers and other support services.

4         73.    In 1989, the Duwamish Tribe hosted the "Paddle to Seattle" along with the

5    Suquamish Tribe, a two-day event involving a flotilla of 18 native canoes that were carved and

6    paddled by members of 13 regional tribes on a seven-mile journey from Suquamish to Duwamish

7    native lands on Shilshole Bay (present-day Golden Gardens Park). More than 5,000 people,

8    including tribal members, the press, supporters, and onlookers, participated in the event.

9         74.    In the 1990s, the Tribe started planning the design and construction of the

10   Duwamish Longhouse and Cultural Center ("Longhouse") with the support of a broad coalition of

11   partners, including local and state governmental entities and other nongovernmental organizations.

12   The Longhouse, which officially opened its doors in 2009, is located in present-day West Seattle

13   and overlooks the Duwamish River Valley across the street from the historic village of həʔapus

14   ("Ha Ah Poos") (where Chief Seattle grew up and which settlers burnt down in 1895) and other

15   historic Duwamish villages. The Longhouse houses the "Birthplace of Seattle Log House

16   Museum," and the Tribe continues to host its annual meeting and other cultural, educational, and

17   social events at the Longhouse to this day. Just last year, the Tribe welcomed more than 3,500

18   people to the Longhouse. Virtual tours of the Longhouse are also available through the Tribe's

19   partnership with the University of Washington.

20        75.    Through the Longhouse, the Tribe is engaged in increasing knowledge and

21   understanding of the Tribe's cultural and historical ties to the Duwamish River. The Tribe's

22   ecotourism program, in partnership with the Duwamish River Cleanup Coalition and the

23

24

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 30

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1   Duwamish Alive Coalition, recruits and trains members to be environmental stewards for the

2   restoration and protection of the Duwamish River. Last year, the Tribe conducted 65 ecotours that

3   served 616 people.

4         76.    In 2017, Real Rent Duwamish ("Real Rent") was launched. Through this nonprofit

5   organization, people who live and work in the Seattle area make rent payments to the Duwamish

6   Tribe. Today, about 20,758 renters participate in Real Rent and more than 100,000 individuals

7   have signed a Change.org petition to #StandWithTheDuwamish and support the Tribe's federal

8   recognition.[4] Today's petition is in stark contrast to the petition by the City's early non-Indian

9   settlers who opposed and eventually prevented the creation of a Duwamish reservation in the

10  1860s.

11        77.    The Tribe is honored that the company Salish Sea Tours, launched last year by

12  Chinook Tribe member Kyle Griffith, guides tourists on two 93-foot catamarans each year to

13  provide tours of the Puget Sound that include Indigenous voices, including the story of the

14  Duwamish.

15        78.    In late 2021, DTS purchased land to the north of the Longhouse and plans to

16  develop the property over the next couple of years to include parking, a coffee stand (which will

17  serve a "Duwamish Blend"), and additional offices for the Tribe. The property is just across the

18  street from the historic village site of Ha Ah Poos and is now connected by a newly installed lighted

19  pedestrian crosswalk, which makes it possible to walk from the trail system on the ridge to the

20  Longhouse, then across Marginal Way to the Duwamish River. The Tribe is in the process of

21  applying for public and non-profit grants to restore the system of trails within the West Duwamish

---

22

23  [4] The Change.org petition for federal recognition of the Duwamish Tribe is available at:
    https://www.change.org/p/federal-recognition-for-the-duwamish-tribe (last accessed Apr. 11, 2022).

24  COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 31

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

Greenbelt. Until then, has partnered with the University of Washington, Seattle Parks and Recreation, and others to monitor the quality of water within the watershed and to create signage identifying native plant species and their traditional use by the Tribe. The Tribe has also been asked to collaborate with the Boeing Company to restore water quality, address invasive plant species, and ensure a healthy ecology of the watershed, as part of a project funded by Boeing and involving the Department of Ecology and the Port of Seattle.

79.     The Tribe has government-to-government relations with other tribes, as well as local governments. In 1976, the Duwamish Tribe, under the leadership of Cecile Hansen, led efforts to establish the Small Tribes Organization of Western Washington ("STOWW"), which provides social services to members of these allied tribes. Today, the Duwamish Tribe continues to be a member of the STOWW's Emergency Food Assistance Program along with allied tribes, including the Chinook, Cowlitz, Hoh, Makah, Samish, Sauk-Suiattle, Snoqualmie, Steilacoom, Stillaguamish, Suquamish, and Upper Skagit Tribes. The Tribe then joined the Affiliated Tribes of Northwest Indians in 1977 and the National Congress of American Indians in 1980.

80.     In December 2021, the City passed an ordinance recognizing Seattle's "first peoples" led by Chief Seattle and establishing an Indigenous Advisory Council to advise the Mayor, the City, and the City's departments on policies directly affecting Indigenous populations. Duwamish Councilmember Ken Workman has been asked to sit on the City's Indigenous Advisory Council and the Green New Deal Oversight Board, both of which are pending Council confirmation. In addition, the Seattle School Board, since 2018, has formally recognized the Duwamish Tribe and has called on the federal government to do the same. More recently, in June 2021, the Martin Luther King, Jr. County Labor Council passed a similar resolution to support the

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 32

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

Tribe's fight for federal recognition. Several other local establishments, including the Frye Museum and Seattle Mennonite Church, provide land acknowledgment to the Duwamish Tribe.

81.     The Duwamish Tribe also enjoys government-to-government relations with the State of Washington. In August 2021, for example, the State of Washington's Recreation and Conservation Office contacted the Duwamish Tribe to initiate a formal consultation regarding anticipated state-funded construction projects to ensure the avoidance or minimization of adverse effects to the Tribe's historic, archeological, cultural, or sacred sites and buildings, as required by the Governor's Executive Order 21-02. Likewise, the Tribe regularly engages in legislative advocacy at the state and local levels. During the 2021–2022 legislative session, the Tribe supported H.B. 1725 concerning the creation of an endangered missing person advisory for Indigenous persons, which passed the state legislature on March 10, 2022. That same legislative session, the Tribe successfully opposed S.B. 5161, which would have required Washington school districts to incorporate into its newly adopted or revised curricula the history, culture, and government of only "federally recognized" Indian tribes—necessarily excluding the teaching of the Duwamish Tribe's history, culture, and government.

82.     To this day, the Duwamish Tribe has survived against all odds, and the Tribe continues to act pursuant to its Constitution, bylaws, and its Tribal Council, which seeks, secures, and administers group resources for the benefit of the Duwamish Tribe's members.

**The Duwamish Tribe has suffered and continues to suffer substantial injury as a result of the Department's illegal termination of the Tribe's unambiguous prior federal recognition.**

83.     The Duwamish Tribe and its members have suffered substantial injury as a result of Defendants' actions, including the deprivation of protected property rights held by the Tribe that are contingent on recognition by the Department. At some point, the federal government

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1  stopped issuing members of the Duwamish Tribe blue cards, which made members eligible for

2  state fishing and hunting licenses, among other rights. Members also lost health care benefits, the

3  right to apply for certain federal scholarships on account of their tribal membership, and other

4  federal benefits because the Defendants unlawfully terminated the Duwamish Tribe's prior

5  unambiguous federal recognition.

6        84.    In addition, beginning in 2013, the Duwamish Tribe lost eight ancient cultural

7  artifacts that had been excavated from a historic Duwamish village after the Muckleshoot and the

8  Suquamish Tribes, both of which are federally recognized, requested that such artifacts be

9  transferred to them and held in their permanent custody. In response, the Duwamish Tribe offered

10  to buy the eight artifacts that had been previously on loan to the Tribe and were displayed with

11  great pride at the Longhouse. The Duwamish's request was denied, despite the fact that these

12  artifacts came directly from a Duwamish village site, directly across the street from the Longhouse

13  (and with no geographic or historical connection to any tribe other than the Duwamish). Because

14  the Duwamish Tribe is not a federally recognized tribe, the Tribe cannot seek repatriation of these

15  sacred artifacts under the Native American Graves Protection and Repatriation Act, 25 U.S.C.

16  § 3001(7), which permits recognized Indian tribes to repatriate cultural items from federal agencies

17  and museums.

18        85.    The Duwamish Tribe and its members are further injured, and will continue to

19  suffer injuries, because of Defendants' unlawful termination of the Tribe's prior recognition. That

20  unlawful termination deprives the Tribe and its members of support and entitlements important to

21  their ability to maintain and support their distinct tribal and cultural identity, community, health,

22  and welfare. *See*, *e.g.*, Indian Financing Act, 25 U.S.C. § 1452(c); Indian Health Care Improvement

23

24

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

Act, 25 U.S.C. §§ 1603(13)(D), (14); Indian Child Welfare Act, 25 U.S.C. § 1903(8); Indian Alcohol and Substance Abuse Prevention and Treatment Act, 25 U.S.C. § 2403(3); Tribally Controlled Schools Act, 25 U.S.C. § 2511(4); Indian Law Enforcement Reform Act, 25 U.S.C. §§ 2801(5)–(6); Native American Languages Act, 25 U.S.C. § 2902(5); and Indian Child Protection and Family Violence Prevention Act, 25 U.S.C. § 3202(10) (each conditioning the eligibility for tribal members to receive these benefits on the tribe's recognition by the Department).

86.     Most recently, for example, when Congress passed COVID-19 relief, it set aside $43 billion to help recognized tribes. Because the Duwamish Tribe is not recognized by the Department, it was not eligible for this relief. Like many others, the Duwamish Tribe has lost members of its own due to COVID-19.

87.     The Duwamish Tribe has also suffered immeasurable harm to its ability to preserve and protect its Indigenous culture, history, beliefs, traditions, as well as its ancestral lands and environment, due to the Department's indefensible position that the Duwamish Tribe no longer exists—the modern manifestation of the federal government's historical efforts to extinguish the Tribe's very existence.

## V.     CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Declaratory relief under the Administrative Procedure Act, 5 U.S.C. § 703**
**and the Declaratory Judgment Act, 28 U.S.C. § 2201, against all Defendants**

88.     Plaintiffs reallege paragraphs 1 through 87 above and incorporate those paragraphs in their entirety herein.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 35

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

89.     The Administrative Procedure Act explicitly authorizes the Court to grant the type of declaratory relief the Duwamish Tribe seeks under 5 U.S.C. § 703.

90.     In addition, under the Declaratory Judgment Act, the Court may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought, and any such declaration shall have the force and effect of a final judgment under 28 U.S.C. § 2201(a).

91.     Under the List Act, "Indian Tribes presently may be recognized by Act of Congress; by the administrative procedures set forth in [25 C.F.R. pt. 83]; or by a decision of a United States court," and "a tribe which has been recognized in one of these manners may not be terminated except by an Act of Congress." 25 U.S.C. § 5130 note.

92.     Based on Congress' plenary power over Indian affairs set forth in the U.S. Constitution, along with separation of powers principles and longstanding Supreme Court precedent, most recently articulated in *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), Congress alone holds the constitutional authority to repudiate a treaty or terminate a tribe, and only through unequivocal Congressional action.

93.     Beginning in 1859 through at least the 1970s, dozens of acts of Congress and two U.S. courts—the Court of Claims and the Indian Claims Commission—have recognized the Duwamish Tribe as an Indian tribe and the successor in interest to the Tribe that signed the Treaty of Point Elliott.

94.     Congress has never abrogated its recognition of the Duwamish Tribe or otherwise limited its rights under the Treaty of Point Elliott. Rather, each time Congress has addressed the issue, it has reaffirmed the Tribe's status a federally recognized tribe.

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

95.     The Duwamish Tribe therefore seeks a declaration pursuant to 5 U.S.C. § 703 that the Duwamish Tribe has been recognized by Congress and other federal authorities as an Indian tribe within the meaning of the List Act and as the successor in interest to the Tribe that signed the Treaty of Point Elliott.

## SECOND CLAIM FOR RELIEF
### Mandamus relief under 5 U.S.C. §§ 703 and 706(1) against all Defendants

96.     Plaintiffs reallege paragraphs 1 through 87 above and incorporate those paragraphs in their entirety herein.

97.     The Administrative Procedure Act authorizes this Court to compel agency action unlawfully withheld and to hold unlawful and set aside agency action, findings and conclusions found to be contrary to a constitutional right, power, privilege, or immunity and in excess of the Department's statutory jurisdiction and authority. 5 U.S.C. § 706(1); *see also id.* § 703 (explicitly authorizing the Court to grant the type of mandamus relief the Duwamish Tribe seeks).

98.     Under the List Act, "Indian Tribes presently may be recognized by Act of Congress; by the administrative procedures set forth in [25 C.F.R. pt. 83]; or by a decision of a United States court," and "a tribe which has been recognized in one of these manners may not be terminated except by an Act of Congress." 25 U.S.C. § 5130 note. The List Act further compels the Secretary to publish a list of all Indian tribes that are currently recognized by the Secretary, an Act of Congress, or a decision of a U.S. court and to make those tribes eligible for special programs and services provided by the United States to Indians because of their status as Indians. *Id.* § 5131.

99.     Based on Congress' plenary power over Indian affairs set forth in the U.S. Constitution, along with separation of powers principles and longstanding Supreme Court precedent, most recently articulated in *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), Congress

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

alone holds the constitutional authority to repudiate a treaty or terminate a tribe, and only through unequivocal Congressional action.

100.    Beginning in 1859 through at least the 1970s, dozens of acts of Congress and two U.S. courts have recognized the Duwamish Tribe as an Indian tribe and the successor in interest to the Tribe that signed the Treaty of Point Elliott. Congress has neither abrogated its recognition of the Duwamish Tribe nor otherwise limited the Tribe's rights under the Treaty of Point Elliott.

101.    The Duwamish Tribe has an indisputable right to mandamus relief based on the dozens of acts of Congress and two U.S. court decisions recognizing the Duwamish Tribe as an Indian tribe and the successor in interest to the Tribe that signed the Treaty under the List Act, 25 U.S.C. § 5130 *et seq.*, longstanding Supreme Court precedent, and the U.S. Constitution.

102.    The Defendants' duty is nondiscretionary, ministerial, and so plainly prescribed in the List Act, 25 U.S.C. § 5131, to be free from doubt.

103.    No other adequate remedy is available to the Duwamish Tribe, as the Tribe has attempted for over 40 years to seek recognition through the Part 83 process, and to be afforded a formal hearing with the ability to supplement the record and confront witnesses, all to no avail.

104.    Mandamus relief is appropriate in this case because Defendants' improper attempt to terminate the Duwamish Tribe's recognition and treaty rights violates separation of powers principles embedded in the U.S. Constitution. Critically, Defendants' termination of the Tribe's recognition and treaty rights threatens the Tribe's political and cultural survival.

105.    The Duwamish Tribe respectfully seeks an order pursuant to 5 U.S.C. §§ 703 and 706(1) vacating the Final Decision against acknowledgement and compelling Defendants to place the Duwamish Tribe on the list of federally recognized tribes, as required under the List Act, and

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1    to adhere to the unambiguous prior recognition of the Duwamish Tribe as conclusive evidence of

2    federal acknowledgment of the Tribe.

3                              **THIRD CLAIM FOR RELIEF**
                     **Violation of Equal Protection under Fifth Amendment of the**
4                              **U.S. Constitution against all Defendants**

5         106.    Plaintiffs reallege paragraphs 1 through 87 above and incorporate those paragraphs

6    in their entirety herein.

7         107.    Under the Fifth Amendment, discrimination based on sex is presumptively

8    unconstitutional and subject to heightened scrutiny.

9         108.    The descendants of Duwamish women and non-Indian men have suffered a long

10   history of extreme discrimination in Washington State and across the United States, and they

11   continue to suffer discrimination to this day. The Department's decisions with respect to the

12   Duwamish Tribe reflect and repeat this discrimination by relying upon the fact that the Tribe's

13   members primarily descend from Duwamish women who married non-Indians when concluding

14   that the Tribe could not satisfy criteria (a), (b), and (c) under the 1978 and 1994 regulations.

15        109.    The former version of criterion (b), which the Department applied to the

16   Duwamish, *see* 25 C.F.R. § 83.7(b)(1)(i) (1994), requires tribes to demonstrate that they have

17   maintained sufficiently distinct communities. That criterion, on its face and as applied,

18   discriminates on the basis of sex against the Duwamish Tribes' members, who are largely the

19   descendants of Duwamish women married to non-Indians.

20        110.    In applying former criterion (b), the Department disparaged the patterned "out

21   marriages" (i.e., marriages outside the tribe) of the Duwamish members' female ancestors because

22   those marriages were not "with other Indian populations." This requirement not only facially

23

24
COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 39

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1   classifies tribal ancestors based on the race of their spouse, but it also classifies tribal ancestors on

2   the basis of their sex because, at the turn of the twentieth century, the out marriages between

3   Indians and non-Indians were almost exclusively among Indian <u>women</u> and non-Indian men. In

4   other words, the prior version of criterion (b) excluded matrilineal tribes that primarily descend

5   from Indian women who married outside the tribe (and did not apply to tribes that primarily

6   descend from Indian men who married outside the tribe).

7       111.    In 2015, the Department revised criterion (b) by deleting the requirement that

8   applicants show evidence of their ancestors' patterned out marriages "with other Indian

9   populations," thereby expressly permitting applicants to present evidence of their ancestors'

10  patterned out marriages with Indians or non-Indians. *See* 25 C.F.R. § 83.11(b)(1)(i) (2015). At that

11  time, the Duwamish Tribe's acknowledgement petition was still being reviewed by the

12  Department. Had the Department granted the Duwamish Tribe's request to be considered under

13  the 2015 regulations, instead of the 1978 or 1994 regulations, the Department would have

14  considered the evidence of the Tribe's female ancestors' patterned out marriages in the late 1800s

15  and early 1900s.

16      112.    Defendants, in applying the former version of criterion (b), expressly refused to

17  consider the evidence showing that the Tribe's female Duwamish ancestors who married non-

18  Indian men nevertheless maintained a sufficiently distinct tribal community from the late 1800s to

19  early 1900s, in part because these women's patterned out marriages were not explicitly recognized

20  under former criterion (b).

21      113.    Defendants' application of former criterion (b) treats the Tribe's members, who

22  largely descend from Duwamish women who married outside the Tribe, differently than similarly

**K&L GATES LLP**
**925 FOURTH AVENUE**
**SUITE 2900**
**SEATTLE, WASHINGTON 98104-1158**
**TELEPHONE: +1 206 623 7580**
**FACSIMILE: +1 206 623 7022**

situated tribes comprising mixed-race descendants of Indians who married outside their tribes, and its application to the Duwamish violates the Tribe's guarantee of equal protection of the laws.

114.    Defendants' application of former criterion (b), requiring that the Duwamish members present evidence that their ancestors entered patterned out marriages "with other Indian populations" is not substantially related to any important government interest. Indeed, it is not even rationally related to any legitimate government interest.

115.    Similarly, the Department's decisions heavily relied on the data and reporting from the early 1900s that largely excluded the Tribe's female Duwamish ancestors and their mixed-race children from tribal enrollment. This data was compiled at a time when the Department, based on an official policy, refused to recognize Indian women and their mixed-race children as members of the mother's tribe. Moreover, the federal agent that compiled the tribal enrollment rolls of the Duwamish from 1916 to 1919 held outward biases against Duwamish women who married non-Indian men, as he did not perceive the so-called "mixed-blood" children of Duwamish women as "Indian" at all.

116.    Defendants' overreliance on the discriminatory data and reporting by federal agents during this time period means that the Duwamish Tribe, whose members primarily descend from Duwamish women, were undeniably treated differently than similarly-situated tribes that primarily descend from Indian men, which violates the Tribe's guarantee of equal protection of the laws.

117.    Defendants' overreliance on this discriminatory data and reporting is not substantially related to any important government interest. Indeed, it is not even rationally related to any legitimate government interest.

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

118.    The sex of one's Indian ancestor bears no relation to whether the Duwamish Tribe, which has been previously federally recognized on several occasions, warrants recognition by the Department.

119.    The Duwamish Tribe respectfully requests a judicial declaration under 5 U.S.C. § 703 that Defendants' differential treatment of the Duwamish Tribe based on the sex of its ancestors violates the Tribe's equal protection rights, and absent such differential treatment, the Tribe would satisfy criteria (a), (b), and (c) of the 1978 and 1994 regulations. The Duwamish Tribe further seeks an order under 5 U.S.C. §§ 703 and 706(1) compelling the Department to place the Duwamish Tribe on the list of federally recognized tribes.

120.    Alternatively, the Tribe seeks an order under 5 U.S.C. §§ 703 and 706(1) compelling the Department to apply criteria (a), (b), and (c) in a manner that does not discriminate against matrilineal tribes like the Duwamish, which primarily descend from Indian women who married non-Indians.

## FOURTH CLAIM FOR RELIEF
### Violation of due process under the Fifth Amendment of the U.S. Constitution against all Defendants

121.    Plaintiffs reallege paragraphs 1 through 87 above and incorporate those paragraphs in their entirety herein.

122.    The Due Process Clause of the Fifth Amendment guarantees a formal hearing before the government may deprive one of any protected property rights.

123.    The Duwamish Tribe and its members have protected property interests in the Indian identification cards (i.e., "blue cards") that the Department previously issued to members of the Duwamish Tribe, which made members eligible for state-issued hunting and fishing

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 42

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

licenses, the right to apply for federal scholarships for tribal members, and the right to apply for other federal health and welfare benefits available only to members of tribes on the Department's list of federally recognized tribes.

124.    The Duwamish Tribe and its members previously received federal and state benefits and entitlements that were cut off by virtue of the Department illegally terminating the Tribe's federal recognition.

125.    It is well established that such fundamental health and welfare benefits to which tribes or their members are entitled cannot be removed without a hearing to determine eligibility. Once Congress narrowed the eligibility for fundamental health and welfare benefits to tribes on the Department's list of federally recognized tribes, the Due Process Clause requires a meaningful hearing to determine whether those previously eligible can meet the new and narrowed requirements before the Department could unilaterally terminate those entitlements.

126.    The Due Process Clause requires an opportunity for a hearing before the deprivation of a protected property interest. Where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.

127.    In terminating the Duwamish Tribe's prior unambiguous federal recognition under both the 1978 and 1994 regulations, Defendants refused to permit the Tribe to supplement the record and otherwise failed to afford the Tribe a formal hearing with the right to confront witnesses.

128.    To determine whether the Department's prior acknowledgement procedures are sufficient, the Court considers (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used; (3) the

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1    probable value, if any, of additional or substitute procedural safeguards; and (4) the government's

2    interest, including the fiscal and administrative burdens that the additional or substitute procedural

3    requirement would entail.

4           129.    The Duwamish Tribe's interests in meeting the threshold eligibility requirements

5    for the myriad federal benefits available to federally recognized tribes and their members are

6    significant. The risk that such eligibility might be unfairly denied is real because of the lack of the

7    Department's procedural safeguards. The Department's informal decision making with respect to

8    the Duwamish Tribe over the past 40-plus years has been very protracted, highly adversarial, and

9    obscured by closed-door review. It has been an inappropriate and unconstitutional process for the

10   determination of matters of such gravity.

11          130.    Defendants' administrative burdens are relatively slight because the Department's

12   2015 regulations now permit petitioning tribes to challenge a negative proposed finding at a formal

13   hearing before an administrative law judge on the record. *See* 25 C.F.R. § 83.39. Had the

14   Department granted the Duwamish Tribe's request to be considered under the 2015 regulations,

15   the Tribe would have been entitled to this type of formal hearing as a matter of right. *Id.* Such

16   procedures are routine in other types of federal entitlements as well. *See* 20 C.F.R. § 404.929 (right

17   to a social security hearing before an administrative law judge).

18          131.    Defendants' refusal to permit the Duwamish Tribe to supplement the record and

19   failure to afford the Tribe a formal hearing with the right to confront witnesses in accordance with

20   25 C.F.R. § 83.39 is contrary to the Duwamish Tribe's due process rights guaranteed by the Fifth

21   Amendment.

22

23

24

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 44

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

132.    The Duwamish Tribe respectfully requests that this Court order an on the record hearing, with the opportunity to present evidence and cross examine witnesses, before Defendants can terminate the Tribe's unambiguous prior federal recognition. The hearing should be before an administrative law judge and provide the Tribe with an opportunity to supplement the record and confront witnesses in accordance with 25 C.F.R. § 83.39.

## FIFTH CLAIM FOR RELIEF
### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2), against all Defendants

133.    Plaintiffs reallege paragraphs 1 through 87 above and incorporate those paragraphs in their entirety herein.

134.    The Department acted arbitrarily and capriciously, abused its discretion, violated its own regulations, and acted contrary to its own precedent and to the Tribe's constitutional rights by refusing to allow the Tribe to proceed under newly adopted 2015 regulations while simultaneously providing that right to similarly situated petitioning tribes. Critically, Defendants refused to permit the Duwamish Tribe to supplement the record and otherwise failed to afford the Tribe a formal hearing with the right to confront witnesses. Had the Department granted the Tribe's request to be considered under the 2015 regulations, the Tribe would have been entitled to challenge, as a matter of right, the negative proposed finding at a formal hearing before an administrative law judge on the record. *See* 25 C.F.R. § 83.39. Defendants' refusal to permit the Duwamish Tribe to proceed under the 2015 regulations is contrary to the Duwamish Tribe's due process rights guaranteed by the Fifth Amendment. *See* 5 U.S.C. § 706(2)(B).

135.    Likewise, had the Department granted the Duwamish Tribe's request to be considered under the 2015 regulations, instead of the 1978 or 1994 regulations, the Department

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1    would have been required to consider the evidence of the Tribe's female ancestors' patterned out

2    marriages, or so-called "pioneer marriages," in the late 1800s and early 1900s. *Compare* 25 C.F.R.

3    § 83.7(b)(1)(i) (1994), *with* 25 C.F.R. § 83.11(b)(1)(i) (2015). Because pioneer marriages were

4    almost exclusively among Indian <u>women</u> and non-Indian men at the turn of the twentieth century,

5    the Department's former regulations disproportionately excluded matrilineal tribes that primarily

6    descend from Indian women who married outside the tribe (and generally did not exclude tribes

7    that primarily descend from Indian men who married outside the tribe). Defendants' refusal to

8    permit the Duwamish Tribe to proceed under the 2015 regulations is contrary to the Duwamish

9    Tribe's right to equal protection of the laws guaranteed by the Fifth Amendment. *See* 5 U.S.C.

10   § 706(2)(B).

11        136.    The Department acted arbitrarily and capriciously, abused its discretion, violated

12   its own regulations, and acted contrary to its own precedent and to the Tribe's constitutional rights,

13   by requiring the Tribe to satisfy the criteria under Part 83, despite overwhelming evidence of

14   unambiguous previous federal recognition under 25 C.F.R. § 83.8(a)–(d) (1994). Congress and at

15   least two U.S. courts have regularly acknowledged the Duwamish Tribe since the signing and

16   ratification of the Treaty of Point Elliott in 1855, including numerous acts of Congress

17   denominating the Tribe from 1860 to 1924, the 1934 Court of Claims decision, a 1953

18   Congressional report identifying the Duwamish Tribe as an Indian tribal governing body, the 1957

19   Indian Claims Commission decision, the Act of 1966, and other Congressional reports through at

20   least the 1970s—each identifying the Duwamish Tribe as an Indian tribe and/or the successor in

21   interest to the historic tribe that signed the Treaty of Point Elliott. Defendants entirely failed to

22   consider or cite at least some of this record evidence, and therefore failed to meaningfully consider

23

24   COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 46

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1  whether this body of evidence is "[u]nambiguous previous Federal acknowledgement" of the

2  Duwamish Tribe, or whether the Duwamish Tribe has been identified "as the same tribal entity

3  that was previously acknowledged or as a portion that has evolved from that entity" under 25

4  C.F.R. § 83.8.

5       137.    The Department acted arbitrarily and capriciously, abused its discretion, violated

6  its own regulations, and acted contrary to its own precedent and to the Tribe's constitutional rights

7  in applying the acknowledgement regulations to the Tribe's petition because it entirely failed to

8  consider an important aspect of, and took no account of relevant factors related to, the historical

9  and present-day context of the Duwamish Tribe. Namely, the Department failed to recognize the

10  actions of local governments, non-Indian settlers, and the federal government itself in the late

11  1800s and early 1900s that forced the Duwamish people from their ancestral lands and attempted

12  to destroy the Duwamish Tribe as it existed at treaty times. For example, the federal government

13  promised to create a separate reservation for the Tribe on the Black River but never fulfilled that

14  promise; attempted to forcibly remove Duwamish members to other tribes' reservations; expressly

15  excluded, as a matter of official policy, Duwamish women who married settlers, and their kin,

16  from tribal enrollment and benefits; and then, in conjunction with local governments, overlooked

17  the actions of non-Indian settlers who destroyed Duwamish villages and took actions to drain the

18  Black River in 1916, causing the last historic Duwamish village on the river to disappear. Today,

19  the Department concludes that the Duwamish Tribe's dispersal throughout Western Washington

20  (primarily King, Pierce, and Kitsap counties) does not meet the standard of a geographically

21  defined community, but that improper conclusion entirely fails to consider or account for the

22  federal governments' own actions or attempts to eradicate the Tribe as it existed at treaty times.

23

24

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

138.    The Department acted arbitrarily and capriciously, abused its discretion, violated its own regulations, and acted contrary to its own precedent and to the Tribe's constitutional rights by treating the Tribe differently than similarly situated tribes by, among other things, construing the fact that the majority of Duwamish did not move to a reservation against the Tribe; failing to consider the proper historical context of the Tribe's membership rolls and improperly interpreting those rolls against the Tribe; failing to consider the proper historical and cultural context of pioneer marriages and improperly interpreting those marriages against the Tribe; failing to interpret the continuity of the Tribe's leadership as evidence of organizational continuity; and failing to consider specific federal actions, including dozens of acts of Congress, two U.S. court decisions, and other evidence of unambiguous prior federal recognition, as evidence of prior federal acknowledgement of the Duwamish Tribe.

139.    Under the 1978 and 1994 regulations, the Department acted arbitrarily and capriciously, abused its discretion, violated its own regulations, and acted contrary to Department precedent by failing to accord the evidence its proper weight. The Department disregarded the "reasonable likelihood" standard mandated by its regulations by resolving all doubts against the Tribe and willfully omitting, failing to consider, and/or misconstruing evidence, both within and outside of its possession, that supports the Tribe's petition. The Department also evaluated and discounted each piece of evidence standing alone without properly considering the record as a whole.

140.    The 1978 and 1994 regulations require acknowledgment decisions to be made on factual and historical evidence weighed in a reasoned and unbiased fashion in accordance with defined criteria. The Department's evaluation of the Duwamish petition does not meet that

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

standard. Instead of considering the evidence according to required legal standards and applying the professional expertise appropriate to the authority delegated by Congress in accordance with the federal fiduciary responsibility and Department precedent, the Defendants evaluated the Duwamish Tribe's petition with undue prejudice, applying arbitrary and capricious methodology contrary to Department regulations and precedent, while selectively rejecting, failing to consider, and/or mischaracterizing evidence and analysis that would have supported the Tribe's petition.

141.    Because the Department failed to present an adequate basis and explanation for its Final Decisions, failed to apply the correct standard of proof, violated and misinterpreted its own regulations, and applied those regulations contrary to Congressional and judicial recognition of the Tribe, without observance of procedure required by law, differently to the Tribe than other similarly situated tribes, and contrary to Department precedent, the Final Decision was arbitrary and capricious, an abuse of discretion, not in accordance with the law, made in clear error, and unsupported by substantial evidence.

## VI.    **REQUESTED RELIEF**

142.    The Duwamish Tribe respectfully requests that this Court, pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 2201(a), issue a declaratory judgment that the Duwamish Tribe has been recognized by Congress and other federal authorities as an Indian tribe within the meaning of the List Act and as the successor in interest to the Tribe that signed the Treaty of Point Elliott.

143.    The Duwamish Tribe respectfully requests that this Court, pursuant to 5 U.S.C. §§ 703 and 706, compel the Defendants to list the Duwamish Tribe on the Department's list of federally recognized tribes and to adhere to the unambiguous prior recognition of the Duwamish Tribe as conclusive evidence of federal acknowledgment of the Tribe.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 49

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

144.    In the alternative, the Duwamish Tribe respectfully requests a judicial declaration under 5 U.S.C. § 703 that Defendants' differential treatment of the Duwamish Tribe based on the sex of its ancestors violates the Tribe's equal protection rights and absent such differential treatment, the Tribe would satisfy criteria (a), (b), and (c) of the 1978 and 1994 regulations.

145.    In the alternative, the Duwamish Tribe respectfully requests that this Court, pursuant to 5 U.S.C. § 706, hold unlawful and set aside the Final Decision on Remand and remand to the Department with instructions to reconsider the Duwamish Tribe's petition for recognition under the Department's 2015 regulations in a manner that does not discriminate against matrilineal tribes like the Duwamish, which primarily descend from Indian women.

146.    In the alternative, the Duwamish Tribe respectfully requests that this Court, pursuant to 5 U.S.C. § 706, hold unlawful and set aside the Final Decision on Remand and remand to the Department with instructions to grant the Tribe a formal on the record hearing before an administrative law judge in accordance with 25 C.F.R. § 83.39.

147.    The Duwamish Tribe respectfully requests that this Court award such other or further relief as the Court may in its judgment deem necessary and appropriate, including awarding the Duwamish Tribe its reasonable fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, or other laws.

DATED this 11th day of May, 2022.

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1    K&L GATES LLP

2

3    s/ Bart J. Freedman
     Bart J. Freedman, WSBA # 14187
4    K&L Gates
     925 Fourth Avenue
5    Suite 2900
     Seattle, Washington  98104-1158
6    Tel: +1 206 623 7580
     Fax: +1 206 623 7022
7    bart.freedman@klgates.com

8    s/ Theodore J. Angelis
     Theodore J. Angelis, WSBA # 30300
9    925 Fourth Avenue
     Suite 2900
10   Seattle, Washington  98104-1158
     Tel: +1 206 623 7580
11   Fax: +1 206 623 7022
     theo.angelis@klgates.com
12

13   s/ J. Timothy Hobbs
     J. Timothy Hobbs, WSBA # 42665
14   925 Fourth Avenue
     Suite 2900
15   Seattle, Washington  98104-1158
     Tel: +1 206 623 7580
16   Fax: +1 206 623 7022
     tim.hobbs@klgates.com
17

18   s/ Benjamin A. Mayer
     Benjamin A. Mayer, WSBA # 45700
19   925 Fourth Avenue
     Suite 2900
20   Seattle, Washington  98104-1158
     Tel: +1 206 623 7580
21   Fax: +1 206 623 7022
     ben.mayer@klgates.com
22

23

24
     COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - 51

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1

2
       *s/ Endre M. Szalay*

3
       Endre M. Szalay, WSBA # 53898
       925 Fourth Avenue

4
       Suite 2900
       Seattle, Washington  98104-1158

5
       Tel: +1 206 623 7580
       Fax: +1 206 623 7022

6
       endre.szalay@klgates.com

7
       *s/ Shelby R. Stoner*

8
       Shelby R. Stoner, WSBA # 52837
       925 Fourth Avenue

9
       Suite 2900
       Seattle, Washington  98104-1158

10
       Tel: +1 206 623 7580
       Fax: +1 206 623 7022

11
       shelby.stoner@klgates.com

12
       *s/ Natalie J. Reid*

13
       Natalie J. Reid, WSBA # 55745
       925 Fourth Avenue

14
       Suite 2900
       Seattle, Washington  98104-1158

15
       Tel: +1 206 623 7580
       Fax: +1 206 623 7022

16
       natalie.reid@klgates.com

17
       Attorneys for Plaintiffs

18

19

20

21

22

23

24

**K&L GATES LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

A current map of the Seattle area showing the modification in the Duwamish watershed, the approximate locations of historic Duwamish villages and longhouses (in blue), as identified by Port of Seattle records and evidence filed in the Court of Claims and other anthropological reports accessed by David Buerge, author of *Chief Seattle and the Town that Took his Name*.



## Historic Map

The Historic Map depicts the historic Duwamish River watershed showing the locations of the Black River, the Duwamish wetlands, and the Duwamish longhouses.



## Present-day Map

The Present-day Map depicts the post-1916 Duwamish watershed showing the modification of wetlands and waterways, and the disappearance of the Black River and the Duwamish longhouses.





# Historical Overview of Duwamish Tribe

## 1855 to 1926

1850 | 1860 | 1870 | 1880 | 1890 | 1900 | 1910 | 1920 | 1930

1855: Chief Seattle signs Treaty on behalf of Duwamish and Suquamish Tribes

1855-1860s: Department recommends reservation for Duwamish

1860s-1918: Department pays treaty annuities to unattached, off-reservation Duwamish, recognizes unattached Duwamish as under agency's jurisdiction

1855-1910s: Duwamish are forced to disperse throughout King and Kitsap counties but continue to hold cultural & religious ceremonies, potlatches, & tribal-business meetings

1860s-1910s: Settlers and City oppose reservation for Duwamish, pass ordinances banning Indians from City, & burn down 94 Duwamish longhouses

1894: 300 tribal members attend ceremony with Duwamish and Puyallup Tribes on Black River

1915: Duwamish Tribe joins Northwest Federation of American Indians & compiles first enrollment list of Duwamish living on and off reservations

1916: Lake Washington Ship Canal completed, draining Black River & wiping out Cedar River salmon run, leaving last Duwamish village on Black River without a source of food or mode of transportation

1919: Dep't compiles an enrollment list of Duwamish members living off reservations

1925-26: Duwamish Tribe establishes constitution/bylaws, renames tribal government "Duwamish Tribal Organization," & compiles all-inclusive enrollment list of Duwamish members living on and off reservations

Proviso.
Preference to ex-service men.
Vol. 42, p. 358.

charges theretofore paid on account of the relinquished farm unit shall be credited on account of the new farm unit taken in exchange: *Provided*, That where two entrymen apply for the same farm unit under the exchange provision of this subsection, only one of whom is an ex-service man, as defined by the joint resolution of January 21, 1922 (Forty-second Statutes, page 358), the ex-service man shall have a preference in making such exchange.

Operation and maintenance charges payable in advance.
By water users' associations.

Adjusted charges.

SUBSEC. N. That all contracts providing for new projects and new divisions of projects shall require that all operation and maintenance charge shall be payable in advance. In each case where the care, operation, and maintenance of a project or division of a project are transferred to the water users the contract shall require the payment of operation and maintenance charges in advance. That whenever an adjustment of water charges is made under this section the adjustment contract shall provide that thereafter all operation and maintenance charges shall be payable in advance.

Main office expenses chargeable to general fund and not to water users.

SUBSEC. O. That the cost and expense after June 30, 1925, of the main office at Washington, District of Columbia, of the Bureau of Reclamation in the Department of the Interior, and the cost and expense of general investigations heretofore and hereafter authorized by the Secretary, shall be charged to the general reclamation fund and shall not be charged as a part of the construction or operation and maintenance cost payable by the water users under the projects.

Irrigation rights of way, etc., over public lands to be reserved.

Recording, etc.

SUBSEC. P. That where, in the opinion of the Secretary, a right of way or easement of any kind over public land is required in connection with a project the Secretary may reserve the same to the United States by filing in the General Land Office and in the appropriate local land office copies of an instrument giving a description of the right of way or easement and notice that the same is reserved to the United States for Federal irrigation purposes under this section, in which event entry for such land and the patent issued therefor shall be subject to the right of way or easement so described in such instrument; and reference to each such instrument shall be made in the appropriate tract books and also in the patent.

Donated property not utilized for projects to be reconveyed.

SUBSEC. Q. That where real property or any interest therein heretofore has been, or hereafter shall be, donated and conveyed to the United States for use in connection with a project, and the Secretary decides not to utilize the donation, he is authorized without charge to reconvey such property or any part thereof to the donating grantor, or to the heirs, successors, or assigns of such grantor.

Amount authorized to determine development of arid, semiarid, swamp, and cut-over timberlands.

SUBSEC. R. That there is hereby authorized to be appropriated from the General Treasury, the sum of $100,000 for investigations to be made by the Secretary through the Bureau of Reclamation to obtain necessary information to determine how arid and semiarid, swamp, and cut-over timberlands may best be developed.

Title of Act.

SEC. 5. That this Act hereafter may be referred to as the "Second Deficiency Act, Fiscal Year 1924."

Approved, December 5, 1924.

---

December 6, 1924.
[H. R. 9561.]
[Public, No. 393.]

CHAP. 5.—An Act Making additional appropriations for the fiscal year ending June 30, 1925, to enable the heads of the several departments and independent establishments to adjust the rates of compensation of civilian employees in certain of the field services.

Additional appropriations for civilian field services employees, fiscal year 1925.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That to enable the heads of the several departments and independent establishments to adjust the compensation of civilian employees in certain field services to correspond, so far as may be practicable, to the rates established by the Classification Act of 1923 for positions in the

Vol. 42, p. 1488.

**705**

departmental services in the District of Columbia the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the service of the fiscal year ending June 30, 1925, namely:

## EXECUTIVE OFFICE AND INDEPENDENT ESTABLISHMENTS

### EXECUTIVE OFFICE

Executive Office.

For repairs, fuel, and so forth, Executive Mansion, $11,040; for improvement and care of public grounds, Executive Mansion, $2,640; for lighting, and so forth, Executive Mansion, $480; and for salaries, White House police, $15,260; in all, $29,420.

Executive Mansion, etc.

### CIVIL SERVICE COMMISSION

For salaries, field force, Civil Service Commission, $64,920.

Civil Service Commission

### INTERSTATE COMMERCE COMMISSION

For Bureau of Inquiry, $760; for Bureau of Accounts, $15,760; for Bureau of Valuation, $3,060; in all, $19,580.

Interstate Commerce Commission

### NATIONAL ADVISORY COMMITTEE FOR AERONAUTICS

For salaries, National Advisory Committee for Aeronautics, $30,000.

Aeronautics Committee

### TARIFF COMMISSION

For salaries, Tariff Commission, $1,260.

Tariff Commission.

### UNITED STATES VETERANS' BUREAU

For salaries and expenses, United States Veterans' Bureau, $1,225,000.

Veterans' Bureau.

### EXECUTIVE DEPARTMENTS

### DEPARTMENT OF AGRICULTURE

Department of Agriculture.

Office of Experiment Stations, general expenses, $23,280.

Experiment Stations.

Office of Extension Service, general expenses, $2,860.

Extension Service.

Weather Bureau: For salaries, $67,520; for general expenses, $259,980; in all, $327,500.

Weather Bureau.

Bureau of Animal Industry: For salaries, $63,740; for general expenses, $313,509; for meat inspection, $833,270; in all, $1,210,519.

Animal Industry.

Bureau of Plant Industry: For salaries, $9,540; for general expenses, $130,191; in all, $139,731.

Plant Industry

Forest Service: For salaries, $824,120; for general expenses, $439,256; in all, $1,263,376.

Forest Service.

Bureau of Chemistry: For salaries, $28,260; for general expenses, $70,700; in all, $98,960.

Chemistry.

Bureau of Entomology: For salaries, $6,780; for general expenses, $54,150; for preventing spread of moths, $17,800; for prevention of spread of European corn borer, $7,280; and for preventing spread of Mexican bean beetle, $1,780; in all, $87,790.

Entomology.

Bureau of Biological Survey: For salaries, $3,340; for general expenses, $41,490; in all, $44,830.

Biological Survey.

Bureau of Public Roads: For salaries, $1,800; for general expenses, $16,220; in all, $18,020.

Public Roads.

**706**     SIXTY-EIGHTH CONGRESS.  Sess. II.  Ch. 5.  1924.

Agricultural Economics.

Bureau of Agricultural Economics: For salaries, $76,000; for general expenses, $64,978; for enforcement of United States Cotton Futures Act, $3,500; for enforcement of United States Grain Standards Act, $48,940; and for administration of United States Warehouse Act, $10,560; in all, $203,978.

Insecticide Act.

Enforcement of the Insecticide Act: For salaries, $1,180; for general expenses, $3,200; in all, $4,380.

Federal Horticultural Board.

Federal Horticultural Board: For salaries, $1,860; for general expenses, $27,708; in all, $29,568.

Miscellaneous items.

Miscellaneous items: For demonstrations on reclamation projects, $2,180; for cooperative fire protection of forested watersheds of navigable streams, $1,520; for acquisition of lands for protection of watersheds of navigable streams, $18,540; for experiments and demonstrations in livestock production, $960; for field station, Woodward, Oklahoma, $300; for experiments in dairying and livestock production in western United States, $1,380; for eradication of foot-and-mouth disease, and so forth, $6,980; for suppressing spread of pink bollworm of cotton, $19,760; for eradication of the date scale, $2,320; for enforcement of Packers and Stockyards Act, $23,140; and for enforcement of Grain Futures Act, $7,070; in all, miscellaneous items, $84,150.

Total, Department of Agriculture, $3,538,942.

Department of Commerce.

# DEPARTMENT OF COMMERCE

Foreign and Domestic Commerce Bureau.

Bureau of Foreign and Domestic Commerce: For commercial attachés, $17,136; for promoting commerce, Europe and other areas, $12,600; for district and cooperative office service, $34,818; for promoting commerce, South and Central America, $5,040; for promoting commerce in the Far East, $5,544; for China Trade Act, $504; for export industries, $504; and for compiling foreign trade statistics, $45,980; in all, $122,126.

Steamboat Inspection.

Steamboat Inspection Service: For salaries, $137,700; for clerk hire, $27,460; in all, $165,160.

Navigation Bureau.

Bureau of Navigation: For enforcement of navigation laws, $11,200; for preventing overcrowding of passenger vessels, $3,920; for wireless communication laws, $24,960; for salaries, shipping commissioners, $7,100; for clerk hire, shipping service, $19,040; and for contingent expenses, shipping service, $480; in all, $66,700.

Standards Bureau.

Bureau of Standards: For testing structural materials, $5,060; for industrial research, $300; in all, $5,360.

Lighthouses Bureau.

Bureau of Lighthouses: For general expenses, Lighthouse Service, $72,000; for salaries of keepers of lighthouses, $402,100; for salaries, lighthouse vessels, $570,000; and for salaries, Lighthouse Service, $120,580; in all, $1,164,680.

Coast and Geodetic Survey.

Coast and Geodetic Survey: For field expenses, Atlantic coast, $2,160; for Pacific coast, $7,120; for State surveys, $9,980; and for pay, and so forth, officers and men, $133,684; in all, $152,944.

Fisheries Bureau.

Bureau of Fisheries: For salaries, $126,520; for officers and crews, Alaska vessels, $16,160; in all $142,680.

Total, Department of Commerce, $1,819,650.

Interior Department.

# DEPARTMENT OF THE INTERIOR

Public lands.

· General Land Office: For salaries and contingent expenses, offices of surveyors general, $39,680; for surveying the public lands, $92,820; for contingent expenses of land offices, $60,280; and for depredations on public timber, $66,400; in all, $259,180.

Indian Affairs Bureau.

Bureau of Indian Affairs: For general expenses, Indian Service, $20,850; for purchase and transportation of supplies, $11,580; for

Case 2:22-cv-00633-JNW   Document 1   Filed 05/11/22   Page 60 of 182

SIXTY-EIGHTH CONGRESS. Sess. II. Ch. 5. 1924.    707

inspectors, Indian Service, $2,000; for pay of judges, Indian courts, $13,660.80; for pay of Indian police, $79,012; for suppressing liquor traffic among Indians, $3,060; and for Indian school and agency buildings, $1,300: in all, general expenses, $131,462.80.

For expenses in probate matters: For determining heirs of deceased Indian allottees, $13,580; and for probate attorneys, Five Civilized Tribes, $7,530; in all, $21,110.

For surveying of Indian lands: For surveying and allotting Indian reservations (reimbursable), $840; and for council for Pueblo Indians in New Mexico, $500; in all, $1,340.

Industrial assistance and advancement: For industrial work and care of timber, $107,936.

Development of water supply: For maintenance and operation of water works, Papago Indian villages, Arizona, $480; for water supply, Navajo and Hopi Indians, $900; and for water supply, Pueblo Indians, New Mexico, $300; in all, $1,680.

Irrigation and drainage: For irrigation, Indian reservations (reimbursable), $27,850; for maintenance and operation, irrigation system, Pima Indian lands, Arizona (reimbursable), $1,200; for irrigation project, Gila River Reservation, Arizona (reimbursable), $2,160; for maintenance and operation irrigation system, Colorado River Reservation, Arizona (reimbursable), $1,840; for maintenance and operation, Ganado irrigation project, Navajo Reservation, Arizona (reimbursable), $300; for maintenance and operation, pumping plants, San Xavier Reservation, Arizona (reimbursable), $240; for improvement, maintenance, and operation, Fort Hall irrigation systems, Idaho (reimbursable), $3,380; for irrigation system, Fort Hall Reservation and ceded lands, Idaho, $12,080; for maintenance and operation, irrigation systems, Fort Belknap Reservation, Montana (reimbursable), $2,150; for irrigation systems, Flathead Reservation, Montana (reimbursable), $7,760; for irrigation systems, Blackfeet Reservation, Montana (reimbursable), $4,020; for improvement, maintenance, and operation, irrigation systems, Crow Reservation, Montana (reimbursable), $5,340; for improvement, maintenance, and operation, Hogback irrigation project, Navajo Reservation, New Mexico (reimbursable), $1,180; for proceeds of Uintah and White River Ute lands, Utah, $6,120; for maintenance and operation, Toppenish-Simcoe irrigation system, Yakima Reservation, Washington (reimbursable), $240; for maintenance and operation, Ahtanum irrigation system, Yakima Reservation, Washington (reimbursable), $480; for diversion dam and distribution and drainage system, Yakima Reservation, Washington (reimbursable), $1,600; for maintenance, irrigation system, Wapato project, special fund, Act of August 30, 1914, $5,880; for Satus irrigation project, Yakima Reservation, Washington (reimbursable), $8,180; for irrigation system, Wind River Diminished Reservation, Wyoming (reimbursable), $1,560; for maintenance, irrigation system, Wind River Diminished Reservation, Wyoming, special fund, $6,220; and for the diversion dam, Gila River Reservation, Arizona (reimbursable), $6,070; in all, irrigation and drainage, $105,850.

Education: For support, Indian schools, $393,423; for Indian schools, as follows: Fort Mojave, Arizona, $11,280; Phoenix, Arizona, $24,750; Truxton Canyon, Arizona, $4,980; Theodore Roosevelt School, Fort Apache, Arizona, $16,980; Riverside, California, $28,330; Fort Bidwell, California, $4,580; Lawrence, Kansas, $33,930; Mount Pleasant, Michigan, $17,750; Pipestone, Minnesota, $10,270; Genoa, Nebraska, $14,950; Carson City, Nevada, $15,430; Albuquerque, New Mexico, $21,695; Santa Fe, New Mexico, $16,970; Cherokee, North Carolina, $12,560; Bismarck, North Dakota, $5,080; Fort Totten, North Dakota, $18,100; Wahpeton, North Dakota,

Probate matters.

Surveying.

Industrial work.

Water supply development.

Irrigation and drainage.

Indian schools

$8,650; Chilocco, Oklahoma, $22,800; Cherokee Orphan Training School, Oklahoma, $10,475; Salem, Oregon, $29,340; Flandreau, South Dakota, $16,260; Pierre, South Dakota, $10,040; Rapid City, South Dakota, $13,680; Hayward, Wisconsin, $11,960; Tomah, Wisconsin, $12,360; Shoshone Reservation, Wyoming, $6,400; for support of Chippewas of the Mississippi, Minnesota, $1,240; for Indian schools, Five Civilized Tribes, $3,240; and for education, Sioux Nation, South Dakota, $109,060; in all, education, $906,563.

Relief of distress, etc.    Relief of distress and conservation of health: For relieving distress and prevention, and so forth, of diseases among Indians, $96,270; for asylum for insane Indians, Canton, South Dakota, $8,320; in all, $104,590.

Support and civilization.    ==General support and civilization: For support of Indians, as follows:== In Arizona, $44,830; California, $8,980; Seminoles in Florida, $540; at Fort Hall Reservation, Idaho, $4,770; Fort Belknap Agency, Montana, $4,560; Flathead Agency, Montana, $1,830; Fort Peck Agency, Montana, $7,540; Blackfeet Agency, Montana, $11,780; for support of Rocky Boy's Band of Chippewas and other Indians in Montana, $880; for support of Indians in Nevada, $7,040; in New Mexico, $37,980; for support of Sioux, Devils Lake Reservation, North Dakota, $2,240; for support of the Indians at Fort Berthold Agency, North Dakota, $4,300; the Chippewas, Turtle Mountain Band, North Dakota, $3,560; Wichitas and affiliated bands, Oklahoma, $1,160; Kansas Indians, Oklahoma, $320; Kickapoos, Oklahoma, $740; Poncas, Oklahoma, $1,680; Grande Ronde and Siletz Agencies, Oregon, $1,560; Yankton Sioux, $1,140; for support of Indians in Utah, $1,150; for Colville and other agencies and Joseph's Band of Nez Perces, Washington, $2,060; Makahs in Washington, $420; ==Dwamish and other allied tribes in Washington, $1,180;== Chippewas of Lake Superior, Wisconsin, $640; Potawatomies, Wisconsin, $780; Coeur d'Alenes, Idaho, $1,360; Bannocks, employees, Idaho, $2,160; for relief of Choctaws in Mississippi, $1,440; for education of Choctaws in Mississippi, $2,160; for fulfilling treaties with Crows, Montana, $1,700; for support of Northern Cheyennes and Arapahoes, Montana, $9,720; for support of Pawnees, schools, $1,140; support of Pawnees, employees, $1,990; support of Quapaws, employees, Oklahoma, $540; for administration of affairs, Five Civilized Tribes, $30,314; for support of Indians of Warm Springs Agency, Oregon (reimbursable), $760; Sioux of different tribes, employees, and so forth, South Dakota, $53,426; confederated bands of Utes, employees, and so forth, Utah, $9,200; Spokanes, Washington, $320; Shoshones, employees, and so forth, Wyoming, $2,240; and for insect infestation, Indian Service, $400; in all, for general support and civilization, $272,530. Total, Bureau of Indian Affairs, $1,653,061.80.

Reclamation Service.    Reclamation Service: For the Reclamation Service $365,400; for general investigations, $7,620; in all, $373,020, payable from the reclamation fund.

Geological Survey.    United States Geological Survey: Geological Survey, $28,941.

Mines Bureau.    Bureau of Mines: For investigating mine accidents, $30,260; operating mine-rescue cars, $15,240; testing fuel, $14,310; mineral mining investigations, $5,800; oil, gas, and oil-shale investigations and leasing, $17,630; enforcement of mineral leases, $4,160; for expenses, mining experiment stations, $14,450; for care, and so forth of buildings and grounds, Pittsburgh, Pennsylvania, $9,630; and for mining investigations in Alaska, $1,320; in all, Bureau of Mines, $112,800.

National Park Service.    National Park Service: For the following national parks: Crater Lake, $1,980; General Grant, $1,180; Glacier, $9,260; Grand Canyon, $4,360; Hawaii, $1,260; Hot Springs, $11,800; Lafayette, $2,820;

79 Ct.Cl. 530
United States Court of Claims

THE DUWAMISH, LUMMI, WHIDBY ISLAND
SKAGIT, UPPER SKAGIT, SWINOMISH,
KIKIALLUS, SNOHOMISH, SNOQUALMIE
STILLAGUAMISH, SUQUAMISH, SAMISH,
PYALLUP, SQUAXIN, SKOKOMISH,
UPPER CHEHALIS, MUCKLESHOOT,
NOOKSACK, CHINOOK, AND SAN
JUAN ISLANDS TRIBES OF INDIANS
v.
THE UNITED STATES

No. F-275
|
June 4, 1934

West Headnotes (10)

**[1]**   **Evidence** 🔑 Uncontroverted evidence

The testimony of witnesses for one party to a suit, though not traversed by testimony for the other party, is not necessarily conclusive on the court as to the facts testified to; the interest of the witnesses in the outcome of the litigation, their relationship to the transactions involved, their opportunity for knowing what they state, and their intelligence and candor in making their statements, are all factors to be considered in determining the weight to be accorded their testimony.

3 Cases that cite this headnote

**[2]**   **Indians** 🔑 Treaties in General

Where Indian treaties have been executed, ratified by the Senate, and proclaimed by the President, the courts will presume that they were lawfully made; and no charge that they were obtained by misrepresentation or that the signatures of the Indians thereto were procured by sharp practices can be entertained.

**[3]**   **Indians** 🔑 Treaties in General

A provision in an Indian treaty that "any substantial improvements heretofore made by any Indian, and which he shall be compelled to abandon in consequence of this treaty, shall be valued under the direction of the President and payment made accordingly therefore," *held,* in view of the nature of the transaction, the object to be accomplished, and the payment to be made, to be intended to convert a possibly individual claim into a tribal claim.

1 Cases that cite this headnote

**[4]**   **Indians** 🔑 Title and rights to Indian lands in general

Recognition by the government of Indian title by occupancy to lands is not established by proof of contacts of the tribes with government Indian Agents in the administration of Indian Affairs. The Indians' right of occupancy has always been a cardinal principle of legislation, and the extent and value of the right are not to be determined by the courts until Congress, by legislation, speaks.

3 Cases that cite this headnote

**[5]**   **United States** 🔑 Claims Under Indian Treaties or Statutes for Relief of Indians

The fact that Indian tradition recognized natural formations as boundary lines and manifested a jealous protection by the tribes of their claimed territorial rights, while available in some instances to fix certain tribal rights, will not warrant a finding of definite takings of land unsurveyed and undescribed, notwithstanding a belief that a portion of the lands taken may have fallen within the areas claimed by the tribes.

6 Cases that cite this headnote

**[6]**   **Judgment** 🔑 Authority of Court or Other Tribunal

The court is without jurisdiction to award a judgment upon any other basis than principles of law; it cannot base a judgment upon an

approximation which would of itself be simply a finding without a basis of fact.

**[7]**   United States 🔑   Indians, claims involving

The special jurisdictional act construed to be limited to claims growing out of the Indian treaties involved except as to the nontreaty claimants, and not to include claims growing out of acts of Congress.

**[8]**   United States 🔑   Indians, claims involving

A provision in the special jurisdictional act "That the Court of Claims shall advance the cause or causes upon its docket for hearing, and shall have authority to determine and adjudge all rights and claims, both legal and equitable, of said tribes or bands of Indians, or any of them, and of the United States in the premises, notwithstanding lapse of time or statutes of limitation," is obviously procedural, and not intended as an enlargement of the jurisdiction of the court so as to include claims aside from those specifically designated in the act.

1 Cases that cite this headnote

**[9]**   United States 🔑   Indians, claims involving

While it may well be supposed that the government would not intentionally take from Indian tribes their tribal lands, held under tribal occupation, without compensation, established precedents hold that the authority to do so exists; and the court is without jurisdiction under the jurisdictional statute of a claim by tribal Indians against the United States for the value of lands thrown open to public settlement by an act of Congress, where there has been no recognition by treaty or act of Congress of Indian title to the land by right of occupancy.

12 Cases that cite this headnote

**[10]**   United States 🔑   Indians, claims involving

Where claims of which the Court of Claims is given jurisdiction by a special statute are limited to legal or equitable claims and the

subject-matter and respective rights of the parties have been adjudicated in another court of competent jurisdiction, the court is bound by such adjudication and cannot redetermine the controversy under the jurisdictional act.

**\*\*1   \*532**   *The Reporter's* statement of the case:

**Attorneys and Law Firms**

*Mr. Arthur E. Griffin* for the plaintiff.

*Mr. George T. Stormont,* with whom was *Mr. Assistant Attorney General Frank J. Wideman,* for the defendant. *Mr. William W. Scott* was on the brief.

The court made special findings of fact as follows:

I. By an act of Congress approved February 12, 1925 (43 Stat. 886, ch. 214), it was provided:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That all claims of whatsoever nature, both legal and equitable, of the tribes and bands of Indians, or any of them, except the S'Klallams, commonly known as the Clallams, with whom were made any of the treaties of Medicine Creek, dated December 26, 1854, Point Elliott, dated January 22, 1855, Point-no-Point, dated January 26, 1855, the Quinaielts, dated May 8, 1859, growing out of said treaties, or any of them, and that all claims of whatever nature, both legal and equitable, which the Muckelshoot, San Juan Islands Indians; Nook-Sack, Suattle, Chinook, Upper Chehalis, Lower Chehalis, and Humptulip Tribes or Bands of Indians, or any of them (with whom no treaty has been made), may have against the United States shall be submitted to the Court of Claims with right of appeal by either party to the Supreme Court of the United States for determination and adjudication, both legal and equitable, and jurisdiction is hereby conferred upon the Court of Claims to hear and determine any and all suits brought hereunder and to render final judgment therein: *Provided,* That the court shall also consider and determine any legal or equitable defenses, set-offs, or counterclaims including gratuities which the United States may have against any of said tribes or bands.

"SEC. 2. That the Court of Claims shall advance the cause or causes upon its docket for hearing, and shall have authority to determine and adjudge all rights and claims, both **\*533** legal and equitable, of said tribes or bands of Indians, or any of them, and of the United States in the premises, notwithstanding lapse of time or statutes of limitation.

"SEC. 3. That suit or suits instituted hereunder shall be begun within five years from the date of the passage of this act by such tribes or bands of Indians, as parties plaintiff, and the United States as the party defendant. The petition or petitions may be verified by attorney or attorneys employed by such tribes of Indians under contract or contracts approved in accordance with existing law upon information and belief as to the facts therein alleged, and no other verification shall be necessary. Upon final determination of such suit or suits the Court of Claims shall have jurisdiction to fix and determine a reasonable fee, not to exceed 10 per centum of the recovery and in no event shall such fee amount in the aggregate under one attorneyship for each tribe to more than $25,000, together with all necessary and proper expenses incurred in preparation and prosecution of the suit, to be paid to the attorneys employed by the said tribes or bands of Indians, or any of them, and the same shall be included in the decree and shall be paid out of any sum or sums found to be due said tribes."

**\*\*2** II. Under the provisions of this act the plaintiffs hereinafter named filed their consolidated petition on August 21, 1926, setting forth causes of action founded upon an alleged failure of the United States to comply with treaty stipulations made for and on behalf of the plaintiff Indians. These plaintiffs are designated as treaty Indians.

III. Five Indian tribes or bands, the Upper Chehalis, the Muckleshoot, the Nooksack, the Chinook, and San Juan Islands, with whom no treaties were ever made, are included in the petition as nontreaty Indians, and allege a taking by the United States of their tribal lands occupied by them, by acts of Congress granting same to white settlers.

IV. The following plaintiffs were parties to the treaty of Point Elliott, viz: The Duwamish, Lummi, Whidby Island Skagit, Upper Skagit, Swinomish, Kikiallus, Snohomish, Snoqualmie, Stillaguamish, Suquamish, and the Samish Tribes.

The Point Elliott Treaty was concluded at Point Elliott, Washington Territory, January 22, 1855, ratified by the Senate March 8, 1859, and proclaimed April 11, 1859.

**\*534** V. The provisions of the Point Elliott Treaty pertinent to plaintiffs' cause of action are as follows (article I, which contains a cession of the plaintiffs' lands, does not need to be quoted):

"Article II. There is, however, reserved for the present use and occupation of the said tribes and bands the following tracts of land, viz: The amount of two sections, or twelve hundred and eighty acres, surrounding the small bight at the head of Port Madison, called by the Indians Noo-sohk-um; the amount of two sections, or twelve hundred and eighty acres, on the north side of Hwhomish Bay and the creek emptying into the same called Kwilt-seh-da, the peninsula at the southeastern end of Perry's Island called Shais-quihl, and the island called Chah-choo-sen, situated in the Lummi River at the point of separation of the mouths emptying respectively into Bellingham Bay and the Gulf of Georgia. All which tracts shall be set apart, and so far as necessary surveyed and marked out for their exclusive use; nor shall any white man be permitted to reside upon the same without permission of the said tribes or bands, and of the superintendent or agent, but, if necessary for the public convenience, roads may be run through the said reserves, the Indians being compensated for any damage thereby done them.

"Article III. There is also reserved from out the lands hereby ceded the amount of thirty-six sections, or one township of land, on the northeastern shore of Port Gardner, and north of the mouth of Snohomish River, including Tulalip Bay and the before-mentioned Kwilt-seh-da Creek, for the purpose of establishing thereon an agricultural and industrial school, as hereinafter mentioned and agreed, and with a view of ultimately drawing thereto and settling thereon all the Indians living west of the Cascade Mountains in said Territory: *Provided, however,* That the President may establish the central agency and general reservation at such other point as he may deem for the benefit of the Indians.

**\*\*3** "Article IV. The said tribes and bands agree to remove to and settle upon the said first above-mentioned reservations within one year after the ratification of this treaty, or sooner, if the means are furnished them. In the meantime it shall be lawful for them to reside upon any land not in the actual claim and occupation of citizens of the United States, and upon any land claimed or occupied, if with the permission of the owner.

"Article V. The right of taking fish at usual and accustomed grounds and stations is further secured to said **\*535** Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and unclaimed lands. *Provided, however,* that they shall not take shellfish from any beds staked or cultivated by citizens.

"Article VI. In consideration of the above cession, the United States agree to pay to the said tribes and bands the sum of one hundred and fifty thousand dollars, in the following manner-that is to say: For the first year after the ratification hereof, fifteen thousand dollars; for the next two years, twelve thousand dollars each year; for the next three years, ten thousand dollars each year; for the next four years, seven thousand five hundred dollars each year; for the next five years, six thousand dollars each year; and for the last five years, four thousand two hundred and fifty dollars each year. All which said sums of money shall be applied to the use and benefit of the said Indians under the direction of the President of the United States, who may from time to time determine at his discretion upon what beneficial objects to expend the same; and the Superintendent of Indian Affairs, or other proper officer, shall each year inform the President of the wishes of said Indians in respect thereto.

"Article VII. The President may hereafter, when in his opinion the interests of the Territory shall require and the welfare of the said Indians be promoted, remove them from either or all of the special reservations hereinbefore made to the said general reservation, or such other suitable place within said Territory as he may deem fit, on remunerating them for their improvements and the expenses of such removal, or may consolidate them with other friendly tribes or bands; and he may further at his discretion cause the whole or any portion of the lands hereby reserved, or of such other land as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable. Any substantial improvements heretofore made by any Indian, and which he shall be compelled to abandon in consequence of this treaty, shall be valued under the direction of the President and payment made accordingly therefor.

**\*\*4** "Article XIII. To enable the said Indians to remove to and settle upon their aforesaid reservations, and to clear, **\*536** fence, and break up a sufficient quantity of land for cultivation, the United States further agree to pay the sum of fifteen thousand dollars to be laid out and expended under the direction of the President and in such manner as he shall approve.

"Article XIV. The United States further agrees to establish at the general agency for the district of Puget's Sound, within one year from the ratification hereof, and to support for a period of twenty years, an agricultural and industrial school, to be free to children of the said tribes and bands in common with those of the other tribes of said district, and to provide the said school with a suitable instructor or instructors, and also to provide a smithy and carpenter's shop, and furnish them with the necessary tools, and employ a blacksmith, carpenter, and farmer for the like term of twenty years to instruct the Indians in their respective occupations. And the United States finally agree to employ a physician to reside at the said central agency, who shall furnish medicine and advice to their sick, and shall vaccinate them; the expenses of said school, shops, persons employed, and medical attendance to be defrayed by the United States, and not deducted from the annuities." (12 Stat. 927.)

VI. The plaintiffs Puyallup and Squaxin Tribes were parties to the Medicine Creek Treaty, entered into at Medicine Creek, Washington Territory, on December 26, 1854, ratified by the Senate March 3, 1855, and proclaimed April 10, 1855 (10 Stat. 1132).

The plaintiff Skokomish Tribe was a party to the Point-no-Point Treaty entered into at Point-no-Point, Washington Territory, January 26, 1855, ratified by the Senate March 8, 1859, and proclaimed April 29, 1859 (12 Stat. 933).

The pertinent articles of the above treaties are precisely the same as set forth in the Point Elliott Treaty, and the claims of the plaintiffs are in most respects the same.

VII. All the above treaties were negotiated and concluded by Governor Isaac Stevens, acting under the authority given by the act of July 31, 1854 (10 Stat. 315, 330), and the instructions of the Commissioner of Indian Affairs. Governor Stevens was assisted by George Gibbs, a surveyor; Colonel B. F. Shaw, an interpreter; and Colonel M. T. Simmons, Indian agent, all of whom were familiar with Indian affairs, and all of whom participated with Governor Stevens in conducting

Indian councils. Colonel Shaw, the **\*537** interpreter, spoke several of the Indian languages and was decidedly familiar with the Indian language known as Chinook jargon.

VIII. The various councils with the Indians were conducted in the usual way. Presents were distributed to induce good feeling and attendance. Speeches were delivered, couched in plain, simple language, explaining the terms of the treaties, and patience displayed to effect agreements. The interpreter employed the Chinook jargon language in most instances in interpreting the speeches and the articles of the treaties. Chinook jargon was a mixed language made up of English, French, and Indian words, and was not generally understood by the Indians. There was no language common to all the tribes and bands available.

**\*\*5** IX. The treaties were interpreted to the Indians, and they understood that the reservations set apart for them by the treaties were not to be permanent and that whenever conditions warranted the President might establish a larger and general reservation to which they could be removed, and obtain allotments in accord with the provisions of the sixth article of the treaty with the Omaha Indians (10 Stat. 1043). Governor Stevens in his speeches to the Indians assured them that the purpose of the treaties was to give the Indians homes where they could cultivate the soil, schools for the education of their children, a doctor to administer to their sick, and other facilites to promote their welfare. The Government contemplated a change of conditions in the future, established by the article of the treaties, and the treaties were concluded with that purpose in view. The Indians so understood. No general reservation was ever established by the President for the Indians. Some of the reservations were enlarged and allotments made, as will hereafter appear.

Governor Stevens was frank with the Indians and neither sought nor practiced any means to take advantage of them.

X. Article VI of the Medicine Creek Treaty, article VII of the Point Elliott Treaty, and article VII of the Point-no-Point Treaty provided as follows:

"Any substantial improvements heretofore made by any Indian, and which he shall be compelled to abandon in consequence **\*538** of this treaty, shall be valued under the direction of the President and payment made accordingly therefor."

Practically all the plaintiff Indians resided for most of the year in log houses erected by the Indians from cedar logs taken from the forests. These dwellings were substantially built and varied in size according to the notions of the tribes and the number of families occupying them. The cost of erection was confined to labor and time consumed in so doing. The materials used cost the Indians nothing. The houses were erected by a number of Indians combining their labor and these Indians when in occupation thereof had exclusive possession of the same.

The treaties were concluded with the tribes as Indian entities and not with individuals. The councils were made up of representative Indians who spoke for their tribes, and the Commissioners and the Indians understood and intended that improvements on lands ceded were to be valued and paid for to the tribes.

XI. The following tribes and bands abandoned the number of houses herein set forth of the value of $250 each, when they removed to their respective reservations set apart under the treaties, and have received from the United States no payment therefor, viz:

| | *Value* |
|---|---|
| Skokomish, 15 houses.................................................................... | $3,750.00 |
| Squaxin, 6 houses........................................................................ | 1,500.00 |
| Puyallup, 45 houses...................................................................... | 11,250.00 |
| Suquamish, 28 houses................................................................... | 7,000.00 |
| Duwamish, 56 houses.................................................................... | 14,000.00 |
| Snohomish, 12 houses................................................................... | 3,000.00 |

| | |
|---|---|
| Snoqualmie, 11 houses.................................................................. | 2,750.00 |
| Stillaguamish, 12 houses............................................................. | 3,000.00 |
| Kikiallus, 8 houses...................................................................... | 2,000.00 |
| Whidby Island & Upper Skagit, 26 houses.................................... | 6,500.00 |
| Swinomish, 6 houses................................................................... | 1,500.00 |
| Samish, 14 houses...................................................................... | 3,500.00 |
| Lummi, 19 houses........................................................................ | 4,750.00 |
| Total............................................................................ | 64,500.00 |

**6 The lands cleared for cultivation and abandoned are not susceptible to acreage ascertainment, and the value thereof is not established.

*539 XII. By an act of Congress of September 27, 1850 (9 Stat. 496), commonly known as the "Oregon Donation Act", donations of public lands to white settlers under certain conditions and restrictions were provided for. This act was amended by the act approved February 14, 1853 (10 Stat. 158), permitting the reduction of the four years' cultivation and occupation required by the original act to two years upon the payment of $1.25 per acre for the land entered. By the act of March 2, 1853 (10 Stat. 172), the Territory of Washington was organized out of a certain portion of Oregon Territory, and by Section 12 of the act all laws of Congress enacted subsequent to September 1, 1848, applicable to the newly created territory, were continued in force in the Territory of Washington. By section 6 of the act of July 17, 1854 (10 Stat. 305, 306), the provisions of the aforesaid Oregon Donation Act were extended to Washington Territory; and by section 3 of this act the time limit for giving notice of claims under the act of September 27, 1850, was extended to December 1, 1855.

XIII. The boundaries of the sections occupied by the respective tribes, parties to the treaties herein involved, are not established by the record, but in the areas claimed by these tribes to have been occupied by them at and prior to the dates of the treaties, settlements were made under the provisions of the acts just mentioned, as follows:

In the country claimed to have been occupied by the Duwamish tribe, settlements by white settlers were made upon 8,440.10 acres prior to the conclusion of the treaty of Point Elliott on January 22, 1855; and settlements were made upon an additional 1,585.60 acres between the dates of the conclusion and ratification of this treaty. The certificates of settlement for these lands provided for in the Oregon Donation Act and the patents issued in conformity therewith were all issued subsequent to the date of the ratification of the treaty on March 8, 1859.

In the country claimed to have been occupied by the Lummi tribe, settlements were made upon 2,406.05 acres prior to the conclusion of this treaty and upon 926.26 acres between the dates of the conclusion and ratification of the *540 treaty. The settlement certificates and patents for these lands were all issued subsequent to the date of the ratification of the treaty.

In the country claimed to have been occupied by the Squaxin tribe, settlements were made upon 17,025.27 acres prior to the conclusion of the treaty of Medicine Creek on December 26, 1854; and settlements upon an additional 1,284.78 acres were made between the dates of the conclusion and ratification of the treaty. The settlement certificates and patents for these lands were all issued subsequent to March 3, 1855, the date when this treaty was ratified.

In the country claimed to have been occupied by the Puyallup tribe, settlements were made upon 17,627.04 acres prior to the conclusion of the treaty of Medicine Creek, and settlements upon an additional 736.08 acres were made between the dates of the conclusion and ratification of the treaty. The certificates of settlement and patents for these lands were all issued subsequent to the ratification of the treaty on March 3, 1855.

**7 In the country claimed to have been occupied by the so-called "Whidby Island Skagit Tribe", settlements were

made upon 13,013.39 acres prior to the conclusion of the treaty of Point Elliott on January 22, 1855; and settlements upon an additional 1,904.45 acres were made between the dates of the conclusion and ratification of this treaty. The certificates of settlement and patents for these lands were all issued subsequent to the ratification of the treaty on March 8, 1859.

The records of the General Land Office fail to show that any settlements under the Oregon Donation Act were made in the areas claimed to have been occupied by the Kikiallus, Samish, Snohomish, Stillaguamish, Suquamish, Swinomish, Skokomish, Snoqualmie, and the so-called "Upper Skagit" tribes.

XIV. By section 20 of the act of March 2, 1853 (*supra*), creating the Territory of Washington, it was provided "That when the lands in the said Territory shall be surveyed under the direction of the Government of the United States, * * * sections numbered sixteen and thirty-six in each **\*541** township in said Territory shall be, and the same are hereby, reserved for the purpose of being applied to common schools in said Territory * * *." The record fails to show when the survey referred to in the act was made.

XV. By section 4 of the act of July 17, 1854 (*supra*), it was provided that there should be reserved to the Territory of Washington two townships of land of thirty-six sections each, to be selected in legal subdivisions, for university purposes, under the direction of the legislature of that Territory. The record fails to show when the selection thus authorized was made.

XVI. By article VI of the treaty of Point Elliott, concluded on January 22, 1855, with the twenty-two tribes and bands of Indians, ratified by the Senate on March 8, 1859, the United States agreed that in consideration of the cession by the signatory tribes of all their right, title, and interest in and to the lands described in article I of the treaty, it would pay to the said tribes and bands the total sum of $150,000 in graduated payments covering a period of twenty years after the ratification of the treaty, these payments to be applied to the use and benefit of the Indians under the direction of the President, who might from time to time determine at his discretion upon which beneficial objects to expend the money. In enumerating the amounts to be expended, annually, however, the article stated payments totalling $150,250.

By article XIII the United States agreed to expend, under the direction of the President and in such manner as he should approve, the further sum of $15,000 to enable the said Indians to remove to and settle upon the reservations provided in article II and to clear, fence, and break up a sufficient quantity of land for cultivation.

By article XIV the United States further agreed-

 **\*\*8** "* * * to establish at the general agency for the district of Puget Sound, within one year from the ratification hereof, and to support for a period of twenty years, an agricultural and industrial school, to be free to children of the said tribes and bands in common with those of the other tribes of said district, and to provide the said school with a suitable instructor or instructors, and also to provide a **\*542** smithy and carpenter's shop, and furnish them with the necessary tools, and employ a blacksmith, carpenter, and farmer for the like term of twenty years to instruct the Indians in their respective occupations. And the United States finally agree to employ a physician to reside at the said central agency, who shall furnish medicine and advice to their sick, and shall vaccinate them; the expenses of said school, shops, persons employed, and medical attendance to be defrayed by the United States, and not deducted from the annuities."

Commencing with the act of March 29, 1860 (12 Stat. 4, 5), and annually thereafter for the period of twenty years, the Congress, in fulfillment of the obligations of the United States under the treaty, expended a total sum of $320,213.86. Of this amount $150,124.94 was appropriated to carry out the stipulations of article II, $13,340.02 for article XIII, and $156,748.90 for article XIV, which latter article provided for no definite amount. The treaty did not provide that the amounts due under articles VI and XIII should be expended in specific proportions for the benefit of the respective tribes, and the records show that the amounts appropriated were expended for the benefit of the tribes generally.

An itemized statement of expenditures by the United States appears from the report of the General Accounting Office, made a part of this finding by reference.

There is due the Indians under the treaty $1,535.04.

XVII. The school provided for in article XIV of the treaty was established in 1859, discontinued after a short trial because of the indifference or opposition of the Indian parents, was reopened on January 1, 1861, and continued in operation

**WESTLAW**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

until February 19, 1867, when a contract was entered into with one Father Chirouse, of a Catholic mission operating in the vicinity, whereunder he was to assume the care and management and conduct a school of the kind stipulated in article XIV for a consideration of $5,000 annually. This contract was renewed from time to time and the arrangement continued until 1880. Of the amount disbursed for educational purposes under article XIV, as above shown, the records of the General Accounting Office disclose that during the years 1868 to 1880 the sum of $33,336.51 was paid to Father Chirouse under the contracts referred to and **\*543** that a total of $19,685.72 was disbursed for books, stationery, etc., clothing, erection and repair of school buildings, pay of teachers, and other items during the years 1861 to 1868 and 1877 to 1880.

The records of the General Accounting Office disclose that the amounts expended for "pay of blacksmith", "pay of carpenter", and "pay of farmers" were disbursed during the years 1861 and 1863 to 1880, and that the amounts expended for "pay of physician" were disbursed during the years 1863, 1864, and 1866 to 1880. The record further discloses that during the 20-year treaty period an additional farmer was employed, but it is not possible to determine from the record how much of the total amount expended for "pay of farmers" was for this additional farmer.

 **\*\*9** XVIII. The preamble to the treaty of Medicine Creek, concluded on December 26, 1854, with the nine tribes and bands and ratified on March 3, 1855, provided that for the purposes of the treaty the Indian tribes and bands parties thereto should be regarded as one nation.

In consideration of the cession by the Indian parties to the treaty of all their right, title, and interest in and to the lands and country occupied by them and described in article I, the United States by article IV of the treaty agreed to pay to these tribes and bands in graduated payments covering a period of twenty years the total sum of $32,500, the sums paid annually to be applied for the use and benefit of the Indians under the direction of the President, "who may from time to time determine, at his discretion, upon what beneficial objects to expend the same."

By article V the United States agreed to pay the sum of $3,250 under the direction of the President, and in such manner as he might approve, "To enable the said Indians to remove to and settle upon their aforesaid reservations, and to clear, fence, and break up a sufficient quantity of land for cultivation."

By article X, the United States further agreed:

"\* \* \* to establish at the general agency for the district of Puget's Sound, within one year from the ratification hereof, and to support, for a period of twenty years, an agricultural and industrial school, to be free to children of **\*544** the said tribes and bands, in common with those of the other tribes of said district, and to provide the said school with a suitable instructor or instructors, and also to provide a smithy and carpenter's shop, and furnish them with the necessary tools, and employ a blacksmith, carpenter, and farmer for the term of twenty years, to instruct the Indians in their respective occupations. And the United States further agree to employ a physician to reside at the said central agency, who shall furnish medicine and advice to their sick, and shall vaccinate them; the expenses of the said school, shops, employees, and medical attendance, to be defrayed by the United States, and not deducted from the annuities."

In fulfillment of these stipulations the United States appropriated in the years from 1855 to 1874, together with a small deficiency appropriation in 1880, a total of $174,897.13. Of this total amount the sum of $173,936.85 was expended for the benefit of the Indian parties to this treaty.

The records of the General Accounting Office disclose that this aforesaid sum of $173,936.85 was expended by fiscal years as shown therein, and said report is made a part of this finding by reference.

XIX. Article II of the treaty of Medicine Creek provided for the reservation of three tracts of land "for the present use and occupation of the said tribes and bands", these reservations being "the small island called Klah-chemin \* \* \* containing about two sections of land by estimation", "a square tract containing two sections, or twelve hundred and eighty acres, on Puget's Sound, near the mouth of the She-nah-nam Creek", and "a square tract containing two sections, or twelve hundred and eighty acres, lying on the south side of Commencement Bay."

 **\*\*10**  Article VI of the treaty provided:

"The President may hereafter, when in his opinion the interests of the Territory may require, and the welfare of the said Indians be promoted, remove them from either or all of said reservations to such other suitable place or places within said Territory as he may deem fit, \* \* \*. And he may further,

at his discretion, cause the whole or any portion of the lands hereby reserved, or of such other land as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are **\*545** willing to avail themselves of the privilege, and will locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable."

Under this article of the treaty the island of Klah-chemin, now called the Squaxin Island Reservation, containing 1,494.15 acres, was set aside as a reservation for the Indians, parties to this treaty, and was subsequently all allotted to twenty-three Indians.

After the ratification of the treaty, Governor Stevens concluded that the reservation "near the mouth of She-nahnam Creek" was neither large enough nor suitably located, and therefore recommended that its location be changed and that it be enlarged under the authority contained in the sixth article of the treaty. His recommendation was concurred in by the Commissioner of Indian Affairs and the Secretary of the Interior and submitted to the President, who approved the recommendation on January 20, 1857 (1 Kapp. 919-920). This reservation, known as the Nisqually Reservation, as enlarged, consisted of 4,718 acres, instead of the 1,280 acres stipulated in the treaty, and was subsequently all allotted to thirty Indians.

The reservation of two sections, or 1,280 acres, "lying on the south side of Commencement Bay" and known as the Puyallup Reservation, was also enlarged at the same time upon Governor Stevens' recommendation (1 Kapp. 919-920). Subsequently it was discovered that through an error in the survey of the reservation as thus established a certain portion thereof intended to be included and lying on the water front had been excluded.

To correct this error, the President, upon the recommendation of the Secretary of the Interior, on September 6, 1873, ordered that the reservation be extended so as to comprehend this excluded portion (1 Kapp. 922-923). The reservation as thus enlarged by these two aforesaid Executive orders contained 18,062 acres. Seventeen thousand four hundred and sixty-three acres of the reservation were subsequently allotted to 167 Indians, the balance, approximately **\*546** 599 acres, being disposed of for the benefit of the Puyallup Indians under the acts of March 3, 1893 (27 Stat. 612, 633), June 7, 1897

(30 Stat. 62, 87), and June 21, 1906 (34 Stat. 325, 377, as hereinafter detailed.

The loss of 640.75 acres of shore lands was due to the decision of the United States Circuit Court in *United States* v. *Ashton,* 170 Fed. 509, and not to any act of the United States.

**\*\*11** XX. By the act of March 3, 1893 (*supra*), the President was authorized to appoint three commissioners to appraise and sell certain portions of the allotted lands in the Puyallup Reservation and to appraise and sell that part of the agency tract which contained 598.8 acres, of which the commission reserved 62.12 acres for school, farm, and garden; 19.43 acres for cemetery and church; 164.75 acres for railroads, streets, and alleys; and 14.1 acres for the Takoma Land Company as per prior deed; and platted 338.4 acres into lots and blocks for sale.

Twenty thousand dollars ($20,000) was appropriated, afterwards increased to $35,500, for the expenses of the commission. This sum was to be reimbursed to the United States out of the proceeds of the sale of the agency tract.

Under the act of March 3, 1893 (*supra*), the amount received from sales of the agency tract, less the expenses and salaries of the commission, was placed in the Treasury to the credit of the Puyallup Band of Indians as a permanent school fund to be expended for their benefit, and under the act drew interest at the rate of 4% per annum, which interest also was to be expended annually for the benefit of the said Indians.

The proceeds of sales of the agency tract under the act of March 3, 1893, amounted to $302,585.82. This sum was augmented by miscellaneous receipts in the sum of $1,707.20 and by a transfer of $11,362.87 from another fund of the plaintiff Puyallup Tribe, thus making a total credit to the fund, denominated the "Puyallup 4% school fund" of $315,655.89.

By the act of June 21, 1906 (*supra*), the Secretary of the Interior was authorized to sell any tract or tracts of land **\*547** theretofore reserved for the Puyallup Indian School not then needed for school purposes, and to use the proceeds for the establishment of an industrial and manual training school for the Puyallup and allied tribes and bands of Indians at the site of the Puyallup Indian School.

The Puyallup School, above referred to, was established in 1857 on the Squaxin Island Reservation under the aforesaid treaty of Medicine Creek. It was transferred to the Puyallup

Reservation in 1861 and remained in operation until 1920, when it was discontinued. The name of the school was changed in 1910 to the Cushman Boarding School.

From the time of its establishment up to 1883 this school was maintained for the exclusive benefit of the tribes, parties to the treaty of Medicine Creek. Commencing in the year 1888 and continuing until the school was closed in 1920, children from tribes other than the Puyallup were admitted to and educated in the school. From July 1, 1883, to June 30, 1908, this school was supported exclusively by funds furnished gratuitously by the United States. From the latter date until the closing of the school in 1920, it was maintained in part from funds of the Puyallup tribe derived from the sales under the acts of March 3, 1893, and June 21, 1906, and in part out of gratuity appropriations made by the Congress, as follows:

**From July 1, 1883, to June 30, 1908:**

| | |
|---|---|
| Out of Government appropriations........................................... | $592,778.43 |

**From July 1, 1908, to the discontinuance of the school in 1920:**

| | |
|---|---|
| Out of Government appropriations....................................... | 608,343.76 |
| Out of Puyallup tribal funds.................................................. | 388,095.69 |
| Total...................................................................................... | 1,589,217.88 |

**\*\*12** Calculating from the available attendance statistics of the school, showing the total attendance and the tribal origin of the pupils, the average annual attendance of Puyallup children during the period from July 1, 1883, until 1908 was 45.46% of all the attendance.

During the period in which Puyallup funds were used to defray in part the cost of maintainance of the school, that **\*548** is, from July 1, 1908, to the closing of the school in 1920, the percentage of annual attendance of Puyallup pupils, calculated from the available statistics, was 19.16%. The total sum chargeable against the Indians under this item is $72,299.84.

XXI. When the Puyallup School was discontinued certain equipment formerly used therein was sold to the Salem and Tulalip Indian schools. To the Salem school the authorities sold equipment of the value of $27,250.13, and to Tulalip school equipment of the value of $6,096.50, making a total sum of $33,346.63. The plaintiffs are entitled to 19.16% of said total sum, i.e., $6,389.21, less $927.80 heretofore paid them, and a judgment will be awarded for the difference, $5,461.41.

XXII. Article II of the treaty of Point Elliott provided that there should be reserved "for the present use and occupation of the said tribes and bands" four certain tracts of land, as follows:

1. The amount of two sections, or 1,280 acres, surrounding the small bight at the head of Port Madison, called by the Indians Noo-sohk-um;

2. The amount of two sections, or 1,280 acres, on the north side Hwomish Bay, and the creek emptying into the same called Kwilt-seh-da;

3. The peninsula at the southeastern end of Perry's Island called Shais-quihl; and

4. The island called Chah-choo-sen, situated in the Lummi River at the point of separation of the mouths emptying respectively into Bellingham Bay and the Gulf of Georgia.

Article III provided for the reservation out of the lands ceded of-

"the amount of thirty-six sections, or one township of land, on the northeastern shore of Port Gardner, and north of the mouth of Snohomish River, including Tulalip Bay and the before-mentioned Kwilt-seh-da Creek, for the purpose

of establishing thereon an agricultural and industrial school, as hereinafter mentioned and agreed, and with a view of ultimately drawing thereto and settling thereon all the Indians living west of the Cascade Mountains in said Territory."

**\*549** The reservation of two sections at Port Madison, called the Port Madison Reservation, was duly made. It was enlarged by order of the Secretary of the Interior on October 21, 1864, and as enlarged contained 7,284 acres, or 6,004 acres more than was stipulated in the treaty.

The reservation of the peninsula at the southeastern end of Perry's Island, called Swinomish Reservation, was duly made and was subsequently enlarged by Executive order of September 9, 1873, the addition consisting of 59.75 acres. As thus enlarged the reservation contained 7,448.8 acres.

**\*\*13** The Island of Chah-choo-sen was duly reserved as provided and called the Lummi Reservation. By the Executive order of November 22, 1873, 820 acres of this island were excluded from the reservation and 2,170 acres on the mainland were added. Subsequently an additional two acres were purchased for the site of the school for the Indians of this reservation. The net gain in acreage of the reservation as a result of this Executive order and purchase was 1,352 acres. As thus enlarged the reservation consisted of 12,562.94 acres.

The reservation provided for in the third article of the treaty of 36 sections, called Tulalip or Snohomish Reservation, was duly set apart and consisted of 22,489.91 acres. As set apart it included or overlapped the reservation of two sections, or 1,280 acres, on Hwhomish Bay and Kwilt-seh-da Creek, thus making the net loss to the tribes amount to 1,830.09 acres.

As shown above the area of land to be reserved under the treaty amounted to:

|                                                              | Acres     |
| ------------------------------------------------------------ | --------- |
| 1. Reservation at Port Madison                               | 1,280     |
| 2. Reservation on Hwhomish Bay and Kwilt-seh-da Creek        | 1,280     |
| 3. Reservation on Perry's Island, which measured             | 7,381.05  |
| 4. The island of Chah-choo-sen, which measured               | 11,210.94 |
| 5. Reservation under article III of 36 sections, or          | 23,040    |
| Total acreage to be reserved                                 | 44,191.99 |

As laid out and as enlarged or diminished by subsequent executive orders, as above shown, four reservations were established as follows:

|                                                              | Acres     |
| ------------------------------------------------------------ | --------- |
| 1. Port Madison, consisting of                               | 7,284.00  |
| 2. Perry's or Swinomish Reservation, consisting of           | 7,448.80  |
| 3. Island of Chah-choo-sen or Lummi Reservation, consisting of | 12,562.94 |
| 4. Tulalip or Snohomish Reservation, consisting of           | 22,489.91 |
| Total acreage actually reserved                              | 49,785.65 |

**\*550**  making a net gain to the Indian tribes of 5,593.66 acres above the acreage of the reservations as stipulated in the treaty.

XXIII. As stated in finding XXII, article III of the treaty provided for the reservation of 36 sections of land at Port Gardner as the site for an agricultural and industrial school and "with a view of ultimately drawing thereto and settling thereon all the Indians living west of the Cascade Mountains in said Territory." The Indian population west of the Cascade Mountains at this time was estimated to be 7,559 souls.

Article VII of the treaty is as follows:

"The President may hereafter, when in his opinion the interests of the Territory shall require and the welfare of the said Indians be promoted, remove them from either or all of the special reservations hereinbefore made to the said general reservation, or such other suitable place within said Territory as he may deem fit, on remunerating them for their improvements and the expenses of such removal, or may consolidate them with other friendly tribes or bands; and he may further at his discretion cause the whole or any portion of the lands hereby reserved, or of such other land as may be selected in lieu thereof to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable. * * *"

**\*\*14**  Article VI of the treaty of March 16, 1854, with the Omahas referred to in the above article, provides as follows:

"The President may, from time to time, at his discretion, cause the whole or such portion of the land hereby reserved, as he may think proper, or of such other land as may be  **\*551** selected in lieu thereof, as provided for in article first, to be surveyed into lots, and to assign to such Indian or Indians of said tribe as are willing to avail of the privilege, and who will locate on the same as a permanent home, if a single person over twenty-one years of age, one-eighth of a section; to each family of two, one quarter section; to each family of three and not exceeding five, one-half section; to each family of six and not exceeding ten, one section; and to each family over ten in number, one-quarter section for every additional five members. And he may prescribe such rules and regulations as will insure to the family, in case of the death of the head thereof, the possession and enjoyment of such permanent

home and the improvements thereon. And the President may, at any time, in his discretion, after such person or family has made a location on the land assigned for a permanent home, issue a patent to such person or family for such assigned land, conditioned that the tract shall not be aliened or leased for a longer term than two years; and shall be exempt from levy, sale, or forfeiture, which conditions shall continue in force, until a State constitution, embracing such lands within its boundaries, shall have been formed, and the legislature of the State shall remove the restrictions.

"And if any such person or family shall at any time neglect or refuse to occupy and till a portion of the lands assigned and on which they have located, or shall rove from place to place, the President may, if the patent shall have been issued, cancel the assignment, and may also withhold from such person or family, their proportion of the annuities or other moneys due them, until they shall have returned to such permanent home, and resumed the pursuits of industry; and in default of their return the tract may be declared abandoned, and thereafter assigned to some other person or family of such tribe, or disposed of as is provided for the disposition of the excess of said land. And the residue of the land hereby reserved, or of that which may be selected in lieu thereof, after all of the Indian persons or families shall have had assigned to them permanent homes, may be sold for their benefit, under such laws, rules, or regulations, as may hereafter be prescribed by the Congress or President of the United States. No State legislature shall remove the restrictions herein provided for, without the consent of Congress." (10 Stat. 1043, 1044).

Of the Port Madison Reservation, 7,219 acres have been allotted to 51 Indians, leaving 65 acres unallotted.

 **\*552**  Of the Perry's Island or Swinomish Reservation, 7,359 acres have been allotted to 71 Indians, and 89.8 acres reserved for school purposes.

 **\*\*15**  Of the Lummi Reservation, 12,560.94 acres have been allotted to 109 Indians and 2 acres reserved for the school.

Of the Snohomish or Tulalip Reservation, 22,166 acres have been allotted to 164 Indians and 324 acres remain unallotted.

XXIV. In consideration of the cession by the four tribes, parties to the treaty of Point-no-Point concluded on January 26, 1855, and ratified on March 8, 1859, of all their right, title, and interest in and to the lands described in article I, the United States by article V agreed to pay to the Indian parties

in graduated payments covering a period of twenty years, the sum of $60,000, to be "applied to the use and benefit of the said Indians under the direction of the President of the United States, who may from time to time determine at his discretion upon what beneficial objects to expend the same."

By article VI the United States agreed to pay the sum of $6,000 "to enable the said Indians to remove to and settle upon their aforesaid reservations, and to clear, fence, and break up a sufficient quantity of land for cultivation."

By article XI the United States further agreed: "to establish at the general agency for the district of Puget's Sound, within one year from the ratification hereof, and to support for the period of twenty years, an agricultural and industrial school, to be free to children of the said tribes and bands in common with those of the other tribes of said district, and to provide a smithy and carpenter's shop, and furnish them with the necessary tools, and employ a blacksmith, carpenter, and farmer for the term of twenty years, to instruct the Indians in their respective occupations. And the United States further agree to employ a physician to reside at the said central agency, who shall furnish medicine and advice to the sick, and shall vaccinate them; the expenses of the said school, shops, persons employed, and medical attendance to be defrayed by the United States, and not deducted from the annuities."

 *553  In fulfillment of these stipulations, the Congress, commencing with the act of March 29, 1860, *supra,* and continuing for the full twenty-year period, appropriated a total sum of $206,200, $60,000 being for the purposes stipulated in article V, $6,000 for article VI, and $140,200 for article XI.

Of the amounts thus appropriated the total sum of $198,945.54 was expended for the benefit of tribes, parties to this treaty.

No claim is made on account of disbursements under article VI.

XXV. The United States endeavored to, but did not conclude or ratify treaties with the Upper Chehalis, the Muckleshoot, the Nooksack, the Chinook, and the San Juan Islands Indian Tribes. A large area of lands over which the above tribes roamed, and within portions of which they had their villages, was by acts of Congress thrown open as part of the public domain to white settlers and taken up by them. The precise extent of the area settled upon, as well as the location of the same within the boundaries of the lands claimed by the tribes

by right of occupancy, cannot be definitely determined from the record. Neither by act of Congress nor treaty were any one of the tribes given a delimited reservation for their occupancy, although public appropriations were from time to time made and disbursed for their benefit. The above tribes have no claim growing out of a treaty with the United States. A large portion of the areas claimed by some of the above tribes was included within land reserved under treaties to other tribes, or included within the boundaries of lands ceded to the United States by other tribes.

 **16  The habitat of the tribes, their relationship to the United States, and what was expended in their behalf, as well as the administration of their Indian affairs, appear in the findings as to each tribe.

XXVI. In the early fifties the various bands and tribes of Salish Indians living upon the Chehalis River and its affluents and on Grays Harbor in southwestern Washington were known collectively as the Chehalis Tribe and were divided  *554  into the Lower Chehalis, who lived generally on the Chehalis River below the Satsop River, and the Upper Chehalis, who inhabited the country on the Chehalis River above the Satsop. In 1855 the Upper Chehalis numbered 216.

In 1855 Governor Stevens attempted to negotiate a treaty with the Chinook, Chehalis, and other tribes living upon the Chehalis River and in southwestern Washington for the cession of their rights in that part of the territory lying to the south and west of the country theretofore ceded in the treaties of Medicine Creek, Point-no-Point, etc.

The treaty failed of consummation because of the opposition of the chief of the Chehalis, arising out of the refusal of Governor Stevens to agree that the reservations to be provided should be located in the Chehalis country and that the Chehalis chief should be the chief of all the tribes. No further effort to negotiate a treaty with the Chehalis Tribe appears ever to have been made.

Subsequently, in 1862, after various propositions made to the Indians by the Superintendent of Indian Affairs looking to their removal to other reservations had been rejected, the Indians expressed a willingness to relinquish all lands theretofore claimed by them provided that they were not removed and that a sufficient quantity of land be retained for them at the mouth of Black River. With their assent, the area then being occupied by them was reduced to about six sections, and the Superintendent of Indian Affairs reported to

the Commissioner of Indian Affairs his action in the matter and the willingness of the Indians to accept the reservation and relinquish their claims to other lands without entering into a formal treaty, and recommended that this arrangement be confirmed. The Superintendent's recommendation was submitted to the Secretary of the Interior on May 17, 1864, by the Commissioner of Indian Affairs with a recommendation for favorable action and was approved by the Secretary of the Interior on July 8, 1864.

As thus established the reservation consisted of 4,224.63 acres. By the Executive order of October 1, 1886 (1 Kapp. 903), 3,753.63 acres of the reservation were restored to the public domain for Indian homestead entry and 471 acres **\*555** set aside for school purposes. Thirty-six of the Indians upon the reservation made homestead selections covering all the land with the exception of the amount reserved for school purposes.

During the period from July 1, 1857, to June 30, 1929, the United States disbursed for the benefit of the Indians upon this reservation out of gratuity appropriations the total sum of $209,166.92.

**\*\*17** XXVII. Following a conference with the principal men of the Nisqually, Puyallup, and Snohomish Tribes in August 1856, Governor Stevens on December 5, 1856, recommended that the reservations for the Nisqually and Puyallup Tribes be enlarged and that a new reservation be established on Muckleshoot Prairie, then being occupied as a military station but about to be abandoned. The site of the new reservation lay within the country ceded to the United States by the parties to the treaty of Medicine Creek. This recommendation was approved by the President on January 20, 1857 (1 Kapp. 919). Subsequently, on April 9, 1874, the reservation thus established was given definite metes and bounds by Executive order of that date. As thus established the reservation consisted of 3,532.72 acres, all of which was subsequently allotted to Indians located thereon.

Shortly after its establishment about 300 Indians, consisting of Upper Puyallup or Tooahk, Nooscopes, S'Balahcos, and Green River and White River Indians, were located thereon.

The term "Green River Indians" was merely a geographical designation and included the bands of Indians residing upon that stream, otherwise known as the Skopamish, Skopabsh, or Skopeamish, and the Niskap, Neccope, Nescope, or Nooscope.

The term "White River Indians" was also merely a geographical designation and included the bands of Indians living upon that stream otherwise known as Klikitats, Niskaps, Skopamish, and Smulkamish.

The Skopamish, or Skopabsh, and its subordinate bands, the S'yi-lal-ko-absh and St-kabish or Sekamish were first assigned to the Port Madison Reservation, established, as **\*556** hereinbefore shown, under the treaty of Point Elliott, but upon the establishment of the Muckleshoot Reservation, were removed thereto.

The Smulkamish were also called S'Balahco, Smahl-kahmish, Smulcoe, or Sobal-ruck.

All of the Indians placed upon the Muckleshoot Reservation except the Muckleshoot tribe or band, were parties to the treaty of Point Elliott, the "Smahl-kamish", "Skope-ahmish", and "St-kah-mish" (or properly "Sekamish") as independent bands. By article I of this treaty the Indian parties thereto ceded, relinquished, and conveyed to the United States all their right, title, and interest in and to a certain described tract of country and also all their right, title and interest in and to any lands within the territory of the United States.

XXVIII. At and prior to the time of the treaties involved in this case, the Nooksack Tribe numbered approximately 450 individuals and inhabited that part of the Territory of Washington stretching from Bellingham Bay northeastwardly to Mount Baker within the area ceded to the United States by the tribes parties to the treaty of Point Elliott. The country to the north of them up to the international boundary was inhabited by a number of smaller tribes.

After the negotiation of the treaty of Point Elliott they were, with other tribes, placed under the charge of an agent and after the ratification of the treaty were placed under the charge of the agent for the Lummi Reservation and participated in the distribution of annuities under that treaty and in the distribution of gratuity appropriations made by the Congress for the benefit of the parties to the treaty of Point Elliott.

**\*\*18** XXIX. In the early days the Chinooks were living in the valley of the Columbia River, mostly on the north side, from The Dalles to the ocean. They were divided into the Upper Chinooks, who lived along the Columbia from The Dalles nearly to the mouth of the Cowlitz, and the Lower Chinooks, who formerly occupied the country bordering on

the Columbia from the mouth of the Cowlitz to the ocean. **\*557** By the early fifties, because of violent epidemics, they had become almost totally exterminated, the Lower Chinooks numbering only about 120, and the Upper Chinooks less than 250.

In 1851 the Superintendent of Indian Affairs for Oregon, under proper authorization negotiated thirteen treaties with the Indian tribes residing along the Columbia River in what is now Oregon and Washington, a number of them being with the bands of the Chinook Tribe who claimed the country along the Columbia River from Oak Point to the ocean and north to the country claimed by the Chehalis Tribe. These treaties were never ratified by the Senate of the United States and no further action taken with reference thereto by the Congress, except as detailed below.

Among the treaties referred to was one with the Waukikum (properly "Wahkiakum") Band of Chinook Tribe, concluded on August 8, 1851, by which the band ceded the country claimed by them to the United States, reserving to itself its "present place of residence." In consideration of this cession the treaty provided that the United States should pay to the Indian band a total sum of $7,000 in ten equal annual payments. The country ceded was described as-

"beginning at the mouth of a certain stream called Labacluthl, which empties into the north side of the Columbia River at the west end of Gray's Bay; running thence up and along the Columbia to the mouth of a certain stream called the Neuc-tuc-hae, which empties into the Columbia on the north side above Oak Point; thence northerly along said Neuc-tuc-hae to its headwaters; thence north to the summit of the highlands between the Columbia and Chehalees Rivers; thence following the summit of said highlands westerly to a point opposite or directly north of the headwaters of the said Labacluthl; thence south to said headwaters, and following said last-named stream to the place of beginning. The above description is intended to include all the lands claimed by the said band of Chinook Indians."

In a treaty concluded on the following day, August 9, 1851, the Wheelappa (properly "Willopah") Band of the Chinook Tribe ceded to the United States all the land owned or claimed by it, the treaty stating that the land intended to be ceded- **\*558** "is bounded on the north by lands owned by the Cheehales Tribe of Indians, on the east by lands of the Cowlitz Band of Indians, on the south by lands of the Waukikum and

Lower Bands of Chinooks, and on the west by the ocean and Shoalwater Bay."

In consideration of this cession the treaty provided that the United States should pay to the band an annuity of $500 for ten years.

**\*\*19** On the same day a treaty was concluded with the Lower Band of the Chinook Indians, by which the Indians ceded to the United States all the lands claimed by them, said lands being described as-

"beginning at the mouth of a certain stream entering Gray's Bay on the north side of the Columbia River, which stream forms the western boundary of lands ceded to the United States by the Waukikum Band of Chinooks; running thence northerly on said western boundary to lands of the Wheelappa Band of Indians; thence westerly along said lands of the Wheelappa Band to the Shoalwater Bay; thence southerly and easterly following the coast of the Pacific Ocean and the northern shore of the Columbia to the place of beginning. The above description is intended to embrace all the land owned or claimed by said Lower Band of Chinook Indians."

In consideration of this cession the treaty provided that the United States should pay the Indians an annuity of $2,000 for 10 years.

By an Executive Order of September 22, 1866 (1 Kapp. 924), a reservation of 335 acres was set apart for the remnants of the Chinook Bands and the Lower Chehalis.

By the act of Congress approved August 24, 1912, ch. 388, sec. 19 (37 Stat. 518, 535), it was provided:

"that there be paid to the \* \* \* Waukikum Band of Chinook Indians of Washington the sum of seven thousand dollars, to be apportioned among those now living and the lineal descendants of those who may be dead, by the Secretary of the Interior, as their respective rights may appear; that there be paid to the Wheelappa Band of Chinook Indians of Washington the sum of five thousand dollars, to be apportioned among those now living and the lineal descendants of those who may be dead, by the Secretary of the Interior, as their respective rights may appear; and that **\*559** there be paid to the Lower Band of Chinook Indians of Washington the sum of twenty thousand dollars, to be apportioned among those now living and the lineal descendants of those who may be dead, by the Secretary of

the Interior, as their respective rights may appear; and for this purpose there be, and is hereby, appropriated, out of any money in the Treasury not otherwise appropriated, the sum of sixty-six thousand dollars:

"*Provided,* That said Indians shall accept said sum, or their respective portions thereof, in full satisfaction of all demands or claims against the United States for the lands described in the agreements or unratified treaties between the United States and said Indians dated, respectively, * * * August eighth, eighteen hundred and fifty-one; August ninth, eighteen hundred and fifty-one; and August ninth, eighteen hundred and fifty-one: *Provided further,* That if, after investigation by the Secretary, he shall find that all of the Indians of either of said tribes or bands and their lineal descendants are dead, then none of the money hereby appropriated for such tribe or band shall be paid to any person for any purpose: *Provided further,* That the Secretary of the Interior shall find and investigate what attorney or attorneys, if any, have rendered services for or on behalf of said Indians, and shall fix a reasonable compensation to be paid said attorney or attorneys for their services in prosecuting the claims of said Indians hereunder, which compensation, if any, shall be paid out of the sum hereby appropriated, in full payment of services rendered; and the decision of the Secretary of the Interior with respect to the attorneys and their compensation shall be final and conclusive * * *.'"

 **20  Out of the appropriation thus made, and in accordance with its provisions, there was paid as attorneys' fees $12,900 and to the Indians belonging to the bands named in the act a total of $49,741.28, the balance, $3,358.72, being returned to the Treasury. Out of the payments to Indians, the surviving members of the Lower Chinooks received $14,837.36; the survivors of the Wheelappa Band received $3,833.33; and the survivors of the Waukikum Band received $5,600.

XXX. The group of islands known as the "San Juan Islands" lay within the boundary of the cession made by the tribes and bands, parties to the treaty of Point Elliott, concluded on January 22, 1855. The Indians inhabiting these islands at and prior to the time of the treaty were members of  *560 the Lummi and Samish Tribes. The Lummi Tribe was a party to the treaty of Point Elliott. The Samish Indians were also parties to the treaty and were on Guemas Island. Hutatchl was a former Lummi village on Orcas Island, and Lemaltcha and Stashum were formerly Lummi villages on Waldron Island; Swalash was a Lummi subdivision, formerly on Orcas Island; Nukhwhaiimikhl was a Samish village on Guemas Island; the

Klalakamish, an extinct band of the Lummis, resided on the east side of San Juan Island, showing that the tribes on the eastern shore of the Sound possessed territory on the islands. The islands were inhabited by Lummis.

It is doubtful if there has ever been a linguistic, racial, or ethnological entity known as the "San Juan Islands Tribe", or that there has ever been governmental recognition of a political entity of that designation.

XXXI. The jurisdictional act provides:

"That the court shall also consider and determine any legal or equitable defenses, set-offs, or counterclaims including gratuities which the United States may have against any of said tribes or bands."

XXXII. During the period from July 1, 1856, to June 30, 1929, the records of the General Accounting Office disclose that the United States, out of gratuity appropriations made by the Congress, expended a total of $112,715.53 for the benefit of the tribes and bands, parties to the treaty of Medicine Creek of December 26, 1854.

There were nine tribes and bands parties to the treaty of Medicine Creek. It is impossible now to determine the relative populations of these tribes and bands, and the estimates of population made prior to and shortly after the treaty vary considerably. The Nisqually, the Puyallup, and the Squaxin Tribes constituted more than one-half of the total number of Indians; the Nisquallys constituted approximately four-thirteenths of the whole number, and the Puyallup and Squaxin combined constituted approximately four-thirteenths of the whole. Six hundred and fifty Indians were present at the treaty councils, and the estimates of  *561 population give the population of the Nisquallys at approximately 200, the Puyallups at 100, and the Squaxins at 100. Four-thirteenths of said $112,715.53 is $34,681.68, and is the amount chargeable against the plaintiffs Puyallup and Squaxin Tribes as their proportionate share of these gratuities.

 **21  XXXIII. During the period from July 1, 1854, to June 30, 1929, the records of the General Accounting Office disclose that the United States, out of gratuity appropriations made by the Congress, expended a total of $1,712,608.77 for the benefit of the tribes and bands, parties to the treaty of Point Elliott of January 22, 1855.

XXXIV. During the period from July 1, 1860, to June 30, 1929, the records of the General Accounting Office disclose that the United States, out of gratuity appropriations made by the Congress, expended for the benefit of the tribes parties to the treaty of Point-no-Point of January 26, 1855, a total of $272,402.89.

There were four tribes party to the treaty of Point-no-Point. At the time of the treaty the S'Klallams (Clallam) numbered approximately 800, the Skokomish 200, the To-an-hooch (Twana) 265, and the Chem-kum (Chimakum) 75. The To-an-hooch, or Twana, was a branch of the Skokomish. The name Skokomish in the early days was frequently used to designate the two tribes and as now used includes the Twana. The Skokomish and To-an-hooch of the treaty comprised approximately one-third of the total number of Indians included in the treaty. One-third of said $272,402.89 is $90,800.96, and is the amount chargeable against the plaintiff Skokomish Tribe as its proportionate share of the gratuities.

XXXV. Prior to 1883, the tribes and bands, parties to the treaty of Medicine Creek, were under the supervision of the agent at the Puyallup and Nisqually Agency; the tribes and bands, parties to the treaty of Point-no-Point, were under the jurisdiction of the Skokomish Agency; and the tribes and bands, parties to the treaty of Point Elliott, were under the jurisdiction of the Tulalip Agency. Under **\*562** authority granted in the act of May 17, 1882 (22 Stat. 68, 88), these agencies were all placed under the supervision of one agent. This consolidation went into effect on July 1, 1882, and continued until July 1, 1883, when under the act of March 1, 1883 (22 Stat. 433, 451), the Tulalip Agency was reestablished and a new agency created under the name of the Nisqually and Skokomish Agency. This arrangement continued until June 30, 1888.

During this period from July 1, 1882, to June 30, 1888, the records of the General Accounting Office disclose that there was expended out of gratuity appropriations made by the Congress for the benefit of the Indians attached to this consolidated agency the total sum of $14,833.23.

The expenditure of this amount, based upon available population statistics chargeable against such tribes, is as follows:

| | |
|---|---:|
| Puyallup and Squaxin Tribes.......................................................... | $5,389.18 |
| Skokomish Tribe............................................................................... | 1,880.69 |
| Point Elliott Treaty Tribes................................................................ | 979.60 |

XXXVI. In 1888 the Quinaielt Agency was consolidated with the Nisqually and Skokomish Agency, and the combined agencies thereafter were known as the Puyallup Consolidated Agency. This arrangement continued until January 16, 1912, when the Muckleshoot Reservation was placed under the supervision of the agent at the Puyallup Consolidated Agency. In 1914, jurisdiction over the Quinaielt Agency was transferred to the Taholah Agency. The Puyallup Consolidated Agency was discontinued in 1920.

**\*\*22** During the period from July 1, 1888, to June 30, 1921, the records of the General Accounting Office disclose that there was expended for the benefit of the tribes and bands attached to the Puyallup Consolidated Agency, out of gratuity appropriations by the Congress, a total sum of $146,300.87.

The expenditure of this amount, based upon available population statistics, and chargeable against such tribes is as follows:

| | |
|---|---:|
| Puyallup and Squaxin Tribes...................................................... | $39,684.11 |
| Skokomish Tribe......................................................................... | 14,387.90 |
| Point Elliott Treaty Tribes.......................................................... | 3,298.51 |

**\*563**  XXXVII. During the period from July 1, 1907, to June 30, 1921, the day schools at various agencies were placed under the supervision of the Puyallup Consolidated Agency, as follows: From 1908 to 1911 and 1914 to 1920 the day schools at the Jamestown and Port Gamble Agencies, maintained for the Sklallam Tribe; the Skokomish, maintained for the Skokomish Tribe, from 1908 to 1918; the Taholah, maintained for the Quinaielt Tribe, from 1908 to 1914; the Chehalis, maintained for certain nontreaty tribes, during the years 1908, 1911, 1919, and 1920; and the Queets River Reservation day school during the years 1911 to 1914.

During this period there was expended through the Puyallup Consolidated Agency for the benefit of the day schools under its supervision, as above noted, out of gratuity appropriations made by the Congress, the total sum of $47,751.08.

The expenditure of this amount, based upon available population statistics, and chargeable against such tribes is as follows:

| | |
|---|---|
| Puyallup and Squaxin Tribes...................................................... | $14,162.47 |
| Skokomish Tribe......................................................................... | 5,952.23 |

XXXVIII. In 1920, upon the abolishment of the Puyallup Consolidated Agency, supervision of the tribes attached to that agency was transferred to the Taholah and Tulalip Agencies. The Skokomish, Chehalis, Nisqually, and Squaxin Island Reservations and the Chehalis Day School were placed under the Taholah Agency; and the Puyallup, Muckleshoot, and Klallam Reservations and the Jamestown and Port Gamble Day Schools were placed under the Tulalip Agency.

During the period from July 1, 1920, to June 30, 1929, there was expended for the benefit of the Indians attached to the Taholah Agency, out of gratuity appropriations made by the Congress, the total sum of $74,610.29.

The expenditure of this amount, based upon available population statistics and chargeable against such tribes, is as follows:

| | |
|---|---|
| Squaxin Tribe.......................................................................... | $3,575.39 |
| Skokomish Tribe...................................................................... | 11,854.47 |

**\*564**  XXXIX. During the period from July 1, 1920, to June 30, 1929, there was expended for the benefit of the Indians attached to the Tulalip Agency, out of gratuity appropriations by the Congress, the total sum of $110,148.95.

The expenditure of this amount, based upon available population statistics and chargeable against such tribes, is as follows:

| | |
|---|---|
| Puyallup Tribe.............................................................................. | $7,850.05 |
| Point Elliott Treaty Tribes............................................................ | 78,601.26 |

**\*\*23**  XL. Prior to the closing of the Cushman or Puyallup School in 1920, the Tulalip Boarding School, which had been established originally under the provisions of the treaty of Point Elliott, had been maintained for the benefit of the tribes and bands of Indians parties to that treaty. Upon the closing of the Puyallup School pupils from other tribes were admitted to the Tulalip Boarding School. From and after that date, to

wit, from July 1, 1920, to June 30, 1929, there was expended by the United States in the maintenance of this school, out of gratuity appropriations made by the Congress, the total sum of $504,776.42.

The following table shows the expenditure of this amount by fiscal years, the total attendance by years at the school,

as shown by the official records, and the average amount
expended per pupil per year:

| Fiscal year | Amount | Total attendance | Average expenditure per pupil |
|---|---|---|---|
| 1921..................... | $18,016.72 | 233 | $77.33 |
| 1922..................... | 60,072.50 | 218 | 275.56 |
| 1923..................... | 61,260.26 | 215 | 284.93 |
| 1924..................... | 57,547.73 | 273 | 210.79 |
| 1925..................... | 70,613.15 | 274 | 257.71 |
| 1926..................... | 62,191.03 | 234 | 265.77 |
| 1927..................... | $46,603.25 | 225 | $207.12 |
| 1928..................... | 60,073.54 | 244 | 246.20 |
| 1929..................... | 68,398.24 | 231 | 296.09 |
| Total..................... | 504,776.42 | | |

The following tables show the attendance by years by children of the Medicine Creek Treaty tribes, of the Point Elliott Treaty tribes, of the Point-no-Point Treaty tribes, and of the nontreaty tribes, and the amounts chargeable against such tribes on the basis shown in the table just above:

### *Medicine Creek treaty tribes (Puyallup and Squaxin)*

| Year | Number of pupils | Amount |
|---|---|---|
| 1921........................ | 1 | $77.33 |
| 1922........................ | 3 | 826.68 |
| 1923........................ | 5 | 1,424.65 |
| 1924........................ | 17 | 3,583.43 |
| 1925........................ | 17 | 4,381.07 |
| 1926........................ | 11 | 2,923.47 |
| 1927........................ | 3 | $621.36 |
| 1928........................ | 7 | 1,723.40 |
| 1929........................ | 7 | 2,072.63 |
| Total........................ | | 17,634.02 |

### *Point Elliott treaty tribes*

| Year | Number of pupils | Amount |
|---|---|---|
| 1921........................ | 229 | $17,708.57 |
| 1922........................ | 200 | 55,112.00 |
| 1923........................ | 182 | 51,857.26 |
| 1924........................ | 195 | 41,104.05 |
| 1925........................ | 182 | 46,903.22 |
| 1926........................ | 135 | 35,878.95 |
| 1927........................ | 145 | $30,032.30 |
| 1928........................ | 146 | 35,945.20 |
| 1929........................ | 142 | 42,044.78 |
| Total........................ | | 356,586.33 |

### *Point-no-Point treaty tribes (Skokomish)*

| Year | Number of pupils | Amount |
|---|---|---|
| 1921.......................... | 1 | $77.33 |
| 1922.......................... | 1 | 275.56 |
| 1923.......................... | 1 | 284.93 |
| 1925.......................... | 3 | 773.13 |
| 1926.......................... | 1 | 265.77 |
| 1927.......................... | 1 | $207.12 |
| 1929.......................... | 3 | 888.27 |
| Total.......................... | | 2,772.11 |

### *Nontreaty tribes*

| | Chehalis | | Chinook | |
|---|---|---|---|---|
| Year | Number of pupils | Amount | Number of pupils | Amount |
| 1924............... | 6 | $1,264.74 | | |

| | | | | |
|---|---|---|---|---|
| 1925................ | 9 | 2,319.39 | | |
| 1926................ | 3 | 797.31 | 4 | $1,063.08 |
| 1928................ | 2 | 492.40 | | |
| 1929................ | 5 | 1,480.45 | | |
| Total................ | | 6,354.29 | | 1,063.08 |

**24  *565  XLI. The act of March 3, 1891 (26 Stat. 851), commonly known as the "Indian Depredations Act", conferring power upon this court to adjudicate certain claims arising out of  *566  Indian depredations, provided in section 6 for the payment of judgments under the act out of funds of the United States in the event that the tribes implicated had no funds available to satisfy such judgments. If paid out of the funds of the United States, the section provided that the amounts paid should remain a charge against the defendant tribe, to be deducted from any fund which thereafter became due the tribe from the United States. The act was amended by the act of July 28, 1892 (27 Stat. 282, 319), which provided that the deductions from tribal funds in payment of judgments should be made in accordance with the discretion of the Secretary of the Interior. The records of the General Accounting Office disclose that judgments in the total sum of $12,157.05 in which the plaintiff Puyallup tribe was named as one of the defendants, have been paid out of funds of the United States and that no reimbursement therefor has ever been made. The amount chargeable against the plaintiff Puyallup tribe is as shown in the table below:

### *Judgments in Indian depredation cases*

| Year of payment | Amt. of judgment | Deft. tribes | Amt. chargeable against Puyallups |
|---|---|---|---|
| 1893...................... | $636.50 | Puyallup and Nisqually...... | ½ or $318.25 |
| 1893...................... | 1,116.50 | Puyallup and Nisqually...... | ½ or 558.25 |
| 1897...................... | 1,000.00 | Nisqually and Puyallup...... | ½ or 500.00 |
| 1898...................... | 2,160.50 | Puyallup and Nisqually...... | ½ or 1,080.25 |
| 1898...................... | 446.75 | Puyallup and Nisqually...... | ½ or 223.37 |
| 1899...................... | 916.80 | Puyallup, White River, and Klickitat............................ | # or 305.60 |
| 1899...................... | 3,241.00 | Nisqually, Puyallup, and White River...................... | # or 1,080.33 |
| 1901...................... | 1,575.00 | Puyallup and Nisqually...... | ½ or 787.50 |
| 1901...................... | 1,064.00 | White River, Puyallup, and Nisqually.......................... | # or 354.66 |

| | | |
|---|---|---|
| Total....................... | 12,157.05 | 5,208.21 |

XLII. The total set-offs against the Puyallup Indians, including an item set forth in finding XX of $72,299.84, amount to $141,133.82. The counterclaim against the Squaxin Tribe totals $59,351.11, or a total set-off against Medicine Creek Treaty claimants of $200,484.93.

XLIII. The total set-offs against Point Elliott Treaty claimants amount to $2,153,074.47.

XLIV. The total set-offs against the Point-no-Point Treaty claimants amount to $127,648.26.

 **\*567** XLV. There has been disbursed by the United States as gratuity payments the sum of $6,354.29 to the Chehalis Tribe and $1,063.08 to the Chinook Indians.

XLVI. The plaintiffs are entitled to a judgment under findings XI, XVI, and XXI of $71,496.45. The counterclaims of the United States exceed this amount and the petition will be dismissed.

The court decided that plaintiffs, on their petition, were entitled to recover $71,496.45, but that the defendant, on its counterclaim, was entitled to an amount in excess of this sum, and therefore that the petition should be dismissed.

**Opinion**

BOOTH, *Chief Justice,* delivered the opinion of the court:

 **\*\*25** The special jurisdictional act conferring jurisdiction upon this court to adjudicate this Indian case appears in 43 Stat. 886, ch. 214. Reference to this act will be frequently made hereafter and to quote it at present is not necessary.

The magnitude of this involved and complicated controversy is illustrated by the following facts: The special jurisdictional act was approved February 12, 1925. The plaintiffs' petition was filed August 21, 1926. The audit of the General Accounting Office was filed April 28, 1932. In 1927 the testimony of 155 witnesses was taken and later additional oral testimony was adduced. On August 1, 1932, plaintiffs' brief was filed, defendant's brief being filed May 22, 1933. On September 12, 1933, plaintiffs' reply brief was filed, and the case argued and submitted October 11, 1933.

The record is most voluminous, containing, aside from depositions noted, innumerable documentary and historical data and printed briefs of great proportions. The case itself involves the claims of nineteen Indian tribes or bands and over one hundred items, and is complicated by interlocking and separate controversies exacting minute examination of facts and law applicable thereto.

The plaintiff Indians in 1855 occupied an extensive area of lands west of the Cascade Mountains in what is now the State of Washington. Their tribal organization was broken up into numerous small bands, each possessing a distinct Indian name, and they were generally designated **\*568** as "Canoe Indians", i.e., they utilized the waters of and tributary to Puget Sound in pursuit of fish and in hunting for bear, beaver, and other fur-bearing animals, traversing a wide range of territory, and transporting their catch to their individual habitat in innumerable canoes.

The Indians as a rule were capable and industrious. They cleared sections of the dense forests for their villages, displayed inventive genius in fashioning needed tools for felling trees and building houses, and cultivated cleared spaces in raising potatoes and other vegetables. The precise acreage extent of lands claimed is not shown, and the boundaries of their individual villages are more or less conjectural. The total population of all the bands now suing probably does not exceed four thousand.

The rich and abundant timberlands of Washington directed emigration thereto as early as 1850, and even prior to this date a sedulous and persistent agitation prevailed to treat with the Indian occupants of the lands, delimit for them a separate reservation, and make available to the white settlers the surplus lands. The Government enlisted the services of Isaac I. Stevens, a distinguished and well-known citizen of the Territory, its Governor and ex-officio Superintendent of Indian Affairs at the time, to negotiate and if possible conclude treaties with the Indian tribes of the Territory looking toward the establishment of reservations and the cession of surplus lands.

What is known as the Medicine Creek Treaty was concluded with the Indians of Medicine Creek on December 26, 1854, ratified by the Senate March 3, 1855, and proclaimed by the President April 10, 1855 (10 Stat. 1132). Nine tribes or bands signed this treaty; two only, the Puyallup and Squaxin, are

parties plaintiff. Twenty-three tribes or bands signed a treaty at Point Elliott on January 22, 1855. This treaty was not ratified by the Senate until March 8, 1859, over four years later, being finally proclaimed by the President on April 11, 1859. Eleven of said tribes or bands to this treaty are parties plaintiff.

**\*\*26** The third and last treaty was signed at Point-no-Point by fourteen tribes or bands on January 26, 1855, ratified **\*569** March 8, 1859, and proclaimed April 29, 1859; but one of said tribes or bands, i.e., the Skokomish, is a party plaintiff. These fourteen tribes or bands are what are known and will hereafter be referred to as treaty claimants.

In addition to the treaty claimants the Upper Chehalis, Muckleshoot, Nooksack, Chinook, and San Juan Island Tribes, with whom no treaties were made, prefer a claim predicated upon an unlawful taking of their tribal lands by the Government and the granting of same to white settlers. The total sum sought by both the nontreaty and treaty claimants, as stated in the petition, is $73,365,416.00, reduced in the requested findings to $69,703,466.69. The defendant pleads a counterclaim sufficient in amount, if sustainable, to preclude a judgment for the plaintiffs in any event.

THE OREGON DONATION ACT OF
SEPTEMBER 27, 1850 (9 STAT. 496)

Seven treaty tribes or bands contend that prior to the execution of the treaties of 1855 the Government, by the enactment of the Oregon Donation Act, took from them certain areas of tribal lands for which no compensation has been paid. The Oregon Donation Act was a comprehensive measure designed to confer upon white settlers and American half-breed Indians title to lands in the territory described upon certain terms and conditions. A surveyor general was to be appointed and under his supervision the applicants could procure a patent to at least three hundred and not to exceed six hundred and forty acres of land.

The Duwamish, Lummi, Whidby Island Skagit, Samish, Snohomish, Puyallup, and Squaxin Tribes insist that a proven claim exists for payment at the rate of five dollars an acre for 64,965.24 acres patented to applicants under the Oregon Donation Act. It is established that portions of the lands occupied and roamed over by the plaintiff Indians were taken as claimed. The impediment to a recovery is not only confined to an impossibility of ascertaining with any degree of accuracy the extent of the loss suffered by each tribe, but to the additional fact that the boundaries of the tribes are incapable of being definitely or approximately **\*570** fixed so as to enable the Interior Department to ascertain what if any portion of the patented lands falls within the lands occupied by the respective tribes. Plaintiffs' counsel predicates this item in suit upon an asserted certainty that a map of the lands occupied by the Indians discloses the extent of the same. While we might definitely dispose of this contention by a finding without comment, the argument advanced is so often repeated, and it is so sedulously insisted that certainty is not exacted in view of the facts and circumstances of this case, that we cite the facts upon which we rest our findings and conclusion.

The map relied upon, known as exhibit A-3, is not an official or an ancient document; it was not made by surveyors. It was prepared about 1927 from other maps and from oral statements of elderly Indians, all of whom detail what they honestly considered the natural boundaries of their lands. The Interior Department, with these exhibits before it, made the report found in the record, stating "A glance at the map submitted, marked 'claimants' exhibit A-3', will show the impossibility of determining the boundaries in connection with the public land surveys." Therefore, it is apparent that the court may not invoke the legal rule that dispenses with evidential certainty in cases where the loss suffered may be ascertained upon a reasonable and logical basis. Unfortunately for the plaintiffs, the unsurveyed condition of their vast territory occupied by their great number of tribes and bands renders it impossible to fix the boundaries of their separate lands except upon oral evidence given many years after the lands had been vacated and under circumstances which preclude the award of a legal judgment for more than two millions of dollars.

**\*\*27** A careful and deliberate study of the record exhibits the necessity of basing the claimed loss upon an approximation which would of itself be simply a finding without a basis of fact. This we cannot do. The Supreme Court in *Mille Lac Indian case*, 229 U.S. 498, 500, said:

"The jurisdictional act makes no admission of liability, or of any ground of liability, on the part of the Government, but merely provides a forum for the adjudication of the claim according to applicable legal principles. Nor does it **\*571** contemplate that recovery may be founded upon any merely moral obligation, not expressed in pertinent treaties or statutes, or upon any interpretation of either that fails to give

effect to their plain import, because of any supposed injustice to the Indians."

The defendant challenges our jurisdiction to adjudicate any of plaintiffs' claims which arose prior to the execution of the treaties of 1855. The special act provides (43 Stat. 886):

"That all claims of whatsoever nature, both legal and equitable, of the tribes and bands of Indians, or any of them, except the S'Klallams, commonly known as the Clallams, with whom were made any of the treaties of Medicine Creek, dated December 26, 1854, Point Elliott, dated January 22, 1855, Point-no-Point, dated January 26, 1855, the Quin-ai-elts, dated May 8, 1859, growing out of said treaties, or any of them, and that all claims of whatever nature, both legal and equitable which the Muckelshoot, San Juan Islands Indians; Nook-Sack, Suattle, Chinook, Upper Chehalis, Lower Chehalis, and Humptulip Tribes or Bands of Indians, or any of them (with whom no treaty has been made), may have against the United States shall be submitted to the Court of Claims, with right of appeal by either party to the Supreme Court of the United States for determination and adjudication, both legal and equitable, and jurisdiction is hereby conferred upon the Court of Claims to hear and determine any and all suits brought hereunder and to render final judgment therein * * *."

The act, except as to nontreaty tribes, is limited to claims growing out of the three treaties mentioned, and omits a provision for a recovery of any sums growing out of acts of Congress. In the case of *Price v. United States and Osage Indians,* 174 U.S. 373, 375, the Supreme Court said:

"The right of the plaintiff to recover is a purely statutory right. The jurisdiction of the Court of Claims cannot be enlarged by implication. It matters not what may seem to this court equitable, or what obligation we may deem ought to be assumed by the Government, or the Indian tribe, whose members were guilty of this depredation, we cannot go beyond the language of the statute and impose a liability which the Government has not declared its willingness to assume. It is useless to cite all the authorities, for they are many, upon the proposition. It is an axiom of our jurisprudence. **\*572** The Government is not liable to suit unless it consents thereto, and its liability in suit cannot be extended beyond the plain language of the statute authorizing it. See, among other cases, *Schillinger* v. *United States,* 155 U.S. 163, 166, in which this court said: 'The United States cannot be sued in their courts without their consent, and in

granting such consent Congress has an absolute discretion to specify the cases and contingencies in which the liability of the Government is submitted to the courts for judicial determination. Beyond the letter of such consent the courts may not go, no matter how beneficial they may deem or in fact might be their possession of a larger jurisdiction over the liabilities of the Government.'DDDD'

**\*\*28** The plaintiffs traverse the jurisdictional contention of the defendant by citing section two of the special act. This language of the section is relied upon, viz:

"SEC. 2. That the Court of Claims shall advance the cause or causes upon its docket for hearing, and shall have authority to determine and adjudge all rights and claims, both legal and equitable, of said tribes or bands of Indians, or any of them, and of the United States in the premises, notwithstanding lapse of time or statutes of limitation."

Obviously this section is procedural; it is not the enabling clause of the act. It waives the limitation statute of six years and prescribes a rule of adjudication for the subject matter referred to in section one of the act. It was not intended as an enlargement of the jurisdiction of the court so as to include claims aside from those specifically mentioned.

### LANDS ALLEGED AS TAKEN FROM ALL THE TREATY TRIBES UNDER THE ACT OF MARCH 2, 1853 (10 STAT. 172)

This statute was enacted for the purpose of establishing a "Territorial Government of Washington." Section 20 is as follows:

"That when the lands in said Territory shall be surveyed under the direction of the Government of the United States, preparatory to bringing the same into market or otherwise disposing thereof, sections numbered sixteen and thirty-six in each township in said Territory shall be, and the same are hereby, reserved for the purpose of being applied to common schools in said Territory. And in all cases where **\*573** said sections sixteen and thirty-six, or either or any of them, shall be occupied by actual settlers prior to survey thereof, the county commissioners of the counties in which said sections so occupied as aforesaid are situated, be, and they are hereby, authorized to locate other lands to an equal amount in sections, or fractional sections, as the case may

be, within their respective counties, in lieu of said sections so occupied as aforesaid."

A judgment for the value of 383,461 acres is sought under this item, the contention being that all said lands were situated within the occupied areas of the fourteen tribes, plaintiffs in this suit, and "constituted a grant *in presenti* taking from the Indians one-eighteenth of all the land in the territory." What we have said with reference to the alleged takings under the Oregon Donation Act is applicable to this claim. It is utterly impossible from the record to find that 67,067 acres of this land were taken from the Upper Skagit Tribe; this acreage is manifestly obtained by a process of arithmetical computation which is demonstrably devoid of that degree of accuracy sufficient to convince a court sitting as a jury that the lands claimed fell within this tribe's occupied territory. No possible means exist by which the court may ascertain the landed boundaries of the Indian plaintiffs and award one tribe a judgment which may not do an inexcusable and palpable injustice to another. The fact that Indian tradition recognized natural formations as boundary lines and the Indians manifested a jealous protection of their claimed territorial rights, while available in some instances to fix certain tribal rights, will not warrant a finding of definite takings of land unsurveyed and undescribed, notwithstanding a belief that a portion of the lands taken may have fallen within the areas claimed by the tribes. The oral assent of the Indians as to the accuracy of their boundary lines given unanimously in 1926 and 1927 may not be accepted by the court as irrefutably correct in view of positive rules of evidence which preclude such a procedure. It is no reflection upon their veracity and no challenge to their intelligence when we say that this is a suit in court involving an adjudication of the reciprocal rights of the parties litigant upon principles of settled law. The **\*574** court is without jurisdiction to award a judgment or judgments upon any other basis. *Osage case (supra), Choctaw and Chickasaw Nation* v. *United States,* 75 C.Cls. 494.

### ALLEGED TAKINGS UNDER THE ACT OF JULY 17, 1854 (10 STAT. 305)

**\*\*29** The above statute provided in part as follows:

"That, in lieu of the two townships of land granted to the Territory of Oregon by the tenth section of the Act of eighteen hundred and fifty, for universities, there shall be reserved to each of the Territories of Washington and Oregon two townships of land of thirty-six sections each, to be selected in legal subdivisions, for university purposes, under the direction of the Legislatures of said Territories, respectively."

The Duwamish and Snoqualmie Tribes contend that 8,643.94 acres of lands occupied by them were taken for university purposes. For the reasons stated above, we think the claim is without merit.

### IMPROVEMENTS

Article VII of each of the treaties, Medicine Creek, Point Elliott, and Point-no-Point, contained the following language:

"Any substantial improvements heretofore made by any Indian, and which he shall be compelled to abandon in consequence of this treaty, shall be valued under the direction of the President and payment made accordingly therefor."

The parties plaintiff, fourteen in number, all of whom were parties to the treaties, ask a judgment for $2,236,334.50, the alleged value of substantial improvements abandoned by them when they removed to their respective reservations delimited in the treaties. The cause of action is predicated upon the Government's failure to either fix a value upon or pay any sum for the same.

Reliable Indian histories and oral testimony disclose the irrefutable fact that the Indian plaintiffs erected, and a large portion of the time lived in, substantial log houses. These dwellings varied in size and were almost uniformly designed to accommodate from one to five Indian families. **\*575** This was accomplished by their division into apartments by means of mats. The lodging quarters traversed the lower portion of the buildings, above which were extensive permanent shelves upon which their food and living necessities were stored. The buildings were heated by means of fires in the center thereof, the smoke escaping through an aperture directly above the fire. The center of the buildings, aside from adaptation for heating purposes, served as a lobby or a foyer where the occupants gathered for both social and educational purposes.

Available timber was abundant and the Indians exerting a great amount of personal labor took from the forests large quantities of cedar logs which constituted the main constructional element of their houses. Without a doubt these dwellings involved a vast amount of time and labor and served a distinct and important purpose in the comfortable

accommodation of the inhabitants of the numerous Indian villages. That they were abandoned and never paid for is not disputed.

The defendant resists a judgment upon the theory that the claims are individual and the special jurisdictional act precludes consideration of any other than tribal claims. The *Blackfeather case,* 37 C.Cls. 233, 🔖 190 U. S. 368, is cited as sustaining the defense. We think the defense untenable. The ownership of the dwellings may have been in individuals, and while the language of article VII is susceptible to the meaning given it by the defendant, nevertheless it is apparent from the nature of the transaction, the object to be accomplished, and the payment to be made, that the intention of the parties was to convert a possibly individual claim into a tribal one.

**30** The Government was securing a cession of lands improved by the individual efforts and industry of the Indians, and, in addition to the value thereof free from improvements, the clear intention of the parties was to fix a value upon all substantial ones and increase the compensation to the tribe accordingly. It is difficult to believe that the Government intended a detail survey as to value and title of property involved, and to search out the individuals for payment when the negotiations culminating in the treaties were conducted **576** with the tribes, and the primary object was to adjust and settle tribal affairs. The dwellings housed the members of the tribe and the treaty dealt with the tribe as such, and in the absence of more positive provisions to the contrary, we think the claims are tribal.

The plaintiffs present a record rested upon a great volume of oral testimony and supported to some extent by documentary proof as to the number and value of the dwellings abandoned. This record, it is said, has not been traversed by testimony on behalf of the defendant, and hence must be accepted. This enunciation of an inflexible rule as to the probative value of oral testimony is novel in the extreme, when it is apparent from the record that it was impossible for the Government to traverse it by positive statements as to a different number of dwelling houses.

An analysis of plaintiffs' oral testimony may form a basis for a judgment, but it, like all other oral statements, is subject to contradiction when it is disclosed on cross-examination and upon its own facts to be so decidedly at variance with the established *status quo* of the tribes as to abound in exaggeration and hearsay. We will not cite authorities to sustain the rule that the interest of witnesses in the outcome

of the litigation, and their relationship to the transaction involved, their opportunity for knowing what they state, their intelligence and candor in making statements, are all factors in giving weight to the testimony adduced. Applying these rules, the plaintiffs' testimony as to the precise number of dwellings is so obviously contrary to the basis given for the existence of the number stated, as well as the accommodation of the Indian population living therein, that it may not be accepted as entirely accurate.

The record furnishes a reasonable basis upon which the court can predicate a finding that an estimated number of dwellings were abandoned. It is shown what the average size of an Indian family was and the average number of families accommodated in each dwelling. Accepting a computation rested upon these figures and the given population of the Indian tribes in 1854, we think finding XI reflects what at least was the minimum loss suffered by the Indians in surrendering their dwellings.

**577** The plaintiffs claim a value of $900 for each dwelling. The claimed value must of necessity be predicated upon the labor of the Indians in erecting the same. The logs with which they were constructed were free of cost, near at hand, and plentiful, so that all that entered into the expense of their building was the labor, and this was supplied upon a communal basis. While the means of felling trees employed by the Indians now seem crude and inefficient, it is a fact that they served the purpose, and in an astonishingly short time the houses were completed. Considering all factors, we believe $250 each is sufficient to cover all expense, and judgment will be awarded as found in finding XI.

**31** The treaty tribes prosecuting this case ask for a large judgment for a failure of the Government to observe the alleged treaty obligation to allot to each of the Indians residing on the reservations delimited by the treaties eighty acres of land out of a general reservation to be established subsequent to the ratification of the treaties.

The liability asserted develops out of a similar article in each treaty, in part as follows:

"The President may hereafter, when in his opinion the interests of the territory shall require and the welfare of the said Indians be promoted remove them from either or all of the special reservations hereinbefore made to the said general reservation, or such other suitable place within said territory as he may deem fit, on remunerating them for their

improvements and the expenses of such removal, or may consolidate them with other friendly tribes or bands; and he may further at his discretion cause the whole or any portion of the lands hereby reserved, or of such other land as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, * * *.''

The sixth article of the Omaha Treaty provides in part as follows:

"The President may from time to time at his discretion cause the whole or such portion of the lands hereby reserved * * * to be surveyed into lots and to assign to **\*578** such Indian or Indians of said tribe as are willing to avail themselves of the privilege and who will locate on the same as a permanent home, if a single person over twenty-one years of age, one-eighth of a section; to each family of two, one-quarter of a section; to each family of three and not exceeding five, one-half section; and to each family of six and not exceeding ten, one section; and to each family over ten, one-quarter section for every additional five members" (10 Stat. 1043).

The three treaties of 1855, ratified and proclaimed as previously noted, delimited to the tribes mentioned a reservation. As to this fact there can be no doubt, and the language of the article quoted leaves no room for a contention that the question of establishing a general reservation at some future date was not left to the discretion of the President. It was not mandatory. No such reservation was ever established, and with the exception of allotments subsequently made to the Indians out of their final reservations, they never received an allotment of eighty acres of land as herein claimed.

Plaintiffs resort to contemporaneous events and assertions to prove that the representative of the Government assured them, and the Indians understood, that the reservations delimited under the 1855 treaties were but temporary and were to be followed later by permanent allotments of 80 acres each out of a general reservation of sufficient extent to accomplish this purpose, and that the word "may" in the article should be construed to mean "will."

**\*\*32** The meaning and binding force of the treaties, it is said, were interpreted to the Indians by the use of the "Chinook jargon language", a medium of communication

composed of a combination of the Indian, French, and English languages, embracing about three hundred words and employed generally by Indian traders, a language the tribes did not understand and the use of which led them into a belief that they were acquiring individual allotments under the treaties.

The numerous Indian tribes and bands involved, as the record shows, possessed no common language. Between them existed the instinctive Indian hostility towards each **\*579** other, and they were jealous of their autonomy. Preliminary legislation for the negotiation of the treaties, as well as instructions to the Government's representative commissioned to conclude them, clearly discloses that the object to be accomplished was the cession of their claimed rights of occupancy to a vast extent of territory to the Government, and the establishment of delimited reservations for them, with the hope that sometime in the future, when conditions warranted, a general reservation would be established and allotments thereon made to them. This procedure and the provisions of the treaties clearly reflect the then prevailing governmental Indian policy to convert the Indian population into agriculturists, bring about peaceable relations between the tribes, and eventually provide them with permanent farms of their own.

Why it was not done is not for the decision of the court. We are not at liberty to charge it to the Indian wars which prevailed from 1855 to 1857, or to any other cause. The issue is, "Did the treaty confer upon the Indians title to eighty acres of land in a general reservation the Government was bound to establish?" We think not. The court must accept the treaties as they were written, and no charge that they were obtained by misrepresentation or that plaintiffs' signatures were procured by sharp practice can be entertained.

The treaties did provide for delimited reservations and for the discretionary right of the President to alter the situation when in his judgment it should be done, and make permanent allotments upon the same terms and conditions as were provided in the Omaha Treaty out of a general reservation to be established in the future. This was the extent of the legal obligation assumed by the Government and beyond it we may not go. The precedents are many and explicit. *Old Settlers case,* 27 C.Cls. 1. In *Leighton's case,* 29 C.Cls. 288, 321, this court said:

"Even if the contention of the defendants is correct, the court cannot inquire into it (*Doe* v. *Braden,* 16 How. 657). * * *

When a treaty has been executed, and ratified by the Senate and proclaimed by the President, courts will presume **\*580** that such treaty was lawfully made. This question was passed upon in the case of 🏳️ *Fellows v. Blacksmith* (19 How. 366, 372), where it was said:

**\*\*33** "'An objection was taken on the argument to the validity of the treaty on the ground that the Tonawanda Band of the Seneca Indians were not represented by the chiefs and headmen of the band in the negotiations and execution of it. But the answer to this is that the treaty, after executed and ratified by the proper authorities of the Government, becomes the supreme law of the land, and the courts can no more go behind it for the purpose of annulling its effect and operation than they can behind an act of Congress." DDDD'

🚩 *Leased District case,* 34 C.Cls. 17; *The Amiable Isabella,* 6 Wheat. 1.

What we have said is not in conflict with the precedents establishing the rule that in the construction of Indian treaties the Indians, because of their political and natural status, are to receive the benefit of the doubt in giving effect to doubtful and ambiguous articles of the same. 🏳️ *Minnesota v. Hitchcock,* 185 U.S. 402.

In this instance we do not encounter the rule contended for by plaintiffs. Here we have a positive grant and cession, perhaps induced and coupled with a reserved discretionary right to alter the same upon the happening of certain events and conditions. It is not a positive obligation and obviously was not so intended, and the court is without jurisdiction to disregard its terms and read into it a word or words which would change its obligatory character.

## ANNUITIES-POINT ELLIOTT TREATY TRIBES

The Duwamish, Lummi, Suquamish, Upper Skagit, Kikiallus, Swinomish, Whidby Island Skagit, Samish, Stillaguamish, Snohomish, and Snoqualmie Tribes, parties to the above treaty, rely upon a nonobservance of article VI of the treaty for a recovery of one-eleventh each of the sum mentioned therein on the grounds that no substantial payments either in money or goods were made to any of said plaintiffs. The amount claimed is $13,636.33 for each of the tribes.

**\*581** Article VI of the treaty is in this language:

"In consideration of the above cession, the United States agree to pay to the said tribes and bands the sum of one hundred and fifty thousand dollars, in the following manner-that is to say: For the first year after the ratification hereof, fifteen thousand dollars; for the next two years, twelve thousand dollars each year; for the next three years, ten thousand dollars each year; for the next four years, seven thousand five hundred dollars each year; for the next five years, six thousand dollars each year; and for the last five years, four thousand two hundred and fifty dollars each year. All which said sums of money shall be applied to the use and benefit of the said Indians, under the direction of the President of the United States, who may from time to time determine at his discretion upon what beneficial objects to expend the same; and the Superintendent of Indian Affairs, or other proper officer, shall each year inform the President of the wishes of said Indians in respect thereto."

**\*\*34** There is a controversy in the record as to the correct number of plaintiffs. The defendant insists that the Whidby Island Skagits and the Upper Skagits constituted one band, the Skagit, and that the Samish Indians were a band of the Lummi Tribe. The plaintiffs, on the contrary, insist that the Samish Indians were a separate tribe and their signatures appear by the Samish chief signing the treaty under the name "Noo-wha-ha." Other chiefs are alleged to have signed for two bands, the remaining ones representing their own tribe. The controversy is difficult to correctly solve. If the plaintiffs are right, whatever recovery may be had is apportioned among eleven out of the total amount due. If the defendant prevails, the apportionment would be one twenty-third of the total sum due divided among nine instead of eleven claimants.

The controversy is not of easy solution. We think in view of the jurisdictional act the correct way to determine the fact is to resort to the treaty, 12 Stat. 927. The preamble of the treaty enumerates twenty-two bands or tribes, while the parties' signatures indicate a participation of twenty-three. The one defense relied upon is that the full amounts to be paid have been appropriated for and disbursed **\*582** in accord with the provisions of the treaty. The report of the General Accounting Office, itemized and exhaustively made, discloses that a total sum of $320,213.86 was disbursed over annual periods from 1861 to 1881. This report allocates to article VI of the treaty the sum of $172,243.80, which is manifestly in excess of the $150,000 annuities due. $13,340.02 is allocated to article XIII and $134,630.04 to articles XIV of the treaty.

The plaintiffs contend that the entire sum of $172,243.80 allocated to article VI of the treaty was paid and properly chargeable under article XIV of the treaty, which contains the following provisions:

"The United States further agree to establish at the general agency for the district of Puget's Sound, within one year from the ratification hereof, and to support for a period of twenty years, and agricultural and industrial school, to be free to children of the said tribes and bands in common with those of the other tribes of said district, and to provide the said school with a suitable instructor or instructors, and also to provide a smithy and carpenter's shop, and furnish them with the necessary tools, and employ a blacksmith, carpenter, and farmer for the like term of twenty years to instruct the Indians in their respective occupations. And the United States finally agree to employ a physician to reside at the said central agency, who shall furnish medicine and advice to their sick, and shall vaccinate them; the expenses of said school, shops, persons employed, and medical attendance to be defrayed by the United States, and not deducted from the annuities."

This article supplies the Indians with five distinct activities free of expense-the school, blacksmith shop and blacksmith, carpenter shop, carpenter and tools, a farmer, and a physician. While the school is to be free to the children of this and such other tribes as may avail themselves of it, the article does not charge the expense of subsistence and clothing to the Government. The complications which exist, and which the defendant concedes to exist and the General Accounting Office experienced, reside in the fact that definite information as to many of the early accounts is absent, and the allocation of the disbursements to specific articles of the treaty is in some instances doubtful.

**35  *583  Article VI applies the annuities to the "benefit of said Indians" as determined by the President, acting under information to be supplied him by the Superintendent of Indian Affairs. Clearly, the activities, the expense of which the Government assumed liability under article XIV, were for the benefit of the Indians, so that it is apparent that only those disbursements which inured to the general benefit of the Indians, aside from the specific ones mentioned in article XIV, are to be allocated to article VI.

Agricultural aid, implements and equipment, for which the sum of $16,405.88 was disbursed, are, we think, to be allocated to agricultural and industrial schools under article XIV. The counterclaim exhibits but $84.50 disbursed for

implements for the school. The Indians, when the treaties were proclaimed, were not expert farmers; they did cultivate the soil to a limited extent, but the development of a desire for farming as an occupation was foreign to their nature, and the free school was designed to cultivate an ambition of this sort by instructions in the art of employing modern implements in farming operations.

The sum of $1,146.21, medical attention and supplies, allocated to article VI, is clearly chargeable to article XIV.

A contention is advanced by plaintiffs that agency expenses, including cost and maintenance of building, as well as Indian interpreters, should be classed as administrative costs and not chargeable against the Indians' annuities. No article of the treaty mentions the same unless they fall within the general classification as beneficial to the Indians under article VI. The policy of establishing agencies to look after tribal affairs, whatever the results, was intended for their benefit. The authority conferred upon the Superintendent of the agency was directed towards a beneficial administration of the tribal estate and the welfare of its inhabitants, protect the Indians against exploitation and loss of property rights from designing traders, and advise the authorities at Washington as to the wisdom or inadvisability of proposed proceedings affecting their interest, and in the absence of a specific provision to the contrary, we think these expenses are properly allocable to article VI of the treaty.

*584  The item of pay of miscellaneous and skilled employees is a most troublesome one, as well as the expense of feeding livestock and supplying tools and materials for mills. It is evident that the annual sums to be disbursed under article VI, while designated annuities, were not to be prorated in cash among the Indians. The necessity for skilled and other employees does not appear. In the absence of definite information upon the subject, and in view of the general intent and purpose of the treaty in establishing an agricultural and industrial school for the purpose of instructing "the Indians in their respective occupations", we are inclined to the opinion that the expense incurred for the employees involved is not chargeable under article VI but under article XIV. Their employment for any other purpose would seem needless, and in addition to school instruction practical education in the field was essential. Tools and material for mills and the feeding and care of livestock we think come under article VI.

**36  Additional items of disbursements under article VI are specifically objected to, but we think that finding XVI

correctly allocates the expenditures. Article VI provided for a payment of $150,000 over a period of twenty years. During that period there was disbursed for the benefit of the Indians a total sum of $150,124.94, or $124.94 in excess of treaty stipulations. Article XIII of the treaty provided for the payment of $15,000 to defray the expenses of removal of the Indians to their new reservations; but $13,340.02 of this sum was so expended, leaving a balance due the Indians of $1,535.04, for which amount they are entitled to a judgment.

### ANNUITIES-MEDICINE CREEK TREATY TRIBES

The claims of the Medicine Creek Treaty plaintiffs for annuities are similar in all respects to the Point Elliott Treaty claims, and the facts with respect thereto are set forth in finding XVIII of the court from which it appears that, irrespective of misallocation of particular sums to particular purposes under certain articles of the treaty, the United States has appropriated and disbursed a sum more than sufficient to meet its obligations under the treaty.

### *585  ALLEGED LOSS OF LANDS BY OVERLAPPING OF RESERVATIONS DELIMITED TO POINT ELLIOTT TREATY TRIBES

The area of land granted to plaintiffs for their reservation totaled 44,191.99 acres. In delimiting under article III of the treaty a reservation of thirty-six sections called the Tulalip or Snohomish Reservation two sections of land included in the Tulalip Reservation overlapped the lands set aside in the Point Elliott Treaty, causing a loss of 1,830.09 acres to the tribes. Subsequently, by Executive orders, the treaty reservations were increased to 49,785.65 acres. Thus it is apparent that the Indians gained 5,593.66 acres. The plaintiffs in the reply brief make no objection to the facts as stated. The claim is without merit.

### LOSS DUE TO FAILURE TO MAINTAIN FOR THE TREATY TRIBES AN AGRICULTURAL AND INDUSTRIAL SCHOOL UNDER ARTICLE XIV OF THE POINT ELLIOTT TREATY

Article XIV of the treaty has been heretofore quoted. The Government agreed to establish an agricultural and industrial school at the general agency of Puget Sound, and to supply the Indians with a farmer, blacksmith, carpenter, and physician

for a period of twenty years. The school was to be free to the tribes and bands in common. The failure of the Government to observe these obligations, except in a most feeble way, is marked and irrefutable. Beyond a doubt it was the intention of the Government at the time the treaties were concluded to ultimately provide a general reservation for all the Indians west of the Cascade Mountains, and while the treaty left the future action of the Government to the discretion of the President, the assumed obligations to maintain a free school as mentioned, and to supply the blacksmith, carpenter, farmer, and physician, index unmistakably that a centralization of the tribes was the final object to be accomplished.

 **37  We say this because the Point Elliott Treaty was concluded with a large number of tribes and bands to whom four delimited reservations were set aside, and the educational facilities to be offered them were to be located at the *general agency* of Puget Sound in order to accommodate not  *586 only the children of the Point Elliott tribes and bands but the children of other tribes and bands. Granting the fact to be that in 1859 a small school was established, but not at Puget Sound, it was soon thereafter discontinued and not reopened until 1861, and it was not until 1867 that a semblance of real school was put in operation. Whether this school was an agricultural, industrial, or a general school is not shown. It was conducted by a learned Catholic priest, obviously established through the efforts and interest of a Catholic mission located in the vicinity. There is no reliable evidence in this record that an agricultural and industrial school was established until fifty years after the treaties were made. The annual expense incurred by the Government in conducting the school at intermittent periods provided for under article XIV of the treaty was $2,619.65, or a total expenditure, audited by the General Accounting Office for a period of twenty years, of $52,393.01. Both the facilities offered and the sums expended were decidedly insufficient to accommodate the children of the numerous tribes. Official reports confirm the fact that educational facilities of any sort were lamentably inadequate for the Indians, and never available to all of them. The record is positive and extensive as to these facts.

The plaintiffs claim a large sum in damages, $350,000 to each tribe. The court is confronted with the legal proposition that, given a plain failure to observe the treaty, by what process may it award damages? The survivors of the failure to obtain educational benefits intended are necessarily few and manifestly too advanced in age to now secure more than a sum of money. The claim is not for them alone but for the living members of the tribe. How may the court, sitting as a jury,

appraise the money value of the loss of educational facilities guaranteed to one?

The plaintiffs cite several authorities exemplifying the fundamental rule that when the Government fails in its contractual obligations it becomes liable for damages, and from them insist that the ascertainable costs of conducting schools of a similar character form a correct basis for estimating the extent of the injury. Quoting from *Baltimore* **\*587** *& Potomac Railroad Co. v. Fifth Baptist Church,* 108 U.S. 317, 335, the plaintiffs say the Supreme Court held "As with a blow on the face, there may be no arithmetical rule for the estimate of damages. There is, however, an injury, the extent of which the jury may measure." With the assailant and the assaulted present, coupled with proof of actual damages by way of loss of time, medical and other expenses, the jury does have a basis for a verdict. The case cited concerned a suit by a religious corporation against the railroad company for maintaining a nuisance, and the Supreme Court affirmed a verdict against the railroad company, predicated not only upon the depreciation in the value of the property of the plaintiff but upon the physical discomfort the nuisance occasioned and the loss in congregation, all of which tended to destroy the use of the church building for the purposes to which it was dedicated.

**\*\*38** We search the record in vain for any accurate estimate of the number of persons eligible and willing to attend the schools. In fact, there is some testimony that the parent Indians did not encourage their children to attend. The money value to be placed upon the extent to which the absence of schools impeded the civilization and intellectual development of the tribes must of necessity rest in conjecture without any substantial basis upon which to rest it. The real sufferers are the children of the Indians living in 1859 to 1879; the adults of this generation now living would recoup but a small sum, and the generation who came afterwards the larger part, when as a matter of fact the later generation was generously offered the advantages of education. There is no evidence in the record that the plaintiffs sent their children to other schools and thereby incurred expense. No proof is adduced that funds were expended in building schoolhouses or employing teachers to conduct schools. All the record discloses is as stated. The right which the Indian children lost, deplorable as it may be, was seemingly an intangible one, the right to an education denied them not only by the Government's failure but by the Indians' inability to supply it. This right we think is incapable of being estimated in dollars and cents. It is incontrovertible-Indian **\*588** history sustains the statement-

that in early times the Indian tribes were in no sense partial to schools upon their reservations. Their establishment was a feature of governmental policy, and while in this instance the Government signally failed to observe it, the court is powerless to award a money judgment for such failure, in the complete absence of a substantial basis of fact upon which to predicate it.

CLAIM OF MEDICINE CREEK TREATY PLAINTIFFS FOR FAILURE TO ESTABLISH AND MAINTAIN AGRICULTURAL AND INDUSTRIAL SCHOOLS

Article X of the Medicine Creek Treaty is in precisely the same language as article XIV of the Point Elliott Treaty. The same argument is advanced to sustain the claim as was urged in the case of the Point Elliott Treaty claimants. It is conceded by the Government that no general agency was established for these Indians on Puget Sound. The agency was established upon the Squaxin Reservation and a schoolhouse erected thereon, the school being later removed to the Puyallup Reservation. The two parties plaintiff under the Medicine Creek Treaty are the Puyallup and Squaxin Tribes. This treaty, unlike the Point Elliott and Point-No-Point ones, was ratified March 3, 1855, and the school to be established was to accommodate the children of not only the nine tribes signing the treaty but the children of the tribes signing the other two treaties. The total sum expended by the Government for educational purposes under article X of the treaty is $17,528.58. Of this amount $14,539.37 was for teachers' salaries, an annual average outlay of $726.96 to provide teachers for the children of these tribes, whose population, aside from additional children to be educated, was approximately 1,400 Indians. Whatever may have been the lamentable cause for the failure of the Government to observe its obligations and encourage education, it is manifest, we think, that nonobservance is completely established. A contradictory record of documentary reports emanating from a disinterested source discloses, on the one hand, an ardent desire upon the part of the Indians **\*589** for a school adequate in every particular and, upon the other, a disinclination to send their children to school. Nevertheless, as previously observed, it was in keeping with the spirit and intent of the treaty and in harmony with the Indian policy of the Government to maintain schools and encourage education. It was not done, but for reasons stated we are unable to award damages.

## CLAIMS OF POINT ELLIOTT AND MEDICINE CREEK TRIBES FOR FAILURE TO EMPLOY BLACKSMITH, CARPENTERS, FARMERS, AND PHYSICIANS

**\*\*39** The report of the General Accounting Office discloses a disbursement of $86,135.26 for the employment of the persons mentioned in article X of the Medicine Creek Treaty. For the same purposes the Government disbursed under article XIV of the Point Elliott Treaty $77,097.10, and while the services of the designated persons were not continuous as to either of the treaty tribes, they did continue for many years. The plaintiffs offer no proof establishing the expenditure of any definite sum of money caused by the absence of the above persons; no evidence whatever is offered. The plaintiffs' contention for a large judgment is rested exclusively upon proof of failure to keep the persons employed continuously, and the inadequacy of what was done to meet the necessities of the Indians in this respect due to a violation of treaty obligations to establish a general reservation for all the Indian tribes and remove them thereto.

It may well be and doubtless is true that scattered as the tribes were over an extensive territory, the employees mentioned in the articles of the treaties could not serve each one to the full limit of its necessities, and maybe in some instances not at all. The court, however, must take the treaties as written; we cannot under the jurisdictional act extend their provisions so as to embrace within their articles alleged injustices which resulted from the written contracts, when the same do not provide for numerous employees but for single persons. The amounts disbursed by the Government for the pay of these employees, i.e., carpenters **\*590** and farmers, were paid during the years 1863, 1864 to 1880, and for physicians, 1863, 1864, and 1866 to 1880.

The demonstration of the fact that the court cannot award a judgment upon the basis of what it cost the Government to employ the persons involved lies in the fact that the sums expended, as stated by the plaintiffs, served to procure their services for certain bands and tribes to the exclusion of others, and it is impossible to conclude, in view of the disparity in population, location of the Indians, and their varied necessities for such services, that the cost would have been uniform. The Lummi Indians were supplied a farmer for twenty years, but it does not follow that the other tribes needed the same services at the same cost, in the absence of some proof of their needs, or the expenditure of the funds of the Indians to procure the same.

In accord with article X of the Medicine Creek Treaty, a carpenter and blacksmith were employed for seventeen years, a farmer for eighteen years, and a physician for sixteen years. Basing a claim upon this proof, the plaintiffs contend for a judgment of $3,537 for each of the tribes for failure to furnish a physician for four years in the face of the fact that article X of the treaty does not obligate the Government to do more than furnish the named employees at the general agency on Puget Sound. Aside from the physician, who was to administer generally to the sick, the additional employees were supplementary to the school to be established at the agency. The extent of the injury occasioned the various tribes because of being unable to avail themselves of the services of these employees during the years they were not furnished, is not shown.

## REDUCTION OF PUYALLUP RESERVATION-FINDING XIX

**\*\*40** Article II of the Medicine Creek Treaty set aside as the Puyallup Reservation 1,280 acres of land "lying on the south side of Commencement Bay." The reservations delimited to the Indians, parties to the Medicine Creek Treaty, were found to be unsuitable as such, and under article VI of the treaty the President on January 20, 1857 (1 Kapp. Treaties 919, 920), by Executive order enlarged the same. **\*591** The actual addition made to the Puyallup Reservation was found upon survey to have been less in acreage than intended, and certain lands had been unintentionally excluded.

On September 6, 1873 (1 Kapp. Treaties, 922-923), the President, by Executive order, added to the reservation for the purpose of correcting the previous error all that portion of section 34 not theretofore included within the same. It was the express intention of the Government to delimit for the Indians a reservation so as to give to them a frontage upon the bay and thereby secure free ingress and egress to the waters of the bay for fishing, and the Executive order of 1873 gave them a mile of water frontage directly north of the Puyallup River. The plaintiffs now contend that a portion of this water frontage equal to 640.75 acres has been taken from them and for the same no compensation has been paid, due entirely to the fault and omissions of the Government to assert title to these shore lands against the State of Washington, the State having platted the same and added them to its tide land property, later permitting individuals and corporations to exercise ownership over them.

The controversy over the ownership of the shore lands, i.e., the acreage between high and low watermark, reached the Federal court, and Judge Hanford sitting in the then Circuit Court for the Western District of Washington, on April 19, 1909, handed down an exhaustive opinion wherein he confirmed the State's title to the shore lands as against the Indian claimants (170 Fed. 509). The Supreme Court declined to review the decision on the grounds of lack of jurisdiction (220 U. S. 604). The United States was a party to this suit as guardian and protector of the Indians and was represented by a Special Assistant Attorney General and a special attorney. Seemingly then the United States did all that could be done to protect the Indians in their claim of title to these lands. The decision pointed out the conflict between the grant set forth in the Executive order of the President and the State's claim of title. Resort having been had to the courts, and legal remedies exhausted, all that remained, so far as the Government was concerned, was congressional action, and obviously that was discretionary.

**\*592** Significant with regard to this claim is the fact that the Puyallup Reservation contained 18,062 acres and was eventually allotted to 167 Indians to the extent of 17,463 acres, the surplus lands being sold for the benefit of the Indians (27 Stat. 612, 633; 30 Stat. 62, 87; 34 Stat. 325). What we have said includes the entire acreage claimed by plaintiffs.

**\*\*41** It is true the jurisdictional act comprehends all claims arising out of treaties, and this particular claim does arise out of the treaty of Medicine Creek, but the claim to be allowable must be a legal or equitable one, and where the subject matter and the respective rights of the parties have been adjudicated we think the court is bound by the judgment and cannot redetermine the controversy under a special jurisdictional act. *Mille Lac Indian case, supra.*

ALLEGED MISUSE OF PUYALLUP SCHOOL FUNDS

The Puyallup Reservation of 18,062 acres of land proved sufficient in extent after allotments to produce not only surplus lands but individual allotments in excess of the allottees' necessities for a home. On March 3, 1893 (27 Stat. 612, 633), in the annual Indian appropriation bill chapter 209 was inserted. This chapter authorized the President to appoint three commissioners to appraise and sell all portions of the allottees' lands not needed for a home, and that portion of the agency tract, exclusive of the Indian burying ground and land, not needed for school purposes.

The act appropriated $20,000, afterwards increased to $35,500, for expenses of the commissioners, and contained a provision that the sums realized from the sale of the agency tract, less the expenses and salaries of the commissioners, were to be placed in the United States Treasury to the credit of the Indians as a permanent school fund to be expended for their benefit. The act also provided for the payment by the United States of interest on the sums deposited in the Treasury at the rate of four per centum per annum.

The plaintiffs' petition asserts that subsequent to the establishment of the Puyallup Boarding School not only the children of Puyallup Indians but children of other bands **\*593** and tribes attended and were educated there for the maintenance of which funds derived from the sale of Puyallup agency lands were expended. It is said in plaintiffs' request for a finding upon this issue that the average attendance of all children during the continuance of the school was 5,018, and the average attendance of children of other tribes was 3,115, leaving an average attendance of Puyallup children of 1,903, and upon this basis the amount expended by the United States and out of the Indian fund should be proportioned. Plaintiffs' calculation results in a claim for $216,238.63. In the brief of plaintiffs, filed subsequent to the report of the General Accounting Office, a different conclusion is reached. The issue is one of accounting.

The school fund created under the act of March 3, 1893, totaled $388,095.69. What was afterwards known as the Puyallup Boarding School was established in 1857, located then on the Squaxin Island Reservation; it was in the beginning quite inconsequential. In 1861 the school was transferred to the Puyallup Reservation and remained in operation until discontinued in 1920. In 1910 the name of the school was changed to the Cushman Boarding School. From July 1, 1883, to June 30, 1908, the school was maintained by Government funds exclusively, the expense being $592,778.43, and during this period the average attendance of Puyallup Indian children was 45.46%, the amount chargeable to the Puyallups under this computation being $269,477.07.

**\*\*42** From 1908 to 1920, during which time the Puyallups contributed to the maintenance of the school $388,095.69 and the United States $608,343.76, the average attendance of Puyallup Indian children was 19.16%. The amount therefore

chargeable to the Puyallup school fund is $190,917.80, i.e., 19.16% of $996,439.45. The amount chargeable against the Indians for both periods of time, that is, from 1883 to 1908 and from 1908 to 1920, totals $460,395.53. Of this amount the Indians contributed $388,095.69, leaving a difference in favor of the United States of $72,299.84.

The defendant suggests, without argument, that inasmuch as the average attendance of Puyallup children over the period from July 1, 1883, to 1920 was 37.75% of the whole **\*594** attendance, the contributions of the Puyallups failed by $385,605.53 to meet their proportionate part of the expense of maintenance. It is true that during the entire period of the existence of the school the total expense was $1,589,217.88, and of this amount the Puyallups contributed $388,095.69, or 24.42%, when their average attendance was 37.75%.

We think, however, that it is inequitable to charge the Puyallups on the basis of the average attendance of children over the entire period, i.e., from 1883 to 1920. From 1883 to 1908 the cost of the school to the United States was $592,778.43 and during this period when the Puyallups possessed no funds to contribute towards the upkeep of the school, and at a time previous to the sale of their lands to create a school fund, they should only be charged with a sum proportionate to the benefits received on the basis of the daily attendance of their children. This sum the plaintiffs seem to concede, i.e., $269,477.07. From 1883 to 1908 the attendance of Puyallup children attained its maximum and during this twenty-five-year period the contributions of the United States were much less than they were for the remaining twelve years, and to carry back to this period the average daily attendance of the Puyallup children and charge them accordingly is, we think, in keeping with the intention of the act which subsequently imposed upon the Indians a liability to contribute towards the maintenance of the school.

From 1908 to 1920, when the Indian fund became available, the Puyallup attendance decreased materially and the maintenance expense increased correspondingly. Apparently the school grew in importance; its facilities expanded, and the opportunities offered both the plaintiffs' and foreign Indian children were much enlarged. To add to the plaintiffs' proportionate share of this increased expense their proportionate share of the expense incurred, during a period when conditions were in no sense alike, is, we think, both inequitable and not in accord with the act which imposed the liability. Therefore, the total sum chargeable against the Indians upon this issue is $72,299.84. See finding XX.

**\*595** FAILURE TO ESTABLISH AND MAINTAIN AN AGRICULTURAL AND INDUSTRIAL SCHOOL UNDER ARTICLE XI OF POINT-NO-POINT TREATY

**\*\*43** The argument advanced to sustain this claim is the same as that urged to sustain a similar claim under the Point Elliott and Medicine Creek Treaties. Finding XXIV discloses the situation from the standpoint of facts, and what we have previously said as to the same issue applies here.

DISPOSAL OF PUYALLUP
INDIAN SCHOOL EQUIPMENT

After the discontinuance of the above school certain equipment and property used in the operation of the school were disposed of by order of the Commissioner of Indian Affairs. Many items of personalty were invoiced to the Tulalip and Salem Indian schools. The plaintiffs contend for a judgment for the entire amount stated in the invoices. The defendant contends that the articles purchased from funds appropriated by the United States should be excluded from allowance, leaving due the Indians the sums expended from their tribal funds in equipping the school.

The controversy, like the preceding one, is a matter of accounting. The defendant designates the funds of the United States used to purchase equipment as "gratuity funds." Why they are to be considered as gratuity funds is not clear. The money arose from appropriations by Congress and was spent in precisely the same way and for the same purpose; $996,439.45 was expended in maintaining the school from 1908 to 1920. During this same period of time the Indians expended for the same purpose $388,095.69, and have been charged with their proportionate part of maintenance expense. Just why either party insists upon allowances as set forth in the briefs is decidedly obscure.

We think the plaintiffs are entitled to a judgment on this item for the sum of $5,461.41. The property involved was acquired from 1908 to 1920 and funds of the Indians in the proportion heretofore stated were expended in its acquisition. The money due for its salvage value should be distributed **\*596** on the same basis, i.e., 19.16% of $33,346.63 is $6,389.21, less previous payment of $927.80, leaving a balance due the Indians as stated. For this amount the Indians are entitled to a judgment. This we think is accurate because the Indians

receive credit for the overpayment made by them from 1908 to 1920 upon the underpayments made from 1883 to 1908.

## CLAIM OF THE SKOKOMISH TRIBE UNDER POINT-NO-POINT TREATY-ANNUITIES

Article V of the Point-no-Point Treaty is in precisely the same language as article VI of the Point Elliott Treaty except as to the amount of the consideration to be paid the Indians for the cession of their lands. The Point-no-Point Treaty stipulated for the payment to the Indians of the total sum of $60,000, to be paid in fixed annual installments over a period of twenty years. The installments to be paid were to be "applied to the use and benefit of the said Indians under the direction of the Presidnet of the United States."

We have heretofore discussed on page 37 of this opinion the issue of annuities claimed as due under the Point Eliott Treaty, and the contentions now made by plaintiff are similar in all respects to those heretofore made.

 **44  The records of the General Accounting Office disclose a total disbursement under the various articles of the Point-no-Point Treaty of $198,945.54, extending over a period from 1861 to 1881, and while some of the items allocated to certain articles of the treaty, as we have previously found, should have been allocated to other articles, nevertheless the sums disbursed clearly exceed the sums due under the treaty, and the annuity claim must fail. See finding XXIV.

The oral testimony of many witnesses, declaring that as to them they received no annuities, was taken in 1926 and 1927, some five or six years previous to the coming in of the report of the General Accounting Office. It is doubtless true that certain tribes and bands received small, if any, allocation of supplies intended to be furnished under the treaties. This was due in some measure to their locations and the difficulties incident to their distribution. However,  *597  the fact that certain individuals did not benefit from the distribution and other tribes and bands were discriminated against is not, standing alone, sufficient to enable the court to find either the extent of their loss or the proportion of supplies they would have been entitled to receive.

The treaty did not specify any definite amount for each tribe and band, and the difference in population renders it impossible to allocate the same. The report of the General Accounting Office, replete in detail, discloses the sums disbursed and the items to which allocated. The plaintiffs do not and may not challenge the fact that the sums were appropriated by Congress and disbursed. The challenge to their accuracy goes only to their proper allocation, and the present record, as well as the record searched by the General Accounting Office, discloses in some instances a lack of information as to their allocation. Nevertheless, in the great majority of instances the report of the General Accounting Office is reliable. We cannot disregard it when as a matter of law the appropriations were made by Congress and disbursed through the established agencies of the Government.

## CLAIMS OF NONTREATY TRIBES

Five tribes, the Upper Chehalis, the Muckleshoot, the Nooksack, the Chinook, and the San Juan Island Indians, living in or adjoining the territory involved in this case, have never entered into a treaty with the United States. The defendant interposes a defense as to their claims, stated in the brief as follows:

"* * * the Government never having recognized that these tribes were the possessors of title in any degree to the land now claimed by them, they have no right thereto which can be litigated in this or any other court; that whether or not an Indian tribe has title to any particular section is dependent in the first instance upon sovereign recognition and that until that recognition has been accorded by the sovereign the entire matter rests in the realm of politics and is not determinable in a court of law or equity."

 **45  The issue thus presented, so far as cited precedents are available, has not heretofore been presented to the court. It is, we think, an important one, not to be ignored. The five  *598  tribes mentioned were not included in treaties because of dissatisfaction with proffered terms, and continued to reside upon certain lands and certain ones did receive contributions of funds from the Government. Their claim now is that a vast extent of territory to which they claimed Indian title has been allotted and disposed of to white settlers by the United States, contrary to the Indians' wishes, to their injury and loss of a large sum of money.

A review of the very early decisions of the Supreme Court, consistently followed, establishes beyond doubt the plenary and exclusive authority of the Government over Indian tribal lands and funds. The political department of the Government conceded to the Indian tribes a qualified land title to the

lands over which they roamed and upon which they lived, predicated upon the right of occupancy The tribal Indians could not dispose of the lands nor profit beyond their tribal necessities from their resources. The Government alone possessed the authority to ultimately direct the course of their disposal. This was accomplished at first in the familiar way of concluding treaties with what the Supreme Court designated as "dependent nations", and these instruments contained specific cessions of all the Indians' described and undescribed lands claimed by occupancy, and set aside to them described and ascertained territory for their reservations.

*Johnson* v. *McIntosh,* 8 Wheat. 543.

This Governmental policy of recognizing tribal rights and providing delimited lands for former nomadic and frequently hostile tribes, in an endeavor to promote peace and advance them in the pursuits of the whites, continued until 1871. The Indians as a tribe were vested with no right to sue the United States for the taking of their lands, until subsequent to the conclusion of treaties which fixed their landed domain, and only then by special jurisdictional acts of Congress in cases where allegations prevailed that treaty stipulations had not been observed, or acts of Congress had deprived them of lands included in their reservations. No case has been cited, and a diligent research reveals none, where tribal Indians have been recognized as *sui juris* entitled **\*599** to sue in the courts of the United States for the taking of lands claimed merely by the right of occupancy. It may not be contended that the right of the United States with respect to Indian tribal lands and funds is not supreme.

"No private individual", as said in the case of *Buttz* v. *Northern Pacific Railroad Co.,* 119 U.S. 55, 66, "could invade it, *and the manner, time, and conditions of its extinguishment were matters solely for the consideration of the Government, and are not open to contestation in the judicial tribunals.*" (Italics ours.)

**\*\*46** President Roosevelt, in a special message to Congress, transmitted May 10, 1934, Executive Document 179, 73d Congress, 2d session, vetoing a special jurisdictional act conferring on this court jurisdiction of an Indian case, the Turtle Mountain Band of Chippewa Indians of North Dakota, said:

"Section 4 of the bill opens the doors of the court to the institution of suits for individual losses or claims, something which the Congress has heretofore sedulously refused to do.

This section also empowers the court to entertain questions with reference to agreements and treaties which the courts have uniformly held are strictly political and not within the province of a court. Recognition of Indian title is a purely political matter and can be accorded solely by the sovereign. Section 4 of this act might fasten upon the United State's liability for the payment of the value of land which they had never recognized as belonging to these particular Indians solely because some official of the United States, minor or otherwise, had 'recognized' title and occupancy by long possession as being in these particular Indians."

The case of *Conley* v. *Ballinger,* 216 U.S. 84, so holds.

Tribal Indians claimed by right of occupancy such vast and unlimited areas of lands, encompassing in many instances the greater and better portions of what are now States of the Union, that had it ever been the political policy of the Government to accord them the same proprietary right that attaches to a title superior to that of occupancy, and open the courts to suits as and for their taking when thrown open to public settlement by the United States, Congress and the courts would have left open no doubts upon the subject.

**\*600** Indian special jurisdictional acts, of which there are many, exemplify the established rule that resort to the courts by tribal Indians has always been restricted to adjudication of treaty rights and losses suffered by acts of Congress with respect thereto. The cases are too numerous to cite. As said in

*Lone Wolf* v. *Hitchcock,* 187 U.S. 553, 568:

"In effect, the action of Congress now complained of was but an exercise of such power, a mere change in the form of investment of Indian tribal property, the property of those who, as we have held, were in substantial effect the wards of the Government. We must presume that Congress acted in perfect good faith in the dealings with the Indians of which complaint is made, and that the legislative branch of the Government exercised its best judgment in the premises. In any event, as Congress possessed full power in the matter, the judiciary cannot question or inquire into the motives which prompted the enactment of this legislation. If injury was occasioned, which we do not wish to be understood as implying, by the use made by Congress of its power, relief must be sought by an appeal to that body for redress and not to the courts. The legislation in question was constitutional, and the demurrer to the bill was therefore rightly sustained."

**\*\*47**  See also *Beecher* v. *Wetherby,* 95 U.S. 517; *United States* v. *Rogers,* 4 How. 567.

We are of the opinion that this court is without jurisdiction in a case between tribal Indians and the United States for the recovery of the alleged value of lands thrown open to public settlement by an act of Congress, in the absence of a treaty or an act of Congress recognizing the Indians' title by right of occupancy to the same. The special jurisdictional acts do not confer such jurisdiction (*Mille Lac Indian case, supra*), and the issue is a political and not a judicial one.

In addition to what has been said, the history and status of the tribes seemingly negative a right of recovery for lack of proof. The claim of the Upper Chehalis Tribe is for 614,400 acres of land at five dollars per acre. This acreage, it is said, is proven by a return of the Interior Department made in pursuance of a call from the court, based not upon an original document in the Indian Bureau **\*601** but in accord with a map supplied by the plaintiffs. No accurate record is offered as to the precise extent of territory inhabited by this and affiliated tribes, and this is due to the following state of facts:

It is always difficult, if not impossible, to delimit the acreage of lands claimed by tribal Indians by right of occupancy. There were various bands of Indians living upon the Chehalis River and its tributaries and on Grays Harbor in southwestern Washington. They were known as the Chehalis Tribe and included at least members of the Satsop, Humptulip, and other tribes, divided into what was known as Upper and Lower Chehalis Tribes, the Satsop River being the dividing line.

An effort was made in 1855 to conclude a treaty with all these Indians. It proved abortive because of a wish to have delimited for them a reservation which had been set aside to other Indians in the treaties of Medicine Creek and Point-no-Point. In 1859 the Superintendent of Indian Affairs for Washington Territory set apart a certain tract of land for a reservation for the Upper Chehalis and Cowlitz Tribes at the mouth of Black River. In 1862 this reservation was by mutual agreement reduced to about six sections of land, and a recommendation was forwarded to Washington for an affirmance of this agreement, and the Secretary of the Interior on July 8, 1864, approved the same. In Kappler's Indian Treaties, vol. 1, page 241, the details of this transaction are officially set forth. After a recitation of the claims of the Indians to their lands by right of occupancy and the manner of treatment accorded them, the Commissioner reports:

"After various propositions made to them by Superintendent Hale, looking to their removal and joint occupation of other Indian reservations, to all which they strenuously objected, they expressed a willingness to relinquish all the lands hitherto claimed by them, provided they shall not be removed, and provided that a sufficient quantity of land shall be retained by them at the mouth of the Black River as a reservation.

**\*\*48**  "The selection herein made in accordance with their wishes, and approved by Superintendent Hale, reduces the dimensions of their former claim to about six sections of **\*602** land, with which they are satisfied, and which selection has been submitted to this office for its approval. There seems one drawback only to this selection, and that is one private land claim-that of D. Mounts-which it is proposed to purchase. The price asked is $3,500, which he considers not unreasonable. (See his communication of March 30, 1863, and accompanying papers.)"

The reservation established consisted of 4,224.63 acres of land. The troublesome acreage of Mounts was to be purchased, and on October 1, 1886, President Cleveland, by an Executive order, restored 3,753.63 acres of the same to the public domain for Indian homestead entry and 471 acres were set aside for a school, and thereafter thirty-six of the Indians upon the reservation made homestead selections of all the lands except the school reservations. From July 1, 1857, to June 30, 1929, the Government appropriated for them the total sum of $209,166.92, which included $3,500 paid to Mounts for land within the reservation.

What the Chehalis Tribe complained of was the lack of a definite reservation to their liking and their removal to a location distasteful to them. When the events above detailed finally culminated in a settled arrangement the discontent disappeared. We cite these facts as disclosing the absence of any governmental recognition of Indian title to ascertainable territory claimed by them by right of occupancy, and no claim is now preferred of a divestment of title to reservation lands by the defendant. The plaintiffs state that no reservation was set aside for these Indians; and "that acting under the friendly advice of an agent, thirty-three Indians took up homesteads on their tribal domain." If this is the situation and the tribes in the past and up to the present have failed to receive political recognition from the Government and their right to any limited area of lands remains unrecognized, they remain in that status, for the correction of whatever inequalities or injustices prevail is for the determination

of Congress and not the courts. To the extent of granting homesteads to the Indians the Government has exercised its political prerogatives; beyond this Congress has not gone, and we are convinced that no monetary **\*603** liability exists because of an absence of such legislation. While we may well suppose that the Government would not intentionally take from Indian tribes their claimed tribal lands without compensation, established precedents hold that the authority to do so exists and until Congress grants lands to the Indians, either in treaties or acts of Congress and afterwards takes them, a special act worded as in the instant case confers upon this court no jurisdiction to award a judgment as herein claimed.

### THE MUCKLESHOOT TRIBE

The petition in stating the grounds of recovery for this tribe defines an area of land embracing approximately 491,520 acres, increased in the requested findings to 608,000 acres, lying in what are now King and Pierce Counties, Washington. Wth this tribe no treaty was made, and the judgment asked amounts to $3,047,000. In addition to a valuation of $5 per acre for the land, $7,000 is asked for improvements placed thereon.

**\*\*49** In 1856, following a period of hostility upon the part of the Indians, a council with them was held at Fox Island Reservation. The representatives of the Government, in order to allay discontent and do justice, offered to change and enlarge the treaty reservations of the Nisqually, Puyallup, and Snohomish Tribes. This was to be accomplished under article VI of the treaty which authorized the President to change the established reservations when in his opinion the welfare of the Indians required it.

On January 19, 1857, the Commissioner of Indian Affairs recommended the approval of the enlargement of the reservations and the purchase of private land claims within the same. There was to be an enlargement of the Puyallup Reservation, a change in location and enlargement of the Nisqually Reserve, and "the establishment of a new location, Muckleshoot Prairie", a former military station which was to be abandoned. President Pierce on January 20, 1857, approved the report (1 Kapp. Treaties, 919). On April 9, 1874, President Grant by Executive order delimited a described **\*604** acreage and "set apart" the same "as the Muckleshoot Indian Reservation, for the exclusive use of the Indians in

that locality, the same being supplemental to the action of the Department approved by the President January 20, 1857."

Without proceeding further in tedious detail with respect to the Muckleshoot Indian Reservation it is, we think, clear that the proceedings taken to locate the Indians upon the three reservations mentioned were taken in view of the articles of the treaty which authorized the same. No act of Congress established the reserves, and the Executive orders were in keeping with the working and intent of the treaty of 1855.

It is true the Executive order employs the term "Muckleshoot Reserve", but it is extremely doubtful if in so doing the President intended more than a designation of the location of the lands rather than the name of a tribe or band of Indians, and inasmuch as the reservations established emanated from the articles of the treaty of 1855, and that treaty contained a cession of all lands claimed by right of occupancy, this item in suit must be dismissed. In any event, the occupancy by the Muckleshoot Tribe of the reservation set apart by the Executive orders mentioned, which consisted of 3,532.72 acres, was accepted by the Indians living thereon and eventually allotted to them. From contemporaneous records, official in character, it induspustably appears that several tribes of Indians other than the so-called "Muckleshoots" inhabited what was known as the Muckleshoot Reservation, and that all of those placed upon the same were parties to the treaty of 1855.

Difficult as it has been to trace the genealogy of the Muckleshoots, it is from the record quite clear that at no time has the Government recognized its claimed right of occupancy to the vast acreage claimed. The Indian tribes and bands in this very region were segregated into small entities, their villages were scattered, and the domain over which they roamed shared by too many others to warrant the court in awarding a large money judgment in the absence of positive proof to sustain such a claim.

### **\*605** THE NOOKSACK TRIBE

**\*\*50** The petition as to this tribe describes an area of land located in what is now Whatcom and a portion of Skagit County, Washington. The claim is for approximately 498,080 acres of land alleged to have been occupied by the tribe, and the amount claimed is as for a taking thereof is $3,735,600.

The defendant insists that the Nooksack Indians were a subordinate band of the Lummi Tribe, and therefore were parties to the Point Elliott Treaty of 1855. If this fact is established they therein ceded to the United States all right, title, and interest in all their lands, except as to treaty reservations. The plaintiffs contest this fact and state that while it is true that some members of the Nooksack Tribe were present when the Point Elliott Treaty was signed, they were not the authorized representatives of the tribe and were without authority to bind it.

It is admitted that the lands now claimed for by the Nooksack Tribe are within the boundaries ceded to the United States by the Indian parties to the Point Elliott Treaty. To escape the consequences of this admission the plaintiffs contend that the two chiefs of all the bands authorized to speak for them were not present when the treaty was concluded and did not sign the same.

The documentary and historical evidence available is quite contradictory. There is no doubt that the Nooksack Tribe lived within the territory of the now State of Washington upon an area of land extending from Mt. Baker, in what is now Whatcom County, to the international boundary line. They were essentially mountain Indians, lived by the chase, and the contacts of Government officials with them disclose their aversion to inhabiting other than the mountain lands. There is no doubt that to the north of them other Indians had their habitat.

It is to be noted that no delimited reservation was ever set aside for these Indians; at least the plaintiffs' petition so states. There is no doubt that after the execution of the Point Elliott Treaty they were placed under the charge of an Indian agent, and after the ratification of the treaty  **\*606** came under the charge of the Indian agent for the Lummi Reservation, and participated in the distribution of benefits set forth in the treaty. The report of the Commissioner of Indian Affairs for the year 1877, page 198, states:

"The reservations provided for in the treaty [Point Elliott Treaty] were located in the vicinity of the most numerous and powerful tribes * * *. The Nugh-lemmy (Lummi) Tribe with its subordinate tribes, viz, Nugh-sahk [Nooksack], Sab-sh, No-ah-ha, and Swalash were assigned to the Lummi Reservation * * *."

We cite and discuss these details, abbreviated it is true, in order to disclose the obstacle in the way of definitely determining the exact status of the Indians and the relationship between them and the Government. In this instance we have a controversy of fact, the plaintiffs' insistence predicated upon what is obviously a failure of the Government to recognize the tribe's title by occupancy to a vast landed domain, and on behalf of the Government a contention that their history indicates beyond doubt that they were a part of the Lummi Tribe and hence concluded as to claims for occupied lands by the cession of the same in the articles of the Point Elliott Treaty.

 **\*\*51**  The Nooksacks were never a large tribe; they were as a rule peaceable and industrious, they cultivated the soil to some extent, and preferred the chase to fishing or exploiting the adjoining bays and streams as most of the so-called "Sound" Indians did. Why no treaty was made with them is not important in this case. Whatever may have been their original status, the Government's relationship with them appears as stated, and unfortunately for the tribe no governmental recognition of its claimed rights to occupancy of lands appears, and judgment may not be awarded.

In this connection it is apropos to state that the recognition by the Government of Indian title by occupancy is not established by proof of the innumerable contacts of the tribes with Indian agents in the administration of Indian affairs. The general policy of the Government, indexed in its gratuity appropriations, is not of itself a congressional action conferring upon the tribes a proprietary right in their occupied lands which may be asserted against the  **\*607** Government's alleged invasion, in the absence of a law granting the privilege.

A large acreage of land over which these various Indian tribes roamed and which has been in many instances segregated and generally described by Indian officials, historians, and others as their habitat, has been by acts of Congress thrown open to white settlers as a part of the public domain, and no payment made to the Indians therefor. As we have previously said, these great Indian domains have been acquired by the Government in times past by the conclusion of treaties wherein the consideration for the cession is expressly stated. At no time have the tribal Indians ever been free to challenge in a court the right of the Government to dispose of their occupied lands upon a basis of the rights guaranteed in the Constitution of the United States prohibiting the Government from taking the private property of its citizens for a public purpose without paying just compensation therefor.

The plaintiffs cite the act of June 5, 1850 (9 Stat. 437), wherein the President was authorized to appoint Commissioners to negotiate treaties with the Indian tribes of Washington and Oregon for the extinguishment of their claims to land west of the Cascade Mountains and making an appropriation of $25,000 to carry the same into execution. This act is of course an authorization to do what is provided therein, but the authority to act and the accomplishment of the purposes of the act are different.

Congress in enacting the statute was endeavoring to acquire by negotiation and compensation all the rights the Indians claimed in their lands. The treaties were the preliminary step; they depended for validity upon future ratification by the Senate, and while of course the Government knew the Indians were inhabitants of the lands, this legislation did not in any sense impose upon the Government a legal liability or interfere with whatever future policy the Government might choose to adopt in the event the conclusion of treaties failed. The legislation was designed in consonance with the Government's policy to deal justly with the Indians. It was not a surrender of its sovereign rights in the premises, but an observance of its established political **\*608** policy to consummate by agreement what might have been done by legislation. The Indians' right of occupancy has always been a cardinal principle of congressional legislation.

**\*\*52** What we mean is that the extent and value of the right are not to be determined by the courts until Congress by legislation speaks.

THE CHINOOK TRIBE AND BANDS OF INDIANS

The petition as to this tribe sets out by description a large tract of land bordering on the north of the Columbia River, embracing an acreage of approximately 714,240 acres, and for an alleged taking of this land the plaintiffs ask a judgment for $3,571,200. A motion to amend the petition, which is allowable under the rules of court, increases the acreage claimed to 822,000 and the amount claimed correspondingly.

A review of the Government's dealings with this tribe conclusively shows the claim to be without merit. The Superintendent of Indian Affairs for Oregon in 1851 negotiated thirteen treaties with all the Indian tribes then domiciled along the Columbia River, among them bands of the Chinook Tribe. These treaties were never ratified by the Senate.

One band of the Chinook Tribe, i.e., the Waukikum or Wahkiakum, signed a treaty on August 8, 1851, and therein ceded to the United States all the lands claimed by said band in consideration of the payment to them of $7,000 in ten annual installments. On August 9, 1851, the Wheelappa or Willopah Band of Chinooks in consideration of the payment of an annuity of $500 for ten years, ceded to the United States in a signed treaty all the lands claimed by them in this territory.

On the same day, i.e., August 9, 1851, the Lower Band of Chinook Indians signed a treaty ceding to the United States all the lands claimed by it for an annuity of $2,000 for a period of ten years. Later on, September 22, 1866 (1 Kapp. 924), a reservation of 335 acres was established by Executive order for the remnants of the Chinook bands and the Lower Chehalis Indians.

 **\*609** On August 24, 1912 (Ch. 388, Sec. 19, 37 Stat. 518, 535), an act of Congress was approved which we think it essential to quote:

"That there be paid to the \* \* \* of Waukikum Band of Chinook Indians of Washington the sum of seven thousand dollars, to be apportioned among those now living and the lineal descendants of those who may be dead, by the Secretary of the Interior, as their respective rights may appear; that there be paid to the Wheelappa Band of Chinook Indians of Washington the sum of five thousand dollars, to be apportioned among those now living and the lineal descendants of those who may be dead, by the Secretary of the Interior, as their respective rights may appear; and that there be paid to the Lower Band of Chinook Indians of Washington the sum of twenty thousand dollars to be apportioned among those now living and the lineal descendants of those who may be dead, by the Secretary of the Interior, as their respective rights may appear, and for this purpose there be, and is hereby, appropriated, out of any money in the Treasury not otherwise appropriated, the sum of sixty-six thousand dollars: *Provided,* That said Indians shall accept said sum, or their respective portions thereof, in full satisfaction of all demands or claims against the United States for the lands described in the agreements or unratified treaties between the United States and said Indians dated, respectively, \* \* \* August eighth, eighteen hundred and fifty-one; August ninth, eighteen hundred and fifty-one; and August ninth, eighteen hundred and fifty-one: *Provided further,* That if, after investigation by the Secretary, he shall find that all of the Indians of either of said tribes or bands and their

lineal descendants are dead, then none of the money hereby appropriated for such tribe or band shall be paid to any person for any purpose: *Provided further,* That the Secretary of the Interior shall find and investigate what attorney or attorneys, if any, have rendered services for or on behalf of said Indians, and shall fix a reasonable compensation to be paid said attorney or attorneys for their services in prosecuting the claims of said Indians hereunder, which compensation, if any, shall be paid out of the sum hereby appropriated in full payment of services rendered; and the decision of the Secretary of the Interior with respect to the attorneys and their compensation shall be final and conclusive * * *.''

 **53**  The attorneys' fees paid out of the above appropriation totaled $12,900, and to the Indians there was paid $49,741.28,  **610**  with $3,358.72 being returned to the Treasury. The Lower Chinooks received $14,837.36, the Wheelappa Band $3,833.33, and the Waukikum Band $5,600.

The facts recited are similar in import to those which caused the veto of the special jurisdictional act in behalf of the Turtle Mountain Band or Bands of Chippewa Indians of North Dakota, heretofore cited.


THE SAN JUAN ISLANDS TRIBE

The San Juan Island Indians claim a loss by governmental invasion of an area of land of approximately 113,920 acres, for which a judgment of $2,278,400 is asked. The controversy involving these Indians signally illustrates the inherent difficulty of resolving it definitely and accurately from a standpoint of fact. The defendant sets out documentary evidence that the San Juan Indians were a subordinate band of the Lummi and Samish Indian tribes, and as such bound by the treaty of Point Elliott to which the Lummi Tribe agreed. If this fact is established, the claim of the San Juans is determined by the articles of that treaty and their tribal lands were ceded to the United States.

The plaintiffs, on the other hand, resort to both documentary and oral testimony to contradict the defendant's contention, and claim that the San Juans inhabited and occupied all of the islands and lands of San Juan County, Washington.

The decision of the issue of fact is, if we are correct as to the status of the nontreaty Indians, unimportant. However, if we are not correct, the record does disclose such a preponderant doubt as to tribal status of these Indians that we would be unable to find that they constituted what was known as a separate and distinct Indian tribe, but acquired a name due more to location of their villages upon the San Juan Islands, in association with other tribes of the same locality, and it is not disputed that the San Juan Islands were within the territory ceded to the United States in the Point Elliott Treaty of 1855. We think the claim is without merit.


 **611**  COUNTERCLAIMS OF THE UNITED STATES

The jurisdictional act provides expressly for set-offs or counterclaims, including gratuities. Congress was unwilling to afford the plaintiffs a right to assert legal and equitable claims against the United States arising out of treaties, without asserting a corresponding right to set off against liabilities all legal and equitable defenses.

This court had occasion in the *Blackfeet Indian case,* No. E-427, decided December 4, 1933,[1] to discuss *in extenso* the issue of legal and equitable set-offs and counterclaims emanating from a special jurisdictional act worded precisely in this respect as the act in this case. In that case the court in discussing the issue, among other things, said:

"In this case the special act authorizes 'set-offs, or counterclaims, *including gratuities.*' No such language appears in the Fort Berthold act, and we are of the opinion that in this case it was the intent and purpose of Congress to charge the plaintiffs with all sums disbursed for their benefit over and above those provided for in treaty or other obligations."

 **54**  The plaintiffs' objections to the allowance of counterclaims are predicated mostly upon a contention that all sums charged to administrative expenses should be eliminated, and that the segregation of the plaintiffs from other Indians united under a single agency, is not possible upon the basis of a pro rata expenditure for all of the same. It is said by plaintiffs that large sums appropriated for the Indians were consumed in the payment of salaries and agency expenses, and little, if any amounts, left for the individual members of the tribes.

The report of the General Accounting Office discloses detail expenditures and the purposes for which the money was disbursed. It is true that there is room for doubt as to the allocation of certain funds to certain articles of the treaties, and if the disparity between the sums to which the Indians are entitled and the sums disbursed approached a point where

doubtful allocations would result benefically to the Indians, the plaintiffs' objections would be exceedingly forcible. However, with the exceptions noted in the findings, the appropriations for and the disbursements made by **612 the United States so greatly exceed the possibility of an injustice to the Indians in this respect that we feel the objections of the plaintiffs are untenable.

With numerous tribes and bands, some residing on treaty reservations and others on nontreaty lands, at one time attached to one Indian agency and at other times to another and different one, we know of no other way to apportion the benefits to all the Indians except upon a pro rata basis, predicated upon percentages of population. Congress made the appropriations; this fact is not open to dispute. The reports of the Indian agents and the files of the Interior Department were all available to the General Accounting Office, and in the face of this documentary evidence, in nowise contradicted except by oral statements of individual Indians that they did not receive what the treaties said they should receive, the court is bound to give effect to the complete audit of the affairs of the Indians from 1855 to date. True, we are not bound as to the proper allocation of the appropriations to certain articles of the treaties, but as to the amount appropriated and disbursed we accept it as accurate.

It is impossible to discuss in detail the multitude of controversial issues of fact involved in this complicated case. We have endeavored to disclose the facts in the findings. The one controversy of signal importance and upon which the issue of a very substantial judgment depends, is centered in the contention that the treaties of 1855 vested in the Indians, parties thereto, a right to an allotment of eighty acres of land in an enlarged and general reservation to be established for them. While of course other issues of importance are directly involved, they are more or less matters of accounting. The three involving legal questions are the grants of land to white settlers preceding the treaties, the construction and effect of the treaties, and the right of the nontreaty claimants to sue.

**55 The deductions pleaded on account of judgments awarded by this court under the Indian Depredations Act (26 Stat. 851) arise because the act prior to amendment made them payable out of tribal funds if available, and if not to be paid by direct appropriation by Congress. The act of July 28, 1892 (27 Stat. 282, 319), amended the foregoing statute, and judgments *613 in Indian depredation cases should be paid from tribal funds in accordance with the discretion of the Secretary of the Interior.

The Secretary of the Interior did not deduct from Puyallup Indian funds any amount for judgments awarded against the tribe. Whether the tribe possessed tribal funds in addition to sums due under treaty stipulations is not shown. All that appears is that no deductions for the judgments found were made by the Secretary from the annuities due the Indians under the treaty of 1855. We include the same in defendant's counterclaim under the theory that in the absence of some affirmative record from the Interior Department, some direct action with respect thereto, the act of our jurisdiction comprehends them as set-offs. The language of the jurisdictional act is broad and does, we think, intend a disclosure of all sums of money disbursed by the United States for or in behalf of the Indian claimants. The set-off is a legal one and not a gratuity.

The United States has appropriated and disbursed the total sum of $2,488,624.53 for the benefit of the plaintiffs. The question of the adequacy or inadequacy of this sum for the purposes intended is not a judicial one. The special jurisdictional act marks out the limits of the court's authority, and under our view of the case the petition must be dismissed. It is so ordered.

WHALEY, *Judge;* WILLIAMS, *Judge;* LITTLETON, *Judge;* and GREEN, *Judge,* concur.

**All Citations**

79 Ct.Cl. 530, 1934 WL 2033

## Footnotes

1    See final decision, April 8, 1935, on new trial, 81 C. Cls.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**1366   INVESTIGATION OF THE BUREAU OF INDIAN AFFAIRS**

TABLE K.—*Indian tribal governing bodies*

| Name of tribal governing body | Reservation and State | Title | Address in care of agency |
|---|---|---|---|
| Absentee-Shawnee Tribal Council. | Oklahoma............. | Chairman..... | Southern Plains Agency, Anadarko, Okla. |
| Alabama-Coushatta Tribal Council. | Ala.-Coushatta, Tex. | ....do...... | Do. |
| Alabama-Quassarte Creek Tribal Town. | Oklahoma............. | Chief...... | Five Civilized Tribes Agency, Muskogee, Okla. |
| Arapaho Business Council....... | Arapaho, Wyo..... | Chairman..... | Wind River Agency, Fort Washakie, Wyo. |
| Bad River Tribal Council....... | Bad River, Wis... | ....do...... | Great Lakes Agency, Ashland, Wis. |
| Bay Mills General Tribal Council. | Bay Mills, Mich.. | President. | Do. |
| Big Valley Rancheria Community Council. | Big Valley, Calif.. | Chairman..... | Sacramento Area Office, P. O. Box 749, Sacramento, Calif. |
| Blackfeet Tribal Business Council. | Blackfeet, Mont... | ....do...... | Blackfeet Agency, Browning, Mont. |
| Burns-Paiute Tribal Council.... | Burns, Oreg...... | ....do...... | Warm Springs Agency, Warm Springs, Oreg. |
| Caddo Tribal Council.......... | Oklahoma............ | ....do...... | Southern Plains Agency, Anadarko, Okla. |
| Camp Verde. (*See* Yavapai-Apache.) | | | |
| Catawba General Tribal Council. | Catawba, S. C.... | Chief..... | Cherokee Agency, Cherokee, N. C. |
| Chehalis Tribal Council....... | Chehalis, Wash... | Chairman..... | Western Washington Agency, Everett, Wash. |
| Cherokee Tribal Council (Eastern). | Cherokee, N. C... | Chief......... | Cherokee Agency, Cherokee, N. C. |
| Cherokee Nation (Oklahoma)... | Oklahoma.......... | Principal chief | Five Civilized Tribes Agency, Muskogee, Okla. |
| Cheyenne-Arapaho Business Council. | ....do............ | Chairman..... | Southern Plains Agency, Anadarko, Okla. |
| Cheyenne River Sioux Tribal Council. | Cheyenne River, S. Dak. | ....do...... | Cheyenne River Agency, Cheyenne Agency, S. Dak. |
| Chickasaw Nation............ | Oklahoma......... | Governor...... | Five Civilized Tribes Agency, Muskogee, Okla. |
| Chitimacha Tribal Council..... | Louisiana......... | Chairman...... | Choctaw Agency, Philadelphia, Miss. |
| Choctaw Nation (Oklahoma)... | Oklahoma......... | Principal chief | Five Civilized Tribes Agency, Muskogee, Okla. |
| Choctaw Tribal Council (Mississippi). | Choctaw, Miss... | Chairman...... | Choctaw Agency, Philadelphia, Miss. |
| Citizen Band of Potawatomi Council. | Oklahoma......... | ....do...... | Southern Plains Agency, Anadarko, Okla. |
| Cocopah Tribal Council........ | Cocopah, Ariz... | President..... | Colorado River Agency, Parker, Ariz. |
| Coeur d'Alene Tribal Council.. | Coeur d'Alene, Idaho. | Chairman..... | Northern Idaho Agency, Lapwai, Idaho. |
| Colorado River Tribal Council.. | Colorado River, Ariz. | ....do...... | Colorado River Agency, Parker, Ariz. |
| Colusa Indian Community Council. | Colusa, Calif..... | ....do...... | Sacramento Area Office, P. O. Box 749, Sacramento, Calif. |
| Colville Business Committee.... | Colville, Wash.... | ....do...... | Colville Agency, Nespelem, Wash. |
| Covelo Indian Community Council. | Covelo, Calif..... | President..... | Sacramento Area Office, P. O. Box 749, Sacramento, Calif. |
| Cow Creek Seminole Community Council. | Seminole, Fla..... | Head...... | Seminole Agency, Dania, Fla. |
| Creek Nation................ | Oklahoma......... | Principal chief. | Five Civilized Tribes Agency, Muskogee, Okla. |
| Crow Tribal Council.......... | Crow, Mont....... | Chairman...... | Crow Agency, Crow Agency, Mont. |
| Crow Creek Tribal Council..... | Crow Creek, S. Dak. | ....do...... | Crow Creek Agency, Fort Thompson, S. Dak. |
| Delaware Tribal Council....... | Oklahoma......... | President..... | Southern Plains Agency, Anadarko, Okla. |
| Dresslerville. (*See* Washoe.) | | | |
| Duck Valley. (*See* Shoshone-Paiute.) | | | |
| Duckwater Shoshone Tribal Council. | Duckwater, Nev.. | Chairman..... | Carson Agency, Stewart, Nev. |
| Duwamish Tribal Council..... | Washington........ | ....do...... | Western Washington Agency, Everett, Wash. |
| Eastern Shawnee Tribal Council. | Oklahoma......... | Chief...... | Five Civilized Tribes Agency, Muskogee, Okla. |
| Elwha Valley Tribal Council.... | Washington........ | Chairman..... | Western Washington Agency, Everett, Wash. |
| Fallon-Paiute Tribal Council... | Fallon, Nev....... | ....do...... | Carson Agency, Stewart, Nev. |
| Flandreau Santee-Sioux General Business Council. | Flandreau, S. Dak. | President..... | O/o Flandreau School, Flandreau, S. Dak. |
| Flathead (Confederated Salish and Kootenai). | Flathead, Mont... | Chairman..... | Flathead Agency, Dixon, Mont. |
| Forest County Potawatomi General Tribal Council. | Wisconsin......... | ....do...... | Great Lakes Agency, Ashland, Wis. |
| Fort Apache. (*See* White Mountain Apache.) | | | |

MATERIAL, LAWS, AND TREATIES AFFECTING INDIANS   **1367**

TABLE K.—*Indian tribal governing bodies*—Continued

| Name of tribal governing body | Reservation and State | Title | Address in care of agency |
|---|---|---|---|
| Fort Belknap Community Council. | Fort Belknap, Mont. | President | Fort Belknap Agency, Harlem, Mont. |
| Fort Berthold Tribal Business Council. | Fort Berthold, N. Dak. | Chairman | Fort Berthold Agency, Elbowoods, N. Dak. |
| Fort Bidwell General Community Council. | Fort Bidwell, Calif. | do | Sacramento Area Office, P. O. Box 749, Sacramento, Calif. |
| Fort Hall Business Council | Fort Hall, Idaho. | do | Fort Hall Agency, Fort Hall, Idaho. |
| Fort McDermitt Tribal Council. | Fort McDermitt, Nev. | do | Carson Agency, Stewart, Nev. |
| Fort McDowell. (*See* Mohave Apache.) | | | |
| Fort Peck Tribal Executive Board. | Fort Peck, Mont. | do | Fort Peck Agency, Poplar, Mont. |
| Fort Sill Apache Tribal Council. | Oklahoma | do | Southern Plains Agency, Anadarko, Okla. |
| Fort Totten Tribal Council | Devils Lake, N. Dak. | do | Turtle Mountain Consolidated Agency, Belcourt, N. Dak. |
| Gila River Pima-Maricopa Indian Community Council. | Gila River, Ariz. | do | Pima Agency, Sacaton, Ariz. |
| Goshute Business Council | Goshute, Utah | do | Western Shoshone Agency, Owyhee, Nev., via Elko, Nev. |
| Grand Ronde Business Committee. | Grand Ronde, Oreg. | do | C/o Portland Area Office, Swan Island Building 34, Portland 18, Oreg. |
| Hannahville Indian Community Council. | Michigan | do | Great Lakes Agency, Ashland, Wis. |
| Havasupai Tribal Council | Havasupai, Ariz. | do | Colorado River Agency, Parker, Ariz. |
| Hopi Tribal Council | Hopi, Ariz | do | Hopi Agency, Keams Canyon, Ariz. |
| Hopland Rancheria | California | do | Sacramento Area Office, P. O. Box 749, Sacramento, Calif. |
| Hoopa Valley Tribal Council | Hoopa Valley, Calif. | do | Do. |
| Hualapai Tribal Council | Hualapai, Ariz. | President | Colorado River Agency, Parker, Ariz. |
| Iowa (Kansas and Nebraska) Tribal Executive Committee. | Iowa, Kans. and Nebr. | Chairman | Southern Plains Agency, Anadarko, Okla. |
| Iowa (Oklahoma) Business Committee. | Oklahoma | do | Do. |
| Jamestown Indian Council | Washington | do | Western Washington Agency, Everett, Wash. |
| Jicarilla Apache Tribal Council. | Jicarilla, N. Mex. | do | Jicarilla Agency, Dulce, N. Mex. |
| Kaibab Tribal Council | Kaibab, Utah | do | Uintah and Ouray Agency, Fort Duchesne, Utah. |
| Kalispel Indian Community Council. | Kalispel, Wash. | do | Northern Idaho Agency, Lapwai, Idaho. |
| Kanosh Tribal Council | Kanosh, Utah | do | Uintah and Ouray Agency, Fort Duchesne, Utah. |
| Kaw Tribal Council | Oklahoma | do | Southern Plains Agency, Anadarko, Okla. |
| Keweenaw Bay Indian Tribal Council. | L'Anse, Mich. | President | Great Lakes Agency, Ashland, Wis. |
| Kialegee Creek Tribal Town | Oklahoma | Town King | Five Civilized Tribes Agency, Muskogee, Okla. |
| Kickapoo (Kansas) Tribal Council. | Kickapoo, Kans. | Chairman | Southern Plains Agency, Anadarko, Okla. |
| Kickapoo (Oklahoma) Tribal Council. | Oklahoma | do | Do. |
| Kiowa, Comanche, Apache Tribal Council. | do | do | Do. |
| Kootenai Tribal Executive Committee. | Kootenai, Idaho | do | Northern Idaho Agency, Lapwai, Idaho. |
| Klamath Business Committee | Klamath, Oreg. | President | Klamath Agency, Klamath Agency, Oreg. |
| Lac Courte Oreilles Tribal Council. | Lac Courte Oreilles, Wis. | Chairman | Great Lakes Agency, Ashland, Wis. |
| Lac du Flambeau Tribal Council. | Lac du Flambeau, Wis. | President | Do. |
| Lower Brule Sioux Tribal Council. | Lower Brule, S. Dak. | Chairman | Crow Creek Agency, Fort Thompson, S. Dak. |
| Community Council of Lower Sioux Indian Reservation. | Lower Sioux, Minn. | President | Minneapolis Area Office, Buzza Building, Room 250, 2908 Colfax Ave, South Minneapolis 8, Minn. |
| Lummi Tribal Council | Lummi, Wash. | Chairman | Western Washington Agency, Everett, Wash. |
| Makah Indian Tribal Council | Makah, Wash. | do | Do. |
| Manchester Community Council. | Manchester, Calif. | do | Sacramento Area Office, P. O. Box 749, Sacramento, Calif. |
| Menominee Advisory Council | Menominee, Wis. | do | Menominee Agency, Neopit, Wis. |
| Mescalero Tribal Business Committee. | Mescalero, N. Mex. | President | Mescalero Agency, Mescalero, N. Mex. |

1368   INVESTIGATION OF THE BUREAU OF INDIAN AFFAIRS

TABLE K.---*Indian tribal governing bodies*---Continued

| Name of tribal governing body | Reservation and State | Title | Address in care of agency |
|---|---|---|---|
| Miami Tribal Council | Oklahoma | Chief | Five Civilized Tribes Agency, Muskogee, Okla. |
| Minnesota Chippewa Tribal Executive Committee. | Bois Fort, Minn., Fond du Lac, Grand Portage, Leech Lake, White Earth. | President | Consolidated Chippewa Agency, Cass Lake, Minn. |
| Moapa Business Council | Moapa River, Nev. | Chairman | Colorado River, Parker, Ariz. |
| Mohave Apache Community Council. | Fort McDowell, Ariz. | President | Pima Agency, Sacaton, Ariz. |
| Mole Lake. (*See* Sakaogon Chippewa.) | | | |
| Muckleshoot Indian Tribal Council. | Muckleshoot, Wash. | Chairman | Western Washington Agency, Everett, Wash. |
| Nashero. (*See* Pawnee Business Council.) | | | |
| Navajo Tribal Council | Navajo, Ariz. and N. Mex. | do | Navajo Agency, Window Rock, Ariz. |
| The Tribal Council of the Northern Cheyenne. | Tongue River, Mont. | President | Northern Cheyenne Agency, Lame Deer, Mont. |
| Nez Perce Tribal Council | Nez Perce, Idaho | Chairman | Northern Idaho Agency, Lapwai, Idaho. |
| Nisqually Tribal Council | Nisqually, Wash. | do | Western Washington Agency Everett, Wash. |
| Nooksack Tribal Council | Washington | do | Do. |
| Oglala Sioux Tribal Council | Pine Ridge, S. Dak. | President | Pine Ridge Agency, Pine Ridge, S. Dak. |
| Omaha Tribal Council | Omaha, Nebr. | Chairman | Winnebago Agency, Winnebago, Nebr. |
| Oneida General Tribal Council | Oneida, Wis. | do | Great Lakes Agency, Ashland, Wis. |
| Osage Tribe | Osage, Okla. | Principal chief | Osage Agency, Pawhuska, Okla. |
| Otoe Tribal Council | Oklahoma | Chairman | Southern Plains Agency, Anadarko, Okla. |
| Ottawa Council | do | Chief | Five Civilized Tribes Agency, Muskogee, Okla.   m |
| Owens Valley Council | California | Chairman | Sacramento Area Office, P. O. Box 749, Sacramento, Calif. |
| Palm Springs | Palm Springs, Calif. | do | Do. |
| Papago Council | Gila Bend, Ariz., San Xavier, Sells. | do | Papago Agency, Sells, Ariz. |
| Pawnee Business Council | Oklahoma | President | Southern Plains Agency, Anadarko, Okla. |
| Peoria Council | do | Chief | Five Civilized Tribes Agency, Muskogee, Okla. |
| Pinoleville Community Council. | California | Trustee | Sacramento Area Office, P. O. Box 749, Sacramento, Calif. |
| Ponca Board of Governors (Nebraska). | Ponca, Nebr. | President | Winnebago Agency, Winnebago, Nebr. |
| Ponca Tribal Council (Oklahoma). | Oklahoma | Chairman | Southern Plains Agency, Anadarko, Okla. |
| Port Gamble Community Council. | Port Gamble, Wash. | do | Western Washington Agency, Everett, Wash. |
| Potawatomi (Prairie Band) Business Council. | Kansas | do | Southern Plains Agency, Anadarko, Okla. |
| Prairie Island Tribal Council | Prairie Island, Minn. | President | Minneapolis Area Office, Buzza Building, Room 250, 2908 Colfax Ave., South Minneapolis 8, Minn. |
| Puyallup Tribal Council | Puyallup, Wash. | Chairman | Western Washington Agency, Everett, Wash. |
| Pyramid Lake Paiute Tribal Council. | Pyramid Lake, Nev. | do | Carson Agency, Stewart, Nev. |
| Quapaw Tribal Business Committee. | Oklahoma | Chief | Five Civilized Tribes Agency, Muskogee, Okla. |
| Quartz Valley General Community Council. | Quartz Valley, Calif. | Chairman | Sacramento Area Office, P. O. Box 749, Sacramento, Calif. |
| Quechan Tribal Council | Fort Yuma, Calif. | President | Colorado River Agency, Parker, Ariz. |
| Quileute Tribal Council | Quileute, Wash. | Chairman | Western Washington Agency, Everett, Wash. |
| Quinaielt Tribal Council | do | do | Do. |
| Red Cliff Tribal Council | Red Cliff, Wis. | do | Great Lakes Agency, Ashland, Wis. |
| Red Lake General Council | Red Lake, Minn. | do | Red Lake Agency, Red Lake, Minn. |
| Reese River. (*See* Yomba.) | | | |
| Reno-Sparks Indian Council | Reno-Sparks, Nev. | do | Carson Agency, Stewart, Nev. |
| Rocky Boys' Business Committee. | Rocky Boys, Mont. | do | Fort Belknap Agency, Harlem, Mont. |

TABLE K.—*Indian tribal governing bodies*—Continued

| Name of tribal governing body | Reservation and State | Title | Address in care of agency |
|---|---|---|---|
| Rosebud Tribal Council | Rosebud, S. Dak. | President | Rosebud Agency, Rosebud, S. Dak. |
| Round Valley. (*See* Covelo.) | | | |
| Rumsey Farming Association | California | Chairman | Sacramento Area Office, P. O. Box 719, Sacramento, Calif. |
| Sac and Fox Tribal Council (Sac and Fox). | Sac and Fox, Iowa | do | Great Lakes Agency, Ashland, Wis. |
| Sac and Fox Tribal Council (Kansas and Nebraska). | Kansas and Nebraska. | do | Southern Plains Agency, Anadarko, Okla. |
| Sac and Fox Tribal Council (Oklahoma). | Oklahoma | do | Do. |
| Saginaw-Chippewa Tribal Council. | Isabella, Mich. | Chief | Great Lakes Agency, Ashland, Wis. |
| Salt River Pima-Maricopa Community Council. | Salt River, Ariz. | President | Pima Agency, Sacaton, Ariz. |
| San Carlos Tribal Council | San Carlos, Ariz. | Chairman | San Carlos Agency, San Carlos, Ariz. |
| Santee-Sioux Tribal Council | Santee, Nebr. | do | Winnebago Agency, Winnebago, Nebr. |
| Seminole Tribe (Florida) | Seminole, Fla. | Head | Seminole Agency, Dania, Fla. |
| Seminole Tribe (Oklahoma) | Oklahoma | Principal chief | Five Civilized Tribes Agency, Muskogee, Okla. |
| Seneca-Cayuga Tribal Business Committee. | do | Chief | Do. |
| Shivwits Business Council | Shivwits, Utah | Chairman | Uintah and Ouray, Fort Duchesne, Utah. |
| Shoshone Business Council (Wind River). | Shoshone, Wyo. | do | Wind River Agency, Fort Washakie, Wyo. |
| Shoshone Paiute Business Council. | Duck Valley, Nev. | do | Western Shoshone Agency, Owyhee, Nev., via Elko, Nev. |
| Sisseton-Wahpeton Tribal Council. | Sisseton, S. Dak. | do | Aberdeen Area Office, Bradbury Building, 820 South Main, Aberdeen, S. Dak. |
| Skagit Tribal Council | Washington | do | Western Washington Agency, Everett, Wash. |
| Skokomish Tribal Council | Skokomish, Wash. | do | Do. |
| Snoqualmie Tribal Council | Washington | do | Do. |
| Siletz Business Council | Siletz, Oreg. | do | Portland Area Office, Swan Island Building 34, Portland 18, Oreg. |
| Sokaogon Chippewa Tribal Council. | Mole Lake, Wis. | do | Great Lakes Agency, Ashland, Wis. |
| Southern Oregon Indian Business Council. | Oregon | do | Portland Area Office, Swan Island Building 34, Portland 18, Oreg. |
| Southern Ute Tribal Council | Southern Ute, Colo. | do | Consolidated Ute Agency, Ignatio, Colo. |
| Spokane Business Council | Spokane, Wash. | do | Colville Agency, Nespelem, Wash. |
| Standing Rock Tribal Business Council. | Standing Rock, N. Dak. and S. Dak. | do | Standing Rock Agency, Fort Yates, N. Dak. |
| St. Croix Business Council | St. Croix, Wis. | President | Great Lakes Agency, Ashland, Wis. |
| Stewarts Point Rancheria Community Council. | California | Chairman | Sacramento Area Office, Post Office Box 749, Sacramento, Calif. |
| Stockbridge-Munsee Tribal Council. | Wisconsin | President | Great Lakes Agency, Ashland, Wis. |
| Suiattle Tribal Council | Washington | Chairman | Western Washington Agency, Everett, Wash. |
| Summit Lake Paiute Shoshone Board of Trustees. | Summit Lake, Calif. | do | Carson Agency, Stewart, Nev. |
| Suquamish Tribal Council | Washington | do | Western Washington Agency, Everett, Wash. |
| Swinomish Indian Senate | Swinomish, Wash. | do | Do. |
| Tamiami Seminole Council | Florida | Head | Seminole Agency, Dania, Fla. |
| Te-Moak Western Shoshone Council. | Nevada | Chief | Western Shoshone Agency, Owyhee, Nev., via Elko, Nev. |
| Thlopthlocco Creek Tribal Town. | Oklahoma | Town King | Five Civilized Tribes Agency, Muskogee, Okla. |
| Tonkawa Tribal Committee | do | President | Southern Plains Agency, Anadarko, Okla. |
| Tulalip Board of Directors | Tulalip, Wash. | Chairman | Western Washington Agency, Everett, Wash. |
| Tule River Tribal Council | Tule River, Calif. | do | Sacramento Area Office, P. O. Box 749, Sacramento, Calif. |
| Tuolumne Rancheria Community Council. | California | do | Do. |
| Turtle Mountain Advisory Committee. | Turtle Mountain, N. Dak. | do | Turtle Mountain Agency, Belcourt, N. Dak. |
| Uintah and Ouray Tribal Business Committee. | Uintah and Ouray, Utah. | do | Uintah and Ouray Agency, Fort Duchesne, Utah. |
| Umatilla Tribal Business Committee. | Umatilla, Oreg. | do | Umatilla Agency, Pendleton, Oreg. |
| United Keetoowah Band of Cherokee Indians. | Oklahoma | President | Five Civilized Tribes Agency, Muskogee, Okla. |

1370   INVESTIGATION OF THE BUREAU OF INDIAN AFFAIRS

TABLE K.—*Indian tribal governing bodies*—Continued

| Name of tribal governing body | Reservation and State | Title | Address in care of agency |
|---|---|---|---|
| United Pueblos (All Pueblo) Council. | New Mexico | Chairman | United Pueblos Agency, Post Office Box 1346, Albuquerque, N. Mex. |
| Individual pueblos: | | | |
| Acoma | do | Governor | Do. |
| Cochiti | do | do | Do. |
| Isleta | do | do | Do. |
| Jemez | do | do | Do. |
| Laguna | do | do | Do. |
| Nambe | do | do | Do. |
| Pojoaque | do | do | Do. |
| Santa Ana | do | do | Do. |
| Santa Clara | do | do | Do. |
| San Felipe | do | do | Do. |
| San Ildefonso | do | do | Do. |
| San Juan | do | do | Do. |
| San Lorenzo (formerly Picuris). | do | do | Do. |
| Sandia | do | do | Do. |
| Santo Domingo | do | do | Do. |
| Sia | do | do | Do. |
| Taos | do | do | Do. |
| Tesuque | do | do | Do. |
| Zuni | do | do | Do. |
| Upper Lake Executive Committee. | California | Chairman | Sacramento Area Office, P. O. Box 749, Sacramento, Calif. |
| Ute Mountain Tribal Council | Ute Mountain, Colo. | do | Consolidated Ute Agency, Ignacio, Colo. |
| Walker River Paiute Tribal Council. | Walker River, Nev. | do | Carson Agency, Stewart, Nev. |
| Warm Springs Tribal Council | Warm Springs, Oreg. | do | Warm Springs Agency, Warm Springs, Oreg. |
| Washoe Tribal Council | California and Nevada. | do | Carson Agency, Stewart, Nev. |
| White Mountain Apache Tribal Council. | Fort Apache, Ariz. | do | Fort Apache Agency, Whiteriver, Ariz. |
| Wichita Tribal Business Committee. | Oklahoma | do | Southern Plains Agency, Anadarko, Okla. |
| Wilton Rancheria Community Council. | California | do | Sacramento Area Office, P. O. Box 749, Sacramento, Calif. |
| Wind River. (*See* Arapaho and Shoshone.) | | | |
| Winnebago Tribal Council | Winnebago, Nebr. | do | Winnebago Agency, Winnebago, Nebr. |
| Wyandotte Tribal Business Committee. | Oklahoma | Chief | Five Civilized Tribes Agency, Muskogee, Okla. |
| Yakima Tribal Council | Yakima, Wash. | Chairman | Yakima Agency, Toppenish, Wash. |
| Yavapai Apache Tribal Council. | Camp Verde, Ariz. | do | Colorado River Agency, Parker, Ariz. |
| Yerington Paiute Tribal Council. | Yerington, Nev. | do | Carson Agency, Stewart, Nev. |
| Yomba Shoshone Tribal Council. | Yomba, Nev. | do | Do. |

NOTE.—In writing the history of the some 193 tribal governments at present recognized by the Indian Bureau one would first make an inventory of the kinds of data available for analysis. Most of this material would ordinarily be available at the local Agencies of the Bureau. However, the central office of the Indian Bureau maintains a card file of tribal council resolutions and ordinances which require approval of the Secretary of the Interior. There are also minutes of the tribal councils in the files of the Washington office. The written constitutions and corporate charters of the organized tribes are also ordinarily available at Washington. Tribal codes of law and order seem to be mostly available only in the field agencies. Similarly data in regard to tribal rolls, tribal enterprises, economic organizations among tribesmen, tribal land, and details of tribal finance seem to be available mainly in the field agencies.

A thorough investigation of the operations of the tribal organizations and their significance would doubtless require a visit to each field agency of the Indian Bureau. There are some sixty of these local jurisdictions and it would require either a large staff operating simultaneously or a small staff operating over a considerable period of time to make a thorough and complete investigation of these political and economic groups among Indians. Interviews with secretaries, chairmen, and other officials of the tribal councils could be of help. In any case some of these organizations ought to be available for analysis and study with a view to recommendations for legislative action.

5 117

BEFORE THE INDIAN CLAIMS COMMISSION

THE DUWAMISH TRIBE OF INDIANS,      )
                                    )
                Petitioner,         )
                                    )
        v.                          )          Docket No. 109
                                    )
THE UNITED STATES OF AMERICA,       )
                                    )
                Defendant.          )

Decided:  March 25, 1957

FINDINGS OF FACT

The Commission makes the following findings of fact:

1.  The claim in this case was filed by The Duwamish Tribe, peti-
tioner, alleging that said tribe held, possessed and owned from time
immemorial certain lands within what is now the State of Washington.
The lands which petitioner allegedly held by original Indian title
are a specified portion of a larger area ceded to the United States
under the terms and provisions of the Treaty of January 22, 1855, 12
Stat. 927, commonly known as the Point Elliott treaty, and a small
area of the lands ceded by the Treaty of September 26, 1854, 10 Stat.
1132.

2.  The lands which petitioner claims to have held by original
Indian title are located in the Puget Sound area of the State of
Washington in the vicinity of Seattle and the Duwamish River and are
described as follows (Amended Pet., Par. 4):

> Commencing at a point two miles south of the town of
> Des Moines known as Washington State Park; thence to the
> northwest corner of the town of Kent; thence to the town
> of Kangley; thence to Little Lake which is about two miles
> northeast of the town of Grace; thence to the town of Grace;
> thence to the town of Edmonds; thence along the east shore-
> line of Puget Sound to the point of beginning.

3.  (a) By Act of August 14, 1848 (9 Stat. 323), Congress created the Territory of Oregon within the area of which lived various Indian tribes and bands, including the Duwamish Indians.  The Act made all land laws of the United States applicable to Oregon Territory, and in Section 1 provided that nothing therein contained "shall be construed to impair the rights of persons or property now pertaining to the Indians in said territory so long as such rights remain unextinguished by treaty between the United States and such Indians * * *."

(b) By an Act dated June 5, 1850 (9 Stat. 437), Congress authorized the negotiation of treaties with the Indian tribes in the Territory of Oregon for the extinguishing of their claims to lands lying west of the Cascade Mountains.

(c) By the Act of March 2, 1853 (10 Stat. 172), Congress organized the Territory of Washington out of the north half of Oregon Territory, and by Section 12 of said Act provision was made that all laws of Congress relating to Oregon Territory, not inconsistent with said 1853 act, were continued in force in the newly created Washington Territory. Section 2 of the Act provided for the appointment of a Governor who was also to perform the duties of  Superintendent of Indian Affairs in the Territory.

Historical

4.  Apparently the first white contact made with the Indians of what is now the State of Washington occurred in 1592 when Juan de Fuca reached the Straits named after him.  Captain George Vancouver visited the area in 1792 and the Hudsons Bay Company and the Northwest Company soon became active in the region.  The report of Indian agent E. A. Starling

in 1852 appears to be the first to mention the Duwamish Indians.  The
agent listed them as the "Nee-wam-ish", located them on the "Nee-wam-
ish river, bay, and vicinity" and estimated their number at 60 (Def.
Ex. 199).  Lieutenant De L. Floyd in 1853 reported the Duwamish to
number about 60 and located them "on the Duwamish river and vicinity
of the small town of Seattle."  Jones also reported the Sah-ma-mish
Tribe numbering about 100 in the "country bordering on a lake bet.
Nee-wa-mish and Sno-he-mish rivers."  (Def. Ex. 187).

5.  On December 26, 1853, Isaac Stevens, the first Governor and
ex-officio Superintendent of Indian Affairs of Washington Territory,
wrote to the Commissioner of Indian Affairs suggesting the urgent
necessity for making treaties immediately with the Indians west of the
Cascade Mountains in Washington Territory.  He pointed out that these
tribes lived on different water courses or bays and inlets of Puget
Sound, and they had selected spots that were their permanent homes
which they wished to reserve, but would sell the rest of their lands
to the whites.

By Act of July 31, 1854 (10 Stat. 315, 330) an appropriation was
made by Congress for expenses of making treaties with the Indians in
Washington Territory to extinguish their claim to lands.  Thereafter,
on August 30, 1854, the Acting Commissioner of Indian Affairs notified
Governor Stevens of his official appointment to negotiate treaties with
all tribes in Washington Territory by which the United States would
extinguish their "claim of title" to all their lands, except such
limited areas as might be assigned them for future occupancy.  Stevens
was also directed that in making the treaties he should endeavor to

unite the "numerous bands and fragments of tribes into tribes," and to
furnish the Commissioner of Indian Affairs a skeleton map of Washington
Territory, showing the location of the different tribes and bands, and
the boundaries of the regions claimed by each.

In carrying out his duties as Superintendent of Indian Affairs,
Governor Stevens had previously, on March 22, 1854, appointed Colonel
Simmons as Indian Agent for the Puget Sound District wherein the claimed
lands were located, and directed him to visit the various tribes in his
District, make a census of the tribes and bands, ascertaining as nearly
as possible the boundaries of the territory claimed by each, and at the
same time organize the small bands into tribes and appoint chiefs for
each.

6.  Dr. George Gibbs who assisted Governor Stevens in arranging
treaties with the Indians of Washington Territory reported on March 11,
1854, that (Def. Ex. 81):

> March 11th the Indians were called together for a talk.
> There were present Potkanan with part of the Snoqualmoos
> and Seattle with those of the Duwamish in town, also
> George Seattle his son who is in effect chief of the
> Suquamish, his father's tribe proper * * *. * * * The
> following were then recognized as chief and sub chiefs of
> the Duwamish, Suquamish and other tribes connected with them.
> Seattle, head chief; Schwoo-yehim, or George Seattle; Sgoo-
> dahtl or Jake; Nah-wa-chais; Wil-lak or Jack; * * *

7.  On September 16, 1854, Governor Stevens reported as follows to
the Commissioner of Indian Affairs (Def. Ex. 11b):

> One cause of the over-estimate so frequently made of
> Indians is their habit of moving about, gathering in bodies--
> one day at one place, and in another at the next--thus leaving
> the impression of great numbers in each.
>                         * * *
> Upon Puget's sound, and the inlets communicating with it,
> are several small bands, the remnants of once larger tribes, * * *

5 121

Of these the Squally-ah-mish or Nisqually, is the most numerous, * * *.  To the north of this group another may be found of those inhabiting the shores of Admiralty inlet, from Pu-gal-lup river to Su-quamish Head, including Vashon's and Bainbridge's islands, Port Orchard, Elliott bay, and Dwamish river and Port Madison.  Most of them are nominally under a chief named Se-at-tle, belonging to the Lu-qua-mish tribe, but residing principally with another, the Dwamish.  This last is the one called on the charts of Puget's sound the No-wa-mish; and it should be mentioned that a very considerable difference exists in the spelling of almost all the names, arising from the fact that several letters of their alphabet are convertible, as D and N, B and M, Q and G.  For instance, the band are in-differently termed N'wa-mish and Dwa-mish; another clan of the same tribe, Sa-ma-mish, are also called Sa-ba-bish; and the name Suqua-mich is frequently changed into Luguamish.  The Dwa-mish are the best known of this connexion from their neighborhood to the rising town named after their chief, Se-at-tle; and the whole generally bare this name, though they are by no means the most numerous.  Their proper seat is the outlet of a large lake emptying into the Dwamish river, and not on the main branch. At that place they and some others have small patches of potato ground, amounting altogether to perhaps thirty acres, where it is stated they raised, during the last year, about three thous-and bushels, or an average of one hundred bushels to the acre. Of these they sold a part, reserving the rest for their own consumption.  Each head of a family plants his own; the quantity being regulated by the number of his women.  Their potatoes are very fine, though they have used the same seed on the same ground for a succession of years. * * *

In this report (pages 457-458) in his "Estimate of Indian Tribes in Wash-

ington Territory west of the Cascade Mountains," he gave the following

figures and information:

| Names of tribes and bands | Where located | M a l e s | W o m e n | To- tal bands | Total tribes |
|---|---|---|---|---|---|
| To-an-hooch.......... | Hood's Canal | 123 | 109 | 265 | |
| Sho-Komish........... | Hood's Canal, upper end | - | - | 200 | |
| * * * | | | | | |
| Suqua-mish........... | Peninsula between Hood's and Admiralty Inlet | 215 | 270 | 485 | |
| S'Ho-ma-mish........ | Vashon's Island | 16 | 15 | 33 | |
| Dwa-mish............. | Lake Fork, Duwamish river | 89 | 73 | 162 | |
| Sa-ma-mish....) S'ke-tehl-mish) | Duwamish Lake, etc. | 71 | 30 | 101 | |

| Smel-ka-mish..... | Head of White R. | ... ... | 8 |
| Skope-ah-mish.... | Head of Green R. | ... ... | 50 |
| St-ka-mish....... | Main White River | ... ... | 30 |
| | | | 351 |

8.  Pursuant to the Act of July 31, 1854, supra, and the instructions of the Commissioner of Indian Affairs, Governor Stevens negotiated the treaty of January 22, 1855 (12 Stat. 927) between the United States and twenty-two named tribes "and other allied and subordinate tribes and bands of Indians occupying certain lands situated in said Territory of Washington * * *."  The treaty, commonly referred to as the Point Elliott Treaty, was not ratified by the United States Senate until March 8, 1859, and was proclaimed April 11, 1859.  The Dwamish, Sk-tahl-mish and Samahmish Indians were named in the treaty preamble as parties and some of the signatories are those of the Duwamish chief and sub-chiefs.  No one signed as Sk-tahl-mish or Samahmish chiefs or sub-chiefs. By its terms the said tribes and bands ceded, relinquished and conveyed all their right, title and interest in and to a described area of land in northwest Washington Territory "occupied by them," reserving to themselves four small designated areas as reservation.  The area ceded, which includes the claimed area, is shown as Tract 347 and the reserved areas as Tract Nos. 348, 349, 350 and 351 on Royce's Map 1 of the State of Washington.   Since Article 15 of the treaty provided that the "treaty shall be obligatory on the contracting parties as soon as the same shall be ratified by the President and Senate of the United States," the treaty did not become effective until March 8, 1859, the date the treaty was ratified by the Senate.  See Bush v. The United States and Klickitat Indians, 29 C. Cls. 144.

9.  On December 30, 1855, Agent M. T. Simmons reported as follows
(Def. Ex. 201, p. 2):

> On the 28th inst I arrived at Seattle, at first found a
> strong determination among the Indians not to cross over to
> their reservation /Port Madison/ to receive their goods.
> They were anxious to have them at Seattle.  I informed them
> that they must go over or they should receive nothing.
> Finally they obeyed my wishes and those of their head chief.
> 29th arrived at the Duwamish and Suquamish reservations in
> Port Madison at the entrance to Agaline Passage.  Here I
> found a large assemblage of their tribes.  Here they have a
> large house said to of been put up by Chief Seattle some 40
> years ago; it is 525 feet long, 60 feet wide, 18 feet high.
> * * *

Simmons reported 737 Indians of both the Duwamish and Suquamish present

with 70 absent.

10.  Indian Agent D. S. Maynard reported as follows on September 17,
1856 (Def. Ex. 80, pp. 86-87):

> On the 7th of November, 1855, I received an appointment
> over your signature to act as local Indian agent, to look
> after and take charge of the friendly Indians within the
> limits of the county of King, Washington Territory, embrac-
> ing the Dwahmish, Gualtshkanam, chief, numbering about 312;
> the Tsa-bah-bish, Sah-wich-ol-gahdwh, chief, numbering about
> 64; the Ska-whamish Chatskanam, chief, numbering 16; and the
> Suquamish, numbering about 550; Seattle, Snow-chise, Chil-
> whale-ton, and Tswil-at-sap, chiefs, over whom Seattle
> usually presides as head chief in council; total number under
> my charge 942, of which about 434 were on the east side of
> the Sound, and 508 scattered upon the bays of the west side,--
> with instructions to gather and rendezvous at the town of
> Seattle all friendly disposed among them residing on the east
> side of the Sound, and there so provide and care for them as
> to encourage them to remain neutral, if not really friendly.

* * *

> On the 9th of November I started up the Dwahmish and Black
> Rivers, thence along the east coast of Lake Washington, among
> the settlements of the Skawhahmish and the Tsah-bahbish tribes,
> and obtained a promise from Sawichol-gahdwh, the chief of the
> Tsah-bahbish, that they would come in and rendezvous with the
> others in a short time, as soon as Elk-klah-kum returned from
> a visit among the Klikatats, where they said he had gone to get
> blankets due him for a horse.  I returned on the 13th with a

few families of the Dwahmish tribe, whom I found scattered
on the banks of the Dwahmish and Black rivers. I was soon
afterwards informed by the Indians in camp that Elk-klah-kum
was among the Lake Indians at the time I visited them. I
thereupon returned to them, when they made reply much as at
first, and appeared uneasy about Elk-klah-kum. * * *

11. On September 26, 1856, Indian Agent G. A. Paige reported
(Def. Ex. 80, pp. 82-83):

I have charge over two tribes, viz:  the Suquamish or
Seattle Tribe, belonging on the shores of the Sound, numbering
442, and the Duwamish tribe belonging to the river of the same
name, as small portions of this latter tribe are from the
vicinity of the lakes east of Seattle, and are called among
themselves Tsa-bah-bobs, or Lake Indians.

Paige also reported he had moved the "Dwamish" tribe to the eastern

shore of Bainbridge Island but only after much unwillingness on the

part of the Indians and then to satisfy them he moved them to Holder-

ness Point, on the west side of Elliott bay "this being a favorite fish-

ing ground of theirs at certain seasons of the year." Paige was of the

opinion that "the difficulties heretofore encountered in the management

of this tribe, arise partly from their aversion to removing on to lands

occupied by another tribe."

12. Indian Agent James H. Gouty reported on November 21, 1856, to

Agent Paige as follows (Def. Ex. 202):

Maurer had a long talk with William at his camp on Black
river and he says that he will not come down or will he let
any of his people come back as long as he can stop them.
* * * He says his people went to the west side of the sound
last fall and they were promised to be feeded and they got
nothing and came near starving to death and he has better prepa-
rations to live now can get plenty of salmon and can buy flour
and the Snoqualmie Indians will furnish them with all the pota-
toes they want * * *. He says that none of the Duwamish tribe
will cross the sound as it is not their land but the country on
Black river is theirs and they will not sell it but they would
live and die on it. * * * Maurer also says there is several
families of the Snoqualmie tribe stopping at this camp of
Williams and they have a good deal to say to the Indians to
prevent their coming down here again.

Of the band of lake Indians he only saw one family
but the other Indians told him that they with some others
were stopping back on the lake some place.  The number of
the Duwamish tribe that he saw at this camp of Williams
he thinks was about 150.

Indian Agent M. T. Simmons on October 21, 1856, reported the following

Indian tribes and their numbers under the jurisdiction of the Fort

Ketsap (Madison) reservation:  Dwahmish, 312; Tsahbahbish, 64; Skaquah-

mish, 16; Suquamish, 550 (Def. Ex. 80).  Agent Paige in 1857 wrote that

the Duwamish Indians living on and claiming the land on the Duwamish

river were in his charge and he urged a reservation be set aside for

them on or near the "lake fork of the D'Wamish river."  Paige stated,

"This tract of land has been cultivated many years by them, * * *."

In 1860, Agent Simmons wrote that the Dwamish Indians were living on the

river of that name which is formed by the junction of the White and Black

rivers and he recommended a reservation be set aside for them (Def. Ex.

67).  As late as August 1865, Agent S. D. Howe reported that "A portion

of the Indians belonging to the Port Madison reservation now live on

Black river, which was their place of residence at the time of the mak-

ing of the treaty" (Def. Ex. 204).  In 1877 Agent Mollett wrote that:

> The reservations provided for in the treaty were located
> in the vicinity of the most numerous tribes.  The Dughdwabsh,
> (D'wamish) tribe, with the subordinate tribes, viz, Swo-Kwabish,
> Sk-kabish, S'tsa-babsh, and Rha-cho-abish; the Etak-bush with
> its subordinate tribes, viz, S'yi-lal-ko-absh and St-ka-bish,
> were assigned to the Port Madison reservation.

Although the Duwamish were assigned to the Port Madison reservation the

findings previously made show that the majority wanted to remain in their

own country and today reside throughout the northwest with some de-

scendants still living in the  vicinity of their ancestoral lands (Tr.

6-36; Def. Ex. 186).

Ethnological

13.  Doctor George Gibbs (see Finding 6) in 1877 made a comprehensive report on the Puget Sound Indians although his data was obviously obtained during his presence in the Territory of Washington in 1853-55.  He wrote (Def. Ex. 6, pp. 178-179) in part as follows:

> There remains on these waters what may be termed the Nisk-walli nation, which is thus divided, pursuing the geographical order:

> 1st.  The Skokomish * * *

> 2d.   The bands occupying Puget Sound and the inlets opening into it as far down as Point Pully. * * *
>                            * * *
> Below these is the division of which the Dwamish and Suk-wamish are the principal bands, occupying Elliott Bay, Bain-bridge Island, and a portion of the peninsula between Hood Canal and Admiralty Inlet.  Their head chief is Se-aa-thl, or, as it is usually pronounced, Seattle, from whom the town on Elliott Bay has been named.  In this connection are also the Samamish, Skopahmish, Sk'tehlmish, St'kamish, and the other small bands lying upon the lakes and the branches of Dwamish River, who are claimed by the others as part of their tribe, but have in reality very little connection with them.  A very few of these last possess horses, but the majority are river Indians.  The aggregate number of the whole was by census 807, which probably falls a little short of the truth.  They differ but slightly from the Niskwalli in language.  These tribes were included with all the others of the eastern shore and the islands in the treaty of Mukleteoh, or Point Elliott.  A reserve of two sections was retained for them at Port Madison.

14.  In his "The North American Indian (1913), Doctor Edward S. Curtis included under the Puget Sound Tribes the "Tdwabsh (Dwamish), the southern end of Lake Washington, the valley of Duwamish river, and the shore of Elliott Bay" and the "Sababsh (Samamish), the shore of Lake Sammamish and the eastern shore of Lake Washington."  Doctors Herman Haeberlin and Erna Gunther in "The Indians of Puget Sound" (1930) reported:

> The Duwamish (Duxuduwa'bc) lived about the present site of Seattle, their territory extending from the Muckleshoot lands in the south to the Suquamish territory in the north.  They were also called Renton Indians.

Doctor Frederick W. Hodge, (Handbook of American Indians, B.A.E.
Bulletin 30, Part 2, 1910) states that the name Duwamish"being well
known has been improperly applied collectively to a number of distinct
bands in this neighborhood.  Their population about 1856 is variously
given from 64 to 312.  The remnant is incorporated with the Snohomish
and others under the Tulalip school, N. W. Wash., altogether numbering
465 in 1904."

15.  In 1940, Doctor Marian W. Smith published her work "The
Puyallup-Nisqually."  In discussing the Duwamish Doctor Smith in her
publication notes that most of the material presented with respect to
these Indians was collected by Arthur C. Ballard, who appeared before
this Commission as an expert for petitioner in this case.  Doctor Smith
wrote as follows (Def. Ex. 3):

> Duwamish. * * * The drainage was divided into four sections
> each of which was named and each of which included one or more
> separate villages: (a) the river from its mouth up to and in-
> cluding the Black and Cedar Rivers, villages 1-9;  (b) from
> where the Black River flows into the Duwamish to the junction
> of the White and Green Rivers, villages 10-11; (c) the Green
> River, villages 12-14 (Puyallup-Nisqually informants, however,
> tended to place village 12 with the White River people); and
> (d) the White River, village 15.  The people of these four
> sections are called today the Duwamish.  The "real" Duwamish
> were those of section (a), the tuduwabc.  This name was also
> extended to include the people of section (b) and perhaps also
> those  of the entire drainage, in accord with its present usage.
> The people of the Green River villages, section (c), were known
> collectively as the sqwapabc or Green River people.  The Indians
> of Muckleshoot reservation, primarily the people of the White
> River, section (d), included also Green River groups and the
> South Prairie, Puyallup village.  There seems little doubt that
> these represented a distinct division (see page 32).  The Lake
> Washington peoples (16) were separate villages which were
> probably considered as distinct.

Doctor Smith had published "The Coast Salish of Puget Sound" in 1941
and wrote in part as follows (Def. Ex. 14, pp. 206, 207):

\* \* \* for the sake of convenience, I have described
extended villages as single territorial units: in
these cases it must be understood that each of the
villages listed had its own section of territory.
\* \* \*

### Duwamish

A. Duwamish or tuduwabc:  Duwamish River, up to and
including the Black River, and neighboring beach

B. Katilbabc:  Cedar River

C. _____  White River from the mouth of Black
River to its confluence with Green River

D. luwitabc:  Eastern Lake Washington

E. _____  Western Lake Washington.  These and the
other people of the lake were sometimes called xatcoabc.
"Lake people," a term similar to those of topographical
meaning already listed.

F. Sammamish:  Sammamish Lake and River.

16. Mr. A. C. Ballard, who has studied the Indians in the Puget
Sound area since about 1910, appeared as an expert witness for peti-
tioner.  On a map (Pet. Ex. 7) Mr. Ballard marked some 18 village
sites which he testified were within the area claimed by petitioner.
The witness stated that a few of them were probably post treaty sites
and that some of the sites were vacant at times.  Witness Ballard was
in doubt as to whether Sammamish Lake should be included in Duwamish or
Snoqualmie territory but stated he would include the east shore of Lake
Washington (Tr. 44).  He included the Sammamish village at the north
end of Lake Washington with the Duwamish as they "definitely had
Duwamish affiliations.  They were oriented toward the Duwamish," al-
though he evidently was not sure of this connection and he was uncertain
of Duwamish occupation of the territory between Lake Washington and
Lake Sammamish.  The witness did not locate any Duwamish villages east

of Lake Washington.  (Tr. 46-48; Pet. Ex. 7).  Doctor June McCormick
Collins, anthropologist, also appeared as an expert witness for peti-
tioner.  Doctor Collins stated that in part her village sites on the
map introduced into evidence (Pet. Ex. 9) are based on information
received from Mr. Ballard as well as other sources (Tr. 6-11, Hearing,
Seattle, Washington, August 12, 1953).  This expert witness includes
two villages on the eastern shore of Lake Washington not mentioned by
Mr. Ballard.  Doctor Carroll S. Riley, defendant's anthropologist, re-
ported (Def. Ex. 1, page II-11) that "it is uncertain as to how many
villages existed at treaty time for the population lists of early writers
(the Handbook estimates 64 to 312) suggest that what was called Duwamish
may have been one or at most two or three villages of Indians.  The
other villages noted for this area were either small autonomous units
which died out or completely lost their identity in post-reservation
times or they represent settlements deserted before the treaty period."

17.  In aboriginal times village autonomy prevailed in the area
claimed by petitioner, and since these Indians obtained a major part of
their subsistence from the bays, streams and lakes of the area where
they lived, their villages were generally located on the lands adjacent
to their main fishing places.  These villages were also located to give
the Indians access to other means of support needed to supplement the
food obtained from the waters and large areas away from the villages
were also utilized by the villagers for gathering of berries and roots
and for fishing and hunting.  In each of the several villages in part
of the area claimed were concentrated Indians, sharing a common culture
and common dialect, who were linked with the Indians of the other

villages of that part of the area by means of social and economic ties also.  Even prior to the necessity of some semblance of political organization between these villages to permit them to deal with the agents and officers of the United States, they were known collectively as Duwamish because of the ties between the villages, and as such were an identifiable group historically.  For the same reasons these villagers shared the gathering, hunting and fishing spots in the outlying contiguous areas distant from their villages.  It is found, therefore, that peti- tioner's ancestors did exclusively use and occupy at least part of the lands within the area claimed.

18.  That as of the date of the Treaty of January 22, 1855, there were a number of autonomous villages of Indians known collectively as Duwamish using and occupying land in the vicinity of the Black River at the southern end of Lake Washington and on the shores of the Duwamish River and Elliott Bay.  That although the name Duwamish has been used at times ethnologically or historically to include other village groups such as the Samamish, and the Skopamish and Smulkamish (see Muckleshoot Tribe v. United States, 3 Ind. Cl. Comm. 658), the use of the word in such manner has been a geographic term. .The group of villages that came to be known as the Duwamish Tribe were those which had their permanent camps in the vicinity of the lower end of Lake Washington and on the Black and Cedar Rivers near Renton.  There is no substantial evidence to support a finding that petitioner is the successor in interest to the claims, if any, of the Samamish or St-kah-mish Indians.

19.  The Commission finds that the petitioner, The Duwamish Tribe, is the successor in interest to those village-tribes which aboriginally used and occupied lands on the southern end of Lake Washington, the Black

Cedar and Duwamish rivers, and Elliott Bay; that these village-tribes composed the entity that was a party to the Treaty of January 22, 1855; that this entity was the Duwamish Tribe administered to by agents and officials of the United States following said treaty; and that descendants of said entity have continued to reside in and near the lands of their ancestors since said treaty and until the present time. The Commission finds therefore that petitioner is an identifiable tribe of American Indians within the meaning of the Indian Claims Commission Act of August 13, 1946 (60 Stat. 1049), and as such is entitled to maintain this cause of action.

20. The Commission finally finds that the Duwamish Tribe, petitioner herein, held original Indian title as of the date of the Treaty of January 22, 1855, to the lands within the following boundaries:

Commencing at Point Pully on Puget Sound; thence north along the shoreline of said Sound to Fourmile Rock, north of Elliott Bay; thence in a direct line to the western shoreline of Lake Washington; thence south along the west shoreline of said Lake Washington to the entrance of May Creek on the southeastern side of said Lake; thence in a southeastwardly direction to the bend in the Cedar River just south of McDonald Lake; thence in a direct line to the place of beginning at Point Pully.

Edgar E. Witt
Chief Commissioner

Louis J. O'Marr
Associate Commissioner

Wm. M. Holt
Associate Commissioner

*Indian land areas judicially established*, Library of Congress (1978), available at https://www.loc.gov/resource/g3701e.ct008649/?r=0.006,0.486,0.37,0.235,0 (last accessed Apr. 7, 2022)



by the Act of September 30, 1961 (75 Stat. 747), to pay a judgment in Indian Claims Commission docket numbered 124-A, and the interest thereon, after payment of attorney fees and expenses, shall be distributed to the individuals whose names appear on the roll prepared pursuant to section 3, and in accordance with the instructions contained in sections 8 and 9, of this Act.

Sec. 7. The funds on deposit in the Treasury of the United States to the credit of the "Miami Tribe of Oklahoma" that were appropriated by the Act of May 17, 1963 (77 Stat. 43), to pay a judgment in Indian Claims Commission dockets numbered 67 and 124, and the interest thereon, after payment of attorney fees and expenses, shall be distributed to the persons whose names appear on the roll prepared pursuant to section 4, and in accordance with the instructions contained in sections 8 and 9, of this Act.

Payment provisions.

Sec. 8. (a) Except as provided in subsection (b) of this section, the Secretary shall distribute a per capita share payable to a living enrollee directly to such enrollee, and the Secretary shall distribute a per capita share payable to a deceased enrollee directly to his heirs or legatees upon proof of death and inheritance satisfactory to the Secretary, whose findings upon such proof shall be final and conclusive.

(b) A share payable to a person under twenty-one years of age or to a person under legal disability shall be paid in accordance with such procedures as the Secretary determines will adequately protect the best interests of such persons.

Reserve funds for expenses.

Sec. 9. (a) Prior to making any distribution of the funds credited to the Miami Tribe or Nation and the Miami Tribe of Indiana or approving any expenditures of the funds credited to the Miami Tribe of Oklahoma, pursuant to this Act, the Secretary is authorized to reserve in the Treasury of the United States a part of such funds sufficient, in his judgment, to meet the litigation expenses, exclusive of attorney fees, of the remaining cases which each has pending before the Indian Claims Commission.

(b) The funds reserved shall be available for appropriate withdrawal by the Secretary.

Income tax exemption.

Sec. 10. The funds distributed under the provisions of this Act shall not be subject to Federal or State income taxes, and any costs incurred by the Secretary in the preparation of the rolls and in the distribution of per capita shares in accordance with the provisions of this Act shall be paid by appropriate withdrawals from the judgment funds.

Rules and regulations.

Sec. 11. The Secretary of the Interior is authorized to prescribe rules and regulations to carry out the provisions of this Act.

Approved October 14, 1966.

## Public Law 89-660

October 14, 1966
[H. R. 10747]

### AN ACT

To provide for the disposition of funds appropriated to pay a judgment in favor of the Duwamish Tribe of Indians in Indian Claims Commission docket numbered 109, and for other purposes.

Duwamish Tribe of Indians. Judgment funds.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Interior shall prepare a roll of all persons who meet the following requirements for eligibility: (a) They were born on or prior to and living on date of this Act, and (b) they are descendants of members of the Duwamish Tribe as it existed in 1855.  Applications for enrollment must be filed with the area director of the Bureau of Indian

Affairs, Portland, Oregon, on forms prescribed for that purpose. The determination of the Secretary regarding the utilization of available rolls or records and the eligibility for enrollment of an applicant shall be final.

Sec. 2. After the deduction of attorney fees, litigation expenses, the costs of roll preparation, and such sums as may be required to distribute individual shares, the funds, including interest, remaining to the credit of the Duwamish Tribe, which were appropriated by the Act of June 9, 1964 (78 Stat. 213), shall be distributed in equal shares to those persons whose names appear on the roll prepared in accordance with section 1 of this Act.

Equal share distribution.

Sec. 3. The Secretary shall distribute a share payable to a living enrollee directly to such enrollee or in such manner as is deemed by the Secretary to be in the enrollee's best interest. The Secretary shall distribute the per capita share of a deceased enrollee to his heirs or legatees upon proof of death and inheritance satisfactory to the Secretary whose findings upon such proof shall be final and conclusive. Sums payable to enrollees or their heirs or legatees who are less than twenty-one years of age or who are under a legal disability shall be paid to the persons whom the Secretary determines will best protect their interests. Proportional shares of heirs or legatees amounting to $5 or less shall not be distributed, and shall escheat to the United States. In the event that the sum of money reserved by the Secretary to pay the costs of distributing the individual shares exceeds the amount actually necessary to accomplish this purpose, such funds shall also escheat to the United States.

Sec. 4. The funds distributed under the provisions of this Act shall not be subject to Federal or State income taxes.

Income tax exemption.

Sec. 5. The Secretary of the Interior is authorized to prescribe rules and regulations to carry out the provisions of this Act.

Rules and regulations.

Approved October 14, 1966.

## Public Law 89-661

### AN ACT

To provide for the disposition of funds appropriated to pay a judgment in favor of the Otoe and Missouria Tribe of Indians, and for other purposes.

October 14, 1966
[H. R. 10674]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the unexpended balance of funds on deposit in the Treasury of the United States to the credit of the Otoe and Missouria Tribe of Indians that were appropriated by the Act of June 9, 1964, to pay a judgment by the Indian Claims Commission in docket numbered 11–A, and the interest thereon, less payment of attorney fees and expenses, may be advanced or expended for any purpose that is authorized by the tribal governing body and approved by the Secretary of the Interior. Any part of such funds that may be distributed to the members of the tribe shall not be subject to Federal or State income taxes. The sum of $150,000, and any accrued interest thereon, shall be held in the United States Treasury pending final determination of the Yankton Sioux claim in docket numbered 332–A. Any portion of such sum that is determined to belong to the Otoe and Missouria Tribe shall thereupon become subject to the foregoing provisions of this Act.

Otoe and Missouria Tribe of Indians.
Judgment funds.
78 Stat. 204.

Income tax exemption.

Approved October 14, 1966.

Re: _Federal Recognition_

Tribe: _DUWAMISH_

Note: Evaluation is based on data
available as of June 17, 1974.

## DETERMINATION

1. Eligible for Federal
recognition?

Yes. ☒

No. ☐

2. **Comments:** According to available Agency records
and Agency staff comments, this group was
active and worked together through a common
council. "Landless but deserves recognition"

3. By: _Peter P. Three Stars, Tribal Operations_
_Specialist._
Date: _6-24-74_ Final branch
review

## FEDERAL RECOGNITION OF INDIAN TRIBES

| FEDERAL INDIAN LAW: five considerations. (These have been relied upon in reaching the conclusion that a group constitutes a "tribe" or "band".) | Aboriginal | Swinomish | Duwamish | Jamestown | Clallam | Kikiallus | Lower Skagit | Samish | Snohomish * | Snoqualmie | Steilacoom | Cowlitz | Chinook |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1) That the group has had treaty relations with the United States. | | | X | | | | | | | | | | |
| 2) That the group has been denominated a tribe by act of Congress or Executive Order. | | | | | | | | | | | | | |
| 3) That the group has been treated as a tribe or band by other Indian tribes. | | | X | | | | | | | | | | |
| 4) That the group has been treated as having collective rights in tribal lands or funds, even though not expressly designated a tribe. | | | X | | | | | | | | | | |
| 5) That the group has exercised political authority over its members, through a tribal council or other governmental forms. | | | X | | | | | | | | | | |
| OTHER: | | | | | | | | | | | | | |
| 1.  Group has received special appropriations. | | | | | | | | | | | | | |
| 2.  Group is now or has received Federal services (BIA-IHS, etc.). | | | X | | | | | | | | | | |
| 3.  Group is recognized by the Indian Claims Commission. | | | X | | | | | | | | | | |
| 4.  BIA has had regular contacts with the group or its representatives. | | | X | | | | | | | | | | |
| 5.  Group has had frequent contacts with the BIA. | | | X | | | | | | | | | | |
| 6.  BIA has assisted group with special projects. | | | | | | | | | | | | | |
| 7.  Group has an organization which meets regularly and annually. | | | X | | | | | | | | | | |
| 8.  Group has elected officials and tribal council. | | | X | | | | | | | | | | |
| 9.  Group has a constitution and bylaws. | | | X | | | | | | | | | | |
| 10. Group has an official tribal roll it has adopted. | | | X | | | | | | | | | | |
| 11. Group's council meets regularly to conduct tribal business. | | | X | | | | | | | | | | |
| 12. BIA has issued I.D. cards to members of group for fishing, etc. | | | | | | | | | | | | | |
| 13. Group invited to BIA meetings with northwest tribes. | | | X | | | | | | | | | | |
| 14. Group has been active in asserting its fishing rights. | | | X | | | | | | | | | | |
| CONCLUSION:           ELIGIBLE — Y for Yes. N for no. | | | Y | | | | | | | | | | |

*Draft of July 8, 1974
by Peter Threestars*

*never
signed
by
CIA*

FILE COPY
SUMMARY

*Three Stars
bay
white
feather*

Dear Mr. Bill:

In considering the ramifications of Judge Boldt's decision, we have been reviewing the current status of other treaty tribes who were parties to the same treaties as the 14 treaty tribes in United States v. Washington.

We have found the Duwamish Indian group to be eligible for Federal recognition as a tribe based on extensive research which is summarized below.

The broad guidelines for Federal recognition are set forth in Federal Indian Law, pages 460-461, are: 1) That the group has had treaty relations with the United States; 2) That the group has been denominated a tribe by act of Congress or Executive Order; 3) That the group has been treated as having collective rights in tribal lands or funds, even though not expressly designated a tribe; 4) That the group has been treated as a tribe or band by other Indian tribes; and 5) That the group has exercised political authority over its members, through a tribal council or other governmental forms.

We have reviewed the history of the Duwamish Indian group now located in King County in the State of Washington. This community is composed of descendants of the 1855 Dwamish, a Salish speaking people of the eastern shore of the central Puget Sound area. They inhabited the area around the present city of Seattle, Washington, particularly the shores of Lake Washington. In 1855 the group was believed to have numbered between 64 to 312 people, but the actual number may have been larger.

The name Duwamish, under various spellings, has been used since about 1850 to refer to these Indians. They were a party to the Treaty of Point Elliott, January 22, 1855 (12 Stat. 927), under the spelling Dwamish. There were four signatories identified as Dwamish, the main one being Chief Seattle, the principal Indian in attendance and the first Indian to sign.

2

The Indian Claims Commission determined that the Duwamish Tribe of Indians is an identifiable group of Indians within the meaning of the Indian Claims Commission Act of August 13, 1946 (60 Stat. 1049), and, as such, the tribe was entitled to maintain a cause of action against the United States.  In a decision dated March 25, 1957, the Commission found that the Duwamish Tribe of Indians had aboriginal claims to certain lands.  The Commission's award to the descendants of the Duwamish Tribe of Indians is presently held in trust by the United States pending a determination of those eligible to share in the award by the Secretary of the Interior.

Although there has been no official Federal recognition of the present Duwamish group, over the years it has had numerous contacts with local officials of the Bureau of Indian Affairs and has received assistance from the Bureau.  Some examples of Bureau contact are:

1. The Bureau has assisted with tribal organization.

2. The Bureau has assisted the group by providing clerical services such as producing meeting notices, copies of minutes of meetings, and reproducing a constitution.

3. Regular correspondence with leaders has been maintained.

4. Bureau officials have attended meetings of the Duwamish.

5. The group has been invited to and included in Bureau meetings of northwest tribes.

6. The Bureau has had regular contacts with representatives of the group.

7. In the past Federal services such as health services have been extended to Duwamish Indians.

The Duwamish Indians have met regularly and exercised certain powers of self-government.  They meet annually and the elected tribal council meets on a regular basis to conduct business.  In addition the group has maintained membership rolls.  Periodically, these rolls have been updated to reflect deaths and births.  The group has been active in asserting its treaty fishing rights.

3

The Duwamish Indian group is recognized as an Indian tribe by other Indians and Indian tribes.  The presence of the group and its members is well known in the area.  Besides holding meetings in public buildings, they have taken part in community activities as an Indian tribe.

According to the facts discussed above, which are supported by available material, the Duwamish Indian group constitutes a tribe entitled to Federal recognition based on four of the five considerations set forth in Federal Indian Law cited herein: 1) the group has had treaty relations with the United States; 2) the group has been treated as having collective rights in tribal lands or funds, even though not expressly designated a tribe; 3) the group has been treated as a tribe or band by other Indian tribes; and 4) the group has exercised political authority over its members, through a tribal council or other governmental forms.

On the basis of the foregoing review, we have concluded that the group meets the criteria necessary to support an administrative determination that it is entitled to Federal recognition as a tribe.  Therefore, we are officially recognizing the Duwamish descendants as an Indian tribe and eligible for the benefits accruing therefrom, such as treaty fishing rights recently recognized as theirs by the court.  In the absence of a land base, however, services from the Bureau will be limited to those extended to Indians not residing on or near a reservation.

Sincerely yours,


Secretary of the Interior


cc:  Western Washington Agency

Sec. Surname
  "    RF (2)
Signer's Copy
BIA Surname
  "   Chrony
  "   Mailroom
  "   BCCO
  "   COMM RF
  "   TG Chrony
"Holdup
PTHREESTARS:lae      7/8/74      Mag Cards    285 459 & 285 463

Mr. Willard Bill
Chairman, Duwamish Tribe
28 "U" Place
Auburn, Washington  98002



# United States Department of the Interior
BUREAU OF INDIAN AFFAIRS
WASHINGTON, D. C. 20245

IN REPLY REFER TO:
**Tribal Government
Services**

Memorandum                                    *never signed*

To:            Secretary of the Interior

From:          Commissioner of Indian Affairs

Subject:       Federal recognition of treaty tribes
               not parties to <u>United States</u> v. <u>Washington</u>

In considering the ramifications of Judge Boldt's decision, we have been
reviewing the current status of other treaty tribes who were parties
to the same treaties as the 14 treaty tribes in <u>United States</u> v. <u>Washington</u>.

We have reviewed the status of nine such Indian groups in Western
Washington who are not federally recognized. They were not parties to
to the subject case. However, as descendants of tribes who were parties
to the same treaties as the plaintiffs in the suit, each group and its
membership could become eligible for treaty fishing rights upon
receiving official recognition as a tribe.

We are recommending that four of the nine Indian groups be extended
Federal recognition as Indian tribes based upon extensive research sum-
marized herein. The four are the Duwamish, Snohomish, Snoqualmie,
and Jamestown Clallam. Should you concur, the enclosed letters to each
group prepared for your signature will finalize the matter and permit us
to proceed with implementing the determinations made with regard to the
Indians in the subject court decision.

Also enclosed for your signature are letters to the five groups that could
not meet the minimum considerations necessary to become eligible for
Federal recognition. The five groups are the Aboriginal Swinomish,
Samish, Lower Skagit, Kikiallus, and the Steilacoom.

Judge Boldt, in his Declaratory Judgment and Decree, ordered that the
controlling definition of Treaty Tribe shall be: "One of the Indian entities
described in paragraph 10 (14 plaintiff tribes), <u>or</u> <u>any</u> <u>other</u> entity entitled



CONSERVE
AMERICA'S
ENERGY

*Save Energy and You Serve America!*

2

to exercise treaty fishing rights under the treaties construed herein within the Western District of Washington." (Emphasis added)

The following nine groups of Indians in Western Washington presently are not federally recognized. Without Federal recognition being extended to each group as a tribe, the individual members will not be eligible for treaty fishing rights as they are tribal, not individual, rights.

| TRIBE | TREATY |
|---|---|
| 1. Aboriginal Swinomish | Point Elliott Treaty of January 22, 1855. |
| 2. Duwamish | " |
| 3. Kikiallus | " |
| 4. Lower Skagit | " |
| 5. Samish | " |
| 6. Snohomish | " |
| 7. Snoqualmie | " |
| 8. S'Klallam | Point-No-Point Treaty of January 26, 1855. |
| 9. Steilacoom | Medicine Creek Treaty of December 26, 1854. |

We have applied the five considerations set forth in Federal Indian Law, pages 460-461, and emphasized in our recent letter to Chairman Jackson on this subject, as well as other criteria for establishing eligibility for Federal recognition, in our evaluation of the data available on the nine Indian groups. The other criteria in this review included, but was not limited to, such factors as: 1) does the group have a viable organization with elected tribal officials; 2) does the group have a constitution and bylaws; 3) does the group have a tribal roll; 4) does the tribal council of the group have regular meetings, elections and annual meetings; 5) does the group now receive Federal services, or has received such in the past;

6) has the group received assistance from the Bureau of Indian Affairs with special projects such as land acquisition, etc., clerical help for preparing meeting notices, reproducing copies of minutes of meetings, and constitution and bylaws; 7) has the group been active in pressing for its fishing rights with official resolutions, ordinances or other communications; 8) has the membership of the group been issued I.D. cards from the BIA for purposes of fishing, hunting, etc.; 9) has the group been active in other matters than judgment awards from the Indian Claims Commission; and 10) has the BIA had regular contacts with the group's officers or representatives at the Agency office or at the Indian community, by oral or written communications, and vice versa.

The Indian Claims Commission determined that each of these nine Indian groups is an identifiable group of Indians within the meaning of the Indian Claims Commission Act of August 13, 1946 (60 Stat. 1049). The Commission's award to the descendants of each of these treaty tribes is presently held in trust by the United States pending a determination of those eligible to share in each award. Although there was no official recognition of any of these nine Indian groups, the Bureau of Indian Affairs has had contact with each in varying degrees.

Our review of all of the relevant data available to us at this time on each of the nine Indian groups leads us to the conclusion that only four of them could meet the requirements for Federal recognition. They are the Duwamish, Snohomish, Snoqualmie, and Jamestown Clallam groups.

The five groups who did not meet the requirements for Federal recognition, even when most liberally applied, are the Aboriginal Swinomish, Kikiallus, Lower Skagit, Samish, and Steilacoom. Each of these groups appear to be primarily active only for seeking claims awards and are not functioning as a viable self-government. Further, the membership of these groups is scattered throughout the State of Washington and adjacent states. There is little to indicate that each has maintained a community continuing cultural practices as a tribe.

The facts discussed above are supported by available material and justifies the conclusion that the Duwamish, Snohomish, Snoqualmie, and Jamestown Clallam Indian groups are indeed Indian tribes based on four of the five considerations set out in Federal Indian Law, pages 460-461: 1) the group has had treaty relations with the United States; 2) the group has been treated as having collective rights in tribal lands or

4

funds, even though not expressly designated a tribe; 3) the group has been treated as a tribe or band by other Indian tribes; and 4) the group has exercised political authority over its members, through a tribal government or other governmental forms.

# REPORT ON TERMINATED AND NONFEDERALLY RECOGNIZED INDIANS

---

## TASK FORCE TEN: TERMINATED AND NONFEDERALLY RECOGNIZED INDIANS

---

# FINAL REPORT TO THE AMERICAN INDIAN POLICY REVIEW COMMISSION



**JO JO HUNT,** *Chairwoman*
**JOHN STEVENS,** *Member*
**ROBERT V. BOJORCAS,** *Member*
**GEORGE E. TOMER,** *Specialist*

Printed for the use of the American Indian Policy Review Commission

---

**U.S. GOVERNMENT PRINTING OFFICE**
**WASHINGTON : 1976**

78-712 O

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402 - Price $12.00

E. THE LANDLESS TRIBES OF WASHINGTON STATE

———

Prepared in conjunction with Kathleen Bishop and Kenneth Hansen, Task Force No. 10 Washington State Consultants, Seattle, Washington.

———

1. *The Quest for Recognition*

The State of Washington is unique in that it is the state with the most tribes which are currently deemed to be nonfederally recognized but which were parties to ratified federal Indian treaties. Six treaties were made with Indians prior to 1871 in what is now the State of Washington.[1] As a result of the treaties, many Indians moved or agreed to move from traditional areas or reservations.[2]

It has now been 122 years since the majority of the Indian Nations in the Washington Territory entered into treaties with the United States, and yet, the United States has failed to carry out its trust obligations pledged by those treaties with at least eighteen of those tribes.

The most frequently used method of disregarding the trust relationship with the tribes has simply been to deny them a trust land base. The Bureau of Indian Affairs and the Department of the Interior have in the past stated that it was their policy not to provide protection or services to those tribes which lacked a land base. As the tribes began to question the "wisdom" of the Department's policy, they found, in fact, there was no written policy or regulation. The Department had chosen over the course of many years to simply ignore the needs of these tribal groups, apparently hoping they would just go away.

It is the expressed belief of the landless Indian tribes, situated in the State of Washington, that they have, in fact, been recognized as Indian tribes by either Treaty or Act of Congress for many years. One tribe, the Stillaguamish, has filed action against the government [3] over the question of obtaining "federal recognition"; once again, a tribe is forced to protect its own interest. Other action by the landless tribes in Washington State is contemplated in the near future. The necessity of such legal action is due to the lack of a cohesive policy or criteria for obtaining federal recognition. It has been further compounded by the political jockeying of the Department of the Interior staff.

Six landless tribes have thus far filed Petitions with the Department of the Interior requesting a Secretarial review and determination of tribal status in order to be acknowledged as federally recognized. In some cases, 27 months have passed without a determination having

---

[1] Governor's Indian Affairs Task Force. *The People Speak: Will You Listen?* State of Washington (1973), p. 10.
[2] *Ibid.*
[3] *Stillaguamish Tribe of Indians* v. *Kleppe, et al.*, Civil No. 75-1718, U.S. District Court for District of Columbia, filed October 17, 1975.

182

been made. However, since 1971, three Indian tribes in Western Wash-
ington have received federal recognition of their tribal entities through
Department of the Interior administrative decisions. The first of
these, the Nooksack Tribe, was recognized in 1971 by a Solicitor's
Opinion which indicated that because of previous trust dealings by
the Bureau of Indian Affairs with the tribe that the Nooksacks were
eligible to organize under Section 16 of the Indian Re-organization
Act.[4]

In June of 1973, it was determined once again by administrative
decision that the Upper Skagit and Sauk-Suiattle Indian Tribes
should be recognized because in 1913 Congress had authorized the
expenditure of $250.00 for a piece of land to be used jointly as a
cemetery.[5]

These three administrative actions cast further doubt as to the
legitimacy of the Department's recent conclusions that the Secretary
lacks sufficient authority to extend recognition. However, some of the
same criteria which was used to make these determinations have been
used since the 1930's in other cases. Although in the case of the Upper
Skagit and the Sauk-Suiattle Tribes, recognition has not yet resulted
in a major increase in the level of services provided their people.
They have at least gained their Treaty fishing rights and limited
federal funding. Because they lack a landbase from which to operate,
they are severely impaired in their ability to develop a tribal economy.

The signatories of the Steven's Treaties in 1854 and 1855 were
promised that land would be set aside for their use and occupancy.
A system of reservations was established in each of these treaty areas
and, as such, were designated for the use of those tribes. For example,
the Snohomish or Tulalip Reservation was set aside to meet the
needs of those tribes who were party to the *Treaty of Point Elliot*.[6]
It is estimated at the time the treaty was signed that there were
between three and five thousand inhabitants of that treaty area.
Approximately fifteen hundred tribal members were assigned to go
to the Tulalip Reservation.

Only 165 Indians were allotted land on the reservation. Those who
were not allotted land never removed to the reservation for the
following reasons:

    1. Insufficient land was set aside;

    2. The land that was available could not provide a living for
these people;

    3. Much of the land on the Tulalip Reservation was inaccessible
due to heavy underbrush;

    4. Large numbers of Indian people were being "Shanghaied"
from Tulalip Bay, and as a consequence, people were afraid to
go there;

    5. Why leave the homesite where one could be sure of survival?;

    6. The government, after treaty times, promised many people
trust allotments or homesteads in their home territories.
These never materialized; and

    7. There was fear of being attacked by other hostile Indians
from up the coast.[7]

[4] Interior Department Solicitor's Opinion M-36833, dated August 13, 1971.
[5] Letter from La Follette Butler, Acting Deputy Commissioner of Indian Affairs, to Senator Henry M.
Jackson, dated January 7, 1974.
[6] 12 Stat. 927, 1859.
[7] Senate Report No. 91-1144, August 27, 1970.

183

These are perhaps the most significant factors as to why the majority of members of these tribes remained off-reservation. In remaining off-reservation, these people in no way severed their tribal relations. In the past two years, as the guarantee of a protected fishing right emerged from the *U.S.* v. *Washington*,[8] and as the amount of federal funds has increased to the "recognized" tribes, it has become increasingly common to see a reservation tribe openly oppose the rights of the landless tribes. In many cases, it is not only Indian against Indian, but Indians of the same family and tribal origin in conflict with one another. Such tribes as the Tulalip Tribes, Inc. and the Swinomish Tribal Community have expressed very strong concerns that should federal recognition be extended to the landless tribes that somehow:

1. Their political authority will be reduced;
2. That the landless tribal fishery will be largely uneducated and unregulated, causing a reduction of harvestable salmon; and
3. That federal services will be reduced if more tribes become eligible.

Upon discussing these concerns with representatives of the two above-mentioned tribes, Task Force staff found that these fears have not only been introduced by the Bureau of Indian Affairs, but also fostered and promoted beyond any contact with reality. In the case of the Tulalip Tribes, Inc., efforts to intervene in the *Stillaguamish* case and their opposition to the off-reservation treaty fishing rights has cost them in the tens of thousands of dollars in legal fees. Outside observers have indicated their extreme concern over the Tulalips' expenditures, in that had not the Bureau of Indian Affairs instilled these fears in them, they might have better spent their money on other needs of their tribal members instead of fighting blood-related Indian brothers.

*2. Historic Recognition and Relationships*

Since before treaty times, the tribes who are now landless have had social and economic ties with other landed tribes throughout Washington State and the Northwest. Existing records indicated formal political associations between tribal groups began shortly after the turn of the 20th century beginning with the creation of the Northwestern Federation of American Indians. Membership in this organization was composed of Indians from both lands and landless tribes and no distinction relative to reservation or non-reservation status was made. At its height, approximately 17 tribes were active members. Indicative of the high degree of cooperation between tribal groups is the fact that the founding President, Thomas T. Bishop, was a Snohomish Indian; a succeeding President, S. J. Kavanaugh was a Samish Indian; and the President who worked actively during the period of the Indian Re-organization era was Don McDowell, a Samish Indian. All three were landless Indians who worked for their people. A later President was Chief Martin J. Sampson of the Swinomish Tribe, a reservation Indian.

One of the more notable actions which was spawned by the Northwestern Federation of American Indians is best described in an excerpt from a letter to Mr. W. F. Dickens, then Superintendent at the

---

[8] 384 F. Supp. 312 (D.C. Washington, 1974).

184

Tulalip Agency, from Mr. Chas. Roblin, Special Alloting Agent at Hoquiam, Washington. Describing his efforts, Mr. Roblin stated:

I was to investigate and report on unenrolled Indians of Western Washington. This matter arose as follows: For many years Thomas G. Bishop, and the "Northwestern Federation of American Indians" had made claim that there were many thousand Indians in Western Washington who had never shared in any of the benefits derived from any of the treaties of early days and who were entitled to some recognition by the Government and some renumeration for lands taken from them, either in the shape of an allotment on the Quinaielt Reservation, or by the payment of the cash equivalent of such an allotment. These were supposed to be "Indians" who were not enrolled at any agency on the coast. Mr. Bishop has made several trips to Washington on behalf of these homeless Indians, and was advised by the Office that there were no records in the Office showing who these Indians were and that there was no foundation for a request to Congress for relief for them. In 1916 Mr. Bishop urged the Office to have an enrollment made of these Indians, so as to get such information in the record. The Office agreed to have such an enrollment made, with the distinct understanding that such an enrollment would not be a recognition of any claims made by the Indians; but an endeavor to have the record show what their claims were.

To once again meet the needs of the Washington Indians, a successor organization was founded in the 1950's with membership again consisting of Indians from landed and landless tribes with approximately 33 tribes or bands being associated. Charter members came from Tulalip Tribes, Inc., Swinomish Tribal Community, Lummi, Snohomish, Skokomish, Quileute, Quinault, Suquamish, Steilacoom, Samish, Skagit, Stillaguamish and Squaxin Iskand Tribes, to name a few. Officers were selected without regard to land status. Foremo st on the agenda of this Inter-Tribal Council of Western Washington Indians was the fight against the termination policies if the 1950's and the effort to keep the Cushman Indian Hospital in Tacoma open. The group successfully held off termination, but lost the hospital issues which deprived most Indians of much needed hospital care. The Cushman Hospital had for many years been the main source of health services for all Indians regardless of residence. With the closure of the Cushman Hospital, health services for landless Indians were slowly phased out and a new system of contract care was developed. Contract care is only provided to those Indian residents on rust lands.

As the organization grew, several joint meetings were held with Indians from Eastern Washington as a gradual evolutionary process, the Inter-Tribal Council of Western Washington Indians merged into the Affiliated Tribes of Northwest Indians, a group encompassing Indians in Washington State, Oregon, Idaho and Western Montana. This group has once agian given full membership to both landed and landless tribes and both work together for common objectives. Affiliated Tribes has lent its support to six landless tribes, all of whom (Snohomish, Samish, Steilacoom, Stillaguamish, Jamestown Clallam, and Cowlitz) are seeking federal recognition. On the national level, representatives from landless tribes have participated as members of the National Congress of American Indians. In the 1950's, Mr. Hank Hawkins, then Tribal Chairman of the Snohomish Tribe of Indians, served for several years as the first Vice-President of the National Congress of American Indians. The National Congress of American Indians has also provided the support for recognition of several of the non-recognized tribes form Washington State.

In recent years, both landless and landed tribes have entered into binding political relationships in such areas as manpower consortia,

185

joint receipt federal funds or programs, membership in inter-tribal organizations formed to provide training and technical assistance, economic development projects and countless other concerns. Under the authorization of *U.S.* v. *Washington*, several recognized tribes have extended fishing privileges to these landless tribes.

In 1969, Governor Daniel J. Evans of the State of Washington, provided for full representation of the non-recognized tribal governments through his Governor's Indian Advisory Council.[9]

### 3. *The Tribes Themselves*

It was originally contemplated that a brief scenario of each tribal group would be included in this report. In the interest of making this report as concise as possible, a matrix is provided on the following page. The matrix covers the considerations which have *previously* been used in making a determination of whether a group constitutes a "tribe" and how those considerations affect each landless tribe. In the matrix, if a space is left blank, no information was available at the time it was developed. Where a "no" answer is indicated, it should not be viewed as being finally conclusive, as new information is always being discovered.

Bureau of Indian Affairs employees at both the Western Washington Agency and the Portland Area Office freely admit that their records concerning landless tribes have frequently been overlooked or misplaced. These records reappear only when it serves the Bureau's purpose. The second matrix is a copy of a 1974 review of "Non-recognized Tribes" by the Portland Area Office, which is refuted by the results of the first matrix prepared by Task Force staff.

---

[9] *Op. cit., The People Speak.*, at p. ix.

186

| Consideration for determining if a group constitutes a "tribe" (from Cohen's Handbook of Federal Indian Law) | Cowlitz | Chinook | Duwamish | Jamestown Clallam | Samish | Snohomish | Stillaguamish | Snoqualmie | Stellacoom | Kikiallus | Snake River | Walla Walla | Wanapum | Noo Wha Ha | Mitchell Bay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Group has had treaty relations with the United States. | No ¹ | No ¹ | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No |
| Group denominated tribe by act of Congress or Executive order. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | | | | | Yes |
| Group has been treated as a tribe by other Indian tribes. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | | | | | Yes |
| Group has been treated as having collective rights in lands or funds. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | | | | | |
| Group exercises political authority over members, through a government. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | | | | | |
| Group has received special appropriations. | | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | | | | Yes | Yes |
| Group is now or has ever received Federal service BIA-IHS, etc. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | | | | | |
| BIA has had regular contacts with group. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | | | | | |
| Group has had frequent contacts with BIA. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | | | | | Yes |
| Group has an organization which meets regularly or annually. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | | | | | | |
| Group has a constitution and bylaws. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | | | | | | |
| Group has an elected tribal government which regularly conducts business. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | | | | | | |
| Group has a tribally approved membership role. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | | | | | | Yes |
| Group asserts its fishing rights. | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No | | | | No | |
| Group is recognized by the Indian Claims Commission. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | | | | | No |

¹ Treaty was not ratified.

Note: Blank spaces indicate information not available at this time.

FEDERAL RECOGNITION OF INDIAN TRIBES

| | Aboriginal Swinomish | Duwamish | James-town Clallam | Kikiallus | Lower Skagit | Samish | Snohomish | Snoqualmie | Stella-coom | Cowlitz | Chinook |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Federal Indian law (5 considerations; these have been relied upon in reaching the conclusion that a group constitutes a "tribe" or "band"):** | | | | | | | | | | | |
| (1) That the group has had treaty relations with the United States. | X | X | X | X | X | X | X | X | X | N | N |
| (2) That the group has been denominated a tribe by act of Congress or Executive order. | | | | | | | | | | | |
| (3) That the group has been treated as a tribe or band by other Indian tribes. | | X | X | | | | | | | | |
| (4) That the group has been treated as having collective rights in tribal lands or funds, even though not expressly designated a tribe. | X | X | | X | X | X | X | X | X | | |
| (5) That the group has exercised political authority over its members, through a tribal council or other governmental forms. | | X | X | | | | X | X | | | |
| **Other:** | | | | | | | | | | | |
| (1) Group has received special appropriations. | | X | X | | | | | | | | |
| (2) Group is now or has received Federal services (BIA-IHS, etc.). | | X | X | | | | X | X | | | |
| (3) Group is recognized by the Indian Claims Commission. | | X | X | X | X | X | X | X | | | |
| (4) BIA has had regular contacts with the group or its representatives. | X | X | X | | | | X | X | X | | |
| (5) Group has had frequent contacts with the BIA. | | | X | | | | | | | | |
| (6) BIA has assisted group with special projects. | | X | X | | | | | | | | |
| (7) Group has an organization which meets regularly and annually. | | X | X | | | | X | X | | | |
| (8) Group has elected officials and tribal council. | | X | X | | | | X | X | | | |
| (9) Group has a constitution and bylaws. | | X | X | | | | X | X | | | |
| (10) Group has an official tribal roll it has adopted. | | X | X | | | | | | | | |
| (11) Group's council meets regularly to conduct tribal business. | | | | | | | | | | | |
| (12) BIA has issued I.D. cards to members of group for fishing, etc. | | X | X | | | | X | X | | | |
| (13) Group invited to BIA meetings with Northwest tribes. | | X | X | | | | X | X | | | |
| (14) Group has been active in asserting its fishing rights. | | | | | | | | | | | |
| **Conclusion: Eligible—Y for yes; N for no.** | N | Y | Y | N | N | N | Y | Y | N | N | N |

Source: Developed by Portland area office.

*4. Tribal Needs*

It would be almost an impossible task to accurately assess the quantity of services which might be required to meet the needs of the landless tribes. It is, at this time, feasible to present a listing of those problems and needs which the tribes in Washington State have addressed in their testimony to both the formal hearing conducted on March 5, 1976 by Task Force #10, as well as at several informal hearings and interviews which were conducted in the field by Task Force staff. The majority of the discussion will relate to the involvement of the Federal government. This is necessitated in that the State of Washington feels no special obligation to "provide a special relationship with these tribes." It regards the off-reservation Indian as merely a citizen of the state with no special rights. The problems and needs are as follows:

a. The lack of Bureau of Indian Affairs protection of and fiscal support of tribal government has severely impaired the ability of the tribes to exercise their political authority over their tribal members.

b. The lack of Bureau of Indian Affairs protection of the reserved treaty right of fishing for many tribes has meant the loss of both individual and tribal income or economic base.

c. The alleged lack of federal recognition of the tribes by the Bureau of Indian Affairs has caused other federal agencies to deny participation in programs which would serve to enhance the health, education and general welfare of their tribal membership.

d. The denial of health services, provided by the Indian Health Service to the members of nonfederally recognized tribes has caused the greatest hardships to the young and the old, as some of the tribal members in their 20's, 30's, 40's and 50's, if employed, are not covered by third party insurance.

e. The Bureau of Indian Affair's refusal to provide educational services to the members of the landless tribes has created a hardship. The Bureau first reduced the number of Indians who were eligible to participate in educational programs by the establishment of a blood-quantum requirement. Later, in addition to the blood-quantum requirement, a restriction as to residency was established. Although the majority of non-reservation Indians' educational level may tend to be higher than those on the reservation, the educational needs are a long way from being met.

f. The lack of a tribal land base which may serve as the basis for tribal development and self-sufficiency is a major concern to the landless tribes. The amount of lands needed by each tribe to provide a living for those members wishing to live on the land varies from tribe to tribe. In most cases, this land must front on a river or the marine waterways.

g. Landless tribes have been unable to receive Indian Claims Commission judgment awards in any manner other than a *per capita* distribution. Many tribes have requested disbursements of the judg-

189

ment funds in a lump sum or a portion to purchase land to be held in trust. These requests have been denied.

h. The life of the Indian Claims Commission is too short. It needs to hear other types of claims, other than land issues.

i. The housing needs of the landless people in some cases do not meet the local minimum standards for health, safety and construction.

j. Alcoholism and Drug abuse amongst the landless tribal members is extremely high. There appears to be a direct correlation with the cross-cultural conflict many landless people have experienced.

*5. Recommendations of the Landless Tribes*

On July 12, 1976, 18 representatives from 9 landless tribes met under the auspices of the Governor's Indian Advisory Council, Non-Reservation Council, to develop and adopt a position paper and recommendations about the issue of federal recognition as it has affected them. This paper should be widely circulated as it presents some very clear recommendations. The text of the position paper is as follows: [10]

There are numerous Indian tribes in Washington State which do not occupy reservations or have land held in trust for them by the United States government. These landless Indian tribes have been popularly regarded as extinct, although the Governor's Indian Advisory Council recognizes fifteen of them. These tribes include: Snohomish, Cowlitz, Duwamish, Jamestown Band of Clallam, Samish, Steilacoom, Snoqualmie, Mitchell Bay, Stillaguamish, Chinook and others. In spite of the enormous odds against their survival, they continue to function as tribal entities, following the long line of traditional leadership as demonstrated in the 1800's by Seattle, Chief of the Duwamish and Suquamish Tribes, Pat-ka-nam, Chief of the Snoqualmie and Snohomish Tribes, and Leschi, War Chief of the Nisqually Tribe.

For many years after the signing of the Treaties in 1855, many Indian tribes continued to live as they had in the times before the White Man came. Each of the now landless tribes that signed the treaties, and several did not, were promised but never received reservations. Only with the passage of time did it become apparent that the landless tribes were going to be ignored and the Bureau of Indian Affairs would not extend significant services to them.

The Indian Claims Commission was once regarded as an institution responsive to the long standing interests of Indians and able to correct past wrongs. With the passage of time, however, it has become regarded in Indian Country as part of the on-going effort to strip Indians of their land and their rights. Also, landless tribes increasingly consider regaining a land base to be more important than receiving monetary settlement.

Non-reservation Indian tribes have been severely hampered by official neglect resulting in a situation in which thousands of Indians are not recognized officially as Indians, do not have their rights as Indians protected and are not receiving services from the Bureau of Indian Affairs, the federal agency specifically authorized to provide services to "Indians throughout the United States."

The policy of not recognizing some Indians and their rights yet recognizing the rights of other Indians, principally those living on reservations, is a failure of the United States to fulfill its commitments made to all Indians through treaties and various statutes. The failure of the United States to keep its commitment to assist and protect the landless tribes has contributed to the deterioration of the landless tribes' ability to determine their future.

The Bureau of Indian Affairs has consistently excluded Indians who do not live on Indian reservations from its service population. The landless tribes have been notably excluded from Bureau consideration in spite of a specific authorization through the Snyder Act which requires that the Bureau of Indian Affairs assist Indians throughout the United States. Failure of the Bureau to serve landless tribes has seriously hampered the ability of landless tribes to provide proper health care, education, and continuing employment for their people.

[10] Prepared by rerpesentatives of nine landless tribes, July 12, 1976.

190

The State of Washington has also ignored the interests of landless tribes. Consequently, it has acted to limit our governmental powers, although it may not have done so intentionally.

The landless tribal claim for justice has been advanced consistently through our individual tribal governments since the treaty-signing period of the 1850's. It is not presented here for the first time. It is not what the cynical might believe is the last ditch effort to enhance the potential for monetary awards which would satisfy wounded egos and improve our economic situation at the expense of the majority. It is a request that the promises made to us be kept.

For many years our leaders, acting in good faith, have accepted the promises made to them and looked forward to official responses to their legal and moral rights. The nature and enormity of the situation confronting them has been recognized only recently. This is the first time that the landless tribes have attempted to speak as one voice, but it will not be the last time we act together.

The more than 7,000 Indians want to secure their tribal heritage and Indian rights as they gain a prosperous future for their children. To do so, they want land to be held in trust for them by the federal government because this relationship would reaffirm their status as Indian people in the eyes of the government.

The landless tribes are still looking forward to the implementation of President Nixon's Indian self-determination policy and its application to our situation.

*We recommend that*

1. The Congress of the United States direct the primary agent of the trustee, the Secretary of the Interior, to immediately extend full federal recognition to those Indian tribes, groups or bands with whom a legal relationship exists due to treaty, Act of Congress, executive order, administrative decision, Indian claims commission or judicial decree.

2. That the secretary make full case-by-case review, based on an established and well defined criteria for recognition based on ethnological, historical, legal and political findings.

3. That the secretary once making a determination to extend full federal recognition to a tribe, then immediately commence to provide for the protection and the fulfillment of the fiduciary relationship as may be requested by these tribes.

4. That in extending full federal recognition to these tribes, that the secretary will seek from Congress an increase in the allocations to those agencies which are currently providing services to Indian tribes so that no services to other tribes are reduced.

5. That the secretary shall also provide for such trust lands as may be required for the need and exclusive use of these landless tribes.

6. That the Indian claims commission awards be modified by Congress to reflect the tribal attitudes in Indian country to provide land as well as monetary payment for tribal claims to be disbursed or utilized according to a tribally approved plan.

7. That the bureau provide technical assistance to landless tribes in re-establishing a land base for each tribe and provide the necessary funds for operation and administration of the tribal government . . . We are intent upon managing our own affairs and would therefore regard any effort of the Bureau to manage our affairs as undue interference into the self-governing responsibilities of the tribe. It is in this context that we emphasize the need for BIA concentration on technical assistance rather than management. Over the years, we have on our own developed certain management capabilities which have resulted in tribally initiated efforts to serve our Indian people, but we recognize the need for technical and financial assistance.

8. That the bureau be organized so as to include the legal capability to protect *all* Indian rights to fish, water, and land resources as well as exemption from state taxation for *all* Indian tribes   . . This capability should be within the Bureau, independent of the Department of the Interior and Justice Department.

9. That the bureau be independent of the Department of the Interior, free from the conflicts of interests of that department . . . It would be of greater use to Indians if the Bureau functioned administratively under the Congress and was not a political football.

10. That the Bureau be structured to encourage perpetual Indian participation in Bureau policy-making .   . Indians have been too long told how to arrange their affairs rather than allowed to actively initiate efforts on their own behalf. It seemed more important to Bureau officials that the Bureau of Indian Affairs be served and protected rather than the Indian people. We assert that "self-determination" for our people can truly be a way of life if Indians have access to all institutions which impact upon the lives of Indian people.

191

11. That the Bureau be more accessible to Indians, and would be by locating its facilities closer to the people it serves without reducing the current level of services. . . . Indians are a very diverse set of nations, tribes and bands. It would be appropriate then to organize the Bureau from the local level, authority to serve the diverse needs of Indian people. Also, Bureau offices should be near our tribes as they now are near Federal Indian reservations. Local offices should be allowed direct authority from the national office and the area offices should be eliminated. This would provide the local office direct ability to gain authorization for local efforts as defined by the tribes. Elimination of the area office would also represent a major administrative saving while increasing the Bureau's ability to directly serve Indians.

12. That the Bureau have its regulations and guidelines overhauled to reflect greater flexibility in dealing with the diverse interest of Indians. . . . This could be accomplished by a congressionally established Task Force including Indians from all areas of Indian country with specific authorization to re-write the Bureau's regulations and guidelines. Non-Indians should be included as their skills warrant.

13. That the Congress consolidate all essential services for Indians and Indian tribes under a separate independent agency which will be responsive to the needs of Indian people.

[COMMITTEE PRINT]

# AMERICAN INDIAN POLICY REVIEW COMMISSION

## FINAL REPORT

### SUBMITTED TO CONGRESS
### MAY 17, 1977

#### VOLUME ONE OF TWO VOLUMES



U.S. DEPARTMENT OF HEALTH,
EDUCATION & WELFARE
NATIONAL INSTITUTE OF
EDUCATION

THIS DOCUMENT HAS BEEN REPRO-
DUCED EXACTLY AS RECEIVED FROM
THE PERSON OR ORGANIZATION ORIGIN-
ATING IT  POINTS OF VIEW OR OPINIONS
STATED DO NOT NECESSARILY REPRE-
SENT OFFICIAL NATIONAL INSTITUTE OF
EDUCATION POSITION OR POLICY

Printed for the Use of the
American Indian Policy Review Commission

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1977

92-185

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402

ED164229

RC 011071

# CHAPTER ELEVEN
# NONRECOGNIZED TRIBES

### INTRODUCTION

Inconsistencies and oversights in the Indian policy of the United States are exposed by one stark statistic: There are more than 400 tribes within the Nation's boundaries and the Bureau of Indian Affairs services only 289.[1] In excess of 100,000 Indians, members of "unrecognized" tribes, are excluded from the protection and privileges of the Federal-Indian relationship.[1a]

There is no legal basis for withholding general services from Indians, with the sole exception of specific termination acts. There is no legitimate foundation for denying Indian identification to any tribe or community. The BIA has no authority to refuse services to any member of the Indian population.

Many unrecognized tribes have land title problems and are enmeshed in jurisdictional questions. They are severely handicapped by poor health, lack of educational opportunities and economic difficulties, yet they receive no assistance from the Federal Government. Nearby State and county officials are confused by the nebulous political status of these tribes.

The inequitable administration of Federal programs and laws stems, in large measure, from the accidents and vagaries of history. Nonrecognition is incomprehensible to Indians who have been neglected and forgotten. There is no valid reason for it. Long-deferred justice can be given to abandoned tribes only by a congressional declaration stating that all Indian people are included in the Federal-trust responsibility and the anomalous term, "nonrecognized", is as obsolete as the circumstances that led to its invention.

At the root of this problem is the identification of the rights of all Indian peoples to Federal Indian programs, laws, and protections. Since this process of identification has been inconsistent, a number of Indian people have been denied services either because they are not identified as "Indians" or as "tribes" as the terms are used in United States policy and law. To dispel this problem, and to direct the Federal-Indian policy to all Indian peoples, the term "Indian tribe" is defined by any one of a series of definitional factors enumerated in the recommendations which follow, and is intended to apply to all Indian peoples, including Indian communities, bands, clans, societies, alliances and groups, whether amalgamations or fragmentations of Indian tribes; but its use in this chapter is not meant to divide any

---

[1] Figures ascertained by calling the BIA, and by adding the number of known unrecognized communities. From the chart compiled by David Harmon and Suzanne Ahn of the American Indian Policy Review Commission staff.
[1a] See the chart of nonrecognized tribes on p. 468.



*page 460 blank.*       442

presently recognized tribal entities, or to apply to any people who are already formally recognized as part of a tribe by the United States Government for purposes of Federal Indian law or programs.

## MURKY PRECEDENTS, QUIRKY ADMINISTRATION

Trying to find a pattern for the administrative determination of a federally recognized Indian tribe is an exercise in futility. There is no reasonable explanation for the exclusion of more than 100 tribes from the Federal trust responsibility.

The distinction the Department of the Interior draws between the status of recognized and unrecognized tribes seems to be based merely on precedent—whether at some point in a tribe's history it established a formal political relationship with the Government of the United States. The procedure was subject to an accident of history. A number of Indian tribes are seeking to formalize relationships with the United States today but there is no available process for such actions.

The special Federal-Indian relationship usually was established by treaties. There are tribes, however, which have no treaties and receive services from the BIA; and there are tribes which signed treaties but do not receive services. Now, as pointed out earlier, the United States no longer negotiates treaties with Indian tribes.

Congressional measures mentioning a specific tribe often are used as a basis for a tribe's special relationship with the U.S. Government, but there are tribes mentioned in legislation that receive no Federal attention. And there are tribes which never were mentioned in legislation that receive services.

Administrative actions by Federal officials and occasionally by military officers sometimes have, at other times, laid the foundation for Federal acknowledgment of a tribe's rights. Yet, some tribes attracted temporary attention and later were ignored while others simply drew no attention.

### INDEFENSIBLE BUREAUCRATIC DECISIONS

The Bureau of Indian Affairs has no clear authority to deny services to any tribe and never has rationalized its vague policy of excluding a particular tribe. Most legislation affecting Indian policy and law is directed to Indians generally, addressing the general historical situation inherent in Federal-Indian relations. Congress' intent often has been to seek solutions to the problems confronting all Indians. Except in the specific, well-defined cases of terminated tribes, there is no foundation for the executive branch's refusal to serve any tribe.[2]

There is no question that Federal programs and laws are applied inequitably among Indians tribes. The Department of the Interior has enforced these laws only in selected Indian communities without justifying its process of selection.

### TURMOIL IN INDIAN COMMUNITIES

Poorly defined administrative discretionary practices have resulted in widespread confusion affecting the lives of Indians and other

---

[2] Task Force Ten final report, p. 1696. See also Thomas N. Tureen, "Federal Recognition and the Passamaquoddy Decision", in Task Force Ten's report, pp. 1653–74.



citizens throughout the United States. A number of Indian and non-Indian communities are troubled by unclear land titles because Indians who may own the land are not recognized as Indians by Federal officials.

In many areas, tribes arguing jurisdiction over their members and their land have won or lost solely at the discretion of local governmental representatives.

Withholding of recognition has led to bizarre social consequences. There were incidents when Indians speaking their tribal languages were committed to mental institutions because their neighbors, who did not acknowledge their Indian identity, thought they were having "fits." [3] In Louisiana, marriages by tribal custom were not recognized as legitimate on the grounds that the Federal Government did not recognize the tribes themselves.[4] A more widespread occurrence is that Indians asserting their tribal identity are accused by non-Indian neighbors of being imposters.[5]

Task Force Ten summed up the impact of this confusion on Indian communities:

The results of "nonrecognition" upon Indian communities and individuals have been devastating, and highly similar to the results of termination. The continued erosion of tribal lands, or the complete loss thereof; the deterioration of cohesive, effective tribal governments and social organizations; and the elimination of special Federal services, through the continued denial of such services which Indian communities in general appear to need desperately. Further, the Indians are uniformly perplexed by the current usage of "Federal recognition" and cannot understand why the Federal Government has continually ignored their existence as Indians. Characteristically, Indians have viewed their lack of recognition as Indians by the Federal Government in utter disbelief and complete dismay and feel the classification as "nonfederally recognized" is both degrading and wholly unjustified.[6]

## ACCIDENTS OF HISTORY

Stated administrative refusal to recognize certain tribes is a relatively recent phenomenon that gained some support during the years Congress sought to terminate the Federal relationship with specific tribes. The BIA appears to have believed that since termination was the new policy Congress would not want to acknowledge the special relationship to other tribes. The neglect of certain tribes, however, has deeper roots than termination policy. It often is the result of long-forgotten historical accidents.

While the United States was expanding across the North American continent, it was confronted by a formidable task. It was necessary to incorporate or resolve the policies and legal traditions of the colonial governments of France, Spain, Mexico, and Russia in addition to the English systems which were fundamental to early federal development.

In accepting jurisdiction over former colonial territories, American officials had difficulty collecting, translating, and resolving the agreements former powers had made with Indian tribes. Many tribes which were well-known participants in colonial affairs were unfamiliar to the United States. Some tribes were so weakened by colonial govern-

[3] Interdiction papers from the Avoyelles Parish Court House, Marksville, La. The cases involved two members of the Ofo Tribe, whose language is now extinct.
[4] Senostrie Youchicant v. Texas and Pacific Railway Co. La. 22808.
[5] See Task Force Ten report, sections submitted by tribes.
[6] Task Force Ten report, p. 1695.

 ERIC

444

ments that they were overlooked. Other tribes avoided contact with colonial governments and the United States. A brief discussion of this period provides an understanding of the complications in this hidden side of American Indian history.[7]

In the 13 original colonies, some tribes supported England in the War for Independence and were regarded as enemies by Americans. They were treated with disfavor, encouraged to leave the country, and were forgotten in subsequent years.[8]

## COLONIALISM HARSH ON INDIANS

Conversely, in the southeastern and Appalachian regions, where England had competed with France and Spain for control, Indian enemies of England were regarded as enemies of the United States. They were subjugated and ignored.[9]

The Louisiana Purchase from France guaranteed that Indian treaties with former powers would be honored by the United States. Those treaties were ignored and the tribes were forgotten.[10]

In the Floridas, which the United States and Spain contested until 1819, Indians who were allies of Spain lost much of their lands; fled to isolated areas and hid from the advancing Americans.[11]

Mexico's agreements with the tribes of Texas, and the liberal Indian policy which later was administered by the Republic of Texas, were largely forgotten after Texas joined the Union. Many tribes in Texas were ignored after statehood.[12]

Along the northern borders of Michigan, Minnesota, North Dakota, and Montana, some tribes moved freely between American territory and Canadian provinces. Both countries left the responsibility for dealing with those tribes to the other government.[13]

In the southwest, Indian pueblos which had existed independently from time immemorial and were recognized as self-governing entities by Spain and Mexico, were ceded to the United States along with surrounding territory. They were ignored by Federal Indian policy for half-a-century, and some have not been recognized yet as pueblos.[14]

In California, a similar situation developed with the Spanish-organized Indian rancherias. They were absorbed by the United States with no clarification of their Indian status.[15]

In the Pacific Northwest, tribes which had balanced the competing interests of England, Russia, and Spain for centuries, lost the achievements of generations of tribal diplomats when the United States established control of the region. The Americans found little use for native alliances and ignored a number of tribes.[16]

---

[7] Much of the following section evolved from "Those Whom Even Time Forgot", ch. 12 of Kirke K. Kickingbird and Karen Ducheneaux, "100 Million Acres" (Macmillan, New York, 1973), 196–210.

[8] See New England tribal histories in Task Force Ten report, 71–130.

[9] Ernest C. Downs, "The Struggle of the Louisiana Tunica Indians For Recognition," a chapter to be published in Walter Williams, "Southeastern Indians Since the Removal Period."

[10] See Carol J. Meyer, Jr., "The Louisiana Purchase and Indian Rights," in the American Indian Journal, October 1976.

[11] Kickingbird and Ducheneaux, op. cit., 208.

[12] E.g. the Tiguas and Alabama-Coushatta groups; speech of Vine V. Deloria, before a conference of Anthropologists and Indian People in Alexandria, La., January 1973.

[13] Kickingbird and Ducheneaux, op. cit., 203–205.

[14] See Task Force Ten's report on the Pascua-Yaqui, pp. 131–147.

[15] Task Force Ten report, introduction.

[16] See Warren Cook, "Floodtide of Empire" (Yale, 1976), passim.


ERIC

Across the continent, there were tribes which quietly fled colonial settlements and which were completely forgotten by all governments administering the colonies.

Tribes seldom benefited from the colonial period. Those who participated in the colonial schemes of European nations suffered the misfortunes of their European allies without having the advantage of returning to a safe homeland. Many tribes who accustomed themselves to one colonial power had their worlds overturned later by a more formidable power.

Rights guaranteed by one European nation not always were protected by later colonizers. Tribes who refused to side with any invading power usually found themselves distrusted and unaided by all Europeans.

## FEDERAL CONTINUATION OF COLONIAL OVERSIGHTS

Not all the tribes neglected by the United States in the last two centuries were forgotten because of historical accidents in colonial times. A number of tribes were lost as a direct result of Federal Indian policy.

Tribes "lost" after American independence avoided contact with Americans. Indians, who perceived that Federal policies would be harmful to their tribes, that government officials sought to divest them of their land or that Federal agents were corrupt, often decided to remain in hiding. These isolated tribes did not realize or did not believe that there were Federal laws designed to protect their lands and that some Federal programs might have given them needed services. Even when administrators of Indian programs attempted to ameliorate the conditions of tribes, it was likely that peaceful tribes which had not fought against the United States would be unknown and, consequently, overlooked.

Tribes willing to relate to Federal officials sometimes were lost due to bureaucratic oversight or the inept administration affecting them.[17]

In Massachusetts and other Eastern States, tribes which had survived British and American conflicts sometimes found themselves the object of concerted assimilation programs. Indians who resisted the policy achieved hidden independence in isolation. Others who became "Christian Indians" or "Praying Indians" were noted in BIA records but were treated as though they had ceased being "Indian."[18]

### TRIBAL COMMUNITIES DISPERSED, LOST

The Removal Policy contributed to wide dispersion and loss of Indian tribal communities. The first removal treaties promised land west of the Mississippi River, but later treaties located "Indian Territory" hundreds of miles farther west. During the period between the two types of treaties, a number of Cherokee, Creek, and Choctaw towns had moved to the areas promised, unaware that new treaties had changed their official destinations. They settled in Arkansas and Louisiana believing they were fulfilling their part of the treaty.[19]

[17] Kickingbird and Ducheneaux. *op. cit.*
[18] Task Force Ten report, 71–130.
[19] *See* Hiram F. Gregory, "The Jena Band of Louisiana Choctaw" in the "American Indian Journal." Feb., 1977.



Circumstances occasionally caused the accidental exclusion of tribes which would have participated in treaty negotiations with the United States. A day's delay, while an official traveled to the place appointed for the treaty, could result in a group's return home. Snowstorms in the Northwest prevented the attendance of tribes in some treaty proceedings.[20]

In many situations, bands of Indians who disagreed with the provisions of treaties walked out of the negotiations in protest. Years later they suffered because they had no treaty rights, however limited.[21]

Some policies implementing treaty provisions also contributed to tribal isolation. Forced relocation of tribes on reservations, for example, did not take runaways into account. In Arizona, one tribe that was relocated on a reservation with an unfriendly tribe simply returned to its original homeland without telling Federal officials.[22]

When Congress legislated the end of the treaty-making period in American Indian policy in 1871, one Federal official foresaw the problems for tribes that had not yet established relations with the Federal Government. In his 1872 report, the Commissioner of Indian Affairs made these comments:

> This action of Congress . . . presents questions of considerable interest and much difficulty, viz: What is to become of the rights of the Indians to the soil over portions of territory which had not been covered by treaties at the time Congress put an end to the treaty system? What substitute is to be provided for that system, with all its absurdities and abuses? How are Indians, never yet treated with, but having in every way as good and complete rights to portions of our territory as had the Cherokees, Creek, Choctaws, and Chickasaws, for instance, to the soil of Georgia, Alabama and Mississippi, to establish their rights?[23]

### LANDLESS INDIANS

The Allotment policy, parceling out Indian lands to individuals, did not always provide for the tribe's total population. Landless Indians were forced to move off the reservation and regroup in neighboring towns or cities.[24]

The Indian Reorganization Act of 1934 tried to rectify a number of these situations. At that time, in fact, the word "recognized" was first applied to Indian tribal governments. Prior to passage of the IRA, the Bureau of Indian Affairs had seen tribes as being "under the jurisdiction of the Federal Government."[25] The Act proposed the purchase of land bases for some small tribes which had been previously unknown. World War II interfered with these plans, however, and the tribes were forgotten again.[26]

By the 1950's, interest in preserving the special status of Indian tribes had waned and in specific cases tribes were terminated. One Louisiana Congressman who sought Federal programs for five unrecognized tribes in his State received the following response from the BIA: "Current policy in Indian affairs is to promote the social and economic development of Indian tribal groups now under our

[20] Ken Hansen : *see* Task Force Ten Report, pp. 181–191.
[21] Historical research conducted by *U.S.* v. *Washington*, unpublished.
[22] Kickingbird and Ducheneaux, 199–202.
[23] Report of the Commissioner of Indian Affairs for the year 1872 ; cited in Task Force One final report, p. 95.
[24] Kickingbird and Ducheneaux, 203–205.
[25] 24 U.S.C. 479.
[26] Kickingbird and Ducheneaux, *op. cit.*



jurisdiction so that, as rapidly as possible, they may become independent of their special relationship with the Federal Government." [27] From that time to the present, various reasons have been given for the BIA's reluctance to serve some tribes as it does others.

## AVAILABLE INFORMATION ON NONRECOGNIZED TRIBES

Since most of these tribes are in isolated locations and have never been served by the Federal Government under the denomination of "Indians", it is extremely difficult to collect information on them. In many cases, these tribes resist outside investigators asking for information. A few publications have appeared recently in defense of these tribes, but they often have relied on outdated information or vague estimates.

Despite these unavoidable difficulties, Commission staff members, have prepared a chart of known nonrecognized communities, their locations, populations, their colonial treaties and/or United States treaty rights, whether they have been mentioned in BIA records, what services they receive, and the services for which they have expressed a need.

The chart contains many gaps and shortcomings which cannot be corrected at this time without more accurate data. It is important, however, to use the chart to locate almost totally unknown tribes not referred to in any other single source. To summarize the findings in the chart, which is admittedly incomplete, these pertinent facts can be presented:

There are approximately 133 nonrecognized Indian communities in the United States.

Seventy-six communities have stated population figures. The total nonrecognized population appears from these estimates to be in excess of 111,728.

There are at least 23 such Indian communities with land even though Federal officials do not protect that land by applying laws pertaining to Indian tribal lands.

At least 37 communities have had formal treaty relationships with governmental powers that predated the United States.

At least 29 communities have United States treaty rights derived either from obligations the United States assumed from colonial powers or from treaties the United States negotiated with these or other Indian tribes.

At least 25 of these tribes have been mentioned in BIA records and, therefore, are familiar to the United States as tribes of Indians.

Of the tribes receiving services, most get funds from a few Federal programs: CETA funds administered by the Department of Labor, Indian Education Act (title IV) funds administered by the U.S. Office of Education, and some ONAP programs.

The most frequently expressed needs in these communities are education, health services, housing, land, and legal assistance.

[The chart follows.]

[27] Letters kept by the Pierite family and the Barbry family of the Tunica Tribe, photocopied and filed at the Institute for the Development of Indian Law, Washington.



CHART OF AVAILABLE INFORMATION ON NONFEDERALLY RECOGNIZED INDIAN TRIBES

| Name of tribal group and location | Number of members | Land base (acres) | Colonial Treaties | U.S. Treaty Rights | Mentioned in BIA records, reports, or publications | Services now receiving | Services desired | Informa... Bu... sourc... |
|---|---|---|---|---|---|---|---|---|
| **ALABAMA** | | | | | | | | |
| Creek Nation East of the Mississippi: Atmore............ | [1] 545 | | Yes | | | | | (... |
| Choctaw Communities: Washington and Mobile Counties... | 4,000 | | | | | | | (... |
| **ARIZONA** | | | | | | | | |
| Guadalupe, Inc. (Yaqui): Phoenix.................... | [3] 550, [4] 1, .00 | | | | | | | (... |
| Pascua Yaqui Association: Tucson................... | [5] 2,000, [6] 6,500 | 202 | Yes............ | Yes........... | Yes [9] ........ | Public Law 80-350, OEO, CETA.[9] | H, S,T, T, LE...... | (... |
| **CALIFORNIA** | | | | | | | | |
| American Indian Council of Mariposa County (Mono): Yosemite National Park. | | | | | Yes [12] ................ | | | (... |
| Big Meadows Lodge (Maidu, Miwok): Chester................ | | | | | | | | (... |
| Butte Valley Indian Council (Miwok): Durrs................ | | | | | | | | (... |
| Calavaras County Band of Miwok Indians: West Point.............. | | | | | | | | (... |
| Capistrano Indian Council: San Juan Capistrano................... | | | | | | | | (... |
| Central Coast Indian Council: Morro Bay................ | | | | | | | | (... |
| Happy Camp Karok Council: Happy Camp.................. | | | | | Yes..... | | | (... |
| Howonquet Community Association: Smith River................... | | | | | | | | (... |
| Indian Community of Mono Lake: Le Vining................. | | | | | | | | (... |
| Mendo Lake Pomo Council: Ukiah................... | | | | | | | | (... |
| Orleans Karok Council: Orleans................ | | | | | | | | (... |
| Pit River Bands................ | | | | | | | | (... |
| Siskiyou County Indian Association (Shasta, Wintun, Karoks): Etna. | | | | | | | | (... |
| Sonoma County American Indian Council (Pomo): Heraldsburg. | | | | | | | | (... |
| Xabenapo Community Council: Finley................... | | | | | | | | (... |
| Jamul Diegueno: Near San Diego................... | [20] 705 | [23] 100 | | | | | | (... |
| **CONNECTICUT** | | | | | | | | |
| Eastern Pequots (Paucatuck Pequots): New London..... | [18] 19 | 225 | Yes, [14] 1683........ | Yes.................. | | | | (... |
| Mohegan Tribe: Uncasville.................. | [17] 200 | | Yes.................. | | | | | (... |
| Paugusett Tribe (Golden Hill Tribe): Trumbull...... | [19] 50 | 0.25 | | | | | | (... |
| Schaghticoke Indians of Kent, Conn., Inc.: Litchfield..... | [19] 400 | 400 | Yes................. | | | | H, L, E,A...... | (... |
| Western Pequots of Connecticut (Mashantucket Pequots): Ladyard. | 55 | 212.9 | Yes.................. | | | | H, R, S,T, L...... | (... |

149

ERIC

### DELAWARE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Nanticoke Tribe: Millsboro | 411 | | Yes, 1644 | | Yes | State school aid | Ag. Ass | (33) |
| Moors: Kent County | 310 | | | | | | | (34) |

### FLORIDA

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Apalachicola Tribe: Carrabelle | | Yes | Yes, 1678 | Yes, 1823, 1832 | | Indian education grant. | Ed., F., L. Ass., Med. | (35) |
| Cane Creek Seminole | 1,600 | | | | | | | (36) |
| Lower Creek Tribe East of the Mississippi, Inc.: Pensacola. | | | | | | | | (36) |
| Muskogee Creek Nation East of the Mississippi: Perry | | | | | | | | (38) |

### GEORGIA

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Altamaha | 100 | | | | | | | (38) |
| Creek, Tribe East of the Mississippi, Inc.: Cairo | | | | | | | | (38) |
| Muskogee-Creek Tribe East of the Mississippi | | | | | | | | (38) |
| United Cherokee Nation of Georgia | (40) | | | | | | | |

### INDIANA

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Miami: Indianapolis | 700 | | | | | | | (38) |
| Miami: Peru | 63, 93 | | Yes, 1763 | | | | | (33) |

### KANSAS

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Chippewa, Munsee, Delaware: 8 communities | 89 | | Yes | Yes | Yes | | | (38) |
| Delaware, Inc | | | | Yes | | | | (37) |
| Wyandot Community: Wyandot County | 134 | | | Yes | | | | (38) |

### KENTUCKY

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| United Lenape Band and Adopted Tribal Peoples: Moorehead. | | | | | | | | (39) |

### LOUISIANA

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (Atakapa), Attacapa: Gulf coast | 6 | | Yes | Yes | | | | (26) |
| Choctaw Band of Louisiana: Baton Rouge | 2,500 | | Yes | Yes | | | | (29) |
| Choctaw: Saint Tammany Parish | 55 | | Yes | Yes | Yes | | | (33) |
| Choctaw: Rapides Parish | 181 | | Yes | Yes | Yes | | | (33) |
| Houma Alliance, Inc.: Dulac | 1,500 | | Yes, 1777 | Yes | Yes | CETA | H., T., L. Ass | (37) |
| Houma Tribe, Inc.: Galliano | 2,500 | | Go | Yes | Yes | CETA, HEW | H., Ed., L. Ass | (38) |
| Jena Choctaw Band: Jena, La Salle Parish | 200 | Yes | Yes | Yes | Yes | CETA, HUD | Ed., Med, H., L. Ass. | (41) |
| Tunica-Biloxi Tribe: Marksville | 600 | 130 | Yes, 1779 | Yes | Yes | CETA | H., L. Ass. Ed., Med. | (43) |

See footnotes at end of table.

## CHART OF AVAILABLE INFORMATION ON NONFEDERALLY RECOGNIZED INDIAN TRIBES—Continued

| Name of tribal group and location | Number of members | Land base (acres) | Colonial Treaties | U.S. Treaty Rights | Mentioned in BIA records, reports, or publications | Services now receiving | Services desired | Information sources |
|---|---|---|---|---|---|---|---|---|
| **MAINE** | | | | | | | | |
| Association of Aroostook Indians (Micmac and Malecite): Houlton | 1,158 | | Yes, 1794 | | | | Med., H | (⁴) |
| Central Maine Indian Association: Orono | | | | | | | | (⁵) |
| **MARYLAND** | | | | | | | | |
| Lumbees: Baltimore | 3,500 | | | | | | | (⁶ᵇ) |
| Nanticoke: Blue Ridge Mountains | # 700 | | Yes, 1698 | | | | | (⁷) |
| Piscataway-Conoy Indians, Inc.: Oxon Hill | | | Yes, 1634 ᵃ, 1642, ᵃ | | Yes, 1941 | | Ed., L (20 acres) | (⁸) |
| Wesorts (descendants of Piscataway-Conoy): Eastern Shore | | | | | | | | (³⁴) |
| **MASSACHUSETTS** | | | | | | | | |
| Algonquin Indian Association: Brockton | | | | | | | | |
| Boston Indian Council Services Wahanaia: Boston | 3,500 | | Yes | | | CETA | | |
| Bristol County Indian Council: North Dartmouth | | | | | | | | |
| Freetown-Fall River Wampanoag: Freetown and Fall River | | 227.5 | Yes, 1707, ᵃ | | | | | |
| Nipmucksec-Nipmuc: Worcester County | 300 | 11.9 | Yes, 1728 | | Yes | | L, H, Ed | |
| Wampanoag Tribal Council of Gay Head, Inc.: Martha's Vineyard Island | # 400 | 200 | Yes, 1620, 1707, ᵃ | | Yes | | L, H | |
| Mashpee Wampanoag Indian Tribal Council: Mashpee Barnstable, environs | 900 | 500 | 1707 ᵃ | | Yes | | L, LAss, H | |
| New England Schaghticoke Indian Association, Inc.: Avon | | | | | | | | |
| **MICHIGAN** | | | | | | | | |
| Consolidated Bahwetieg Ojibwar: Sault-Ste. Marie | | | | Yes ᵃ | | | | |
| Genesee Valley Indian Association: Flint | | | | | | | | |
| Gogebic-Ont. Non-Bee. Indian Council: Bessemer | | | | | | | | |
| Grand Rapids Intertribal Council: Grand Rapids | | | | | | | | |
| Grand River Band of the Ottawa Nation: Hart | | | | | | | | |
| Huron Potawatomie: Fulton | 50 | 120 | | Yes, 1815, 1841, 1836, ᵃ | | | | |
| Kahnichgaming Indian Community Council: Watersme et. | | | | | | | | |
| Lansinee Indians, Inc.: Suttons Bay | | | | | | | | |

470



| | | | | |
|---|---|---|---|---|
| Lac Chomeaux Tribe, Inc.: Hessel........................................ | | | | (³) |
| Native Americans of Macomb County: Mount Clemens........... | | | | (³⁸) |
| Northern Michigan Citizen Association: Petoskey................... | | | | (³⁸) |
| Oakland County American Indians: Auburn Heights............... | | | | (³⁸) |
| Omni Cap: Warl.......................................................... | | | | (³⁸) |
| Ojibway Indians: Iron River........................................... | | Yes ³⁴ | | (³) |
| Ottawa and Chippewa Indians of Michigan: Schoolcraft, Mackinac, and Charlevoix Counties. | 6,000 | 1867, 1872, yes.⁴⁷ | | (³) |
| Pageeon Potawatomi: Berrien, Cass, Van Buren Counties. | 637 | | | (³) |
| Potawatomi Indian Nation, Inc.: Dowagiac.......................... | | | | (³) |
| Potawatomi Indians of Michigan: Watervliet......................... | | | | (³) |
| Potawatomi: Niles and St. Joseph..................................... | | Yes ⁴⁸ | | (³) |
| Saginaw Intertribal Association: Saginaw............................. | | | | (³) |
| Saginaw Valley Indian Association: Pinconning........................ | | | | (³) |
| Thornapple Band of Ottawas: Manistee............................... | | | | (³) |
| Tri-County American Indians: Sault-Ste, Marie....................... | | | | (³) |

### MISSISSIPPI

| | | | | |
|---|---|---|---|---|
| Various Choctaw and Creek Communities: Scattered....... | 1,908 | | | (³⁸) |

### MONTANA

| | | | | |
|---|---|---|---|---|
| Chartered Landless Indians (Chippewa and Cree): Miscosta. | 2,200 (⁹⁵ᵃ) 1,900 | | | (³⁸) |
| Matis: Scattered........................................................ | | | | (⁴⁴) |

### NEW HAMPSHIRE

| | | | | |
|---|---|---|---|---|
| New Hampshire Indian Council (Pennacook): Manchester. | 361 | | | (⁴⁴) |

### NEW JERSEY

| | | | | |
|---|---|---|---|---|
| Jackson Whites and Pineys: Gouldtown.............................. | 1,300 | | | (⁴⁴ᵃ) |
| Lenni Lenape............................................................ | | | | (⁴⁴¹) |
| Powhatan Indians of Delware Valley: Camden........................ | | | | (⁴⁹) |

### NEW YORK

| | | | | |
|---|---|---|---|---|
| Abenaki/Wabenakis: Lake George..................................... | 25 | | | (⁴⁸) |
| Indian Mountain Look-Out Inter-Tribal Native Americans: Otisville. | | | | (⁴⁹) |
| Montauk: Long Island................................................. | 50 | Yes. | | (⁴⁸) |
| Poospatuck Indian Tribe: Long Island................................ | 85 | 60 Yes. | H., E., A., | (⁵⁷) |
| Shinnecock Tribe: Southampton....................................... | 200 | 600 Yes. | New York services... H., Ed., L. Ass. | (⁴⁸) |
| Bushwacker............................................................. | 100 | | | (⁵⁸ₐ) |
| Jackson Whites......................................................... | 500 | | | (⁵⁸ₐ) |

Footnotes at end of table.




ERIC
Full Text Provided by ERIC

## CHART OF AVAILABLE INFORMATION ON NONFEDERALLY RECOGNIZED INDIAN TRIBES—Continued

| ...ame of tribal group and location | Number of members | Land base (acres) | Colonial Treaties | U.S. Treaty Rights | Mentioned in BIA records, reports, or publications | Services now receiving | Services desired | Information source. |
|---|---|---|---|---|---|---|---|---|
| **NORTH CAROLINA** | | | | | | | | |
| ...arne Area Association of Indians | | | | | | | | (3) |
| ...Tribe: Clinton | 1,775 | | | | | | Ed | (4) |
| ...and County Association for Indian People: ...eville. | 3,199 | | | | | | Ed | (5) |
| ...Carolina Indian Association: Robeson County | 1,500 | | | Yes | | | Ed, L. Ass | (1) |
| ...Indian Tribe, Inc.: Halifax, Warren County | 2,500 | | Yes | | | | Ed, H, S. T | (2) |
| ...Indians: Robeson County and environs | 31,000 | 40,000 | Yes, 1584 | | Yes | | Ed, H, etc | (3) |
| ...County Indians: Person County | 333 | | | | | | | (3) |
| ...Siouan | 4,000 | | | | | | | (3) |
| ...ra Eastern Carolina Indian Organization: Maxton | | | | | | | | (3) |
| ...aw Siouan: Boulton | 2,000 | 5 | | | | | | (3) |
| **OHIO** | | | | | | | | |
| ...e Nation United Remnant Band: South Point | | | | | | | | (11) |
| ...ch Confederacy: Xenia | 500 | | | | | CETA | L | (20) |
| **OREGON** | | | | | | | | |
| ...: Tribe of Indians (Tchinook): Mouth of the ...abia River. | | | | | | | | (11) |
| **PENNSYLVANIA** | | | | | | | | |
| ...of Three Rivers American Indians: Pittsburgh | | | | | | | Med | (11) |
| ...rsonderpoole): Towanda and Wyalusing | 500 | | | | | | | (11) |
| ...xannock Area American Indians: Harrisburg | | | | | | | | (11) |
| ...Indians of Delaware Valley: Philadelphia | | | | | | | | (11) |
| **RHODE ISLAND** | | | | | | | | (11) |
| ...esett Indian Tribe: Wakefield | 2,600 | 2 | Yes, 1636 | | | | L, L. Ass. Med, Ed | |

472



## SOUTH CAROLINA

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Brass Ankles: Ridgeville | 250 | | | | | | (44) |
| Four Holes Indian Organization: Ridgeville | 250 | | Yes, 1715 | | | | (34) (54) |
| Lumbee (Croatan): Ridgeville | 604 | | | | | | (34) (53) |
| Santee Tribe: Holy Hill | | | | | | | (34) (52) |
| Summerville Indians: Dorchester, Calleton Counties | 250 | | | | | | (52) |

## TEXAS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Kickapoo (from Oklahoma) | | | | | | | (56) |

## UTAH

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Southern Paiutes: Cedar City | 162 | (46) | Yes | 1863, 1874 | | | (71) |

## VERMONT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Abenaki: Swanton and environs | 1,500 | | Yes, 1765 | | | L. Ass. L, Ed | (44) |

## VIRGINIA

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Amherst Indian Tribe: Amherst County | 200 | | | | CETA | Ed | (56) |
| Chickahominy Tribe: Charles County | 875 | | | | State | H., Ed | (57) |
| Mattaponi Tribe (Powhatan): West Point | 290 | 125 | Yes, 1658 | | State | Cultural center | (11) |
| McLamgton, Fames: Patrick County | | | | | | | (59) |
| Pamunkey: King Williams | 55 | 800 | Yes, 1677, 1646 | | | | (59) |
| Potomacs, Accohanocs, Nansemonds: Blue Ridge Mountains | | | | | | | (52) |
| Rappahannock: Indian Neck | 425 | 2 | | | CETA | Ed, etc | (56) |

## WASHINGTON

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Chinook: Southwest Washington | 2,000 | | | Yes | Yes | | (51) |
| Cowlitz Tribe: Southwest Washington | 1,800 | Yes | | Yes | Yes | L, L.Ass | (51) |
| Duwamish Tribe: Seattle | 1,100 | | | Yes | Yes | do. | (51) |
| Jamestown Clallam Tribe: Sequim | 550 | | | Yes | Yes | do. | (51) |
| Kikiallus: Stanwood | 50 | | | | Yes | do. | (51) |
| Samish: Anacortes | 560 | Yes | | Yes | Yes | do. | (51) |
| Snake River: Eastern Washington | | | | | Yes | do. | (51) |
| Snohomish: Snohomish County | 700 | Yes | | Yes | Yes | do. | (51) |
| Snoqualmie: Snohomish County | 630 | Yes | | Yes | Yes | do. | (51) |
| Steilacoom: Tacoma | 150 | | | Yes | Yes | do. | (51) |
| Walla Walla: Southeast Washington | | | | Yes | Yes | do. | (51) |
| Wanapum: Yakima | 30 | | | Yes | Yes | | (51) |
| Kitchell Bay: Western San Juan Island | 150 | | | | | | (51) |
| Noo Wha Ha: Skagit City | 20 | | | Yes | | | (51) |

Footnotes at end of table.



473

**WISCONSIN.**

| | | | |
|---|---|---|---|
| Brotherton Community: Winnebago, Calumet Counties... | 254 | Yes... | (25) |
| Chippewa. | 181 | | (26) |
| Tripoli–McCord Chippewas. | 65 | | (26) |

**TOTALS**

| | | |
|---|---|---|
| Number of tribal groups. | 133 | |
| Total available population figure. | 120,858 | 250,000 |
| Number of tribes with land. | 27 | |
| Number of tribes with colonial treaties. | 37 plus. | |
| Number of tribes with U.S. treaty rights. | 32 plus. | |
| Number of tribes mentioned in BIA records. | 30 plus. | |
| Most frequent Federal services now received. | | CETA, some education funds. |
| Most frequent services requested. | | Housing, education, legal assistance, land. |

474

1 Theodore Taylor, The States and Their Indian Citizens, 228. Hereafter referred to as "Taylor."

2 T. F. 10 Mailing List, hereafter "List"; and Map of Indian Areas, published by the Department of the Interior, hereafter cited as "BIA Map."

3 Taylor, 228.

4 Task Force 10 hearings at Tucson, Arizona, p. 14, hereafter cited as "Tucson." Baton Rouge hearings will be cited as "Baton Rouge" and Boston hearings will be cited "Boston."

5 Taylor, 229.

6 Tucson, p. 5.

7 Dolas, 14.

8 Task Force 10 Report, p. 139. Hereafter cited as "TF 10."

9 Tucson, 28.

10 TF 10, 131.

11 Taylor, 229.

12 Report of the BIA Commissioner, 1855.

13 Call in Larry Colegrove of Colegrove & Associates.  p. 361.

14 List.

15 Federal and State Indian Reservation Trust Areas, U.S. Dept. of Commerce, p. 173.

16 Boston, 109–110.

17 TF 10, 80; Alfred A. Tamarin, "We have Not Vanished" (Chicago, 1974), 54.

18 TF 10, 77; Tamarin, 55.

19 TF 10, 75.

20 TF 10, 75; Tamarin, 55.

21 TF 10 77–79; Tamarin, 53.

22 Taylor, 228.

23 Haskell Indian Student in 1945, (A. Richardson, Tribal Community Sketches (manus.)

24 Tamarin, 94.

25 List (Task Force 10 Mailing List)

26a Taylor, 229.

26 "The North American Indians" a map by Sol Tax and the University of Chicago.

27 Phone call to the BIA.

28 AIPRC Files; TF 2 Final Report, p. 361.

ERIC
Full Text Provided by ERIC

455

29 Taylor, 228.
30 BIA Maps, 33A: Sol Tax et al., The North American Indians (map).
31 BAE Report 145, "The Indian Tribes of North America" (compiled by John R. Swanton), 292.
32 Ibid., 298.
33 Ibid., 229.
34 Duke, 11.
35 Baton Rouge, 16.
36 National Archives materials presented in The American Indian Journal, March 1976.
37 Duke, 13, 14, 15, 16, 58.
38 Baton Rouge, 70.
39 Duke, 13; Baton Rouge, 72.
40 Baton Rouge, 133.
41 Baton Rouge Hearing, Testimony of Clyde Jackson.
42 TF 10, 193–209.
43 TF 10, 103.
44 Tamarin, 98, BAE, 60.
44a Tamarin, 88.
44b Tamarin, 130.
45 Tamarin, 116.
46 1911 estimate. BAE 145, 60.
47 BAE 145, 58.
48 Tamarin, 90–92.
49 Boston, 34.
50 TF 10, 63, 89.
50a Seasonal population. Boston, 31.
50b Boston, 34.
51 Taylor, 229; "Federal and State Indian Reservation and Trust Areas," U.S. Department of Commerce, 1976, 225.
52 Boston, 31.
53 BAE 145, 262.
54 BAE 145, 249.
55 Commerce, 231.
56 Taylor, 252.
57 Taylor, 246.
58 Phone call to BIA; BIA MAPS No. 50; Taylor, 229; BAE 246.
59 Taylor, 229.
60 BAE 145, 248.
61 BIA Maps No. 8A, No. 51.
62 BAE 145, 194.
63a Taylor, 225.
63 BIA MAps No. 52A, Taylor, 229.
64 TF 10, 106.
65 Tamarin, 84.
66 Tamarin, 82.

67 TF 10, 96–99.
68 TF 10 hearings; Tamarin, 81; Commerce, 412.
68a Tamarin, 82.
69 Richardson, Tribal Community Sketches; Tamarin 113.
70 TF 10, 174.
71 Richardson, p. 3.
72 Tamarin, 152, 156.
73 Taylor, 230.
74 TF 10, 160. Estimates of Lumbee population given as 35,000 to 40,000.
75 Tamarin, 115; TF 10, 160–173.
76 BIA phone call, Taylor, 230.
77 Tamarin, 110.
78 List.
79 TF 10, 156–159.
80 Dayton Daily News, Aug. 31, 1975.
81 Tamarin, 112.
82 Tamarin, 90.
83 TF 10, 92–94, Tamarin, 50.
84 List, BIA phone call, BAE 145, 58.
85 Hearings at Boston, 118–119; TF 10, 105; Tamarin, 43.
86 Richardson, p. 4; Tamarin, p. 112.
87 Tamarin, 108–110, List.
88 Tamarin, 107.
89 Tamarin, 102–107.
90 Tamarin, 111. Richardson, 0, 4.
91 TF 10, 181–189; Report of the Governor's Task Force on Indian Affairs, The People Speak . . . Will You Listen! (Washington State, 1973), pp. 27–32; Conversation with Kenneth Hansen, consultant to Task Force 10.
92 BIA phone call.
93 Tamarin, 111.
94 Several hundred.
95 Conversation with Gamage Rivers.
96 Cemetery.
97 School.
98 Church-lands.
99 Plus.
100 Estimated range.

Note: Abbreviations—L., Land; L. Ass., Legal Assistance; T., Transportation; S.T., Sewage Treatment facilities; Med., Medicine or medical facilities; H, Housing; Ed., Educational Services; L.E., Law Enforcement.

Source: Compiled by Suzanne Ahn and David Harmon, American Indian Policy Review Commission, February 1977.

OFFICIAL
FILE COPY

(4310-02-P)

**DEPARTMENT OF THE INTERIOR**

**Bureau of Indian Affairs**

**FINAL DETERMINATION TO ACKNOWLEDGE THE DUWAMISH TRIBAL ORGANIZATION**

**AGENCY:**   Bureau of Indian Affairs

**ACTION:**   Notice of Final Determination.

**SUMMARY:** This notice is published in the exercise of authority delegated by the Secretary of the Interior to the Assistant Secretary - Indian Affairs (Assistant Secretary) by 209 DM 8.

Pursuant to 25 CFR 83.10(m), notice is hereby given that the Assistant Secretary acknowledges that the Duwamish Tribal Organization, hereafter referred to as the Duwamish, exists as an Indian tribe within the meaning of Federal law. This notice is based on the Assistant Secretary's determination that the group satisfies all seven criteria set forth in 25 CFR 83.7

**DATES:** This determination is final and is effective 90 days from publication of the final determination, pursuant to 25 CFR 83.10(l)(4), unless a request for reconsideration is filed with the Interior Board of Indian Appeals pursuant to 25 CFR 83.11.

**FOR FURTHER INFORMATION CONTACT:** Office of the Assistant Secretary-- Indian Affairs, (202) 208-7163.

**SUPPLEMENTARY INFORMATION:** The Assistant Secretary's proposed finding

1

FEDERAL REGISTER

(4310-02-P)

## DEPARTMENT OF THE INTERIOR

### Bureau of Indian Affairs

## FINAL DETERMINATION TO ACKNOWLEDGE THE DUWAMISH TRIBAL ORGANIZATION

**AGENCY**:    Bureau of Indian Affairs

**ACTION**:    Notice of Final Determination.

---

**SUMMARY:** This notice is published in the exercise of authority delegated by the Secretary of

the Interior to the Assistant Secretary - Indian Affairs (Assistant Secretary) by 209 DM 8.

Pursuant to 25 CFR 83.10(m), notice is hereby given that the Assistant Secretary

acknowledges that the Duwamish Tribal Organization, hereafter referred to as the Duwamish,

exists as an Indian tribe within the meaning of Federal law. This notice is based on the Assistant

Secretary's determination that the group satisfies all seven criteria set forth in 25 CFR 83.7.

**DATES**: This determination is final and is effective 90 days from publication of the final

determination, pursuant to 25 CFR 83.10(l)(4), unless a request for reconsideration is filed with

the Interior Board of Indian Appeals pursuant to 25 CFR 83.11.

**FOR FURTHER INFORMATION CONTACT**: Office of the Assistant Secretary--

Indian Affairs, (202) 208-7163.

**SUPPLEMENTARY INFORMATION**: The Assistant Secretary's proposed finding

1

(PF) against acknowledgment of Duwamish was published in the **Federal Register** on June 28, 1996. Notice, Proposed Finding Against Federal Acknowledgment of the Duwamish Tribal Organization, 61 FR 33763. The Duwamish chose to continue its pursuit of acknowledgment under the 1978 regulations which had no particularized provisions for previous Federal Acknowledgment. After the PF was published in the **Federal Register**, the Duwamish requested numerous extensions to the deadline for their comment. An extension of 120 days was granted on November 4, 1996, a 150-day extension was granted after a Duwamish request, on March 11, 1997, another 150-day extension was granted on July 25, 1997, and the last extension, of 30 days, was granted on December 22, 1997. No further requests were granted, and the reply-period closed January 21, 1998.

The Duwamish then had a total of 570 days to prepare its comment after the PF was issued. The then policy of the BIA provided for a 60-day period during which the Duwamish could respond to third-party comments, which expired March 23, 1998. The third-party comments consist of four letters received by the BIA between October 10, 1996, and February 21, 1997, from three individuals and the Tulalip Tribes. These comments were not extensive.

The AS-IA makes this final determination based on the documentary and interview evidence which formed the basis for the PF not to acknowledge the Duwamish, and an analysis of the information and argument received in response to the PF from third party comments on the PF and of the Duwamish response to the PF. The AS-IA reached additional factual conclusions after a review and analysis of the existing record in light of the additional evidence.

A review of the information submitted by the Duwamish and the third parties, as well as those in the PF, establishes that the petitioner has satisfied the criteria under the 1978 regulations for recognition. In addition, the AS-IA further concludes that, while the petitioner meets the

2

seven criteria throughout the period from first contact to the present, as an alternative basis for recognition, the petitioner has demonstrated prior Federal acknowledgment in the form of numerous statutory references of the "Dwamish Tribe" or the "D'Wamish Tribe," beginning with the Senate ratification of the 1855 Treaty of Point Elliott in 1859, up until the final appropriation statute in 1923, and the petitioner further meets the seven criteria for the period from 1923 to the present.  These express statutory references are found in an unbroken series of appropriations statutes, beginning in 1860, and ending in 1923.  These are unequivocal expressions of congressional recognition and solicitude.  Absent any other clear congressional intent to the contrary, the fulfilling of the treaty obligations cannot be ignored.  These statutes also constitute an immutable basis for recognition which cannot be abrogated by any other body than Congress.

As stated in the Final Notice of the 1994 regulations, these "new" regulations still maintain the same requirements regarding the character of the petitioner, and maintain the essential requirements that to be acknowledged a petitioner must be tribal in character and demonstrate historical continuity of tribal existence.  Thus, the petitioners that were not recognized under the previous regulations would not be recognized by these revised regulations. Final Rule, *Procedures for Establishing That An American Indian Group Exists as an Indian Tribe*, 59 Fed. Reg. 9280 (Feb. 25, 1994).  The 1994 regulations do, however, reduce the burden of production on petitioners that demonstrate prior recognition by requiring that the petitioner demonstrate historical continuity only for the period from the time of previous acknowledgment to the present.  Duwamish meets the criteria under both the 1978 and 1994 regulations.

Pursuant to 25 CFR 83.10(l)(1), the Assistant Secretary has considered additional data obtained through research to evaluate and supplement the record, and arrange the previously

3

existing data in a suitable context giving due consideration to previous acknowledgment of petitioner.

Criterion (a):

In the PF, the AS-IA found that the Duwamish were clearly identified as an historical tribe by the first Federal officials and American settlers in the 1850's, being most explicitly identified as the aboriginal occupants of the territory at the river outlet at the southern end of Lake Washington, and along the length of the Duwamish River system comprising the Duwamish, Black and Cedar Rivers. The name "Duwamish" was used broadly to refer to natives found along the eastern shore of Puget Sound, in the area of Elliott Bay and along the shores of Lake Union and Lake Washington. By the Treaty of Point Elliott, which the Duwamish signed, along with 22 other Indian leaders, the Federal Government created four reservations along the shores of Puget Sound. These reservations were referred to as Duwamish reservations for the next 50 years, and the residents were called Duwamish Indians and allied tribes.

The AS-IA review finds that the Congress appropriated funds for the support of the Duwamish Tribe and tribes allied with it throughout the 19th century and into the 20th century. Thus, over a period of sixty-two years, the Duwamish tribe were denominated and recognized in one treaty and fifty-nine separate statutes.[1] These statutes that were enacted to carry out the provisions of the treaty show, in an overwhelming array, the concerns governing the United States Congress as to the welfare of its Duwamish wards. These appropriation statutes, passed in order to fulfill the obligations of the Treaty of Point Elliott, began in 1860 and continued for the rest of the century. In them there was an express reference to the Treaty of Point Elliott, and the

4

categorical grouping of the appropriation was to either the "Dwamish" or "D'Wamish" Tribe.

The petitioner submitted additional evidence of published articles for the final determination. In re-examining the evidence as a whole, the AS-IA finds the petitioner has demonstrated substantially continuous existence of the treaty tribe of 1855 and from the 1923 statutorily referenced Duwamish tribe. The AS-IA finds that the petitioner has evolved from the historical Duwamish tribe and the 19th century entity named in the statutes.

The AS-IA finds that the expressed Federal identification of the Duwamish Tribe in the treaty and numerous statutory references overcomes the absence of conclusive documentary evidence for the period of 1855 to 1923. It also provides context for and increases the significance of the evidence listed above in support of the finding of substantially continuous identification. Moreover, to state that these statutes, passed on annual, and sometimes bi-annual basis, are but indications of the 83.7(a) identification criterion would trivialize the legislative process. If law is the solemn expression of legislative will, then the 1855 Point Elliott Treaty, and the legislation passed subsequently, establishes, as a principle of law, that the Duwamish are recognized. However, a few years after the last appropriation statute explicitly naming the Duwamish Tribe, the Congress enacted a statute waiving the sovereign immunity of the United States, and vesting jurisdiction in the Court of Claims to adjudicate "all claims of whatever nature, both legal and equitable, which the Muckelshoot, San Juan Islands Indians; Nook-Sack, Suattle, Chinook, Upper Chehalis, Lower Chehalis, and Humptulip Tribes or Bands of Indians, or any of them (with whom no treaty has been made), may have against the United States shall be submitted to the Court of Claims, with right of appeal by either party to the Supreme Court of the United States for determination and adjudication, both legal and equitable, and jurisdiction is hereby conferred upon the Court of Claims to hear and determine any and all suits brought

5

hereunder and to render final judgment therein * * *." Act of February 12, 1925, ch. 214, 43 Stat. 886.

This statute was enacted because there was a perception "that some of these tribes, at least, may be entitled to further payments under the positive contracts made in the treaties with the Government. * * * The [House] Committee [on Indian Affairs] feel[s] that they have been very shabbily treated by the Government, and that they should have an opportunity to have their equities properly presented to the Court of Claims." H. Rep. No. 1705, 67th Cong., 4th Sess. , 3 (1923). Pursuant to the 1925 Act of Congress, the Duwamish sued the United States in the Court of Claims as the first signatory Indian tribe of the Treaty of Point Elliott and acted as lead plaintiff in the suit cited as *Duwamish Tribe v. United States*, 79 Ct. Cl. 530 (1934).

These same statutes form the basis for the AS-IA's finding of prior Federal acknowledgment. The regulations and guidelines define the various forms of previous Federal recognition and set out a number of examples, but expressly do not limit recognition to them: negotiating or signing a treaty with the Federal Government; the Federal Government declaring war on or removing a tribe; placement on a reservation by the Federal Government; being denominated a tribe by Congressional action or Executive Order; and having collective rights in tribal lands or funds administered by the Federal Government. 25 CFR 83.8(c). Here, the 1855 ratified treaty, and the unbroken stream of acts from 1860 until 1923 do not just suggest recognition, but constitute a commitment on the part of the Federal Government that the Tribe receive the full benefits of Federal wardship. There is no ambiguity in what is enacted; the fact that "other allied tribes" are mentioned does not dilute the integrity of purpose with which the Federal Government adhered to the responsibilities assumed when it concluded the treaty in 1855.

6

In this case the explicit statutory recognition is not just probative of the existence of a tribe; it establishes that a tribe has a relationship with the Federal Government. There is a major consequence flowing from the repeated express statutory recognitions. Congress has never terminated the Duwamish, and the Department is loathe to infer such a withdrawal. Indeed, once recognized, a tribe may lose its Federal recognition only by Act of Congress or by the voluntary abandonment of its tribal relations. And while we will not presume continuity of tribal relations, neither should we presume abandonment of tribal relations. The petitioner was formally organized as the Duwamish Tribal Organization in 1925, and had sporadic meetings. Duwamish was sufficiently organized politically to pursue claims before the Indian Claims Commission throughout the 1950's, but it had broader purposes than just that, since it enacted a constitution which promoted the educational development of its members, the general welfare of the Duwamish tribe, and investigation of the Tribe's legal problems.

This criterion of substantially continuous identification as Indian from historical times, in 25 CFR 83.7(a), is thus satisfied, because the statutes have never been repealed, amended or otherwise modified. In addition, the genealogical review shows the petitioner to consist primarily of descendants of the 1855 treaty tribe and the tribes mentioned in the legislation. The AS-IA finds that the Duwamish, as a whole, satisfy criterion (a).


Criterion (b)

The PF for the Duwamish petitioner concluded that the petitioner's ancestors were widely distributed in non-Indian communities and family enclaves around Puget Sound. The activities were between families, and manifested itself in shared gift-giving, cooperative hunting and summertime berry-picking among brothers, sisters, aunts, uncles, nieces and nephews along

7

the lines of an extended family. It is from the family relationship that an individual Duwamish knows and acts out her or his identity as a member of the tribe, and they maintain distinct ethnic identities in the midst of the dominant European-descent society, since each individual identifies herself or himself as a Duwamish, and have so for their entire lives.

In 1919, the Indian Agent, Charles Roblin, compiled a list of unenrolled Indians in western Washington who were able to trace their ancestry from treaty tribes, with some of Duwamish ancestry. While Roblin identified the individuals rather than a tribal entity, his list does show that such a tribal entity did exist, and that the congressional appropriations were attaining their stated objectives of support and civilization.

Alternatively, the AS-IA finds that Duwamish meets criterion (b) as a result of the multiple prior Federal statutory recognitions, which begun the year after the 1855 Treaty of Point Elliott was ratified in 1859. It cannot be presumed that there was an abandonment of tribal relations after 1923; what happened, on the contrary, was that the tribal designation was dropped in the 1924 appropriation act, *see* Act of June 5, 1924, ch. 264, 43 Stat. 409, and the funds were designated by state and agency. There is certainly no conclusive record of abandonment. There are further considerations for this finding of compliance with criterion (b), which derive from a consideration of the "Supplementary Information," published when the final rule setting forth the 1994 regulations were promulgated. See Final Rule, *Procedures for Establishing That an American Indian Group Exists as an Indian Tribe*, 59 Fed. Reg. 9280 (Feb. 25, 1994), where there is a discussion of the public comments of the proposed regulation.

A new provision, § 83.6(e), defining "continuity," defined it to mean that "overall continuity has been maintained, even though there may be interruptions or periods where evidence is absent or limited." 59 Fed. Reg. 9281. Further, this "continuity" does not mean that

8

a level of tribal activity must always be at a high pitch, but that it "should take into account that the level of tribal activity may decrease temporarily for various reasons such as a change in leadership or a loss of land or resources. These real historical fluctuations are different from variations in documentation that result from an incomplete historical record." Id. The regulation itself provides:

> Existence of community and political influence or authority shall be demonstrated on a substantially continuous basis, but *this demonstration does not require meeting these criteria at every point in time. Fluctuations in tribal activity* during various years shall not in themselves be a cause for denial of acknowledgement under these criteria.
> 25 C.F.R. § 83.6(e)  Emphasis supplied.

The PF for the Duwamish indicated that although the evidence for some periods is sparse, *there are no real gaps for the period after 1939.* Thus, there was evidence, and there were no gaps, even though there were times, because of the ongoing Second World War, when the activities of the Duwamish slowed down considerably. It was a situation fitting rather precisely what the intent of the 1994 regulations deemed a "real historical fluctuation" and a temporary decrease in tribal activity due to external forces over which the tribe had no control. There is sufficient evidence of the conditions in the 1950's, 1960's and 1970's, where there was claims activity. There were also political factions, along family lines, which is, in itself, rather strong evidence of political authority. The PF acknowledges this evidence, but a look at the *cumulative effect* of this information shows those indications of tribal community which are envisioned by criterion (b). It was not only just isolated, random acts, but ones which arose in the context of family-group factionalism which form a pattern of political authority, albeit

9

disputed. A dispassionate view of the *cumulative effect* of all this shows a discernible pattern, especially when it is borne in mind that the 1994 regulations intended that fluctuations and temporary decreases in tribal activity are to be considered. There are no gaps; it is a question of applying the proper standard concerning fluctuations and showing them to be such, and not just an absence of evidence.

While the record is not conclusive, there is no affirmative indication of abandonment, and the voluntary pursuit of the ICC claim and this petition argue against any such abandonment. Therefore, by a combination of evidence and taking account of the limitations inherent in demonstrating the historical existence of community, the evidence which is available is sufficient to show that the Duwamish, as a whole, meets criterion (b).

Criterion (c)

The continuity of political influence in section 83.7(c) is met by the polity manifested through the organizations formed to pursue claims under the 1925 statute and the Indian Claims Commission Act of 1946. These organizations were formed to pursue tribal claims, not individual ones, and required descent from the historic Duwamish Tribe as a basis for membership. Their purpose was not just to aid litigation or pursue claims, but encompassed other matters, such as whether the Duwamish would organize under the Indian Reorganization Act of 1934, as well as matters relating to the welfare and legal issues confronting the Duwamish. The organization also pledged to foster the social, educational development of its members as a whole, as well as the promotion of charitable and historical activities of the tribe. Governmental purposes were implied by the constitutional provisions, echoing the Federal Constitution, of promoting the general welfare, as well as pursuing the tribe's legal rights. The

10

claim organizations were embryonic governing bodies and, from 1921 until the 1950's, were evolving into bodies exercising modern political authority and influence.  In their guise as transitional governing bodies, they are entitled to the status of organizations wielding political authority and meeting the requirement of political influence or other authority in 25 CFR 83.7(c).

The evidence is undisputed that the focus of the political activity has been the claims, both under the 1925 statute and the Indian Claims Commission Act of 1946.  A claims organization came into being in 1921 under the name of the Northwestern Federation of American Indians, and the Duwamish claims were thus at first pursued through inter-tribal groups.  In 1925 the Duwamish Tribal Organization was formed, in response to the 1925 Claims Court statute, and after the decision in *Duwamish Tribe v. United States*, 79 Ct. Cl. 530 (1934), which rejected the statutory claim, the Duwamish sought to introduce a bill in Congress for compensation of their claims.  A bill was introduced in 1939, but did not pass, due to the opposition of the Department of the Interior, and the same effort was still-born in 1941.  After passage of the Indian Claims Commission Act in 1946, the Duwamish retained legal counsel and filed a claim with the Indian Claims Commission in 1951.  In 1962, the Indian Claims Commission awarded the Duwamish $62,000, which was appropriated in 1964.  Therefore, taking into consideration the limitations inherent in demonstrating political influence or authority on a substantially continuous basis, and realizing that fluctuations in tribal activity occur at different points in time, the combination of evidence demonstrated is sufficient to show that the Duwamish, as a whole, meets criterion 83.7(c).

Criterion (d)

11

The petitioner submitted a copy of the "Constitution and By Laws of the Duwamish Tribal Organization of Duwamish American Indians," dated February 25, 1925, which described membership criteria, election of officers, the duties of the officers, and general membership meetings. The petitioner also submitted council minutes from the 1950's, and an August 27, 1964, letter from the superintendent of the Western Washington Agency. Therefore, the petitioner meets criterion 83.7(d).

Criterion (e)

The petitioner provided nine membership lists dated 1915, 1926, 1950, 1951, 1964, 1987, 1989, 1991, 1992 and 1995. The membership rolls since 1987 included the individual's name, roll-number, sex, blood-degree and "family tree" (ancestor). The Duwamish meets criterion 83.7(e).

Criterion (f)

There is no evidence that the Duwamish members belong to any federally recognized tribe. Therefore, the petitioner meets criterion 83.7(f).

Criterion (g)

There is no evidence that the Duwamish have been explicitly terminated or forbidden a Federal relationship by an act of Congress. Therefore, petitioner meets the requirements of criterion 83.7(g).

This determination is final and will become effective 90 days from the date of

12

publication, unless a request for reconsideration is filed pursuant to Section 83.11. The

petitioner or any interested party may file a request for reconsideration of this determination with

the Interior Board of Indian Appeals (Sec. 83.11(a)(1)). The petitioner's or interested party's

request must be received no later than 90 days after publication of the Assistant Secretary's

determination in the **Federal Register** (Sec. 83.11(a)(2)).


Dated:


Michael Anderson
*Acting Assistant Secretary – Indian Affairs*


1. *See* Act of March 29, 1860, ch. 10, 12 Stat. 5; Act of March 2, 1861, ch. 85, 12 Stat 232; Act of July 5, 1862, ch. 135, 12 Stat. 532; Act of March 3, 1863, ch. 99, 12 Stat. 786; Act of June 25, 1864, ch. 148, 13 Stat. 172; Act of March 3, 1865, ch. 127, 13 Stat. 551; Act of July 26, 1866, ch. 266, 14 Stat. 266; Act of July 27, 1868, ch. 248, 15 Stat. 207; Act of April 10, 1869, ch. 16, 16 stat. 23; Act of July 15, 1870, ch. 296, 16 Stat. 343; Act of March 3, 1871, ch. 120, 16 Stat. 552; Act of May 29, 1872, ch. 233, 17 Stat. 173; Act of February 14, 1873, ch. 138, 17 Stat. 446; Act of June 22, 1874, ch. 389, 18 Stat. 146; Act of March 3, 1875, ch. 132, 18 Stat. 420; Act of August 15, 1876, ch. 289, 19 Stat. 176; Act of March 3, 1877, ch. 101, 19 Stat. 271; Act of May 27, 1878, ch. 142, 20 Stat. 63; Act of February 17, 1879, ch. 87, 20 Stat. 295; Act of May 11, 1880, ch. 85, 21 Stat. 114; Act of March 3, 1881, ch. 137, 21 Stat. 485; Act of May 17, 1882, ch. 163, 22 Stat. 68; Act of March 1, 1883, ch. 61, 22 Stat. 433; Act of July 4, 1884, ch. 180, 23 Stat. 76; Act of March 3, 1885, ch. 341, 23 Stat. 362; Act of March 2, 1887, ch. 320, 24 Stat. 449; Act of June 29, 1888, ch. 503, 25 Stat. 217; Act of March 2, 1889, ch. 412, 25 Stat. 980; Act of August 19, 1890, ch. 807, 26 Stat. 336; Act of March 3, 1891, ch. 543, 26 Stat. 989; Act of July 13, 1892, ch. 164, 27 Stat. 120; Act of March 3, 1893, ch. 209, 27 Stat. 612; Act of August 15, 1894, ch. 290, 28 Stat. 286; Act of March 2, 1895, ch. 188, 28 Stat. 876; Act of June 10, 1896, ch. 398, 29 Stat. 321; Act of June 7, 1897, ch. 3, 30 Stat. 62; Act of July 1, 1898, ch. 545, 20 Stat. 571; Act of March 3, 1899, ch. 324, 30 Stat. 924; Act of May 31, 1900, ch. 598, 31 Stat. 221; Act of March 3, 1901, ch. 832, 31 Stat. 1058; Act of May 27, 1902, ch. 888, 32 Stat. 245; Act of March 3, 1903, ch. 994, 32 Stat. 982; Act of April 21, 1904, ch. 1402, 33 Stat. 189.

In this century alone, there were 17 consecutive appropriation statutes which named the "D'Wamish and other allied tribes" for purposes of paying for their "support and civilization":

1. Act of March 3, 1905, ch. 1479, 33 Stat. 1057: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, five thousand dollars ***." *See also* III C. Kappler, edr., Indian Affairs Laws and Treaties 133 (1913).

2. Act of June 21, 1906, ch. 3504, 34 Stat. 377: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, five thousand dollars ***." *See also* III C. Kappler, edr., Indian Affairs Laws and Treaties 245 (1913).

3. Act of March 1, 1907, ch. 2285, 34 Stat. 1050: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, seven thousand dollars ***." *See also* III C. Kappler, edr.,

13

Indian Affairs Laws and Treaties 301 (1913).

 4. Act of April 30, 1908, ch. 153, 35 Stat. 96: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, seven thousand dollars ***." *See also* III C. Kappler, edr., Indian Affairs Laws and Treaties 344 (1913).

 5. Act of March 3, 1909, ch. 263, 35 Stat. 1812: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, seven thousand dollars ***." *See also* III C. Kappler, edr., Indian Affairs Laws and Treaties 420 (1913).

 6. Act of April 4, 1910, ch. 140, § 25, 36 Stat. 286: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, seven thousand dollars." *See also* III C. Kappler, edr., Indian Affairs Laws and Treaties 446 (1913).

 7. Act of March 3, 1911, ch. 210, § 23, 36 Stat. 1074: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, seven thousand dollars." *See also* III C. Kappler, edr., Indian Affairs Laws and Treaties 503 (1913).

 8. Act of August 24, 1912, ch. 388, § 23, 37 Stat. 538: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, seven thousand dollars." *See also* III C. Kappler, edr., Indian Affairs Laws and Treaties 549 (1913).

 9. Act of June 30, 1913, ch. 4, § 23, 37 Stat. 100: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, $ 7,000." *See also* III C. Kappler, edr., Indian Affairs Laws and Treaties 584 (1913).

 10. Act of August 1, 1914, ch. 222, § 22, 38 Stat. 605: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, $ 7,000." *See also* IV C. Kappler, edr., Indian Affairs Laws and Treaties 29 (1929).

 11. Act of May 18, 1916, ch. 125, § 24, 39 Stat. 153: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, $ 7,000." *See also* IV C. Kappler, edr., Indian Affairs Laws and Treaties 83 (1929).

 12. Act of May 25, 1918, ch. 86, § 24, 40 Stat. 587: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, $ 7,000." *See also* IV C. Kappler, edr., Indian Affairs Laws and Treaties 173 (1929).

 13. Act of June 30, 1919, ch. 4, § 22, 41 Stat. 27: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, $ 7,000." *See also* IV C. Kappler, edr., Indian Affairs Laws and Treaties 218 (1929).

 14. Act of February 14, 1920, ch. 75, § 22, 41 Stat. 431: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, $ 6,500." *See also* IV C. Kappler, edr., Indian Affairs Laws and Treaties 258 (1929).

 15. Act of March 3, 1921, ch. 119, § 22, 41 Stat. 1245: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, $ 6,500." *See also* IV C. Kappler, edr., Indian Affairs Laws and Treaties 312 (1929).

 16. Act of May 24, 1922, ch. 199, 42 Stat. 578: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, $ 6,000." *See also* IV C. Kappler, edr., Indian Affairs Laws and Treaties 356 (1929).

 17. Act of January 24, 1923, ch. 42, 42 Stat. 1199: "For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, $ 6,000." *See also* IV C. Kappler, edr., Indian Affairs Laws and Treaties 392 (1929).

14

cc: ████████████;Sec'yRF(2)
      BIASurname;Chron;100;101A;BureauRF;400;600;Hold
MAnderson;x7163;01/19/01;k:\share\bar\Duwamish\ASIA'FR.wpd

15

025 ACR-FDD-V002-D0161 Page 16 of 16



# Federal Recognition of Duwamish Tribe

## 1859 to 2001

**1855:** U.S. and Chief Seattle sign Treaty of Point Elliott

**1859:** Congress ratifies Treaty of Point Elliott

**1860 to 1924:** Congress passes Acts appropriating funds to fulfill treaty promises made to the "Dwamish" or "D'Wamish and other allied Tribes"

**1925:** Congress passes Act authorizing Tribe to bring treaty claims against the U.S. in Court of Claims

**1934:** Court of Claims recognizes the Duwamish Tribe as "Indian tribe" entitled to recover communal property

**1938:** Congress passes an Act authorizing investment of Indian funds later deposited with Duwamish Tribe

**1946:** Congress passes Act authorizing Duwamish Tribe to bring treaty claims against the U.S. before Indian Claims Commission

**1953:** House Report recognizes "Duwamish Tribal Council" as one of several "Indian tribal governing bodies"

**1957:** Indian Claims Commission finds Tribe is a "tribe of American Indians" and "successor in interest" to signatory of the Treaty, awarding a $62,000 judgment against the U.S.

**1966:** Congress passes Act appropriating funds to pay judgment in favor of "Duwamish Tribe of Indians"

**1974:** Dep't issues "Three Stars Determination" recommending administrative recognition of Tribe

**1976 to 1977:** Two Congressional Reports recognize Duwamish Tribe as "landless tribe" with treaty relations with U.S. and prior acknowledgement by Dep't

**2001:** AS-IA notifies Tribe it will be placed on list of recognized tribes



**Duwamish Leadership**

1855 to Present

1850 1860 1870 1880 1890 1900 1910 1920 1930 1940 1950 1960 1970 1980 1990 2000 2010 2020

Chief Seattle

Chief William ("Stoda")

Chief/Sub-Chief William Rogers

Chief Satiacum

Peter James

George James

Henry Moses

Ruth Scranton

Willard Bill

Cecile Hansen